**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br><br>**ARCH COAL, INC.**, *et al.*,<br><br><br>Debtors.[1] | **Chapter 11**<br>**Case No. 16-40120**<br><br>**(Joint Administration**<br>**Proposed)**<br><br>**Hearing Date and Time:**<br>TBD<br><br>**Hearing Location:**<br>TBD |

**DECLARATION OF JOHN T. DREXLER IN SUPPORT OF DEBTORS'**
**CHAPTER 11 PROCEEDINGS AND FIRST DAY PLEADINGS**

John T. Drexler declares and says:

1.      I am a Senior Vice President and the Chief Financial Officer of Arch Coal, Inc. ("**Arch Coal**"). I have been employed by Arch Coal since 1998. I have been the Chief Financial Officer since April 30, 2008. Prior to that time, I held several management positions at Arch Coal, including Vice President of Finance and Accounting and Director—Planning and Forecasting. I am familiar with the day-to-day operations, business, and financial affairs of the Debtors (as defined below).

2.      I submit this declaration (i) in support of the petitions of the Debtors for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (the "**First Day Motions**") and (iii) to assist the Court and other interested

---

[1] The Debtors are listed on Schedule 1 attached hereto. The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

parties in understanding the circumstances giving rise to the commencement of these chapter 11 cases. I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization.

3.     Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the coal industry as a whole. If called upon to testify, I would testify competently to the facts set forth in this declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

### Commencement of Reorganization Proceedings

4.     On January 11, 2016, (the "**Petition Date**"), Arch Coal and those of its subsidiaries that are debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor subsidiaries, "**Arch**" or "**the Company**"),[2] each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     Section I of this declaration describes the Debtors' businesses; Section II describes the Debtors' prepetition restructuring initiatives and the circumstances giving rise to

---

[2] All wholly owned domestic direct and indirect subsidiaries of Arch have commenced chapter 11 cases except for Arch Receivable Company, LLC ("**Arch Receivable**"), a special purpose, bankruptcy-remote indirect subsidiary of Arch that is party to the Securitization Facility (as defined below). The Debtors have seven non-Debtor foreign subsidiaries.

the commencement of these chapter 11 cases; and Section III sets forth the relevant facts in support of the First Day Motions.

## I.

## The Debtors' Business

### A.      Operations

6.      Arch is a leading producer and marketer of coal in the United States, with operations and coal reserves in each of the major coal-producing regions of the country.  As of January 2016, it was the second-largest holder of coal reserves in the United States, owning or controlling over five billion tons of proven and probable reserves.

7.      Arch's principal business is the mining and preparation of metallurgical and thermal (or steam) coal.  Metallurgical coal is sold primarily to steel mills and independent coke producers for the manufacture of steel.  Steam coal products are sold to electricity generators to produce electricity, steam, or both.

8.      Arch supplies different qualities of coal to a variety of domestic and international customers located in 36 U.S. states and 20 countries throughout North America, Europe, Asia and South America.  The Company's principal customers are domestic and foreign utilities (including 159 power plants in the United States), steel producers and other industrial facilities.  Arch sold approximately 134 million tons of coal in 2014.

9.      The Company was founded in 1969 as Arch Mineral Corporation and initially produced coal primarily from the eastern United States.  Through a series of acquisitions beginning in the late 1990s, the Company expanded its holdings into the western United States.

10.      Today, Arch conducts mining operations at ten active mine complexes.  For reporting purposes, the Company organizes its production units into three segments: the Powder River Basin segment, with operations in Wyoming, the Appalachia segment, with operations in

3

West Virginia, Kentucky, Maryland and Virginia, and the Bituminous Thermal segment, with operations in Colorado and Illinois. In 2014, 84% of the coal Arch produced and sold based on volume was from the Powder River Basin. The Appalachia segment accounted for approximately 10% of Arch's sales in 2014, and operations in Colorado and Illinois comprised the remaining 6% of sales.

11.     Arch employs a variety of mining techniques, namely surface mining, underground longwall mining and underground room-and-pillar mining. Surface mining, which is used when coal is located near the surface of the earth, involves removing the soil and rock overlying a coal deposit in order to remove the coal. After the coal is removed, the rock and soil are replaced and vegetation is reestablished. Longwall mining involves using a mechanical shearer to extract coal from long rectangular blocks developed in the coal seam; the roof is supported by pillars and hydraulic supports until it is allowed to collapse in a controlled fashion after the coal has been removed. In room-and-pillar mining, which is effective for small blocks of thin coal seams, "rooms" are created by mining machinery as it cuts coal from a mine, leaving pillars of coal to support the ceiling between the rooms. Some additional coal may be mined from the pillars as miners retreat.

12.     Underground mining methods, which are used primarily in Arch's Appalachia, Colorado and Illinois mines, tend to be more costly than surface mining, which is used in the mines in the Company's Powder River Basin region.

13.     As is common in the industry, Arch enters into fixed-price, fixed-volume, multi-year supply contracts with many of its customers. These agreements allow customers to secure a steady supply of coal for their future needs and allow Arch to predict its sales volume and prices with greater certainty. Most of the Company's sales contracts are for terms of one to five years.

These contracts generally contain a fixed price for the term of the agreement or a pre-determined escalation in price for each year, although some agreements include a variable pricing system. The supply agreements generally specify, among other things, the coal sources, quality and technical specifications, shipping arrangements, pricing and force majeure provisions that are unique to each purchaser.  In 2014, Arch sold approximately 60% of its coal under multi-year supply arrangements.  Remaining volume under multi-year supply agreements, including those subject to price re-opener or extension provisions, was approximately 189 million tons at the end of 2014.  Coal products sold outside of these supply contracts are subject to current market pricing, which can be significantly more volatile than the pricing structures negotiated through term supply agreements.

14.     For the 12 months ended December 31, 2014, Arch reported revenues of $2.94 billion, adjusted EBITDA from continuing operations of $280 million, and a net loss of $558 million.  These figures represent a 2.5% decrease in revenue and a 10% increase in adjusted EBITDA from the previous fiscal year.

15.     The U.S. coal industry is intensely competitive.  Arch's principal domestic competitors include Alpha Natural Resources, Inc., Cloud Peak Energy Inc., CONSOL Energy Inc., Peabody Energy Corporation ("**Peabody**"), Walter Energy, Inc., Murray Energy Corporation and Alliance Resource Partners, L.P.  Arch competes with these companies on the basis of coal quality, delivered costs to the customer and reliability of supply.

16.     As described in Section II, this competitive operating environment has been compounded by decreased coal consumption by the electricity and steel industries in the United States and around the world, due, in part, to weakened international and domestic economies, the

availability and lower price of competing fuels for electricity generation—particularly natural gas—and the impact of increasingly stringent environmental and other government regulations.

17.     The Company has an extraordinary and dedicated workforce that has continued to meet performance metrics and enabled Arch to continue to achieve its high standards of productivity, safety and environmental compliance despite exceedingly difficult markets.  By way of example, in the first three quarters of 2015, the Company achieved significant reductions in cash cost per ton in its Powder River Basin and Appalachia operations.  The Company is also an industry leader in workplace safety and environmental compliance.  In 2014 and the first three quarters of 2015, the Company's safety performance was three times better than the industry average based on lost-time safety incident rates, and its safety performance in 2015 was the best on record in Company history (measured by total incident rate), which represented a 10% improvement over 2014.  The Debtors also set a new Company record for environmental compliance performance in 2015, which represented a 50% improvement when compared to full year 2014.  Remarkably, seven of the Debtors' complexes operated during the fourth quarter of 2015 without a single reportable safety incident or environmental violation.

18.     As of the Petition Date, Arch employed approximately 4,600 full- and part-time employees.  These employees include miners, engineers, truck drivers, mechanics, administrative staff, managers, directors and executives.  None of Arch's employees is represented by a union.  Arch provides funded and unfunded non-contributory defined benefit pension plans covering certain of its salaried and hourly employees, as well as postretirement medical and life insurance coverage for eligible employees.  The amount of these benefits is generally based on the employee's age and compensation, and the Company funds the cost of all postretirement benefits as they are paid.  As of the end of 2014, Arch estimated that its pension benefit obligations

totaled $353 million, with funded assets of $337 million and post-retirement benefit obligations of $36 million.[3]

### B. Corporate Structure

19.     Arch is the direct or indirect parent of each of the Debtors.  Arch's common stock is publicly traded on the New York Stock Exchange under the ticker symbol "ACI."  As of the Petition Date, there were approximately 5,500 holders of record of Arch's common stock.  The Company is headquartered in St. Louis, Missouri.

### C. Capital Structure[4]

20.     Arch Coal, as borrower, and substantially all of the other Debtors, as guarantors, are parties to an Amended and Restated Credit Agreement dated June 14, 2011 (as amended, supplemented or modified from time to time, the "**Credit Agreement**"), by and among the Debtors, Wilmington Trust, N.A. as administrative agent (solely in its capacity as such, "**Wilmington Trust**"), and the lender parties thereto.  The Credit Agreement governs a $1.9 billion secured term loan facility due in 2018 (the "**Term Loan**").  Obligations arising under the Term Loan are guaranteed by substantially all of the Debtor subsidiaries of Arch Coal and are secured by first-priority liens on substantially all of the Debtors' assets.

21.     The Credit Agreement also provided for up to $250 million in revolving loans. The Company had no borrowings under its revolver and, on November 11, 2015, terminated all revolving credit commitments.

22.     Arch has several outstanding series of unsecured notes: (a) $1 billion in 7.000% senior unsecured notes due 2019; (b) $375 million in 9.875% senior unsecured notes due 2019;

---

[3] Arch is not a signatory, and does not contribute, to any multiemployer pension plan.

[4] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

(c) $500 million in 7.25% senior unsecured notes due 2020 (the "**2020 Notes**"); and (d) $1 billion in 7.25% senior unsecured notes due 2021.

23.     Arch also has issued $350 million in 8% senior secured second lien notes due 2019.  These notes are secured by the same assets that secure indebtedness under the Term Loan, but on a second-priority basis, subject to certain exceptions and permitted liens.

24.     In recent months, the Company's notes have traded at a deep discount.  As of January 8, 2016, which is the most recent day for which pricing information is available, the unsecured notes were trading in the secondary market at less than one cent on the dollar.  The second lien notes also traded at a deep discount to par value, most recently at less than five cents on the dollar.  As of the same date, obligations under the Term Loan traded at 43.5 cents on the dollar.

25.     The Debtors' outstanding letters of credit are issued under a $200 million accounts receivable securitization facility (the "**Securitization Facility**") with PNC Bank, National Association, as administrator (solely in its capacity as such, the "**Administrator**") and letter of credit bank (solely in its capacity as such, the "**LC Bank**") on behalf of a syndicate of purchasers and letter of credit providers (with the LC Bank, the "**Securitization Purchasers**").  The letters of credit are collateralized by a combination of eligible accounts receivable (including collections, proceeds and certain other interests related thereto, the "**Receivables**") and cash.  As of the Petition Date, approximately $178 million in letters of credit were outstanding under the Securitization Facility, which were secured by eligible accounts receivable and approximately $97 million of cash collateral.

26.     The Securitization Facility operates through the true sale of the Receivables by certain of the Debtors to Arch Coal's wholly-owned special purpose entity, Arch Receivable,

which in turn obtains letters of credit secured by the Receivables pool.  Under the Securitization

Facility, the transfer of the Receivables has also been perfected by filing UCC financing

statements.  To the extent these transfers are recharacterized as an extension of credit rather than

true sales, the Debtors party to the Securitization Facility have granted first lien security interests

and liens on the Receivables in favor of the Administrator and the Securitization Purchasers.

## II.

### Events Leading to the Chapter 11 Cases

27.     Despite the many proactive steps the Debtors have taken over the last several

years to enhance the efficiency of their operations and to focus on high-return opportunities, the

Debtors' highly leveraged capital structure, consisting of more than $5 billion in outstanding

indebtedness and approximately $360 million in annual debt service, cannot be sustained in the

current depressed coal market.  The Debtors' operational success is closely linked to global

demand for coal-fueled electricity and steel.  Over the past several years, a confluence of

economic challenges and regulatory hurdles has hobbled the coal industry.  In domestic thermal

markets, the industry has experienced falling coal demand and an associated decline in coal

prices, precipitated by flat U.S. power demand, a surge in low-cost natural gas availability and

increasingly burdensome environmental regulations.  As a result, generators are expected to

retire nearly 13 gigawatts of coal-based capacity in 2015.  In metallurgical markets, the industry

has suffered from slowing global economic growth, a related decline in global steel production,

the start-up of significant new coal mine capacity in Australia and a strong U.S. dollar that has

undermined the competitiveness of U.S. producers.  As a result of these challenges, several

major U.S. coal companies have filed for chapter 11 protection in the last several years, and

virtually all are in distress.

### A.    Market Challenges Facing the Coal Industry

28.    The Debtors' revenue is largely dependent on coal prices, which have plummeted in the face of a significant decrease in U.S. thermal coal consumption and a global decline in metallurgical coal demand.  In June 2015, the price of metallurgical coal fell to its lowest point since 2004, down more than 70% from its previous high in 2011.  The price of steam coal has followed a similar trajectory.  Domestically, coal consumption in the United States fell by nearly 200 million tons between 2008 and 2014.  The available data for 2015 suggest another significant decline in 2015, and preliminary discussions with domestic customers indicate that 2016 pricing will remain weaker than previously anticipated.  Arch's sales commitments remain well behind the pace of prior years.

29.    A key factor in the declining demand for coal is the availability of inexpensive natural gas.  Vast quantities of natural gas have become available at economically competitive prices due to discoveries of large shale deposits in the United States and advances in extraction technology.  As a result, prices for natural gas have recently reached near-record lows, spurred by a glut of production from shale fields in Pennsylvania, West Virginia and Ohio.  Earlier this year, and for the first time ever, natural gas surpassed coal as the largest source of electricity in the United States in certain months.  In 2014, coal accounted for 38.7% of U.S. energy generation by megawatt hour; this figure is down from 42.2% in 2011 and 48.2% in 2008.  Based on government forecasts, coal is expected to account for approximately 34% of U.S. energy generation in 2016.

30.    Demand for metallurgical coal depends on the strength of the global economy, and in particular, the demand for steel.  Weak economic growth, particularly in Europe and in China, has lowered demand for construction materials and other steel products, which has

reduced demand for metallurgical coal.  Increased steel imports and reduced steel demand by oil
and gas producers have also eroded metallurgical coal demand in the United States.

31.     In the face of these competitive pressures, U.S. coal producers are especially
disadvantaged.  The strength of the U.S. dollar reached an 11-year high in March 2015.  A strong
dollar benefits foreign producers, whose input costs are generally denominated in local
currencies.  Australia, whose currency has been particularly weak, is especially benefiting from
the strong U.S. dollar, given its significant coal reserves and established infrastructure.
Consequently, supply rationalization—the reduction in production as a result of lowered prices—
has thus far been largely confined to U.S. coal producers.

**B.      Environmental and Governmental Regulation**

32.     These macroeconomic trends have been compounded by an increasingly
unfavorable regulatory environment.  Stricter enforcement of existing laws and the promulgation
of new regulations have made it more costly for companies to use coal as an energy source.
Other regulations, such as those governing mining and reclamation, have imposed even more
direct costs on the coal industry.

*1.      Regulation of Power Plants*

33.     In 2011, the EPA issued Mercury and Air Toxics Standards ("**MATS**"), which set
limits on the amount of mercury and so-called acid gases that oil- and coal-fired power plants
may emit.  Although the Supreme Court struck down the regulations in June 2015—requiring the
agency to perform a cost-benefit analysis before issuing the final rule—many coal-fired power
plants had already taken steps to comply by retiring older power plants or setting in motion their
retirements, concluding that retrofitting them to meet the new regulations would be cost-
prohibitive.

34.    In August 2015, the EPA proposed new rules to limit emissions from new and existing power plants.  Among these rules is the Clean Power Plan, which requires by 2030 that carbon emissions be reduced by 32% from 2005 levels.  If implemented as currently proposed, the Clean Power Plan will, by some estimates, reduce demand for coal in the United States to 650 million tons annually—nearly a 30% decline from consumption in 2014.  Although the Clean Power Plan is subject to a number of legal challenges, states and power generators could commence work on meeting the compliance deadlines, which begin in 2022, while litigation is ongoing.  By the time legal challenges have been resolved, it is possible that many of the required investments may have already been made, resulting in further coal plant retirements, which would have severe consequences for Arch's business.

35.    As a result of EPA regulations, nearly 400 coal-fired electricity-generating units have been retired or converted, and this trend is predicted to continue.  Overall, 23% of existing U.S. coal units are expected to retire or convert by 2025.  These regulations also disincentivize the construction of new coal-burning units.

36.    In addition to imposing strict regulations on coal-burning power plants, federal and state governments have in recent years subsidized the development and use of alternative energy sources through tax credits.  While these alternative sources remain a relatively small percentage of the U.S. power mix, they have nevertheless served to erode coal's market share.

## 2.    *Regulation of Coal Mining*

37.    Federal, state, and local authorities similarly regulate the U.S. coal mining industry with respect to employee safety and the environment, including the protection of air quality, water quality, wetlands, and other environmental resources.  Reclamation—the restoration of land and environmental values to a mining site after the coal is extracted—is

required during production and after mining has been complete. Regulations also govern how materials used and generated by mining operations must be managed.

38.    For example, the Surface Mining Control and Reclamation Act ("**SMCRA**") establishes mining, environmental protection, reclamation and closure standards for all aspects of surface mining, as well as many aspects of underground mining. In July 2015, the Obama administration proposed much-anticipated regulations under SMCRA to reduce the impact of coal mining on the nation's streams, the Stream Protection Rule, which, if implemented, may raise the cost of coal extraction and make it more difficult to secure mining permits. SMCRA also created the Abandoned Mine Land Fund, which aims to restore mines closed or abandoned prior to the Act's passage in 1977.

## III.

### Prepetition Restructuring Initiatives and Circumstances Leading to Chapter 11

39.    Arch's management team has taken many actions in response to the challenges described above in order to enhance its operations by focusing on high-return opportunities, as well as to improve its liquidity profile and deleverage its balance sheet. The Debtors have at the same time implemented an aggressive cost-savings initiative Company-wide intended to leverage their base of high-quality, low-cost assets.

40.    From an operational perspective, in light of the decreased demand for thermal and metallurgical coal, the Company has taken steps to reduce coal production to match market expectations and to reduce operating costs (including through salary and wage reductions) and capital expenditures per ton. In particular, the Company has reduced the cash cost of coal from the Powder River Basin by $0.47/ton in the first nine months of 2015 from 2014, and has reduced the cost of coal from its Appalachia segment by $10.00/ton over the same period. This significant reduction in the Appalachia segment was generated, in part, by the idling of the

Cumberland River Coal Company complex, a metallurgical coal mining complex in Appalachia, in the third quarter of 2014, as well as improving productivity at the Company's Leer operating complex.

41.     The reduction in the price of coal has been accompanied by a reduction in the Company's already lean Selling, General and Administrative expense, which was reduced by 15% during 2014 from 2013 levels.  In the first nine months of 2015, this expense was the lowest in six years.

42.     In recent years, the Company has taken numerous steps to streamline its mining portfolio and monetize assets that are not essential to future growth plans.  Since the beginning of 2012, the Company has divested, closed or idled eight mining complexes, which included the sale of the Canyon Fuels operations in 2013 for approximately $435 million.  During that same period, the Company has reduced its workforce by nearly 3,000 employees.  On December 31, 2014 the Company's single-employer pension plan was frozen to future benefit accruals.

43.     In addition, the Company has continued to demonstrate its commitment to long-term success by streamlining operations and increasing efficiencies.  Over the past year, the Company has adjusted operating schedules and reduced shift work and contract labor throughout its operations to better align with sales volume.  The Company has also taken aggressive measures to cut costs across the organization, including through improvements to process, material optimization, implementation of predictive maintenance and decreasing parts and supplies expense through renegotiated supplier terms.

44.     The Company has also divested certain non-core assets and explored the divestiture of others, and, in the first quarter of 2014, sold a highwall miner thermal mining

manufacturing unit, ADDCAR Systems, LLC, for $21 million, and its Hazard, Kentucky subsidiary for $26 million.

45.     The Company also made efforts to preserve liquidity by decreasing capital expenditures in 2014 to $147 million—down $250 million from 2012 levels.  Arch has further reduced expected capital spending levels in 2015 to less than $140 million, a level that it feels is sustainable.  The Company also reduced the annual cash dividend rate to $0.01 per year in the first quarter of 2014 (as compared to $0.11 per quarter at the beginning of 2012), before eliminating the dividend entirely in the first quarter of 2015.

46.     As a result of these efforts by management, the Company achieved a significant operational restructuring and further enhanced its position to benefit from an upturn in the demand for coal.  However, in light of the ongoing challenging market conditions, it became clear that material changes to its balance sheet were necessary.

47.     Accordingly, in February 2015, the Company retained Davis Polk & Wardwell LLP as its legal advisor and PJT Partners, Inc. (then known as Blackstone Advisory Services L.P.) as its investment banker to begin exploring the possibility for an out-of-court restructuring with certain of its unsecured noteholders in order to de-lever its balance sheet and improve liquidity.  As a result thereof, on July 2, 2015, Arch launched two private debt exchange offers (the "**Exchange Offers**"), one to exchange all of its outstanding 2020 Notes for new 6.25% Trust Certificates due 2021 and a cash payment, and one to exchange its other outstanding unsecured notes for new 6.25% Trust Certificates, newly issued 8.00% Senior Secured Notes due 2022 and/or newly issued 12.00% Senior Secured Lien Notes due 2023.  Each of the 6.25% Trust Certificates represented a fractional undivided interest in a Delaware statutory trust whose assets would have been (i) up to $150 million in incremental first lien term loans issued under the

Credit Agreement and (ii) up to $250 million in first lien revolving loans issued under the Credit Agreement. In order to effectuate the exchange offers, the Term Loan administrative agent would have had to execute certain documents, including an amendment and joinder to the Credit Agreement and a new intercreditor agreement.

48.     Simultaneously with the launch of the Exchange Offers, the Company entered into a lock-up and support agreement with holders of approximately 56.9% of the aggregate principal amount of outstanding 2020 Notes, pursuant to which the Company committed to, among other things, launch and consummate the Exchange Offer for the 2020 Notes, and the holders committed to, among other things, support and participate in such Exchange Offer (the "**Support Agreement**"). The Exchange Offers and the Support Agreement were initially scheduled to expire on July 30, 2015 and August 30, 2015, respectively; however, the Company extended these dates multiple times through October 26, 2015.

49.     On July 28, 2015, a group of Term Loan lenders purporting to hold more than 50% of the term loans under the Credit Agreement (the "**Directing Lenders**") delivered a letter to the Term Loan administrative agent (at that time, Bank of America, N.A. (solely in its capacity as such, "**BofA**")) directing it not to execute or approve documentation relating to the Exchange Offers that would be required for the Exchange Offers to close (the "**Direction Letter**"). The Direction Letter included other assertions regarding the Exchange Offers and the existence of a default under the Credit Agreement.

50.     After receiving the Direction Letter, BofA resigned as administrative agent under the Credit Agreement. The Term Loan lenders then appointed Wilmington Trust as the new administrative agent pursuant to the Credit Agreement.

16

51.     On September 16, 2015, GSO Special Situations Master Fund LP sued Wilmington Trust and the Directing Lenders in the Commercial Division of the Supreme Court of the State of New York, County of New York (the "**State Court**") (Index No. 653110/2015). None of the Debtors were party to the lawsuit.

52.     The complaint alleged that the Directing Lenders were improperly attempting to block the Exchange Offers.  The plaintiff sought a declaration from the State Court that the Exchange Offers were permissible under the Credit Agreement and that the Directing Lenders had no basis for directing the Term Loan administrative agent to refrain from approving the necessary documents, as well as a permanent injunction to preclude the Directing Lenders from taking further action to block the Exchange Offers.  Upon filing, the plaintiff also sought a temporary restraining order and preliminary injunction on the same bases.

53.     On October 16, 2015, the State Court denied the plaintiff's request for a temporary restraining order and preliminary injunction, holding that the plaintiff had not made the required showing of irreparable harm.  On October 21, 2015, the plaintiff appealed the State Court's decision.  On November 16, 2015, the parties filed a stipulation that the State Court action be discontinued without prejudice and the notice of appeal filed by the plaintiff be withdrawn.

54.     On October 26, 2015, the Exchange Offers were permitted to expire in accordance with their terms, and the Support Agreement expired by its terms.  Arch believed that Wilmington Trust was highly unlikely to execute the documentation required to consummate the Exchange Offers on their proposed terms.  As a result of the position of the Directing Lenders, the intervening litigation, current market conditions and various other factors, Arch concluded that the conditions to the Exchange Offers had not and would not be satisfied, and that the

Exchange Offers would not be consummated.  Accordingly, Arch elected to terminate the Exchange Offers.

55.     As of the expiration of the Exchange Offers on October 26, 2015, 51.97% of the aggregate principal amount of 7.000% senior unsecured notes due 2019, 47.97% of the 9.875% senior unsecured notes due 2019, and 48.19% of the senior unsecured notes due 2021, had been tendered for exchange.  In aggregate, just less than 50% of the eligible notes were tendered.  In addition, more than 90% of the outstanding principal amount of the 2020 Notes were tendered.

56.     Had the Exchange Offers closed at this level of participation, the maturities of a portion of the Company's debt would have been extended from 2019 through 2021 to 2021 through 2023.  However, the Company would have remained significantly leveraged.  Based on the Company's pro forma analysis, and after giving effect to the Exchange Offers, Arch would have had outstanding overall debt of more than $4.2 billion and annual interest expense of approximately $291 million.

57.     While the Debtors had hoped to potentially avoid a chapter 11 filing through the ongoing rationalization of operations and consummation of the Exchange Offers and other transactions, market conditions further deteriorated significantly during the latter half of 2015.  As coal prices continued to decline, it became increasingly clear to the Company that revenues from operations would not be able to support the Company's existing capital structure—even assuming overall debt of more than $4.2 billion and annual interest expenses of approximately $291 million—and that a restructuring under chapter 11 was likely to be necessary.

58.     During this period, as a chapter 11 filing became more likely, the Debtors entered into discussions with various of their financial creditors to discuss potential debtor-in-possession ("**DIP**") financing and the terms and conditions of a proposed chapter 11 restructuring.  In

connection therewith, the Company entered into nondisclosure agreements ("**NDAs**") with certain of their Term Loan lenders holding in excess of 50% of the Term Loan (the "**Ad Hoc Committee Lenders**").

## IV.

## DIP Financing and Continued Securitization of Receivables

59.     Ultimately, the Debtors and the Ad Hoc Committee Lenders were able to agree on the terms and conditions of a $275 million DIP term loan facility (the "**DIP Financing**").  The proposed DIP Financing includes a carve-out for a super-priority claim in connection with any environmental reclamation bonding obligations up to $75 million and is otherwise secured by a priming first priority lien on substantially all assets of the Company, subject to certain customary exceptions.  The proposed DIP Financing will fortify the Company's balance sheet during these cases and provide it with the liquidity to weather the continuing downturn in coal prices.  In connection with the proposed DIP Financing, the Ad Hoc Committee Lenders have also agreed to consent to the Company's continued use of cash and other collateral during the cases, in exchange for adequate protection of their interests.  The proposed DIP Financing and the Company's use of cash collateral are conditional on the Company's compliance with certain milestones with respect to progress in these chapter 11 cases.

60.     Through the Company's negotiations, the Company and the Ad Hoc Committee Lenders were also able to reach an agreement on the principal terms of a plan of reorganization. The term sheet attached hereto as Exhibit A (the "**Plan Term Sheet**") describes the terms of this plan and the Company's anticipated post-reorganization capital structure.  The restructuring contemplated by the Plan Term Sheet provides unsecured creditors with an opportunity for a recovery even though, in light of the Company's highly-leveraged capital structure, they might

otherwise receive no recovery at all.  In the coming weeks, the Debtors will seek approval from

the Court of a restructuring support agreement formalizing the terms of the Plan Term Sheet.

61.     Concurrently with the foregoing negotiations, the Debtors sought to secure the

right to preserve the Securitization Facility on a postpetition basis and prevent it from

terminating automatically as a result of the commencement of these chapter 11 cases.

Termination of the Securitization Facility would cause considerable harm to the Debtors.  Upon

termination, the proceeds of outstanding Receivables would cease to be remitted to the Debtors

upon collection.  Instead, such proceeds would be trapped at Arch Receivable and used to cash

collateralize outstanding letters of credit and pay certain related fees and expenses.  Moreover,

termination of the Securitization Facility could cause the LC Bank to deliver non-renewal

notices, which could entitle the beneficiaries of outstanding letters of credit to draw on such

letters of credit unless the Debtors were able to secure replacements.  Once the cash was in the

hands of a letter-of-credit beneficiary, the beneficiary may be able to hold the cash until they

determined that all the obligations supported by the letters of credit were satisfied.  In the event

of such termination, the Debtors do not believe any alternative source of letter-of-credit

financing would be available on terms as favorable as the Securitization Facility.

62.     Following extensive, good-faith negotiations, the Debtors, Arch Receivable, the

Administrator and the Securitization Purchasers reached agreement on the terms of amended and

restated versions (the "**Securitization Facility Amendments**") of the agreements that set forth

the terms of the Securitization Facility.  As described in greater detail in the summary of the First

Day Motions provided below, and in the Securitization Facility Motion (as defined below) filed

contemporaneously herewith, the Securitization Facility Amendments prevent the automatic

termination of the Securitization Facility that would otherwise occur as a result of the filing of

20

these chapter 11 cases.  In exchange for this right to continue the Securitization Facility during their chapter 11 cases, the Debtors agreed, *inter alia*, to increase certain pricing elements of the Securitization Facility, eliminate the ability to obtain cash advances thereunder (but preserve the right to obtain letters of credit), relinquish control over the accounts in which the Receivables are collected and provide more frequent reports on Receivables balances before cash is remitted to their control.

63.     I believe that the proposed DIP Financing and the continuation of the Securitization Facility are in the best interests of the Debtors and their estates and are a prudent exercise of their business judgment.  At a time when the market for the Company's primary product continues to decline, access to the proposed DIP Facility will send a strong message to the Company's regulators, vendors, customers, and employees that operations are continuing in the ordinary course.  These agreements provide a framework for an expeditious emergence from chapter 11, so that the Debtors can ensure that maximum value can be preserved and realized for the benefit of their estates.

*         *         *         *         *

64.     As negotiations with creditors continued, on December 15, 2015, the Company elected to exercise the 30-day grace period under its 7.000% senior unsecured notes due 2019; 9.875% senior unsecured notes due 2019; and its 7.25% senior unsecured notes due 2021. Accordingly, before the expiration of the grace period on January 14, 2016, the Debtors commenced these chapter 11 cases to pursue and consummate a restructuring.

65.     The Debtors expect to restructure their debt obligations and capital structure, return to viability and obtain the highest recovery possible for creditor constituencies through a chapter 11 plan of reorganization.  Unlike almost all other coal producers that have sought

bankruptcy protection, Arch has no labor-related issues that need to be resolved in chapter 11. There will be no section 1113 or section 1114 process in these cases. Arch's single-employer pension plan, which is frozen, is well-funded, and is not expected to be affected in any way by or during these cases. Nor does Arch anticipate any significant layoffs as a result of the restructuring. Thus, the Debtors can focus their attention on marshaling their resources to continue to operate their businesses in the ordinary course, honor their strong customer and vendor relationships and maintain their award-winning safety and environmental practices. Upon emergence, the Debtors are confident that they will leverage their superior low-cost thermal and metallurgical coal asset base and their highly-skilled management team and workforce to create substantial value for their stakeholders and continue their prominence as a leader in the coal industry.

## V.

## First Day Motions

66. The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions. The Debtors request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition to chapter 11.

67. For a more detailed description of the First Day Motions than set forth below, the Debtors respectfully refer the Court to the respective First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control. Capitalized terms that are used in this Part IV but not otherwise defined in this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

### A.    Administrative Motions

     i.    *Debtors' Motion for Entry of an Order Setting an Expedited Hearing on "First Day Motions" and Related Relief (the "**Expedited Hearing Motion**")*

68.    The Debtors seek entry of an order setting an expedited hearing at the Court's earliest convenience on the Debtors' First Day Motions.  I believe that the relief requested in the Expedited Hearing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Hearing Motion should be granted.

     ii.    *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**")*

69.    The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015(B) of the Local Rules of the United States Bankruptcy Court for the Eastern District of Missouri (the "**Local Bankruptcy Rules**").  Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Arch Coal, Inc.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors to indicate the joint administration of the estates.

70.    Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources.  The Debtors' financial affairs and business operations are closely related.  Many of the motions, hearings and orders in these chapter 11 cases will affect each Debtor and their respective estates.  The rights of creditors will

23

not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.  Moreover, each creditor can still file its claim against a particular estate.  In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these chapter 11 cases.  The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the administrative aspects of these chapter 11 cases by the United States Trustee for the Eastern District of Missouri will be simplified.

71.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

iii.    *Debtors' Motion for Entry of an Order (i) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs, (ii) Waiving the Requirements to File Equity Lists and Provide Notice to Equity Security Holders and (iii) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors (the "**Extension of Schedules Motion**")*

72.    The Debtors seek entry of an order (a) granting additional time to file their schedules and statements of financial affairs, (b) waiving the requirement to file a list of equity security holders and the requirement to give notice of the order for relief to all equity security holders of the Debtors and (c) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors.  Due to the complexity of their operations, the large number of contracts to which the Debtors are party and the numerous other matters that the Debtors must attend to in connection with filing these cases, the Debtors will not be able to complete the

24

schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs in the fourteen days provided under Bankruptcy Rule 1007(c).

73.     Given the many critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these chapter 11 cases, I believe that with the extension requested, the Debtors will be able to focus their attention on business operations to maximize the value of the Debtors' estates during the first critical post petition months for the benefit of creditors and all parties in interest.

74.     I believe that the relief requested in the Extension of Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Extension of Schedules Motion should be granted.

      iv.      ***Debtors' Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "Case Management Motion")***

75.     The Debtors seek entry of an order to implement certain procedures in connection with the administration of the chapter 11 cases, including procedures to: (a) establish requirements for the filing and service of notices, motions, applications, documents filed in support thereof and objections and responses thereto; (b) delineate standards for notices of hearing and agendas; (c) articulate mandatory guidelines for the scheduling of hearings (including periodic omnibus hearings); objection deadlines, reply deadlines and evidentiary hearings; (d) limit matters that are required to be heard by the Court; (e) authorize electronic service of documents; (f) authorize the service of documents by email on certain parties in interest; and (g) authorize the Debtors to establish a website (to provide interested parties with access to certain documents filed in these chapter 11 cases).

76.     The Debtors believe that the requested relief will maximize the efficiency and orderliness of the administration of these chapter 11 cases and reduce the costs associated with traditional case management procedures.  The Debtors also believe that granting the relief requested will limit the administrative burdens and costs associated with preparing for hearings and serving and mailing documents.  In addition, the relief requested will assist the Debtors and their personnel and professionals in organizing and prioritizing the numerous tasks attendant to these cases.

77.     I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be granted.

> v.     *Debtors' Motion for Entry of an Order Authorizing Debtors to File the Creditor Matrix and Any Amended Creditor Matrix Under Seal (the "**Creditors Matrix Motion**")*

78.     The Debtors seek entry of an order (a) authorizing the Debtors to file the creditor matrix required under Local Bankruptcy Rule 1007-8 and any amendment thereto under seal and (b) deeming that the Procedures satisfy the requirements of Local Bankruptcy Rules 1007-8 and 1009.  A substantial number of individual creditors are at risk of having their personal information unnecessarily disclosed publicly without their knowledge or consent if the Debtors are required to file an unredacted version of the Debtors' Creditor Matrix.

79.     I believe that the relief requested in the Creditors Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditors Matrix Motion should be granted.

vi.    *Debtors' Motion for Entry of a Standing Order Confirming the Protections of Sections 362, 365 and 525 of the Bankruptcy Code and Approving Procedures to Address Violations of the Bankruptcy Code (the "Automatic Stay Motion")*

80.    The Debtors seek entry of an order (a) confirming the application of the Statutory Protections of sections 362, 365 and 525 of the Bankruptcy Code and (b) approving a procedure to expeditiously address any violations of the Statutory Protections.

81.    The Debtors are seeking an order confirming the Statutory Protections to facilitate their regulatory or commercial dealings during the course of these chapter 11 cases with parties who are unfamiliar with, are mistaken regarding or simply ignore the Statutory Protections.  Additionally, to ensure that any violations of the Statutory Protections do not disrupt the Debtors' businesses, the Debtors are seeking approval of a process to promptly adjudicate any such violations, to the extent not otherwise resolved.

82.    I believe that the relief requested in the Automatic Stay Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Automatic Stay Motion should be granted.

**B.    Operational Motions Requesting Immediate Relief**

i.    *Debtors' Motion for Entry of an Order Authorizing (i) the Debtors to Continue to Maintain Existing Cash Management System, Fuel Card Programs, Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "Cash Management Motion")*

83.    The Debtors seek entry of an order (a) authorizing the Debtors, in their sole discretion, to (i) continue to operate their prepetition cash management system with respect to intercompany cash management and obligations, (ii) maintain the Fuel Card Programs, (iii) fund the operations of subsidiaries, (iv) maintain the Debtors' existing bank accounts located at

27

various banks and financial institutions and (v) maintain the Debtors' existing business forms; (b) granting administrative expense priority to intercompany obligations of the Debtors; and (c) waiving the requirements of section 345(b) of the Bankruptcy Code and authorizing the Debtors, in their sole discretion, to continue to invest their cash in accordance with their Investment Guidelines.  Without the requested relief, the Debtors would have great difficulty maintaining their operations, which could cause grievous harm to the Debtors and their estates.

84.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

   ii. *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(e) and 365 and Bankruptcy Rule 4001 (i) Authorizing Certain Debtors to Continue Selling and Contributing Receivables and Related Rights Pursuant to the Securitization Facility, (ii) Modifying the Automatic Stay and (iii) Granting Related Relief (the "Securitization Facility Motion")*

85.     The Debtors seek entry of interim and final orders (a) authorizing certain of the Debtors to enter into the Securitization Facility Amendments and assume, amend and continue to perform under the agreements that govern the Debtors' Securitization Facility, (b) granting superpriority claims (the "**Securitization Superpriority Claims**"), subject only to the DIP Superpriority Claims (which shall be *pari passu* with the Securitization Superpriority Claims), the Fees Carve-Out and the Bonding Carve-Out (in each case as defined in the "**Securitization Facility Motion**"), in favor of Arch Receivable, the Administrator and the Securitization Purchasers in respect to the Debtors' obligations under the Securitization Facility, (c) granting security interests and liens on the Receivables purported to be sold on or after the Petition Date in favor of the Administrator and the Securitization Purchasers to the extent any transfer of such

Receivables is subsequently avoided or recharacterized as an extension of credit or a pledge rather than an absolute sale (the "**Securitization Liens**"), (e) modifying the automatic stay to permit certain setoff and netting transactions contemplated under the Securitization Facility and (f) granting certain other related relief.

86.     As discussed above, the relief requested in the Securitization Facility Motion is being sought in connection with, and as a condition to, the Administrator's and Securitization Purchasers' agreement to the Securitization Facility Amendments.  Among other things, the Securitization Facility Amendments prevent automatic termination of the Securitization Facility, which would result in immediate and adverse consequences to the Debtors' liquidity and operational stability.  Based on my knowledge of the Debtors' businesses and ongoing efforts to maintain value-maximizing financing arrangements, I believe that the Securitization Facility (as modified by the Securitization Facility Amendments) is the Debtors' most efficient and cost-effective means of issuing and maintaining letters of credit.  Moreover, the Debtors would not be able to continue the Securitization Facility or obtain adequate alternative letter-of-credit financing on a lower priority basis.  Thus, the relief sought by the Securitization Facility Motion, including, among other things, approval of the Securitization Superpriority Claims and the Securitization Liens, is necessary to preserve the Securitization Facility and sufficiently fund the Debtors' operations.

87.     Further, it is my experience that the Administrator, the Securitization Purchasers, Arch Receivable and the Debtors have all acted in good faith in conducting the purchases and sales of Receivables, the issuance of letters of credit and the other transactions consummated under the Securitization Facility.

88.    I believe that the relief requested in the Securitization Facility Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Securitization Facility Motion should be granted.

    iii.    *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Letter Agreements Relating to the Debtors' Securitization Facility Motion (the "**Sealing Motion**")*

89.    The Debtors seek entry of an order authorizing the Debtors to file under seal the Letter Agreements with the Banks setting forth fees and other costs associated with the Receivables Purchase Agreement and the Debtors' proposed accounts receivable securitization program and directing that the Letter Agreements shall remain under seal and confidential and not be made available to anyone without the consent of the Debtors and the Banks or further order from the Court (after notice and hearing), in each case, under appropriate confidentiality agreements reasonably satisfactory to the Debtors and the Banks.

90.    The Letter Agreements contain commercially sensitive information that merits protection under section 107(b)(1) of the Bankruptcy Code and require the confidentiality of the fees therein.  As is customary in the finance industry, the Banks treat this information as highly sensitive and confidential.  Such information is rarely disclosed to the public or made available to competitor financial institutions.

91.    I believe that the relief requested in the Sealing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Sealing Motion should be granted.

      iv.        *Debtors' Motion for Entry of an Order Authorizing (i) The Debtors to (a) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Current and Former Employees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers (the "***Wages and Benefits Motion***")*

92.      The Debtors seek entry of an order (a) authorizing the Debtors, in their sole discretion, (i) to pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages, the Withholding Obligations, the Reimbursement Obligations, the Relocation Obligations, the Health and Welfare Plan Obligations, the Vacation and Sick Leave Obligations, the Disability Obligations, the Retirement and Savings Obligations, the Severance Obligations, the Workers' Compensation Obligations, the Contingent Workers Obligations, the Non-Insider Incentive Plan Obligations, the Allowance Programs and the Other Employee Programs, (b) to continue, in their sole discretion, the Employee Programs, as those Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended or supplemented from time to time by the Debtors, in their sole discretion, and to make payments pursuant to the Employee Programs in the ordinary course of business, as well as to pay related administrative obligations, (c) permitting current and former Employees holding claims under the Workers' Compensation Programs to proceed with such claims in the appropriate judicial or administrative fora and permitting insurers to continue to access collateral and security provided by the Debtors pursuant to the Workers' Compensation Programs and (d) authorizing applicable banks and other financial institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing.

93.     If the requested relief is not granted, the Debtors' relationships with their Employees would be adversely impacted and there could well be irreparable harm to the Employees' morale, dedication, confidence and cooperation.  The Debtors' businesses hinge on their relationships with their customers, and the ability to provide superior services is vital.  The Employees' support for the Debtors' efforts is critical to the success of these chapter 11 cases.  At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend any decline in their Employees' morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

94.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be granted.

> v.      *Debtors' Motion for Entry of an Order Authorizing (i) Payment of Certain Prepetition Claims of Critical Vendors, (ii) Payment of 503(b)(9) Claims to Certain Critical Vendors and (iii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Critical Vendors Motion**")*

95.     The Debtors seek an entry of an order (a) granting them the authority, in their sole discretion, to pay all or a portion of their prepetition obligations to certain Critical Vendors up to the Critical Vendor Claims Cap, (b) granting them the authority in their sole discretion, but not requiring them, to pay claims of Critical Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date, which are likely entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code and (c) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing.

96.     The Debtors operate in a highly competitive, highly specialized and highly regulated industry.  The unique nature of the coal mining industry often leaves coal mining companies with few options (and often no practical alternatives) when selecting vendors.  Certain suppliers and service providers at various venues are the only option available to the Debtors.  As a result, if the requested relief is not granted and certain essential trade vendors refuse to continue to supply goods and services to the Debtors postpetition, the Debtors may be unable to continue portions of their operations, thereby endangering the Debtors' successful chapter 11 efforts and substantially harming all creditors.

97.     I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be granted.

      vi.     *Debtors' Motion for Entry of an Order Authorizing (i) The Debtors to Pay Certain Prepetition Claims of Shippers, Warehousemen and Service Providers and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "***Shippers Motion***")*

98.     The Debtors seek entry of an order (a) authorizing the Debtors, in their sole discretion, to pay all or a portion of the Shipping, Warehousing and Servicing Claims and (b) authorizing financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing.

99.     The services provided by the Shippers and Warehousemen are essential to the Debtors' day-to-day operations in that they are necessary for the Debtors to transport coal (i) from mines to preparation plants or directly to customers, (ii) from preparation plants to dock/rail terminals or customers, and (iii) from these terminals to more distant domestic and international customers.

100.    I believe that the relief requested in the Shippers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers Motion should be granted.

vii.    *Debtors' Motion for Entry of an Order Authorizing (i) The Debtors to Pay Prepetition Obligations Owed to Foreign Creditors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Foreign Creditors Motion**")*

101.    The Debtors seek entry of an order (a) granting them the authority, in their sole discretion, to pay or honor all or a portion of their prepetition obligations to Foreign Creditors in the ordinary course of business and (b) authorizing financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay prepetition obligations to Foreign Creditors.

102.    In the ordinary course of conducting their businesses, the Debtors regularly incur obligations for the maintenance of their international operations to foreign vendors, service providers, utility providers and independent contractors.  Certain of the Foreign Creditors may lack minimum contacts with the United States and therefore are not likely to be subject to the jurisdiction of the Court or provisions of the Bankruptcy Code, such as the automatic stay, that otherwise protect the Debtors' assets and business operations.  Payments to the Foreign Creditors are essential to protect the Debtors' mining businesses against potentially severe disruptions.  In order to preserve the value of the Debtors' assets, the Debtors must be allowed to continue paying their accounts with the Foreign Creditors.

103.    I believe that the relief requested in the Foreign Creditors Motion is essential to maintaining the Debtors' business operations in chapter 11 and to preserving the value of the

34

estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Foreign Creditors
Motion should be granted.

> viii.    *Debtors' Motion for Entry of an Order Authorizing (i) Debtors to Honor
> Prepetition Obligations to Customers and to Otherwise Continue
> Customer Practices and (ii) Financial Institutions to Honor and Process
> Related Checks and Transfers (the "**Customer Obligations Motion**")*

104.    The Debtors seek entry of an order, (a) authorizing the Debtors, in their sole
discretion, to (i) fulfill and honor such of their Customer Obligations as they deem appropriate
and (ii) continue, renew, replace, implement new, and/or terminate any customer practices as
they deem appropriate, in the ordinary course of business, without further application to the
Court and (b) authorizing financial institutions to receive, process, honor and pay related checks
or transfers.

105.    Before the Petition Date and in the ordinary course of their businesses, the
Debtors incurred various obligations to customers or service providers under contracts, including
true-up, credits and other obligations, certain of which are described in greater detail in the
Customer Obligations Motion.

106.    I believe that the relief requested in the Customer Obligations Motion is essential
to preserve the Debtors' critical business relationships and customer goodwill for the benefit of
their estates, is in the best interests of the Debtors' estates, their creditors, and all other parties in
interest and constitutes a critical element in achieving a successful and smooth transition to
chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Customer
Obligations Motions should be granted.

   ix.  *Debtors' Motion for Entry of an Order (i) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising from the Postpetition Delivery of Goods Ordered Prepetition, (ii) Authorizing Debtors to Pay Those Obligations in the Ordinary Course of Business, (iii) Authorizing Debtors to Return Goods and (iv) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "**Prepetition Goods Motion**")*

  107. The Debtors seek entry of an order (a) granting Vendors administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for those undisputed obligations arising from outstanding prepetition purchase orders for certain Goods received and accepted by the Debtors on or after the Petition Date, (b) authorizing the Debtors, in their sole discretion, to pay such obligations in the ordinary course of business under section 363(c) of the Bankruptcy Code, (c) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code, to return Goods purchased from Vendors by the Debtors prior to the Petition Date, for credit against such Vendor's prepetition claims and (d) authorizing all applicable banks and financial institutions to honor and process related checks and transfers.

  108. In the ordinary course of the Debtors' businesses (and in many cases as required by law or regulation), the Debtors rely on numerous vendors and suppliers to provide the Debtors with parts, inventory, supplies equipment and other goods for use in the regular operation of the Debtors' businesses.  Vendors may refuse to provide Goods to the Debtors (or may recall shipments thereof) unless the Debtors issue substitute purchase orders postpetition or an order approving payment of the Goods is entered.

  109. I believe that the relief requested in the Prepetition Goods Motion will help ensure a continuous supply of materials that are indispensable to the Debtors' operations; is in the best interests of the Debtors' estates, their creditors, and all other parties in interest; and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Prepetition Goods Motion should be granted.

      x.      *Debtors' Motion for Entry of Order Authorizing the Debtors to Enter into and Perform under Coal Contracts in the Ordinary Course of Business (the "**Ordinary Course Contracts Motion**")*

110.    The Debtors seek entry of an order authorizing the Debtors to enter into and perform under Coal Contracts in the ordinary course of business. Entering into and performing under Coal Contracts represents a core and absolutely critical part of the Debtors' operations. In a typical year, the Debtors perform under hundreds of Coal Contracts. As coal sales generate virtually all of the Debtors' revenues, the Debtors submit that it is axiomatic that entering into and performing under Coal Contracts is within the ordinary course of their businesses.

111.    Although the Debtors believe that the Coal Contracts transactions are within the ordinary course of their businesses and may be entered into without notice and a hearing, certain counterparties may be unwilling to transact with the Debtors without the comfort of knowing that such transactions are authorized by this Court. If the Debtors had to seek Court approval every time they wished to enter into a new Coal Contract, the Debtors believe that they would be at a severe competitive disadvantage to their more nimble competitors, resulting in a loss of customers and revenues, thus endangering their business operations and the value of their assets to the detriment of all stakeholders. If the Debtors experienced any delay in their ability to enter into contracts to purchase coal, it could jeopardize the Debtors' ability to obtain the necessary coal within the time frame required to fulfill their obligations to coal brokerage customers. Therefore, the Debtors are seeking entry of an order authorizing them, in their sole discretion, to enter into and perform under such Coal Contracts.

112.    I believe that the relief requested in the Ordinary Course Contracts Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.

Accordingly, on behalf of the Debtors, I respectfully submit that the Ordinary Course Contracts Motion should be granted.

> xi.　*Debtors' Motion for Entry of an Order Authorizing the Debtors to (i) Enter into, Perform Under, Roll Over, Adjust, Modify, Settle, Terminate and Engage in Certain Derivative Contracts and (ii) Pledge Collateral Under Certain Derivative Contracts (the "***Derivative Contracts Motion***")*

113.　The Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to (a) continue entering into, performing under, rolling over, adjusting, modifying, settling, terminating and engaging in similar transactions with respect to prepetition or postpetition Derivative Contracts, (b) pay any amounts owed under prepetition Derivative Contracts and returning any Credit Support held by the Debtors, (c) provide credit support under prepetition and postpetition Derivative Contracts, including posting letters of credit, entering into escrow agreements, opening and funding escrow accounts, posting collateral, margin or other forms of collateral and making prepayments and (d) perform all other actions necessary or appropriate to implement, execute and perform these transactions, including paying premiums, taking physical delivery of commodities and effecting settlement of prepetition and postpetition Derivative Contracts.  The Debtors also seek an order that the automatic stay be modified pursuant to sections 105 and 362(d)(1) of the Bankruptcy Code to the extent it is necessary to assure Counterparties of their ongoing ability to enforce their contractual and legal rights and remedies against the Debtors pursuant to the terms of any prepetition or postpetition Derivative Contract and applicable non-bankruptcy law.

114.　The Debtors' businesses are sensitive to fluctuations in, among other things, the prices of diesel fuel, foreign currency exchange rates, natural gas and coal.  The Debtors are currently party to, and will continue to engage in, derivative contracts including forward contracts, swap contracts, option contracts, or combinations of the foregoing. The Debtors'

ability to hedge their risk of fluctuations in the prices of coal, diesel fuel, foreign currency

exchange rates and other commodities, as well as maintain their proprietary trading activities, is

critical to the Debtors' continued operations.  Without the requested relief, the Debtors'

businesses would be exposed to such risks, which could cause grievous harm to the Debtors and

their estates.

115.    I believe that the relief requested in the Derivative Contracts Motion is in the best

interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Derivative Contracts Motion should be

granted.

xii.    *Debtors' Motion for Entry of an Order Authorizing (i) The Debtors to Continue and Renew Surety Bond Program and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "*Surety Motion*")*

116.    The Debtors seek entry of an order authorizing (a) the Debtors to maintain,

continue and renew, in their sole discretion, their Surety Bond Program on an uninterrupted basis

and in accordance with the same practices and procedures, including, but not limited to, the

maintenance of existing collateral, as were in effect before the Petition Date and (b) financial

institutions to receive, process, honor and pay related checks or wire transfers.  This authority

would include permitting, but not requiring, the Debtors (i) to pay all amounts arising under the

Surety Bond Program due and payable after the Petition Date and (ii) to renew or obtain new

surety bonds as needed, including, but not limited to, as may be required by law or judicial

authority, without further notice or order of the Court.

117.    I believe that the relief requested in the Surety Motion is in the best interests of

the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical

element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of

the Debtors, I respectfully submit that the Surety Motion should be granted.

> xiii.  *Debtors' Motion for Entry of an Order Authorizing (i) Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Programs and Honor All Obligations in Respect Thereof and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Insurance Motion**")*

118.    The Debtors seek entry of an order authorizing (a) the Debtors to maintain,

continue and renew, in their sole discretion, the Insurance Programs on an uninterrupted basis

and in accordance with the same practices and procedures as were in effect before the Petition

Date and (b) financial institutions to receive, process, honor and pay related checks or wire

transfers used to pay for the foregoing.  This would include (i) paying all amounts arising under

the Insurance Programs or the financing thereof and (ii) renewing or obtaining new insurance

policies as needed in the ordinary course of business.

119.    The Debtors maintain various liability, casualty, property and other insurance,

reinsurance and risk control programs through several private insurance carriers in the ordinary

course of the Debtors' businesses.  If the requested relief is not granted and the Insurance

Programs lapse or terminate, the Debtors may well be unable to continue large portions of their

operations, thereby endangering the value of the Debtors' assets and substantially harming all

creditors.  The Debtors believe that all material amounts related to the Insurance Programs that

were due and payable on or prior to the Petition Date have been fully paid but, out of an

abundance of caution and to avoid irreparable harm to their businesses, the Debtors seek

authority to satisfy any such prepetition obligations through the Insurance Motion.

120.    I believe that the relief requested in the Insurance Motion is in the best interests of

the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical

element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

> xiv.     *Debtors' Motion for Entry of an Order (i) Prohibiting Utilities From Altering, Refusing or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured of Future Performance and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "***Utilities Motion***")*

121.     The Debtors seek entry of an order prohibiting the Debtors' utility service providers from altering, refusing or discontinuing service, deeming the utility companies to be adequately protected and establishing procedures for additional adequate assurances.  In connection with the operation of their businesses and management of their properties, the Debtors obtain utility services, including electricity, natural gas, telephone, sewage, telecommunications, waste removal water and other similar services from dozens of utilities, as that term is used in section 366 of the Bankruptcy Code.  The Debtors seek approval of the procedures to avoid the severe consequences to the Debtors of any interruption in services by the Utilities.

122.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

### C.     Tax Motions Requesting Immediate Relief

> i.     *Debtors' Motion for Entry of an Order Authorizing (i) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and Fees and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "***Taxes and Fees Motion***")*

123.     The Debtors seek entry of an order authorizing (a) the Debtors, in their sole discretion, to pay any Covered Taxes and Fees, whether asserted prior to or after the Petition

Date and (b) financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such Covered Taxes and Fees.

124.     In connection with the normal operations of their businesses, the Debtors collect, withhold and incur Production Taxes, Excise Taxes, Environmental and Safety Fees and Assessments, Sales and Use Taxes, Employment and Wage-Related Taxes, Franchise Taxes and Fees, Property Taxes, Foreign Taxes and Income Taxes, as well as other taxes, fees and charges described in the Taxes and Fees Motion.  The Debtors remit the Covered Taxes and Fees to various federal, state, local and foreign governments, including taxing and licensing authorities. The Covered Taxes and Fees are remitted by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions.  Failure to pay the Covered Taxes and Fees could give rise to priority or secured claims or result in Governmental Authorities taking actions that might interfere with the Debtors' businesses.

125.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

       ii.     *Debtors' Motion for Entry of an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Equity Interests in the Debtors' Estates (the "**NOLs Motion**")*

126.     The Debtors seek entry of an order authorizing the Debtors: (a) to establish and implement restrictions and notification requirements regarding the Tax Ownership and certain transfers of common stock of Arch Coal and (b) to notify holders of Stock of the restrictions, notification requirements and procedures.  The Debtors also seek approval of a form of notice, which will notify holders of Stock whose actions could adversely affect the Debtors' tax assets that the Procedures have been established by order of this Court.

127.    The Debtors seek to enforce the automatic stay by implementing court-ordered procedures intended to protect the Debtors' estates against the possible loss of valuable tax benefits that could flow from inadvertent stay violations.

128.    I believe that the relief requested in the NOLs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the NOLs Motion should be granted.

**D.    Professional Retention Application**

i.    *Debtors' Application for Entry of an Order Authorizing the Debtors to Employ and Retain Prime Clerk LLC as Notice, Claims and Solicitation Agent, Effective Nunc Pro Tunc to the Petition Date (the "**Prime Clerk Retention Application**")*

129.    The Debtors seek entry of an order appointing Prime Clerk as Notice, Claims and Solicitation Agent in order to assume full responsibility for, among other things, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  Accordingly, on behalf of the Debtors, I respectfully submit that the Prime Clerk Retention Application should be granted.

130.    I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

*[Signature page follows]*

I, the undersigned Senior Vice President and Chief Financial Officer of Arch
Coal, declare under penalty of perjury that the foregoing is true and correct.


Dated: January 11, 2016

_____
John T. Drexler
Senior Vice President and
Chief Financial Officer

## SCHEDULE 1
## Debtor Entities

| | | | |
|---|---|---|---|
| 1. | ACI Terminal, LLC | 37. | ICG Eastern, LLC |
| 2. | Allegheny Land Company | 38. | ICG Eastern Land, LLC |
| 3. | Apogee Holdco, Inc. | 39. | ICG Illinois, LLC |
| 4. | Arch Coal, Inc. | 40. | ICG Knott County, LLC |
| 5. | Arch Coal Sales Company, Inc. | 41. | ICG Natural Resources, LLC |
| 6. | Arch Coal West, LLC | 42. | ICG Tygart Valley, LLC |
| 7. | Arch Development, LLC | 43. | International Coal Group, Inc. |
| 8. | Arch Energy Resources, LLC | 44. | Jacobs Ranch Coal LLC |
| 9. | Arch Reclamation Services, Inc. | 45. | Jacobs Ranch Holdings I LLC |
| 10. | Arch Western Acquisition Corporation | 46. | Jacobs Ranch Holdings II LLC |
| 11. | Arch Western Acquisition, LLC | 47. | Juliana Mining Company, Inc. |
| 12. | Arch Western Bituminous Group, LLC | 48. | King Knob Coal Co., Inc. |
| 13. | Arch Western Finance LLC | 49. | Lone Mountain Processing, Inc. |
| 14. | Arch Western Resources, LLC | 50. | Marine Coal Sales Company |
| 15. | Arch of Wyoming, LLC | 51. | Melrose Coal Company, Inc. |
| 16. | Ark Land Company | 52. | Mingo Logan Coal Company |
| 17. | Ark Land KH, Inc. | 53. | Mountain Coal Company, L.L.C. |
| 18. | Ark Land LT, Inc. | 54. | Mountain Gem Land, Inc. |
| 19. | Ark Land WR, Inc. | 55. | Mountain Mining, Inc. |
| 20. | Ashland Terminal, Inc. | 56. | Mountaineer Land Company |
| 21. | Bronco Mining Company, Inc. | 57. | Otter Creek Coal, LLC |
| 22. | Catenary Coal Holdings, Inc. | 58. | Patriot Mining Company, Inc. |
| 23. | Catenary HoldCo, Inc. | 59. | P.C. Holding, Inc. |
| 24. | Coal-Mac, Inc. | 60. | Powell Mountain Energy, LLC |
| 25. | CoalQuest Development LLC | 61. | Prairie Coal Company, LLC |
| 26. | Cumberland River Coal Company | 62. | Prairie Holdings, Inc. |
| 27. | Energy Development Co. | 63. | Saddleback Hills Coal Company |
| 28. | Hawthorne Coal Company, Inc. | 64. | Shelby Run Mining Company, LLC |
| 29. | Hobet Holdco, Inc. | 65. | Simba Group, Inc. |
| 30. | Hunter Ridge, Inc. | 66. | Thunder Basin Coal Company, L.L.C. |
| 31. | Hunter Ridge Coal Company | 67. | Triton Coal Company, L.L.C. |
| 32. | Hunter Ridge Holdings, Inc. | 68. | Upshur Property, Inc. |
| 33. | ICG, Inc. | 69. | Vindex Energy Corporation |
| 34. | ICG, LLC | 70. | Western Energy Resources, Inc. |
| 35. | ICG Beckley, LLC | 71. | White Wolf Energy, Inc. |
| 36. | ICG East Kentucky, LLC | 72. | Wolf Run Mining Company |

**Exhibit A**

# RESTRUCTURING TERM SHEET
## ARCH COAL, INC.

This term sheet (this "Term Sheet")[1] is a summary of indicative terms and conditions for a proposed restructuring transaction (the "Restructuring") concerning Arch Coal, Inc., a Delaware corporation ("ACI"), and its domestic wholly-owned direct and indirect subsidiaries other than Arch Receivable Company, LLC (collectively, the "Company" or the "Debtors") to be effectuated through a plan of reorganization (the "Plan") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") that is proposed by the Company and is materially consistent with the terms and conditions as set forth in this Term Sheet and otherwise reasonably acceptable in form and substance to the Majority Consenting Lenders (as defined below).

This Term Sheet does not purport to summarize all of the terms, conditions, covenants and other provisions that may be contained in the fully negotiated and executed definitive documentation in connection with the Restructuring.  No provision of this Term Sheet should be considered separate and apart from the whole.  The transactions described in this Term Sheet are subject in all respects to, among other things, the execution and delivery of definitive documentation reasonably satisfactory in form and substance to the Company and the Lenders party to the Restructuring Support Agreement holding in the aggregate more than 66 2/3% of the aggregate principal amount of the Term Loans held by the Lenders party to the Restructuring Support Agreement (the "Majority Consenting Lenders"), and satisfaction or waiver of the conditions precedent set forth therein.  This Term Sheet does not constitute either (a) an offer for the purchase, sale or subscription of, or solicitation or invitation of any offer to buy, sell or subscribe for, any securities or (b) a solicitation of acceptances or rejections of a chapter 11 plan of reorganization pursuant to the Bankruptcy Code.  Any such offer or solicitation shall be made only in compliance with all applicable securities laws of the United States and with the provisions of the Bankruptcy Code.

Prior to the Petition Date, unless counsel to the Ad Hoc Committee Lenders (as defined below) and the Company agree otherwise, this Term Sheet and the information contained herein shall remain strictly confidential and may not be shared with any person or entity other than the Company, the holders of the Term Loans[2] (the "Lenders") incurred by ACI pursuant to that certain Credit Agreement, dated as of June 14, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing First Lien Credit Agreement," and the indebtedness incurred thereunder by ACI, the "First Lien Debt"), among ACI, Wilmington Trust, N.A., as successor administrative agent, the Lenders, and the other agents and parties thereto, that are subject to confidentiality agreements with the Company and are party to the Restructuring Support Agreement in accordance with the terms thereof and their respective professional advisors.

---

[1]  Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings for such terms set forth in the Existing First Lien Credit Agreement or the Restructuring Support Agreement, as applicable.

[2]  The Lenders that constitute the steering committee of Lenders shall be Lenders represented by Houlihan Lokey and Paul Weiss or Kaye Scholer and identified to the Debtors as being a member thereof regardless of whether such Lender has signed a confidentiality agreement with the Company (the "Ad Hoc Committee Lenders").

| FILING ENTITIES/TIMING OF CHAPTER 11 CASES | |
|---|---|
| **Filing Entities** | ACI and each of its direct and indirect wholly-owned domestic subsidiaries, except Arch Receivable Company, LLC. |
| **Timing of Chapter 11 Cases** | The milestones for the chapter 11 cases (the "Chapter 11 Cases") shall be as set forth in the restructuring support agreement by and among the Company and the Lenders that are subject to confidentiality agreements with the Company (the "Restructuring Support Agreement"), the DIP Credit Agreement and the orders of the Bankruptcy Court approving the DIP facility, the use of cash collateral and the granting of adequate protection. |
| **DIP Financing** | Entry into DIP financing consistent with the DIP Term Sheet attached hereto as Exhibit B. |
| **Venue of Chapter 11 Cases** | United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court"). |
| TREATMENT OF CLAIMS AND INTERESTS | |
| **DIP Facility Claims** | On the effective date of the Plan (the "Effective Date"), all allowed claims against each of the Debtors arising under the DIP facility shall (i) be indefeasibly paid in full in cash, or (ii) receive such other treatment as may be consented to by the holders of DIP Facility claims. |
| **First Lien Secured Debt Claims** | On the Effective Date, the outstanding First Lien Debt shall be exchanged for: (a) a combination of (1) $145 million in cash (less (i) the amount of Adequate Protection Payments (as defined below) received by the First Lien Lenders during the Bankruptcy Cases and (ii) the December 2015 interest payment[3]) and (2) $326.5 million (principal amount) of new first lien debt ("New First Lien Debt")[4] and (b) 100% of the New Common Stock outstanding on the Effective Date, subject to dilution on account of (1) the Management Incentive Plan (as defined below) and (2) the distribution to unsecured creditors of any New Common Stock and |

---

[3]   For the avoidance of doubt, ACI shall pay any interest due and payable in December of 2015 in accordance with Section 5.5 of the Existing First Lien Credit Agreement.

[4]   The aggregate amount of cash and principal amount of New First Lien Debt equals 25% of the total principal amount of the First Lien Debt outstanding as of the Petition Date.

-2-

|  |  | Warrants (as defined below) issued in connection with the Restructuring.  The amount of any cash paid pursuant to (a)(1) above in excess of the Adequate Protection Payments is referred to herein as the "<u>Excess Cash Distribution</u>."<br><br>The New First Lien Debt shall have the terms set forth on Exhibit A hereto and such other terms and conditions that are reasonably acceptable to the Majority Consenting Lenders.<br><br>The First Lien Lenders shall receive adequate protection payments during the Chapter 11 Cases equal in amount to post-petition interest at contract non-default rates through the Effective Date (the "<u>Adequate Protection Payments</u>").  Notwithstanding the foregoing, to the extent the Restructuring is not consummated, the First Lien Lenders reserve the right to assert claims for the payment of additional interest calculated at any other applicable rates of interest (including, without limitation, default rates), or on any other basis, provided for in the Existing First Lien Credit Agreement, to the extent permitted by the Bankruptcy Code or applicable law. |
| **First Lien Deficiency Claims; Second Lien Debt Claims, Unsecured Bondholder Claims and Other General Unsecured Claims** | **Unsecured Creditors Vote as a Class in Favor of the Plan** | On the Effective Date, in the event the First Lien Debt Holders (on account of the First Lien Deficiency claims), Second Lien Debt Holders, Unsecured Bondholders and Other General Unsecured Creditors collectively vote as a class in favor of the Plan, (i) each holder of an allowed Second Lien Debt claim, Unsecured Bondholder claim and Other General Unsecured claim shall be entitled to receive its pro rata share of:<br><br><u>Option 1</u>:[5] (a) New Common Stock equal to the product of 4% of the New Common Stock multiplied by the percentage of allowed Second Lien Debt claims, Unsecured Bondholder claims, and Other General Unsecured claims (by amount) that elect this Option 1 out of all allowed Second Lien Debt claims, Unsecured Bondholder claims, and Other General Unsecured claims and (b) warrants (the "<u>Warrants</u>") exercisable into up to an amount of New Common Stock equal to the product of 8% of the New Common Stock outstanding as of the Effective Date |

---

[5] In the event that, by the date that is 45 days after the Petition Date, holders of more than $1.6125 billion in amount of Unsecured Claims do not execute a restructuring support agreement pursuant to which they agree to support the Plan substantially in the form of the Restructuring Support Agreement executed by the Company and the Consenting Lenders, the Company and the Majority Consenting Lenders shall have the right to determine to not offer Option 1 under the Plan or withdraw Option 1 from any filed Plan and instead have the Plan provide that all holders of First Lien Deficiency Claims, Second Lien Debt Claims, Unsecured Bondholder Claims and Other General Unsecured Claims shall receive the treatment set forth under Option 2.

<table>
<tr><td></td><td></td><td>

multiplied by the percentage of allowed Second Lien Debt claims, Unsecured Bondholder claims, and Other General Unsecured claims (by amount) that elect this Option 1 out of all allowed Second Lien Debt claims, Unsecured Bondholder claims, and Other General Unsecured claims, which Warrants shall be struck at a price based on the amount of First Lien Debt (including all accrued interest thereon as of the Petition Date and any unpaid Adequate Protection Payments), minus the Excess Cash Distribution and the aggregate principal amount of the New First Lien Debt as of the Effective Date on account of its allowed Second Lien Debt claims, Unsecured Bondholder claims and Other General Unsecured claims; provided that any such Second Lien Debt Holder, Unsecured Bondholder or Other General Unsecured Creditor does that elects to opt out of releasing the Released Parties (as defined below) shall not be entitled to receive any distribution provided for in this Option 1 and instead shall receive a distribution as set forth in Option 2 below; or

Option 2: the value of the unencumbered assets of the Company, if any, to the extent any such assets are available after giving effect to (i) the adequate protection claims in favor of the First Lien Lenders and (ii) payments made to administrative and priority creditors during the Chapter 11 Cases and upon emergence (including the DIP Facility claims) multiplied by the percentage of allowed Second Lien Debt claims, Unsecured Bondholder claims, and Other General Unsecured claims (by amount) that elect this Option 2 out of all allowed First Lien Deficiency Claims, Second Lien Debt claims, Unsecured Bondholder claims, and Other General Unsecured claims, a fair allocation of which shall be deemed to have been paid out of unencumbered assets (as determined by agreement among the Debtors and the Majority Consenting Lenders or by the Bankruptcy Court);

and (ii) the First Lien Lenders shall waive any distribution (but not the right to vote) on account of their First Lien Deficiency claims.

The Warrants shall have a maturity of 5 years and shall be exercisable upon issuance and not subject to any vesting conditions.

All non-voting creditors shall be deemed to have elected Option 2.

</td></tr>
<tr><td></td><td>

**Unsecured Creditors Do Not Vote as a**

</td><td>

On the Effective Date, in the event the First Lien Debt Holders (on account of their First Lien Deficiency claims), Second Lien Debt Holders, Unsecured Bondholders and Other General Unsecured

</td></tr>
</table>

-4-

|  | **Class in Favor of the Plan** | Creditors do not collectively vote as a class in favor of the Plan, each allowed First Lien Deficiency claim (which for the avoidance of doubt will not be waived), Second Lien Debt claim, Unsecured Bondholder claim and Other General Unsecured claim shall be exchanged for consideration equal to such claim's pro rata share of the value of the unencumbered assets of the Company, if any, to the extent any such assets are available after giving effect to (i) the adequate protection claims in favor of the First Lien Lenders and (ii) payments made to administrative and priority creditors during the Chapter 11 Cases and upon emergence (including the DIP Facility Claims), a fair allocation of which shall be deemed to have been paid out of unencumbered assets (as determined by agreement among the Debtors and the Majority Consenting Lenders or by the Bankruptcy Court). |
|---|---|---|
| **A/R Securitization Facility or New L/C Facility** |  | On the Effective Date, either (i) the A/R Securitization Facility shall be reinstated on terms reasonably acceptable to the Majority Consenting Lenders or (ii) a new L/C Facility shall be entered into on terms reasonably acceptable to the Majority Consenting Lenders. |
| **Executory Contracts** |  | The Debtors shall not assume or reject any material executory contract or material unexpired lease of non-residential real property without the consent of the Majority Consenting Lenders, which consent shall not be unreasonably withheld. |
| **Existing Equity Interests** |  | On the Effective Date, the existing common stock of Arch Coal, Inc. shall be extinguished. |
| **OTHER PROVISIONS** |  |  |
| **Professional Fees** |  | The Company shall pay in cash all reasonable and documented professional fees and expenses for two primary counsels (Kaye Scholer LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP), one local counsel and one financial advisor (Houlihan Lokey Capital Inc.) and one operations or similar consultant (should the Ad Hoc Committee Lenders and the DIP Lenders decide to engage one) for the Ad Hoc Committee Lenders and the DIP Lenders, collectively, and one primary counsel (Seward & Kissel LLP) and one local counsel for the First Lien Agent and the DIP Agent solely in connection with their respective roles as administrative agent, collateral agent and control agent, as applicable. |
| **Management Incentive Plan** |  | The Board of Directors of reorganized ACI (the "New Board") will be authorized to implement a management incentive plan (the "Management Incentive Plan") that provides for the issuance of |

| | |
|---|---|
| | options and/or other equity-based compensation to the management and directors of the reorganized Company.  Up to 10% of the New Common Stock, on a fully diluted basis, shall be reserved for issuance in connection with the Management Incentive Plan.<br><br>The participants in the Management Incentive Plan, the allocations and form of the options and other equity-based compensation to such participants (including the amount of allocations and the timing of the grant of the options and other equity-based compensation), and the terms and conditions of such options and other equity-based compensation (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board. |
| **Board of Directors** | The New Board will consist of seven directors:   (i) the Chief Executive Officer; and (ii) six directors selected by the Ad Hoc Committee Lenders in consultation with the Chief Executive Officer, at least one of which shall be independent. |
| **Releases** | To the extent permitted by applicable law, the Plan shall provide for customary (a) mutual releases, (b) exculpation and (c) indemnification of and among: (i) the Debtors; (ii) the First Lien Agent and the Lenders; (iii) the DIP Agent and the DIP Lenders; and (iv) all parties to the Restructuring Support Agreement, and in the case of each of the foregoing, each such party's current directors, managers, officers, affiliates, partners, subsidiaries, principals, employees, agents, managed funds, representatives, attorneys and advisors, together with their successors and assigns (collectively, the "<u>Released Parties</u>").<br><br>The Plan shall further provide that, to the extent permitted by applicable law, all voting creditors and all creditors in classes deemed to accept or reject the Plan shall be deemed to release all Released Parties unless they elect to opt out of granting such releases. |

## Exhibit A

### Terms of New First Lien Debt

| | |
|---|---|
| **Borrower:** | Arch Coal, Inc., a Delaware corporation. |
| **Facility:** | Term loan facility in principal amount to be determined in accordance with the Restructuring Term Sheet. |
| **Maturity:** | 5 years. |
| **Applicable Margin:** | L+ 900 bps (LIBOR floor of 1.0%), which shall be payable quarterly in cash; provided that, if the unrestricted cash and availability under any working capital facility of the Borrower and the Guarantors would not exceed $375 million after giving effect to such interest payment, as certified by a financial officer of the Borrower as of any interest payment date, such interest shall be paid in kind (by adding the accrued interest to the principal amount). |
| **Guarantors:** | Guarantees provided by all existing wholly-owned domestic subsidiaries of the Borrower, and all newly created or acquired wholly-owned domestic subsidiaries of the Borrower; provided that the following subsidiaries of the Borrower shall not be required to become guarantors: (i) securitization SPV, (ii) bonding subsidiaries, (iii) inactive subsidiaries and (iv) other exceptions consistent with the Existing First Lien Credit Agreement. |
| **Security:** | Perfected first priority security interest in substantially all of the Borrower's and each Guarantor's assets, including 100% of the voting equity interests of directly owned domestic subsidiaries and 65% of the voting equity interests of directly owned foreign subsidiaries, subject to customary exceptions. |
| **Amortization:** | None. |
| **Mandatory Prepayments:** | (i) 100% of the net cash proceeds of non-ordinary course sales or dispositions of assets, subject to customary reinvestment rights and exceptions to be agreed and (ii) 100% of the net cash proceeds received from the incurrence of indebtedness (other than permitted debt). |
| **Representation and Warranties:** | Usual and customary for facilities of this type. |
| **Affirmative Covenants:** | Usual and customary for facilities of this type. |
| **Negative Covenants:** | Usual and customary for facilities of this type. |
| **Financial Covenants:** | None. |

-7-

## **Exhibit B**

**DIP Term Sheet**

**Illustrative Summary of DIP Terms**

| | |
|---|---|
| **Borrower:** | Arch Coal, Inc. as Debtor and Debtor-in Possession. |
| **DIP Facility:** | $275 million Super-Priority Senior Secured Debtor-In-Possession credit facility (the "DIP Facility") consisting of term loans (collectively, the "DIP Term Loan") that may be funded in not more than two draws not later than 4 months after the effective date of the DIP Facility (such 4 month period, the "Availability Period").  Any portion of the DIP Term Loan commitment that has not been funded on or prior to the end of the Availability Period shall be permanently cancelled. |
| **Bonding Carve-Out:** | $75 million carve-out (which amount can be increased with the consent of DIP lenders holding a majority of the DIP Term Loan and unused commitments (the "Required DIP Lenders")) from the DIP Lien (as defined below) for super-priority claims relating to the Borrower's and its subsidiaries' environmental bonding obligations. |
| **Use of Proceeds:** | For general corporate and working capital purposes, including to pay fees and expenses associated with the bankruptcy cases. |
| **Maturity:** | Earliest of (i) January 31, 2017, (ii) effectiveness of a Plan of Reorganization, (iii) the appointment of a trustee, or (iv) the sale of substantially all assets pursuant to Section 363 Sales. |
| **Applicable Margin:** | L+ 900 bps (LIBOR floor of 1.0%). |
| **Fees:** | • Commitment Fee:  500 bps on initial commitments to the DIP Term Loan, earned upon signing and due and payable upon entry of the interim DIP order.<br><br>• Unused Line Fee:  500 bps per annum on the undrawn commitments, payable monthly in arrears.<br><br>• Commitment Termination Fee:  100 bps on any amounts cancelled at the Borrower's option during the Availability Period and on any amounts permanently cancelled as a result of the expiration of the Availability Period. |
| **DIP Guarantors:** | Super-priority secured guarantees provided by all existing wholly-owned domestic subsidiaries of the Borrower, and all newly created or acquired wholly-owned domestic subsidiaries of the Borrower; provided that the following subsidiaries of the Borrower shall not be required to become guarantors: (i) the securitization SPV, (ii) bonding subsidiaries and (iii) inactive subsidiaries. |
| **DIP Facility Collateral:** | First priority lien (priming, where applicable) on all encumbered and unencumbered assets (subject to customary exceptions to be mutually agreed, including, without limitation, equity interests in joint ventures to the extent prohibited by the applicable joint venture documentation (but, for the avoidance of doubt, the proceeds of such equity interests shall constitute collateral)) (the "DIP Lien"), subject to the Bonding Carve-Out and a customary professional fees carve-out. |
| **Priority:** | Super-priority administrative claim against each Borrower and Guarantor, subject to the Bonding Carve-Out and a customary professional fees carve-out. |
| **No Petition Letter:** | The DIP agent shall enter into a no petition letter agreement with PNC, as administrator under the receivables securitization facility, in form and substance satisfactory to PNC and the Required DIP Lenders. |
| **Material Leases:** | To the extent liens/consents are not available on material leases, DIP lenders will have alternative protections, including certain consent rights with respect to rejection of leases, rights to select replacement lessees for rejected leases, rights to compel assumption and assignment of leases upon an event of default, and related protections. |

| | |
|---|---|
| **Financial Covenants:** | • Maximum capital expenditures tested monthly (with a cushion to amounts included in the DIP Budget (as defined below) equal to the greater of (i) 25% (with carryforwards) in any monthly period and (ii) $10 million in the aggregate, in each case with exceptions to be agreed).<br><br>• Minimum unrestricted cash and cash equivalents ("Minimum Liquidity") of $575 million, tested on a monthly basis. |
| **Mandatory Prepayments:** | Usual and customary for DIP facilities, including 100% of net cash proceeds of (i) debt issuances (other than debt permitted to be incurred under the terms of the DIP Facility) and (ii) non-ordinary course asset sales or dispositions in excess of $50 million in the aggregate (with no individual asset sale or disposition in excess of $7.5 million), in each case to be applied to prepay the DIP Term Loan; provided that each DIP lender will have the right to decline to receive its pro rata portion of any mandatory prepayment payable under clause (ii) above. |
| **Cash Management:** | Control agreements shall be required only if requested by the Required DIP Lenders or the DIP agent with the consent of the Required DIP Lenders, in each case after the occurrence and during the continuance of an event of default that has not been waived. |
| **Conditions Precedent for Effectiveness:** | Usual and customary for DIP facilities, including, but not limited to:<br><br>• Receipt of reasonably acceptable (x) monthly projections through to the maturity of the DIP Facility (the "DIP Budget") and (y) initial weekly 13-week cash flow forecast.<br><br>• Entry of interim DIP order, which shall include (x) release of claims of the Debtors against the DIP lenders and first lien lenders and (y) customary stipulations with respect to the validity and priority of the prepetition first lien credit facility (subject to customary challenge period). |
| **Conditions Precedent for Funding:** | Usual and customary for DIP facilities, including, but not limited to:<br><br>• Absence of default and accuracy in all material respects of reps.<br><br>• Entry of final DIP order. |

- 2 -

| | |
|---|---|
| **Adequate Protection for Prepetition First Lien:** | Use of cash collateral subject to the following adequate protection package for first lien lenders, including:<br><br>• Cash payment of interest at the nondefault contract rate for first lien lenders.<br><br>• Replacement liens on all collateral securing the first lien credit facility to the extent of any diminution in value of the prepetition collateral.<br><br>• New liens on existing unencumbered and unperfected assets securing the DIP Facility junior only to the DIP Facility (subject to customary carve-outs, including the carve-outs provided for herein) to the extent of any diminution in value of the prepetition collateral.<br><br>• 507(b) claims for any diminution in collateral value.<br><br>• Current cash payments of all reasonable professional fees and expenses for two primary counsels, one local counsel, and one financial advisor for the first lien administrative agent, the first lien lenders, DIP agent and DIP lenders, collectively.<br><br>• Milestones described below and financial covenants described above.<br><br>• First lien lenders to receive (subject to confidentiality agreements) all financial reporting and other reports and notices delivered by the Borrower under the DIP Facility.<br><br>• Termination of use of cash collateral upon (i) confirmation or filing, proposing or support by the Borrower or any Guarantor of any plan of reorganization that is not reasonably acceptable to the lenders holding a majority of the prepetition term loans (the "Required First Lien Lenders"), (ii) acceleration of loans and/or termination of commitments under the DIP Facility, or (iii) sale of all or substantially all assets of the debtors. |
| **Milestones:** | Limited to the following (any amendment, modification or extension of the Milestones shall require the prior written consent of the Required DIP Lenders or of the DIP agent with the consent of the Required DIP Lenders or, if and only if the DIP Facility has been terminated, the Required First Lien Lenders or the prepetition term loan agent with the consent of the Required First Lien Lenders):<br><br>• No later than 5 days after the petition date, entry of an order approving the DIP Facility and the adequate protection package and authorizing the use of cash collateral on an interim basis.<br><br>• No later than 45 days after the entry of the interim DIP order and interim cash collateral order, entry of a final order approving the DIP Facility and the adequate protection package and authorizing the use of cash collateral on a final basis.<br><br>• No later than 60 days after the petition date, delivery of an updated business plan that is reasonably acceptable to Required DIP Lenders.<br><br>• No later than 90 days after the petition date, filing of a plan and disclosure statement.<br><br>• No later than 60 days after the plan filing date, approval of the disclosure statement.<br><br>• No later than 90 days after approval of the disclosure statement, confirmation of the plan of reorganization.<br><br>• No later than 15 days after entry of the confirmation order, effectiveness of the plan of reorganization. |

| Reporting: | • Financial statements monthly, quarterly, and annually. |
| --- | --- |
| | • Rolling 13-week cash flow forecast to be updated and delivered every 4 weeks in substantially the form attached as an exhibit to the DIP credit agreement. |
| | • Cash flow reporting on a weekly basis including variances to the latest 13-week cash flow forecast. |