UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>ARCH COAL, INC., *et al.,*<br><br>Debtors.[1] | Chapter 11<br>Case No. 16-40120<br><br>**(Joint Administration Proposed)**<br><br>**Hearing Date and Time:**<br>TBD<br><br>**Hearing Location:**<br>TBD |

DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
(i) PAYMENT OF CERTAIN PREPETITION CLAIMS OF CRITICAL
VENDORS, (ii) PAYMENT OF 503(b)(9) CLAIMS TO CERTAIN CRITICAL VENDORS
AND (iii) FINANCIAL INSTITUTIONS TO HONOR AND
PROCESS RELATED CHECKS AND TRANSFERS

NOW COME Arch Coal, Inc. and its subsidiaries that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") and move this Court for entry of an order granting them the authority to pay certain prepetition obligations to certain Critical Vendors (as defined below) and authorizing financial institutions to process related checks or electronic transfers. In support of this motion (the "**Motion**"), the Debtors show the Court as follows:

**Relief Requested**

1.      By this Motion, and pursuant to sections 105(a), 363(b) and 503(b)(9) of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors seek entry of an order (the

---

[1] The Debtors are listed on Schedule 1 attached hereto. The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

"**Proposed Order**")[2] (a) granting them the authority in their sole discretion, but not requiring them, to pay all or a portion of their prepetition obligations to certain Critical Vendors (as defined below) up to the Critical Vendor Claims Cap (as defined below), (b) granting them the authority in their sole discretion, but not requiring them, to pay claims of Critical Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date, which are likely entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code, (c) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing and (d) granting related relief.

## Jurisdiction

2.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## Background

3.      The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on January 11, 2016 (the "**Petition Date**").

4.      The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in these cases.

5.      Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Declaration of John T. Drexler, Senior Vice President and*

---

[2] A copy of the Proposed Order will be provided to the Notice Parties (as defined below) and made available on the Debtors' case information website at *https://cases.primeclerk.com/archcoal*.

*Chief Financial Officer of Arch Coal, Inc.*, filed substantially contemporaneously herewith, which is incorporated herein by reference.

## The Debtors' Critical Vendors

6.     The Debtors purchase goods and services from certain vendors and independent contractors that are unaffiliated with the Debtors and are, by and large, sole source or limited source suppliers or provide a material economic or operational advantage when compared to other available vendors; without them, the Debtors could not operate (collectively, the "**Critical Vendors**").[3] Many of these suppliers are in the unique position of holding a virtual monopoly over the goods and services they provide. As discussed in further detail below, the Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share.

7.     While the Debtors hope and expect to assure a continuing postpetition supply of goods and services by consensual negotiation with the vendors in the categories described in this Motion, the Debtors recognize that their fiduciary duties bind them to consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid. Replacement vendors, even where available, would likely result in substantially higher costs for the Debtors.

8.     If the Debtors can pay selected Critical Vendors some or all of their prepetition claims (such claims, the "**Critical Vendor Claims**") and thereby maintain lower costs of goods and services purchased during the postpetition period and avoid the severe disruption and safety

---

[3] To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors in the ordinary course of their businesses. Identifying the Critical Vendors now would likely cause all such vendors to demand payment in full. However, as noted above, in determining the Critical Vendor Claims Cap, the Debtors were careful to include only such payments that the Debtors, in their best estimate, determined would be required to continue the supply of critical goods and services as a condition of continued sales.

risks to their employees that might result from the cessation of such essential goods and services, it is prudent for the Debtors to do so.  Such disruption would cause irreparable harm to the Debtors and to the recoveries of all of the Debtors' creditors that would far outweigh the cost of payment of the Critical Vendor Claims.

9.       The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates.  In order to do so, the Debtors must preserve key business relationships, an objective that the Debtors are especially mindful of as they transition into chapter 11.  Accordingly, except under extraordinary circumstances, payments of Critical Vendor Claims would be contingent on an agreement that the Critical Vendors continue to sell their goods or services to the Debtors on a going-forward basis on terms most favorable to the Debtors in the one-year period preceding the Petition Date.

10.       The Debtors estimate that the maximum amount needed to pay the prepetition claims (excluding those prepetition claims secured by trade liens or entitled to an administrative expense claim under section 503(b)(9) of the Bankruptcy Code) of Critical Vendors is approximately $ 5 million (the "**Critical Vendor Claims Cap**").[4]

11.       Additional information regarding the Debtors' Critical Vendors and their processes for identifying potential Critical Vendors and evaluating potential Critical Vendor

---

[4] In determining the amount of the Critical Vendor Claims Cap, the Debtors have carefully reviewed their suppliers to determine, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers would present an unacceptable risk to the Debtors' operations or the safety of their employees should they cease the provision of truly essential services or supplies and (d) the extent to which suppliers may be able to obtain or have obtained trade liens on equipment, supplies or goods of the Debtors or an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code.  The Debtors then considered the financial condition of each supplier, where that information was known, including the level of dependence each supplier has on the Debtors' continued businesses.  After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services. The Critical Vendor Claims Cap does not include any prepetition claims that the Debtors seek to pay pursuant to other orders entered by this Court in these chapter 11 cases.

Claims can be found in the *Declaration of Paul Hansen, Managing Director of FTI Consulting, Inc.*, which is attached hereto as Exhibit B.

12.     The Debtors' Critical Vendors include the following:

13.     Safety Equipment Suppliers and Service Providers.  Mine safety is the preeminent concern of the Debtors, their employees and federal and state regulators.  The Debtors must comply with a broad array of federal and state regulations in order to ensure the safe working conditions of coal mines and work sites for employees and to mitigate the potential environmental impact of their mining operations.  In order to ensure their employees' safety and comply with government regulations, the Debtors contract with vendors that provide specialized equipment and services to maintain safe working conditions at their mines.  For example, the Debtors must regularly purchase specialized roof controls and other structural supports that meet specific regulatory standards in order to mitigate the risk of catastrophic collapse.  The Debtors must also obtain specialized operating supplies from very limited sources in order to prevent mine explosions and satisfy federal and state safety regulations.  Because of the industry-specific nature of these and similar goods and services, as well as the strict regulatory conditions under which the vendors and the Debtors operate, the Debtors work with a limited number of safety-related vendors for whom there are few, if any, ready substitutes in the market.  Thus, if the Debtors were suddenly forced to change these and similar vendors, they may be forced to suspend operations at their mines due to their inability to meet regulatory requirements while they searched for qualified replacements and obtained new regulatory approvals.  For example, replacing the Debtors' structural support vendors would require the Debtors and their employees to expend significant time and resources in revising their complex mine structural plans, resubmitting such plans to regulators and awaiting regulatory approval.  Such delays and

increased expenses could prove disastrous for the Debtors' continued operations and significantly decrease the value of their estates.

14.    <u>Parts and Equipment Suppliers and Service Providers</u>.  The Debtors operate thermal and metallurgical coal production businesses through which they mine and sell coal to various purchasers and end-users.  In order to conduct their day-to-day business of mining coal, the Debtors require a continuous, reliable and oftentimes daily supply of equipment and parts that are unique to their mining operations.  The Debtors use highly specialized products, devices and facilities, including heavy machinery, engines, tools and batteries, to mine coal and deliver it to their customers.  This equipment, which was designed to extract coal from seams either through surface or underground mining methods, can only be purchased from original equipment manufacturers or after-market mining manufacturers and suppliers.  Most of these components are designed, built and approved according to regulatory requirements of the Mine Safety and Health Administration ("**MSHA**").  Moreover, because of the heightened safety standards the Debtors must meet, many of these machines and parts must receive regulatory approval as part of the Debtors' comprehensive structural support plans for their mines.  Accordingly, the specialized parts the Debtors require to continue their mining operations and remain competitive are only available from sole or limited source suppliers, most of which supply parts to the Debtors based on one-off purchase orders.

15.    Aside from the availability of suppliers, the quality of the suppliers varies widely.  Suppliers differ in the products they carry, the quality of support services they offer, turnaround time from order to delivery, prices, warranties and terms and conditions.  It can take years for the Debtors to work with their suppliers to achieve maximum efficiency and effectiveness in dealing with the Debtors' equipment.  A sudden need to switch multiple suppliers would result, at the

very least, in unnecessary inefficiencies and expenses, would disrupt normal mining operations and would distract the Debtors from their restructuring efforts. It could also compromise the Debtors' ability to ensure employee safety, comply with regulations and fulfill their obligations under customer contracts.

16.    If the Debtors are unable to make payments to the suppliers for their mining equipment and parts, they will face great difficulty locating adequate replacement vendors, severely hindering their operations. This is especially true because the Debtors obtain a portion of their maintenance services and operating supplies from small, specialized vendors on a purchase-order basis, for which there exist no adequate replacements in the marketplace. Failing to pay these vendors would therefore significantly harm the Debtors' operations, employees and creditors, compromising their restructuring efforts.

17.    <u>Maintenance and Repair Providers</u>. The Debtors rely on a number of key vendors for the maintenance and repair of their mining equipment, assets, infrastructure and facilities. The maintenance and repair of these assets require vendors with highly specialized expertise in unique tools, fixtures and equipment and specially trained personnel, including valuable institutional knowledge of the Debtors' equipment and operations.

18.    For example, the Debtors use vendors that specialize in removing, repairing and installing giant mining tires. Such vendors, of which there is a limited number, have contracts with tire manufacturers and have extensive, specialized knowledge that cannot be readily replicated. Similarly, the Debtors rely on maintenance and repair services by engine building vendors that are approved by MSHA and whose repairs must meet strict regulatory standards.

19.    <u>Environmental Testing and Service Providers</u>. Like all other coal mining companies, the Debtors must comply with a broad range of federal and state regulations intended

to mitigate the potential environmental impact of their operations.  In order to assure regulatory compliance and protect the environment around their mining sites, the Debtors contract with a number of specialized vendors providing environmental services.  For instance, the Debtors routinely work with service providers that specialize in reclaiming former coal mines and restoring surfaces and ponds to their pre-mining condition, as required by strict state and federal regulations.  There are substantial, ongoing reclamation processes underway at many of the Debtors' properties, and they are expected to continue.

20.    Without these and similarly specialized vendors, the Debtors could not continue their mining operations without risking noncompliance with important environmental regulations.  Moreover, these environmental vendors occupy a highly specific niche in the market, and the supply of these goods and services is extremely limited.  Preserving the supply of these goods and services is therefore critically important to the Debtors' business operations and to their restructuring efforts.

21.    <u>Drilling and Blasting Service Providers and Suppliers</u>.  The Debtors rely on vendors to transport, handle, store and use explosives and to assist in making determinations, critical to the Debtors' business, of what types of drilling and extraction techniques should be used for particular sites.  These vendors are experts in recently developed mining explosives techniques, know the specific geology in the Debtors' mining sites and have the infrastructure and personnel necessary to service the Debtors adequately.

22.    Alternative providers of these services would be exceedingly difficult and costly to find.  The Debtors' current vendors provide high-quality services that their competitors are unlikely to be able to replicate, and also have put in place the infrastructure on the Debtors' property.

23.   <u>Fuel and Lubricant Providers</u>.  In order to continue operating the equipment in use at their mines, the Debtors must procure large quantities of diesel fuel and lubricant on a daily basis.  A ready fuel and lubricant supply for the Debtors' vehicles, heavy machinery and other mining equipment is critically important to the Debtors' continued operations and successful reorganization.  The Debtors collectively are projected to use approximately 60 million gallons of diesel fuel in 2015, and there is a limited supply of vendors that can meet this high demand in the often remote locations where the Debtors conduct mining operations.  Moreover, because the Debtors have limited tanks for fuel storage in these remote locations, the Debtors must arrange for new fuel and lubricant deliveries on a daily basis.

24.   Losing access to diesel fuel or lubricant for even a short period of time could therefore bring the Debtors' mining operations to a standstill.  In the event the Debtors were forced to replace their existing diesel fuel or lubricant supply arrangements, the Debtors believe that their fuel and lubricant costs could increase dramatically as they attempted to procure alternative fuel services.  Moreover, there can be no assurance that the Debtors would be able to obtain alternative fuel supply services in time to avoid disrupting essential operations.  It is therefore critical that the Debtors have the authority to pay their diesel fuel and lubricant vendors to continue these essential relationships.  Moreover, because of the short trade terms the Debtors have with their fuel and lubricant providers, nearly all prepetition amounts outstanding are on account of fuel and lubricants delivered to the Debtors within 20 days of the Petition Date and therefore likely entitled to an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code.

25.   <u>Raw Material Suppliers</u>.  In order to continue to operate the equipment in use at their mines and meet obligations to customers and counterparties, the Debtors must procure large

quantities of raw materials, including safety supplies, minerals and various materials used to make explosives, on a regular basis. Losing access to these raw materials for even a short period of time could therefore bring the Debtors' mining operations to a standstill. In the event the Debtors were forced to replace their existing raw material supply arrangements, the Debtors believe that their raw material costs would increase dramatically as they attempted to procure alternative services. Moreover, there can be no assurance that the Debtors would even be able to timely obtain alternatives, potentially disrupting essential operations. It is therefore critical that the Debtors have the authority to pay their raw materials vendors to continue these essential relationships.

26.     <u>Technical, Engineering, Permitting, Surveying and Mapping Service Providers and Information Technology Providers</u>. To support their extensive operations, the Debtors maintain significant engineering, information technology and other technical operations. The engineering and technical components of the Debtors' businesses require a number of products, such as software and technical hardware, and services, such as permitting, surveying, environmental and mapping services, to facilitate the Debtors' coal production activities in an environmentally responsible way, as required by the Debtors' mining permits.

27.     The Debtors' businesses also require a complex constellation of management and information systems that must be able to communicate effectively with each other. Coal mining, by its very nature, is information-intensive and technically specialized, and the Debtors rely upon a vast complement of interrelated computer software, hardware systems and other technical equipment. Without steady access to technical equipment, services and information, such as the amount coal in a specific location, the Debtors would be unable to mine coal or conduct their operations.

28.     The infrastructure knowledge of the Debtors' engineers and information technology suppliers is unique to the coal mining industry and, in many cases, specially tailored to the Debtors' businesses.  Maintenance of these services is critical to continuing smooth operations.  The Debtors cannot simply replace these vendors without significant concerns that the new engineering services and information technology systems would be less than completely capable; replacement services and systems would require comprehensive and lengthy training and evaluation.  Even if the Debtors could replace such suppliers and servicers, replacement would take substantial time and would come at great cost to the Debtors' businesses.

Conditions to Payment of Critical Vendor Claims

29.     The Debtors propose that they may, in their sole discretion, condition payment of the Critical Vendor Claims of each Critical Vendor upon an agreement to continue to supply goods or services to the Debtors on such Critical Vendor's "**Customary Trade Terms**"[5] for a period of time and on other such terms and conditions as are acceptable to the Debtors.

30.     The Debtors further propose that if a Critical Vendor accepts payment for a Critical Vendor Claim and later refuses to continue to supply goods or services to the Debtors on the Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such Critical Vendor, then the Debtors may, in their sole discretion, and without further order of the Court: (a) declare that the payment of such creditor's Critical Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Critical Vendor in cash or in goods, (b) demand that the creditor immediately return such payments in respect of the applicable

---

[5] As used herein, " Customary Trade Terms " means, with respect to a Critical Vendor, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates and other applicable terms and programs), that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors in the one-year period prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such Critical Vendor.

Critical Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments or offsets of any type whatsoever and (c) upon recovery of any such payment by the Debtors, reinstate such creditor's Critical Vendor Claim in such an amount as to restore the Debtors and the Critical Vendor to their original positions, as if the agreement had never been entered into and the payment of the Critical Vendor Claim had not been made. In sum, the Debtors will return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

31.    To ensure that Critical Vendors transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures, to be implemented in the Debtors' sole discretion, as a condition to paying any Critical Vendor: (a) that a letter or contract including provisions substantially in the form of the letter attached hereto as <u>Exhibit A</u> (a "**Vendor Agreement**") be delivered to, and executed by, the Critical Vendors along with a copy of the order granting the relief sought herein and (b) that payment of Critical Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the Eastern District of Missouri, dated _____, 2016 in the chapter 11 cases of Arch Coal, Inc., *et al.* (Cases No. __ through __), entitled "Order Authorizing (i) Payment of Certain Prepetition Claims of Critical Vendors, (ii) Payment of 503(b)(9) Claims to Certain Critical Vendors and (iii) Financial Institutions to Honor and Process Related Checks and Transfers" and submits to the jurisdiction of that Court for enforcement thereof.

32.    As a further condition of receiving payment on a Critical Vendor Claim, the Debtors propose that a Critical Vendor must agree to take whatever action is necessary to remove any existing trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Critical Vendor Claim, *provided*, *however*, that the foregoing shall be determined by the Debtors in their sole discretion.

-12-

33.     To the extent that an agreement relating to Critical Vendor Claims is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume the same.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute postpetition assumption, reaffirmation or adoption of the programs, policies or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors reserve all of their rights under the Bankruptcy Code.  In addition, nothing in this Motion shall be an admission as to any lien or interest, including any possessory lien.

<u>Payment of Critical Vendors Is in the Best Interests of the<br/>Debtors' Estates and Their Creditors</u>

34.     While the Debtors expect to secure a continuing postpetition supply of goods and services in most cases through consensual negotiation with the Critical Vendors, the Debtors recognize that their fiduciary duties require them to consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid.  The Critical Vendors are so essential to the Debtors' businesses that the lack of each of their particular goods and services, even for a short duration, would disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share.  This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendors.

35.     The Debtors therefore seek authority to pay, in their sole discretion and business judgment, some or all of the Critical Vendor Claims to maintain their operations.  Without this authority, these Critical Vendors may refuse to continue to supply goods and services to the Debtors postpetition.  As is illustrated above, the Critical Vendors are essential to the Debtors' continuing operations.

36.     The Debtors believe that payment of some or all Critical Vendor Claims owed to Critical Vendors will be necessary to preserve operations and maximize the value of the Debtors' assets for the benefit of all stakeholders.  The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date.  During this period, the Debtors, their attorneys and financial advisors, and their other professionals will be focusing on stabilizing operations and their efforts in chapter 11.  At the same time, while the Debtors are distracted with stabilizing their businesses and strategic planning, Critical Vendors may attempt to assert their considerable leverage and deny provision of goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment.

37.     Furthermore, if the relief sought herein is not granted, Critical Vendors will have no incentive to continue to supply to the Debtors on Customary Trade Terms.  Indeed, certain vendors that have recently become concerned about the Debtors' financial condition have demanded that the Debtors pay for their goods on accelerated payment terms, or on a cash-in-advance or cash-on-delivery basis.  Any further expansion of these activities by other Critical Vendors would be detrimental to the Debtors, their estates and their creditors.

38.     The continued availability of trade credit, in amounts and on terms consistent with those the Debtors have worked hard to obtain over the years, is clearly advantageous to the Debtors.  It allows the Debtors to maintain and enhance necessary liquidity and to focus on returning to profitability.  The Debtors believe that preserving working capital through the retention and reinstatement of their normally advantageous trade credit terms will enable the Debtors to stabilize business operations at this critical time, to maintain their competitiveness and to maximize the value of their businesses for the benefit of all interested parties.  Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods

-14-

or provision of essential services, could spell disaster for the Debtors' restructuring efforts.

Finally, the relief requested herein also may help to avert the institution of numerous reclamation

claims, suits and motions.  Avoiding the time and expense of evaluating and litigating such

claims will provide another incremental benefit for the Debtors, their estates and their creditors.

Any occurrence affecting operations could prolong the Debtors' chapter 11 cases, increase

administrative expenses and jeopardize a successful outcome of these chapter 11 cases.

## **Basis for Relief**

### Payment of Critical Vendor Claims Is Appropriate Under
### Sections 105(a) and 363(b)(1) of the Bankruptcy Code

39.     In a long line of well-established cases, federal courts have consistently permitted

postpetition payment of certain prepetition obligations where necessary to preserve or enhance

the value of a debtor's estate for the benefit of all creditors.  The Court's power to utilize the

"doctrine of necessity" in chapter 11 cases derives from the Court's inherent equity powers and

its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title."  11 U.S.C. § 105(a).  *See, e.g.*, *Carlson v. United States* (*In

re Carlson*), 126 F.3d 915, 920 (7th Cir. 1997) ("Section 105(a) gives the bankruptcy court the

authority to issue any order necessary to carry out the provisions of the Bankruptcy Code."); *In

re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the

bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy

Code."); *Bird v. Crown Convenience* (*In re NWFX, Inc.*), 864 F.2d 588, 590 (8th Cir. 1988)

("The overriding consideration in bankruptcy, however, is that equitable principles govern . . .").

The United States Supreme Court first articulated the doctrine of necessity more than a century

ago, in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization

by the lower court of the use of receivership funds to pay pre-receivership debts owed to

employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309.

40.    This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("While the doctrine [of necessity] was not codified in the Bankruptcy Code, courts have used their equitable power under Section 105(a) of the Code to authorize the payment of prepetition claims . . . ."); *In re Wehrenberg, Inc.*, 260 B.R. 468 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor").  The doctrine is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.  The court in *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'"  Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

41.    Moreover, section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the

-16-

estate." 11 U.S.C. § 363(b)(1).  Debtors' decisions to use, sell or lease assets outside the

ordinary course of business must be based upon the sound business judgment of the debtor.  *In re*

*Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Chateaugay*

*Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b)

application must find from the evidence presented before him or her a good business reason to

grant such application); *In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr.

W.D. Mo. 2010); *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990)

(citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071

(2d Cir. 1983)); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re*

*Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting the standard for

determining a section 363(b) motion is "a good business reason").

42.     Courts emphasize that the business judgment rule is not an onerous standard and

may be satisfied "'as long as the proposed action *appears* to enhance the debtor's estate.'"

*Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th

Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107

F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations

omitted)); *see also In re AbitibiBowater, Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the

business judgment standard is "not a difficult standard to satisfy").  Under the business judgment

rule, "management of a corporation's affairs is placed in the hands of its board of directors and

officers, and the Court should interfere with their decisions only if it is made clear that those

decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and

directors' fiduciary duty to the corporation, are made on the basis of inadequate information or

study, are made in bad faith, or are in violation of the Bankruptcy Code."  *In re Farmland Indus.*,

*Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315

F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th

Cir. 1985) and *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)); *see*

*also In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) ("[w]here the

[debtor's] request is not manifestly unreasonable or made in bad faith, the court should normally

grant approval as long as the proposed action appears to enhance the debtor's estate" (citing

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985))); *In re*

*Farmland Indus. Inc.*, 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) (approving the rejection of

employment agreements and noting that "[u]nder the business judgment standard, the question is

whether the [proposed action] is in the Debtors' best economic interests, based on the Debtors'

best business judgment in those circumstances." (citations omitted)).

     43.     Similar relief has been granted in many other chapter 11 cases. *See, e.g.*, *In re*

*Walter Energy, Inc.*, Case No. 15-02741 (TOM) (Bankr. N.D. Ala. Sept. 4, 2015) (order

authorizing debtors to pay up to $8.2 million in critical vendor claims); *In re Alpha Natural Res.,*

*Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va. Sept. 3, 2015) (order authorizing debtors to

pay up to $44.5 million in critical vendor claims); *In re Patriot Coal Corp.*, Case No. 15-32450

(KLP) (Bankr. E.D. Va. June 4, 2015) (order authorizing debtors to pay up to $22 million in

critical vendor claims); *In re Magnetation LLC*, Case No. 15-50307 (GFK) (Bankr. D. Minn.

May 7, 2015) (order authorizing debtors to pay up to $27.5 million in critical vendor claims); *In*

*re Quicksilver Res. Inc.*, Case No. 15-10585 (LSS) (Bankr. D. Del. Mar. 19, 2015) (interim order

authorizing debtors to pay up to $5 million in critical vendor claims); *In re Allied Nev. Gold*

*Corp.*, Case No. 15-10503 (MFW) (Bankr. D. Del. Mar. 11, 2015) (interim order authorizing

debtors to pay up to $10.9 million in critical vendor claims); *In re ProNerve Holdings, LLC*,

Case No. 15-10373 (KJC) (Bankr. D. Del. Feb. 26, 2015) (order authorizing debtors to pay prepetition claims of certain critical vendors); *In re James River Coal Co.*, Case No. 14-31848 (KRH) (Bankr. E.D. Va. May 9, 2014) (order authorizing debtors to pay up to $7.5 million in critical vendor claims); *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 2, 2012) (order authorizing debtors to pay up to $25 million in critical vendor claims).

44.     The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment and is justified under sections 105(a) and 363(b) of the Bankruptcy Code, and is also in line with the relief granted in many chapter 11 cases.  The Debtors strongly believe that the uninterrupted supply of goods and services, on Customary Trade Terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors.  Authority to pay the Critical Vendors in the ordinary course of the Debtors' businesses is in the best interests of the Debtors' estates and creditors.  Absent such payment, the operations and value of the Debtors' estates will suffer, possibly precipitously.  Thus, the requested relief is necessary to avoid immediate and irreparable harm to the Debtors and to the recovery of all creditors.  This irreparable harm will far outweigh the cost of payment to Critical Vendors.

45.     The Critical Vendor Claims Cap represents the Debtors' best estimate as to how much must be paid to such creditors to continue the supply of critical goods and services.  The Debtors hope to pay significantly less than the requested amount.  The Debtors' proposed Critical Vendor Claims Cap is within the range of amounts awarded by courts in other chapter 11 cases, as noted in the precedents listed above.

<u>Request for Authority to Pay Certain Claims of Critical Vendors
Under Section 503(b)(9) of the Bankruptcy Code</u>

46.     Under section 503(b)(9) of the Bankruptcy Code, claims of Critical Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date are entitled to administrative priority status (the "**Twenty-Day Administrative Claims**").[6]  The Debtors request that payments of Twenty-Day Administrative Claims not count against the Critical Vendor Claims Cap.  As administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors believe that they are authorized to pay the Twenty-Day Administrative Claims of Critical Vendors pursuant to section 363(c)(1) of the Bankruptcy Code.  However, the Debtors also believe that they are not required to reconcile or pay the Twenty-Day Administrative Claims prior to the conclusion of these cases.  As timely payment of the Twenty-Day Administrative Claims will preserve the Debtors' valued relationships with certain Critical Vendors and reduce the chance that the Debtors will face harmful supply disruptions during the initial and most critical phase of the chapter 11 cases, the Debtors request that, for the avoidance of doubt, the Court enter an order clarifying that the Debtors are authorized, but not required, to pay in their sole discretion the Twenty-Day Administrative Claims, or any portion thereof, of any Critical Vendor in the ordinary course of the Debtors' businesses and on such terms and conditions as the Debtors deem appropriate.

---

[6] Section 503(b)(9) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).

Applicable Financial Institutions Should Be Authorized
to Honor and Process Related Checks and Transfers

47.     The Debtors also request that all applicable banks and other financial institutions

be authorized to (a) receive, process, honor and pay all checks presented for payment of, and to

honor all fund transfer requests made by the Debtors related to, the claims that the Debtors

request authority to pay in this Motion, regardless of whether the checks were presented or fund

transfer requests were submitted before or after the Petition Date and (b) rely on the Debtors'

designation of any particular check as approved by the Proposed Order.

**Necessity for Immediate Relief**

48.     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary

to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the

petition, issue an order granting . . . a motion to use, sell, lease, or otherwise incur an obligation

regarding property of the estate, including a motion to pay all or part of a claim that arose before

the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  For all the reasons set forth herein, if the

Debtors are not authorized to pay certain Critical Vendors, immediate and irreparable harm

might be caused to the Debtors' estates.  Accordingly, the relief requested herein is consistent

with Bankruptcy Rule 6003.

**Waiver of Stay Under Bankruptcy Rule 6004(h)**

49.     The Debtors also request that, to the extent applicable to the relief requested in

this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that

"[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until

the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R.

Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is

necessary for the Debtors to operate their businesses without interruption and to preserve value

for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### Notice

50.      Notice of this Motion has been provided to counsel to the administrative agent and counsel to the lenders under the Debtors' proposed debtor in possession secured credit facility, counsel to the administrative agent and counsel to that certain ad hoc group of majority prepetition senior secured lenders under the Debtors' prepetition secured credit facility, the Debtors' 30 largest unsecured creditors, and the Office of the United States Trustee for the Eastern District of Missouri, the Internal Revenue Service, the Securities and Exchange Commission, the United States Department of the Interior, the United States Department of Labor and the United States Attorney's Office for the Eastern District of Missouri (collectively, the "**Notice Parties**").  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that this Court:

(a)      grant the Debtors the authority in their sole discretion, but not require them, to pay all or a portion of their prepetition obligations to certain Critical Vendors up to the Critical Vendor Claims Cap;

(b)      grant the Debtors the authority in their sole discretion, but not require them, to pay claims of Critical Vendors  for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date;

(c)      authorize financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing; and

(d)      grant the Debtors such other and further relief as is just and proper.

Dated:    January 11, 2016
          St. Louis, Missouri

Respectfully submitted,

BRYAN CAVE LLP


/s/ Brian C. Walsh
Lloyd A. Palans, #22650MO
Brian C. Walsh, #58091MO
Cullen K. Kuhn, #53151MO
Laura Uberti Hughes, #60732MO

One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000
Fax:  (314) 259-2020
lapalans@bryancave.com
brian.walsh@bryancave.com
ckkuhn@bryancave.com
laura.hughes@bryancave.com

*Proposed Local Counsel to the Debtors and
Debtors in Possession*

-and-

DAVIS POLK & WARDWELL LLP

Marshall S. Huebner
Brian M. Resnick
Michelle M. McGreal
Kevin J. Coco

450 Lexington Avenue
New York, New York  10017
(212) 450-4000
Fax:  (212) 607-7983
marshall.huebner@davispolk.com
brian.resnick@davispolk.com
michelle.mcgreal@davispolk.com
kevin.coco@davispolk.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

-23-

**SCHEDULE 1**
**Debtor Entities**

1. ACI Terminal, LLC
2. Allegheny Land Company
3. Apogee Holdco, Inc.
4. Arch Coal, Inc.
5. Arch Coal Sales Company, Inc.
6. Arch Coal West, LLC
7. Arch Development, LLC
8. Arch Energy Resources, LLC
9. Arch Reclamation Services, Inc.
10. Arch Western Acquisition Corporation
11. Arch Western Acquisition, LLC
12. Arch Western Bituminous Group, LLC
13. Arch Western Finance LLC
14. Arch Western Resources, LLC
15. Arch of Wyoming, LLC
16. Ark Land Company
17. Ark Land KH, Inc.
18. Ark Land LT, Inc.
19. Ark Land WR, Inc.
20. Ashland Terminal, Inc.
21. Bronco Mining Company, Inc.
22. Catenary Coal Holdings, Inc.
23. Catenary HoldCo, Inc.
24. Coal-Mac, Inc.
25. CoalQuest Development LLC
26. Cumberland River Coal Company
27. Energy Development Co.
28. Hawthorne Coal Company, Inc.
29. Hobet Holdco, Inc.
30. Hunter Ridge, Inc.
31. Hunter Ridge Coal Company
32. Hunter Ridge Holdings, Inc.
33. ICG, Inc.
34. ICG, LLC
35. ICG Beckley, LLC
36. ICG East Kentucky, LLC
37. ICG Eastern, LLC
38. ICG Eastern Land, LLC
39. ICG Illinois, LLC
40. ICG Knott County, LLC
41. ICG Natural Resources, LLC
42. ICG Tygart Valley, LLC
43. International Coal Group, Inc.
44. Jacobs Ranch Coal LLC
45. Jacobs Ranch Holdings I LLC
46. Jacobs Ranch Holdings II LLC
47. Juliana Mining Company, Inc.
48. King Knob Coal Co., Inc.
49. Lone Mountain Processing, Inc.
50. Marine Coal Sales Company
51. Melrose Coal Company, Inc.
52. Mingo Logan Coal Company
53. Mountain Coal Company, L.L.C.
54. Mountain Gem Land, Inc.
55. Mountain Mining, Inc.
56. Mountaineer Land Company
57. Otter Creek Coal, LLC
58. Patriot Mining Company, Inc.
59. P.C. Holding, Inc.
60. Powell Mountain Energy, LLC
61. Prairie Coal Company, LLC
62. Prairie Holdings, Inc.
63. Saddleback Hills Coal Company
64. Shelby Run Mining Company, LLC
65. Simba Group, Inc.
66. Thunder Basin Coal Company, L.L.C.
67. Triton Coal Company, L.L.C.
68. Upshur Property, Inc.
69. Vindex Energy Corporation
70. Western Energy Resources, Inc.
71. White Wolf Energy, Inc.
72. Wolf Run Mining Company