### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| In re:<br><br><br>**ARCH COAL, INC.,** *et al.,*<br><br><br>Debtors.[1] | **Chapter 11**<br>**Case No. 16-40120**<br><br>**(Joint Administration**<br>**Proposed)**<br><br>**Hearing Date and Time:**<br>TBD<br><br>**Hearing Location:**<br>TBD |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507(b) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363(c)(2), 364 AND 507(b) AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

NOW COME Arch Coal, Inc. (the "**Borrower**") and its subsidiaries that are debtors and

debtors in possession in these proceedings (collectively, the "**Debtors**") and move this Court for

entry of an interim order and a final order (respectively, the "**Interim Order**" and the "**Final**

**Order**" and each a "**DIP Order**", and collectively, the "**DIP Orders**") authorizing the Debtors

to obtain postpetition financing and utilize cash collateral and granting adequate protection to

prepetition secured creditors.  In support of this motion (the "**Motion**"), the Debtors show the

Court as follows:

---

[1] The Debtors are listed on Schedule 1 attached hereto.  The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

**Preliminary Statement**

1.       In the face of unprecedented declines in the coal market, as more fully described in the Drexler Declaration (as defined below), the Debtors have turned to chapter 11 in order to restructure their balance sheet and achieve breathing room during these challenging conditions. In order to ensure their continued operations during chapter 11 and assure stakeholders of their ability to restructure expeditiously, the Debtors are seeking immediate approval to enter into a superpriority, priming lien debtor in possession financing (the "**DIP Financing**"), consisting of a $275 million delayed draw term loan facility (the "**DIP Loans**"), as well as the use of the Prepetition Lenders' (as defined below) collateral, including cash collateral ("**Prepetition Collateral**").  Together, the Debtors' existing resources and the liquidity to be provided by the DIP Loans will enable the Debtors to fund their operations during the course of these chapter 11 cases (these "**Cases**"), as they preserve and maximize the value of their estates for the benefit of all parties in interest.

2.       In addition to being a source of liquidity, the DIP Financing will enable the Debtors' restructuring in two critical ways.  First, it will allow the Debtors to continue to comply with their regulatory obligations by allowing the Debtors to incur up to $75 million of superpriority claims in connection with the Debtors' self-bonding obligations to certain governmental authorities, including in respect of environmental obligations.  Second, it will permit certain of the Debtors to continue selling and/or contributing receivables pursuant to an amendment and restatement of the Debtors' existing $200 million receivables securitization facility, pursuant to which the Debtors obtain letters of credit to secure the payment or performance of certain obligations in respect of, among other things, crucial environmental and

workers' compensation obligations owed to state and federal regulatory agencies, surety bond providers, insurers and other third parties.[2]

3.        Importantly, the Debtors commenced these cases with the support of their Prepetition Lenders, a group of whom have agreed to the terms and conditions of the DIP Credit Agreement (as defined below).  In the weeks leading up to the Petition Date, in connection with negotiating the DIP Financing, the Debtors also negotiated with certain of their Prepetition Lenders regarding the use of the Prepetition Lenders' collateral and a consensual framework for these chapter 11 cases.  As a result of these negotiations, the Prepetition Lenders have agreed, in connection with the proposed DIP Financing, to allow the Debtors to continue to use their Prepetition Collateral during these cases in exchange for the adequate protection proposed to be provided in the DIP Orders.  The Debtors and Prepetition Lenders holding more than fifty percent of outstanding loans under the Prepetition Credit Agreement have also agreed on the principal terms of a plan of reorganization and post-reorganization capital structure, as set forth in the term sheet attached as Exhibit A to Declaration of John T. Drexler, Senior Vice President and Chief Financial Officer of Arch Coal, Inc., in support of the Debtors' Chapter 11 Proceedings and First Day Pleadings filed substantially contemporaneously herewith (the "**Drexler Declaration**").

4.        The proposed DIP Financing reflects the best terms available given the Debtors' existing secured indebtedness and the rapid and continuing deterioration of the coal market over the course of the last several months.  The Debtors believe that immediate approval to enter into

---

[2] The Debtors are seeking to amend and continue the securitization facility pursuant to the *Debtors' Motion for Entry of Interim and Final Orders Pursuant To 11 U.S.C. §§ 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(e) and 365 and Bankruptcy Rule 4001 (i) Authorizing Certain Debtors to Continue Selling and Contributing Receivables and Related Rights Pursuant to the Securitization Facility, (ii) Modifying the Automatic Stay and (iii) Granting Related Relief* (the "**Securitization Motion**"), filed substantially contemporaneously herewith.  The Securitization Motion describes at greater length the significant benefit of continuing the facility.

-3-

DIP Financing is critical to sending a signal to the Debtors' vendors, suppliers, customers, regulators and approximately 4,600 employees that the Debtors intend, and will have the ability, to maintain current operations and successfully emerge from chapter 11.

5.        Obtaining approval to enter into the DIP Financing and the use of the Prepetition Collateral (including Cash Collateral) on the terms proposed is well within the sound discretion of the Debtors, as it will allow the Debtors to preserve and maximize the value of their estates for the benefit of all parties in interest.  The Debtors have no significant unencumbered assets they can use to secure additional indebtedness, and, in light of current conditions in the coal markets, it is uncertain whether they will be able to generate sufficient liquidity to meet their obligations as they come due.  The proposed adequate protection package is reasonable, customary and goes hand-in-hand with the Prepetition Lenders' consent to the use of their Cash Collateral and willingness to provide the DIP Financing.  Accordingly, the Debtors believe that authorization to enter into the DIP Financing and use the Cash Collateral, in each case on the terms as described herein, is in the best interests of the Debtors and their estates and should be granted.

## Relief Requested

6.        By this Motion, and pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Rules of the Bankruptcy Court for the Eastern District of Missouri, the Debtors seek entry of the DIP Orders granting the following relief:

(a)        authorization for the Borrower to obtain the DIP Financing, and all of the other Debtors (other than the Bonding Subsidiaries and the Inactive Subsidiaries (each as defined in the Interim Order)) (the "**Guarantors**") to guaranty the Borrower's obligations

-4-

in connection with the DIP Financing, consisting of the DIP Loans in the aggregate principal amount of $275,000,000 from a syndicate of financial institutions (solely in such capacities, the "**DIP Lenders**"), all on the terms and conditions set forth in the DIP Orders and the DIP Documents (each as defined below);

(b)         authorization for the Debtors to execute and enter into the Superpriority Secured Debtor-in-Possession Credit Agreement among the Borrower, the Guarantors, the DIP Lenders and Wilmington Trust, National Association, acting as administrative agent and collateral agent (solely in such capacities, the "**DIP Agent**") substantially in the form attached hereto as Exhibit A (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**"; together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, including, without limitation, the Collateral Documents (as defined in the DIP Credit Agreement), the "**DIP Documents**") and to perform such other and further acts as may be required in connection with the DIP Documents;

(c)         the grant of adequate protection to the Prepetition Agent (as defined below) and the Prepetition Lenders under or in connection with that certain: (i) Amended and Restated Credit Agreement, dated as of June 14, 2011 (as heretofore amended, restated, supplemented or otherwise modified, the "**Prepetition Credit Agreement**"), among the Borrower, the lenders from time to time party thereto (the "**Prepetition Lenders**"), Wilmington Trust, National Association, as successor term loan administrative agent (solely in such capacity, the "**Prepetition Administrative Agent**") and Wilmington Trust, National Association, acting as successor collateral agent (solely

-5-

in such capacity and, together with PNC Bank National Association ("**PNC**"), in its capacity as bailee or sub-agent to the successor collateral agent, the "**Prepetition Collateral Agent**" and, together with the Prepetition Administrative Agent and the Prepetition Control Agent (as defined in the ICA (as defined below)), the "**Prepetition Agent(s)**"), the Prepetition Agent(s) and the Prepetition Lenders are collectively referred to herein as the "**Prepetition Lender Parties**"); (ii) Amended and Restated Security Agreement (Borrower), dated as of June 14, 2011, between the Borrower and the Prepetition Collateral Agent (as heretofore amended, restated supplemented or otherwise modified, the "**Borrower Security Agreement**"); (iii) Amended and Restated Continuing Guaranty and Suretyship Agreement dated as of June 14, 2011 (as heretofore amended, restated, supplemented or otherwise modified, the "**Prepetition Guaranty**") among the Debtors party thereto (whether as an original signatory thereto, by joinder or otherwise) (the "**Prepetition Guarantors**") and the Prepetition Administrative Agent; and (iv) Amended and Restated Security Agreement (Guarantors), dated as of June 14, 2011, between the Guarantors and the Prepetition Collateral Agent (as heretofore amended, restated, supplemented or otherwise modified, the "**Guarantor Security Agreement**" and, together with the Borrower Security Agreement, the "**Security Agreements**" and, collectively with the Prepetition Credit Agreement, the Prepetition Guaranty, the ICA, the Amended and Restated Collateral Sharing Agreement, dated as of May 16, 2016, among the Prepetition Administrative Agent, the Prepetition Collateral Agent, the swap parties referred to therein, the Borrower and the Prepetition Guarantors (the "**CSA**"), the Intercompany Subordination Agreement, dated as of June 14, 2011, among the Borrower, the Guarantors and the Prepetition Administrative Agent, and the

-6-

mortgages and all other documentation executed in connection with all of the foregoing, the "**Existing Loan Agreements**"), whose liens and security interests are being primed by the DIP Liens (as defined below) granted in respect of the DIP Financing;

      (d)     the grant of adequate protection to the Prepetition Second Lien Notes Trustee (as defined below) and the noteholders (solely in such capacities, the "**Prepetition Second Lien Noteholders**") under or in connection with that certain indenture, dated as of December 17, 2013, between UMB Bank National Association, as trustee and collateral agent (solely in such capacities, the "**Prepetition Second Lien Notes Trustee**" and, together with the Prepetition Second Lien Noteholders, the "**Prepetition Second Lien Noteholder Parties**"), the Borrower and the guarantors listed therein for the issuance of 8.000% senior secured second lien notes due 2019 (the "**Prepetition Second Lien Notes Indenture**" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Prepetition Second Lien Notes Trustee, for its benefit and for the benefit of the Prepetition Second Lien Noteholders, the "**Existing Notes Agreements**" and, together with the Existing Loan Agreements, the "**Existing Agreements**"), whose liens and security interests are junior to the Prepetition Lender Liens (as defined below) and shall be junior to the DIP Liens and the Prepetition Lender Adequate Protection Liens (as defined in the Interim Order);

      (e)     authorization for the Debtors to continue to use Cash Collateral and all other personal and real property in which any of the Prepetition Lender Parties or the Prepetition Second Lien Noteholder Parties (collectively, the "**Prepetition Secured Parties**") have an interest (the "**Prepetition Collateral**"), and the granting of adequate

protection to the Prepetition Lender Parties and the Prepetition Second Lien Noteholder Parties with respect to, inter alia, such use of their Cash Collateral and the other Prepetition Collateral;

(f)      approval of certain stipulations by the Debtors with respect to the Existing Loan Agreements and the liens and security interests arising therefrom;

(g)      the grant of superpriority claims to the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof (including, subject only to and effective upon entry of the Final Order, any Avoidance Proceeds (as defined below)), subject to the Fees Carve-Out (as defined below) and the Bonding Carve-Out (as defined below);

(h)      subject only to and effective upon entry of the Final Order, the limitation of the Debtors' right to surcharge the Prepetition Collateral and the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(i)      modification of the automatic stay to the extent set forth herein and in the DIP Documents;

(j)      to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of an order granting the Motion on an interim basis (i) authorizing the Debtors' use of Cash Collateral and all other Prepetition Collateral and (ii) granting the adequate protection described herein; and

(k)      that this Court schedule a final hearing (the "**Final Hearing**") to be held within 45 days of the entry of this Interim Order to consider entry of the Final Order

-8-

approving the relief herein on a final basis and authorizing the Borrower to borrow from

the DIP Lenders under the DIP Documents up to the full amount of the DIP Financing

and the Guarantors to guaranty all obligations owing to the DIP Lenders under the DIP

Documents.

### Jurisdiction

7.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of

this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2).

### Background

8.      The Debtors filed voluntary petitions for relief under chapter 11 of the

Bankruptcy Code on January 11, 2016 (the "**Petition Date**").

9.      The Debtors have continued in possession of their property and have continued to

operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or

examiner, and no official committee has been appointed in these cases.

10.     Additional information about the Debtors' businesses and the events leading up to

the Petition Date can be found in the Drexler Declaration, filed substantially contemporaneously

herewith, and the Buschmann Declaration, attached hereto as Exhibit B, in each case

incorporated herein by reference.

### The Debtors' Prepetition Obligations

11.     The Debtors have approximately $2.2 billion in secured indebtedness and related

obligations, consisting principally of: (a) approximately $1.9 billion in term loans under the

Prepetition Credit Agreement and (c) $350 million in aggregate principal amount of 8.00%

senior secured second lien notes due 2019 (the "**Prepetition Second Lien Notes**") issued under

the Prepetition Second Lien Notes Indenture.  Additionally, the Debtors have approximately $2.9

billion in aggregate principal amount of senior unsecured notes issued in four separate tranches

(as described in paragraph 15 below) (the "**Prepetition Senior Unsecured Notes**").  A

significant source of liquidity for the Debtors is a $200 million prepetition receivables facility

(the "**Securitization Facility**"), pursuant to which the Debtors sell or contribute trade

receivables to non-Debtor, Arch Receivable Company, LLC ("**Arch Receivable**"), which

obtains letters of credit to support the operations of the Debtors.

Prepetition Credit Agreement

12.     The Borrower, as borrower, and certain of the other Debtors, as guarantors, are

party to the Prepetition Credit Agreement, under which the Borrower incurred $1.4 billion in

term loans, issued at a 1% discount, in May 2012.  In November 2012, the Borrower incurred an

incremental $250 million in term loans under the same facility, also at a 1% discount.  In

December 2013, the parties to the Prepetition Credit Agreement entered into an amendment that

increased the maximum amount of term loans allowed under the facility, and the Borrower

incurred an incremental $300 million aggregate principal amount of term loans, issued at a 2%

discount.  The indebtedness under the Prepetition Credit Agreement is secured by liens (the

"**Prepetition Lender Liens**") on assets pledged by the Borrower and the Prepetition Guarantors,

including, among other things, equity interests in wholly owned subsidiaries, certain real

property interests and inventory.

13.     Prior to November 11, 2015, the Prepetition Credit Agreement also provided for a

$250 million senior secured revolving credit facility (the "**Prepetition Revolving Facility**").  On

November 11, 2015, the Debtors terminated the Prepetition Revolving Facility.  There were no

loans outstanding under the Prepetition Revolving Facility at the time it was terminated.

<u>Prepetition Senior Second Lien Notes</u>

14.     In December 2013, the Borrower issued $350 million aggregate principal amount

of the Prepetition Second Lien Notes at par.  The Prepetition Second Lien Notes are guaranteed

by certain of the Debtors.  The Prepetition Second Lien Notes are secured by liens (the

"**Prepetition Notes Liens**" and, together with the Prepetition Lender Liens, the "**Prepetition**

**Liens**") on the same assets that secure indebtedness under the Prepetition Credit Agreement, but

on a second priority basis, subject to certain exceptions and permitted liens.  As of the Petition

Date, $350 million in aggregate principal amount of the Prepetition Second Lien Notes remains

outstanding.

<u>Prepetition Senior Unsecured Notes</u>

15.     In November 2012, the Borrower issued $375 million aggregate principal amount

of 9.875% senior unsecured notes due 2019 at an issue price of 95.934% of the face amount.

The Borrower also has outstanding $500 million in aggregate principal amount of 7.25% senior

unsecured notes due in 2020, $1.0 billion of 7.00% unsecured senior notes due 2019 and $1.0

billion of 7.25% unsecured senior notes due 2021.

<u>Securitization Facility</u>

16.     The Debtors' $200 million Securitization Facility is the sole means by which the

Debtors obtain letters of credit to support their operations.  Pursuant to the Securitization

Facility, certain of the Debtors' trade receivables are sold to Arch Receivable, which may obtain

advances of funds or letters of credit pursuant to that certain Amended and Restated Receivables

Purchase Agreement, dated as of February 24, 2010, among Arch Receivable, as seller, Arch

Coal Sales Company, Inc., as initial servicer, PNC, as administrator and the various other parties

thereto.  The Debtors are seeking to amend and continue the Securitization Facility postpetition,

as described in greater detail in the Securitization Motion.  Absent the relief requested in the

Securitization Motion, the Securitization Facility would automatically terminate and begin to

wind down as of the Petition Date.  As of the Petition Date, there were $178 million of letters of

credit outstanding under the Securitization Facility, which were secured by eligible accounts

receivable and approximately $97 million of cash collateral.

<u>Other Prepetition Liens</u>

17.     In the ordinary course of business, the Debtors have incurred certain secured

indebtedness as permitted under the Prepetition Credit Agreement and the Prepetition Second

Lien Notes Indenture.  These permitted liens will not be subordinated to the DIP Liens or

Adequate Protection Liens.

<u>Surety Bonds and Self-Bonding</u>

18.     Federal and state laws require the Debtors to assure payment of certain long-term

obligations related to, *inter alia*, mine closure or reclamation costs, water treatment, federal and

state workers' compensation programs and federal coal leases.  In most states in which the

Debtors operate, they satisfy these requirements by obtaining surety bonds from third-party

surety providers; however, in Wyoming, the Debtors are qualified by applicable state regulations

to self-bond with respect to a substantial portion of these obligations.  As of the Petition Date,

the Debtors had $266 million in outstanding third-party commercial surety bonds and are self-

bonded with respect to approximately $490 million in reclamation bonds in favor of the

Wyoming Department of Environmental Quality's Land Quality Division.

## Summary Terms of DIP Facility[3]

19.    Pursuant to Bankruptcy Rule 4001(b), (c) and (d), the following is a concise

statement and summary of the proposed material terms of the DIP Facility, as specified in the

DIP Documents and the DIP Orders:[4]

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Arch Coal, Inc. as Debtor and Debtor in Possession<br><br>*See* **DIP Credit Agreement § 1.01 (Definition of "Borrower").** |
| **Guarantor Subsidiaries**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Superpriority secured guarantees provided by all existing wholly owned domestic subsidiaries of the Borrower, and all newly created or acquired wholly owned domestic subsidiaries of the Borrower; <u>provided</u> that the following subsidiaries of the Borrower shall not be required to become guarantors: (i) Arch Receivable, (ii) bonding subsidiaries and (iii) inactive subsidiaries.<br><br>*See* **DIP Credit Agreement § 1.01 (Definitions of "Guarantor", "Significant Subsidiary" and "Non-Guarantor Subsidiary").** |
| **DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The financial institutions from time to time party to the DIP Credit Agreement.<br><br>*See* **DIP Credit Agreement § 1.01 (Definition of "Lenders").** |
| **Agent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Wilmington Trust, National Association<br><br>*See* **DIP Credit Agreement § 1.01 (Definition of "Agent").** |
| **Use of Proceeds**<br>*Bankruptcy Rule 4001(c)(1)(B)* | (i) For general corporate and working capital purposes and (ii) to pay for fees and expenses associated with the DIP Credit Agreement and the Cases.<br><br>*See* **DIP Credit Agreement § 8.01(i).** |

---

[3] The following summary is included for convenience only and is qualified in its entirety by reference to the definitive DIP Documents, which shall control in the event of any inconsistency.

[4] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Credit Agreement.

-13-

| MATERIAL TERMS OF THE DIP FINANCING | |
| --- | --- |
| **Commitments**<br>*Bankruptcy Rule 4001(c)(1)(B)* | $275 million Superpriority Secured Debtor-in-Possession credit facility (the "**DIP Facility**") consisting of the DIP Loans that may be funded in not more than two draws not later than four months after the effective date of the DIP Facility (such four-month period, the "**Availability Period**"); provided that no such draw may occur prior to entry of the Final Order.  Any portion of the DIP Loans commitment that has not been funded on or prior to the end of the Availability Period shall be permanently cancelled.<br><br>*See* **DIP Credit Agreement §§ 1.01 (Definition of "Availability End Date") and 2.01.** |
| **Maturity and Termination Date**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Earliest of (i) January 31, 2017, (ii) the consummation of the sale of all or substantially all of the assets of the Borrower and the Guarantors pursuant to section 363 of the Bankruptcy Code and (iii) the date of the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of the DIP Credit Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.<br><br>*See* **DIP Credit Agreement § 1.01 (Definition of "Termination Date").** |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Commitment Fee:  500 bps on initial commitments to the DIP Loans, earned on the Effective Date of the DIP Credit Agreement and due and payable upon entry of the Interim Order.<br><br>Unused Line Fee:  500 bps per annum on the undrawn commitments, payable monthly in arrears accruing from the Effective Date of the DIP Credit Agreement until the Availability End Date or, if earlier, the date on which the unused commitments are terminated.<br><br>Commitment Termination Fee:  100 bps on any amounts cancelled at the Borrower's option during the Availability Period and on any amounts permanently cancelled as a result of the expiration of the Availability Period.<br><br>*See* **DIP Credit Agreement §§ 2.04(a), 2.08(a), 7.01(n).** |
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)* | (a) LIBOR Rate + 900 bps (subject to a LIBOR floor of 1.0%) or (b) the Base Rate + 800 bps.<br><br>*See* **DIP Credit Agreement §1.01 (Definitions of "Applicable Margin" and "LIBOR Rate").** |
| **Voluntary Prepayments/ Reductions of Commitments** | The Borrower shall have the right at its option from time to time to prepay the DIP Loans in whole or part without premium or penalty; provided, that the Borrower will pay a fee of 1.00% of any amounts prepaid within the Availability Period.<br><br>*See* **DIP Credit Agreement §5.06(a).** |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Mandatory Prepayments** | The DIP Credit Agreement will contain the following mandatory prepayments: 100% of net cash proceeds of (i) debt issuances (other than debt permitted to be incurred under the terms of the DIP Credit Agreement), (ii) non-ordinary course asset sales or dispositions in excess of $50 million in the aggregate (with no individual asset sale or disposition in excess of $7.5 million) and (iii) any casualty event in excess of $50 million in the aggregate, subject to customary reinvestment rights, in each case to be applied to prepay the DIP Loans; *provided* that each DIP Lender will have the right to decline to receive its pro rata portion of any mandatory prepayment payable under clauses (ii) and (iii) above.<br><br>*See* **DIP Credit Agreement §5.06(b).** |
| **Collateral, Priority and Adequate Protection**<br>*Bankruptcy Rule 4001(c)(1)(B)(i) and (ii)* | Collateral: First priority lien (priming, where applicable) on all encumbered and unencumbered assets (subject to customary exceptions to be mutually agreed, including, without limitation, equity interests in joint ventures to the extent prohibited by the applicable joint venture documentation (but, for the avoidance of doubt, the proceeds of such equity interests shall constitute Collateral)) (the "**DIP Liens**"), subject to the Bonding Carve-Out and the Fees Carve-Out.<br><br>*See* **DIP Credit Agreement §5.13; Interim Order ¶¶ 7, 8.**<br><br>Priority: Superpriority administrative claim against each Borrower and Guarantor, subject to the Bonding Carve-Out and the Fees Carve-Out.<br><br>*See* **DIP Credit Agreement §5.13; Interim Order ¶¶ 7, 8.**<br><br>Adequate Protection: The Debtors will be authorized to use all Cash Collateral subject to the terms of the DIP Orders, including, without limitation, the following adequate protection package for the Prepetition Secured Parties:<br><br>The Prepetition Lender Parties will be granted, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Agent's and the Prepetition Lenders' interest in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition Agent's security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and the DIP Orders, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition Lender Adequate Protection Claim**"). In consideration of the Prepetition Lender Adequate Protection Claim, the Prepetition Lender Parties will be granted the following (collectively, the "**Prepetition Lender Adequate Protection Obligations**"):<br><br>a. *Adequate Protection Liens.* The Prepetition Agent (for itself and for the benefit of the Prepetition Lenders) will be granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of such diminution, a valid, |

| MATERIAL TERMS OF THE DIP FINANCING |
|---|

|  | perfected replacement security interest in and lien upon all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds (as defined in the Interim Order), subject and subordinate only to (i) the DIP Liens and any liens to which the DIP Liens are junior, (ii) the Fees Carve-Out and iii) the Bonding Carve-Out (the "**Prepetition Lender Adequate Protection Liens**");<br><br>b. *Section 507(b) Claim*. The Prepetition Agent and the Prepetition Lenders will be granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Lender Adequate Protection Claim with, except as set forth in the Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition Lender 507(b) Claim**"); which Prepetition Lender 507(b) Claim shall have recourse to and be payable from all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds. The Prepetition Lender 507(b) Claim shall be subject and subordinate only to (i) the Fees Carve-Out, (ii) the Bonding Carve-Out and (iii) the Superpriority Claims (as defined in the Interim Order) granted in respect of the DIP Obligations (as defined in the Interim Order). Except to the extent expressly set forth in the Interim Order or the DIP Credit Agreement, the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property or other amounts in respect of the Prepetition Lender 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claim having a priority superior to or pari passu with the Superpriority Claims have indefeasibly been paid in cash in full and the Commitments have been terminated;<br><br>c. *Interest, Fees and Expenses of Prepetition Agent*. The Prepetition Agent shall receive from the Debtors for the benefit of the Prepetition Lenders: (i) within one Business Day following entry of the Interim Order, immediate cash payment of all accrued and unpaid interest (at the non-default contract rate) on the Prepetition Debt (as defined in the Interim Order) that is due and owing under the Prepetition Credit Agreement as of the Petition Date and all other accrued and unpaid fees and disbursements owing to the Prepetition Agent and the Prepetition Lenders and, in each case, chargeable and reimbursable under the Prepetition Credit Agreement as of the Petition Date; (ii) current cash payments of all reasonable fees and expenses payable to the Prepetition Administrative Agent and the Prepetition Collateral Agent under the Existing Loan Agreements, including, but not limited to, the reasonable and documented fees and disbursements of one lead counsel and one local counsel to the Prepetition Agent(s), which payments shall be made in the manner provided for in paragraph 13(e) of the Interim Order; and (iii) cash payments in an amount equal to the amount of interest on the Prepetition Debt at the non-default contract rate applicable on the Petition Date (including LIBOR pricing options, which shall remain available until such time as the LIBOR Rate Loans (as defined in the Prepetition Credit Agreement) expire, at which such time such loans will accrue interest at the Base Rate provided for under the Prepetition Credit Agreement) under the Prepetition Credit Agreement in accordance with the terms thereof on the dates provided for such interest payments under the Prepetition Credit Agreement; provided, that |

| MATERIAL TERMS OF THE DIP FINANCING |
|---|

the Prepetition Agent and the Prepetition Lenders shall reserve the right to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Prepetition Credit Agreement to the extent permitted by the Bankruptcy Code, and the Debtors shall reserve all rights to object thereto; and provided further that all parties reserve all rights to assert that any payments made by the Debtors on account of the Prepetition Lender Adequate Protection Obligations constitute and may be reallocated or recharacterized as principal repayments on account of the Prepetition Debt. All defenses of the Prepetition Agent and the Prepetition Lenders to any effort to reallocate or recharacterize such payments are expressly reserved;

d.  *Fees and Expenses of Ad Hoc Committee of Prepetition Lenders*. The ad hoc committee of Prepetition Lenders constituting the Required Lenders (as defined in the Prepetition Credit Agreement) shall receive current cash payments of the actual, reasonable and documented fees and disbursements of Kaye Scholer LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP, one local counsel and one financial advisor, which payments shall be made in the manner provided for in paragraph 13(e) of the Interim Order;

e.  *Payment of Fees and Expenses*. The payment of the fees, expenses and disbursements set forth in paragraphs 13(c) and 13(d) of the Interim Order shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the Creditors' Committee and the U.S. Trustee (each as defined below) (the "**Review Period**") of invoices therefor (the "**Invoiced Fees**") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date. The invoices for such Invoiced Fees shall include the number of hours billed and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; provided, however, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information; and (ii) shall not be required to contain individual time detail. The Debtors, the Creditors' Committee and the U.S. Trustee may object to any portion of the Invoiced Fees (the "**Disputed Invoiced Fees**") within the Review Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice to the Prepetition Agent and the Prepetition Lenders of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees; provided, however, that payment of Invoiced Fees shall not be delayed based on any objections thereto.

f.  *Adequate Protection Milestones and Financial Covenants*. The Prepetition Agent, on behalf of itself and the Prepetition Lenders, will be entitled to performance of those certain case milestones set forth in section 8.01(p) of the DIP Credit Agreement and those certain financial covenants set forth in sections 8.02(h) and 8.02(s) of the DIP Credit Agreement (in each case, as may be waived, amended, modified or extended from time to time by the Required Lenders) (the "**Adequate Protection Milestones and Covenants**");

g.  *Reporting*. The Debtors shall promptly provide the Prepetition Agent with all required written financial reporting and other periodic reporting that is provided to the DIP Agent or the DIP Lenders pursuant to section 8.03 of the

-17-

| MATERIAL TERMS OF THE DIP FINANCING |
|---|

DIP Credit Agreement; and

    h.   The Adequate Protection Milestones and Covenants and reporting obligations in subparagraphs (f) and (g) above shall survive any termination of the DIP Credit Agreement or the Commitments thereunder. Following any such termination of the DIP Credit Agreement or the Commitments thereunder, the Adequate Protection Milestones and Covenants may be waived, amended, modified or extended from time to time by the Required Lenders (as defined in the Prepetition Credit Agreement).

The Prepetition Second Lien Noteholder Parties will be granted, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, adequate protection of their interests in the Prepetition Collateral, for and equal in amount to the aggregate diminution in the value of the Prepetition Second Lien Notes Trustee's and the Prepetition Second Lien Noteholders' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition Second Lien Notes Trustee's and the Prepetition Second Lien Noteholders' security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Noteholder Adequate Protection Claim**" and, together with the Prepetition Lender Adequate Protection Claim, the "**Adequate Protection Claims**"). As adequate protection of the Noteholder Adequate Protection Claim, the Prepetition Notes Trustee and the Prepetition Noteholders will be granted the following (collectively, the "**Noteholder Adequate Protection Obligations**" and, together with the Prepetition Lender Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

    a.   *Noteholder Adequate Protection Liens*. The Prepetition Second Lien Notes Trustee (for itself and for the benefit of the Prepetition Second Lien Noteholders) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of such diminution, a replacement security interest in and lien upon all of the Collateral, subject and subordinate to: (i) the DIP Liens and any liens to which the DIP Liens are junior; (ii) the Prepetition Lender Adequate Protection Liens; (iii) the Fees Carve-Out; (iv) the Bonding Carve-Out; and (v) the Prepetition Lender Liens (the "**Noteholder Adequate Protection Liens**" and, together with the Prepetition Lender Adequate Protection Liens, the "**Adequate Protection Liens**"); and

    b.   *Noteholder Section 507(b) Claim*. The Prepetition Second Lien Notes Trustee and the Prepetition Second Lien Noteholders will be granted, subject to the Fees Carve-Out, the Bonding-Carve Out and the Prepetition Lender Adequate Protection Claim, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, junior to the Superpriority Claims and the Prepetition Lender 507(b) Claims (the "**Noteholder 507(b) Claim**" and, together with the Prepetition Lender 507(b) Claim, the "**507(b) Claims**"); provided that: (i) notwithstanding section 1129(a)(9)(A) of the Bankruptcy Code, a plan of reorganization in any of the Cases may provide for the satisfaction of any Noteholder 507(b) Claim in any form having a value on

| MATERIAL TERMS OF THE DIP FINANCING |
|---|

|  | the effective date of such plan of reorganization equal to the allowed amount of such Noteholder 507(b) Claim; and (ii) unless otherwise expressly agreed to in writing by the DIP Agent and the Prepetition Agent, the Prepetition Notes Trustee and the Prepetition Noteholders shall not receive or retain any payments, property or other amounts in respect of the Noteholder 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claim having a priority superior to or pari passu with the Superpriority Claims have indefeasibly been paid in cash and the Commitments have been terminated and the Prepetition Lender 507(b) Claims shall have been satisfied in full.<br><br>**See Interim Order ¶¶ 12, 13, 14.** |
|---|---|
| **Carve-Out** | Fees Carve-Out: an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930 and 31 U.S.C. § 3717, whether arising prior to or after the delivery of a Fees Carve-Out Trigger Notice; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; and (iii) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, and whether before or after delivery of a Fees Carve-Out Trigger Notice, (A) all unpaid fees, costs, disbursements and expenses of professionals retained by the Debtors or the official committee of unsecured creditors in the Cases (the "**Creditors' Committee**") (but excluding fees and expenses of any professionals employed individually by members of the Creditors' Committee and any restructuring fee, sale fee or other success fee of any investment banker or financial advisor of the Debtors or the Creditors' Committee) pursuant to sections 327, 328 and 1103 of the Bankruptcy Code, respectively (collectively, the "**Professional Fees**") incurred at any time on or prior to the first Business Day following the delivery by the DIP Agent of a Fees Carve-Out Trigger Notice not to exceed $10,000,000 (the "**Fees Carve-Out Cap**"), in each case subject to the limits imposed by the Interim Order, the Final Order (if and when entered) or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party. Immediately upon delivery of a Fees Carve-Out Trigger Notice, and prior to the payment to any Prepetition Secured Party on account of any adequate protection or otherwise, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Agent (the "**Fees Carve-Out Account**"), an amount equal to the Fees Carve-Out Cap. The funds on deposit in the Fees Carve-Out Account shall be available only to satisfy obligations benefitting from the Fees Carve-Out, and the DIP Agent and the DIP Lenders (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Fees Carve-Out Account and (ii) shall have a security interest in any residual interest in the Fees Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Fees Carve-Out.<br><br>Bonding Carve-Out: a carve-out from the Collateral entitling certain governmental authorities that are or would be beneficiaries of surety bonds, letters of credit or other financial assurances (each, a "**Bonding Beneficiary**") making any demand, request or requirement for any surety bond, letter of credit or other financial assurance pursuant to applicable law, in each case, to the extent such requested surety bond, letter of credit or other financial assurance is to satisfy or replace an amount for which a Debtor is self-bonded (a "**Bonding Request**") to receive a claim (a "**Bonding Superpriority Claim**") |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| | having priority over any or all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code (including, without limitation, the Fees Carve-Out) to satisfy such Bonding Request.  The aggregate face amount of all Bonding Superpriority Claims shall not exceed $75 million or such greater amount as agreed in writing by the Required Lenders.  The Debtors shall be authorized to terminate the Bonding Carve-Out by issuing and delivering a notice in writing to the DIP Agent (the "**Bonding Carve Out Termination Notice**"), with a copy of any such notice delivered to counsel to each of the Prepetition Agent and Prepetition Second Lien Notes Trustee.  Upon issuance and delivery by the Debtors of the Bonding Carve Out Termination Notice to the DIP Agent, immediately, automatically and without further action, the Bonding Carve-Out will terminate and be permanently reduced to $0 for all purposes hereunder, and the Bonding Beneficiaries shall thereafter cease to have any rights in respect of the Bonding Carve Out.  Except as set forth in paragraph 7(f) of the Interim Order, the Debtors may not terminate the Bonding Carve-Out.<br><br>*See* **Interim Order ¶ 7.** |
| **Conditions Precedent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Conditions Precedent for Effectiveness<br>The conditions precedent to effectiveness of the DIP Credit Agreement include the usual and customary conditions for financings of this type, including, among other things:<br>• Receipt of the DIP Budget and (y) initial 13-Week Projection;<br>• Entry of the Interim Order not later than five calendar days following the Petition Date;<br>• Payment of fees payable on or before the Effective Date; and<br>• Receipt of government and third-party consents and approvals necessary in connection with the DIP Financing and the transactions contemplated thereby.<br><br>Conditions Precedent for Funding<br>The conditions precedent to the borrowings under the DIP Credit Agreement include the usual and customary conditions for financings of this type, including, among other things:<br>• Absence of default and accuracy in all material respects of representations and warranties set forth in the DIP Credit Agreement; and<br>• Entry of the Final Order.<br><br>*See* **DIP Credit Agreement §§7.01, 7.02 and 7.03.** |

-20-

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)* | <u>Affirmative Covenants</u>:  Usual and customary for financings of this type, including, without limitation, (i) preservation of existence, (ii) payment of liabilities, including taxes, (iii) maintenance of insurance, (iv) maintenance of properties and leases, (v) visitation rights, (vi) keeping of records and books of accounts, (vii) compliance with all applicable laws, (viii) use of proceeds, (ix) changes in locations, name, etc., (x) further assurances regarding collateral and guarantors, (xi) subordination of intercompany loans, (xii) first and second day orders, (xiii) certain case milestones (as described in more detail below) and (xiv) reporting requirements, including delivery of financial statements and compliance certificates.<br><br>*See* **DIP Credit Agreement §§ 8.01 and 8.03.**<br><br><u>Negative Covenants</u>:  Usual and customary for financings of this type, including, without limitation, restrictions on (i) indebtedness, (ii) liens and guaranties, (iii) liquidations, mergers, consolidations, acquisitions, (iv) disposition of assets or subsidiaries, (v) affiliate transactions, (vi) creation or ownership of certain subsidiaries, partnerships and joint ventures, (vii) continuation of or change in business, (viii) restricted payments, (ix) sanctions and anti-corruption matters, (x) no restriction in agreements on dividends or certain loans, (xi) loans and investments, (xii) transactions with respect to Bonding Subsidiaries and (xiii) hedging transactions.<br><br>*See* **DIP Credit Agreement § 8.02.**<br><br><u>Financial Covenants</u>:<br><ul><li>Maximum capital expenditures tested monthly (with a cushion to amounts included in the DIP Budget equal to the greater of (i) 25% (with carryforwards) in any monthly period and (ii) $10 million in the aggregate.</li><li>Minimum (i) unrestricted cash and cash equivalents of the Borrower and its domestic subsidiaries *plus* (ii) withdrawable funds from brokerage accounts of the Borrower and its domestic subsidiaries *plus* (iii) any unused commitments under the DIP Facility of $575 million, tested on a monthly basis.</li></ul><br>*See* **DIP Credit Agreement §§ 8.02(h) and 8.02(s); Interim Order ¶ 13(f).** |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Usual and customary for financings of this type, including, without limitation, (i) non-payment of principal (within one business day of the date when due) and non-payment of interest and fees (within three business days of the date when due), (ii) a material inaccuracy of a representation or warranty at the time made, (iii) a failure to comply with the covenants, subject to customary grace periods, (iv) cross-events of default to indebtedness of, or surety, reclamation or similar bonds securing obligations with an aggregate face amount of, at least $25 million, (v) uninsured judgments in excess of $25 million, (vi) any loan document shall cease to be a legal, valid and binding agreement, (vii) uninsured losses or proceedings against assets with a value in excess of $25 million, (viii) ERISA events, (ix) a change of control, (x) bankruptcy or insolvency proceedings relating to any non-Debtor subsidiary or (xi) certain matters relating to the Cases.<br><br>*See* **DIP Credit Agreement §9.01; Interim Order ¶ 18(b).** |

-21-

| MATERIAL TERMS OF THE DIP FINANCING |
| --- |

| | |
| --- | --- |
| **Limitations on Use of DIP Financing and Cash Collateral**<br>*Fed. R. Bankr. P. 4001-2(a)(9)* | No DIP Loans, Cash Collateral, Collateral, Prepetition Collateral, proceeds of any of the foregoing, the Fees Carve-Out or the Bonding Carve-Out may be used:<br><br>a.  for professional fees and expenses incurred for (i) any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise, including any investigation in connection with litigation or threatened litigation) against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or any other Prepetition Lender Party or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by the DIP Agent, the DIP Lenders, the Prepetition Agent or any other Prepetition Lender Party or (ii) asserting any defense, claim, cause of action, counterclaim, or offset with respect to the DIP Obligations, the Prepetition Debt (including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise), the DIP Liens or the Prepetition Lender Liens or against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or any other Prepetition Lender Party or their respective Representatives;<br><br>b.  to prevent, hinder or otherwise delay any of the DIP Agent's or the Prepetition Agent's assertion, enforcement or realization on the Prepetition Collateral or the Collateral in accordance with the DIP Documents, the Existing Loan Agreements or this Interim Order other than to seek a determination that an Event of Default has not occurred or is not continuing;<br><br>c.  to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or any other Prepetition Lender Party under this Interim Order or under the DIP Documents or the Prepetition Loan Documents, in each of the foregoing cases without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion; or<br><br>d.  pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents; <u>provided</u> that, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the DIP Loans under the DIP Credit Agreement, Collateral, Prepetition Collateral (including Cash Collateral) or the Fees Carve-Out may be used by the Creditors' Committee during the Challenge Period (as defined in the Interim Order) to investigate the claims and liens of the Prepetition Lender Parties.<br><br>*See* **Interim Order ¶ 20.** |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Debtor Stipulations**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii) and (viii)* | The Debtors make certain customary admissions and stipulations with respect to the amounts outstanding under the respective Existing Loan Agreements, the validity, perfection, enforceability and priority of the liens and security interests securing the Existing Loan Agreements, the value of the Prepetition Collateral, the non-existence of any grounds for the Debtors to challenge any aspect of the Existing Loan Agreements or the respective holders thereof and a release by the Debtors with respect to the foregoing.<br><br>*See* **Interim Order ¶ 4.** |
| **Automatic Stay**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The Interim Order provides for lifting of the automatic stay to allow the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court.<br><br>*See* **Interim Order ¶¶ 9(b), 15(b).** |
| **Real Property Lease Protections** | As a requirement and precondition to the DIP Lenders' willingness to lend and in furtherance of the Superpriority Claims and pursuant to the DIP Documents, under which the DIP Obligations are payable from and have recourse to all of the Debtors' prepetition and postpetition property including, among other things, all of the Debtors' Real Property Leases, the DIP Lenders shall have certain protections and powers with respect to Real Property Leases, including rights to select replacement lessees for rejected leases, rights to compel assumption and assignment of leases upon an event of default, and related protections.<br><br>*See* **DIP Credit Agreement §11.01; Interim Order ¶ 16.** |
| **Waivers and Consents**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v); Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | Subject only to and effective upon entry of the Final Order, except to the extent of the Fees Carve-Out and the Bonding Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties. Also subject to entry of the Final Order, the Debtors waive any right under the "equities of the case" exception in section 552(b).<br><br>*See* **Interim Order ¶ 10.** |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Milestones**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | <ul><li>No later than 5 days after the petition date, entry of the Interim Order.</li><li>No later than 45 days after the entry of the Interim Order and interim cash collateral order, entry of the Final Order.</li><li>No later than 60 days after the petition date, delivery of an updated business plan that is reasonably acceptable to Required DIP Lenders.</li><li>No later than 90 days after the petition date, filing of a plan and disclosure statement.</li><li>No later than 60 days after the plan filing date, approval of the disclosure statement.</li><li>No later than 90 days after approval of the disclosure statement, confirmation of the plan of reorganization.</li><li>No later than 15 days after entry of the confirmation order, effectiveness of the plan of reorganization.</li></ul>*See* **DIP Credit Agreement §8.01(p); Interim Order ¶ 13(f).** |

## Basis for Relief

**I.    The Debtors Should Be Authorized to Obtain the DIP Financing Under Section 364 of the Bankruptcy Code**

20.    The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property.  Specifically, section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; [or]

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

-24-

11 U.S.C. § 364(c).  Further, section 364(d) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

21.    Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit.  *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment").

-25-

22.    Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

23.    Here, given all the facts and circumstances present in these cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Financing. The Debtors exercised proper business judgment in securing the DIP Financing on terms that are fair and reasonable and the best available to them in the current market. Given the circumstances, the Debtors could not obtain credit on an unsecured or administrative expense basis, and the Debtors have provided the Prepetition Lenders and the Prepetition Second Lien Noteholders with adequate protection against any potential diminution in value of their interests. Moreover, the Prepetition Lender Parties have consented to both the terms of the DIP Financing and the use of Cash Collateral, and the Prepetition Second Lien Noteholder Parties are deemed to have consented under the terms of the Intercreditor Agreement, dated as of December 17, 2013, among the Prepetition Collateral Agent, the Prepetition Second Lien Notes Trustee, and the Borrower (the "**ICA**"). For all the

-26-

reasons discussed further below, therefore, the Court should grant the Debtors' request to enter into the DIP Financing pursuant to sections 364(c) and (d) of the Bankruptcy Code.

> A.    The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Financing

24.    Based on the facts of these Cases, the DIP Financing represents a proper exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including decisions about whether and how to borrow money.  *Grp. of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Farmland Indus., Inc.*, 294 B.R. 855, 882 (Bankr. W.D. Mo. 2003) ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

25.    In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest.  *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981).

26.    Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action *appears* to enhance the debtor's estate.'" *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107

-27-

F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy").  Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code."  *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) and *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997) ("[w]here the [debtor's] request is not manifestly unreasonable or made in bad faith, the court should normally grant approval as long as the proposed action appears to enhance the debtor's estate'" (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985))); *In re Farmland Indus. Inc.*, 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) (approving the rejection of employment agreements and noting that "[u]nder the business judgment standard, the question is whether the [proposed action] is in the Debtors' best economic interests, based on the Debtors' best business judgment in those circumstances." (citations omitted)).

27.     Here, the Debtors have exercised sound business judgment in determining that the DIP Financing is appropriate.  Even assuming the coal markets do not continue on their downward trajectory, the Debtors' continued operations cannot be sustained without immediate access to cash collateral.  *See* Buschmann Decl. ¶¶ 12, 20.  The Prepetition Lenders were willing

to consent to the Debtors' use of their cash collateral provided that that the Debtors obtain simultaneous approval of postpetition financing. Buschmann Decl. ¶ 16. If conditions in the coal markets deteriorate further, the Debtors would be required to seek postpetition financing from a weaker position and would result in correspondingly less favorable terms. Buschmann Decl. ¶ 12. Further, the immediate approval of the Debtors' entry into the DIP Financing would send a crucial signal to the Debtors' vendors, suppliers, customers, regulators and approximately 4,600 employees that the Debtors intend, and will have the ability, to maintain current operations and successfully emerge from chapter 11. Accordingly, if approved, entry into the DIP Financing will preserve and enhance the value of the Debtors' estates, and is therefore a sound exercise of the Debtors' business judgment.

28.     As discussed in the Buschmann Declaration, the pricing, fees and other terms proposed in the DIP Financing are similar to, or more favorable than, those in comparable circumstances. Buschmann Decl. ¶ 19. The DIP Financing offers several essential terms that will enable the Debtors to continue to operate their businesses during the course of the reorganization process. The consent of the DIP Lenders to the Bonding Carve-Out will allow the Debtors to, if necessary, seek to fulfill certain of their self-bonding obligations without obtaining additional third-party surety bonds or posting additional collateral. Finally, another source of financing may have insisted upon a lien on the receivables that are currently securitized through the Securitization Facility, which is the Debtors' sole source of letters of credit and which the Debtors have negotiated to continue, on favorable terms, during these Cases. Buschmann Decl. ¶ 16. The ability to keep the Securitization Facility outstanding is essential to the Debtors' liquidity and ability to maintain letters of credit crucial to the operation of their businesses. The Debtors' decision is therefore sound and reasonable under the circumstances.

B.    The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

29.    Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . ."  11 U.S.C. § 364(c).

30.    Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990); *accord In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

31.    In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. at 549 (secured credit under section

-30-

364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  This is true especially when time is of the essence.  *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).  When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

32.     As set forth in the Buschmann Declaration, the Debtors and PJT Partners made every reasonable effort to secure the best postpetition financing possible under the circumstances.  However, given the challenging state of the coal markets and the Debtors' highly leveraged balance sheets and lack of unencumbered assets, the Debtors were unable to obtain any viable proposals that authorized financing on an unsecured or administrative expense basis.  On the contrary, the Debtors' negotiations and the trading levels of the Debtors' obligations in the secondary market made clear that the Debtors could only obtain the financing necessary to preserve their estates if they extended superpriority to these obligations.  *See* Buschmann Decl. ¶ 15.

-31-

33.     The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of the DIP Lenders, superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in section 364(c)(1) of the Bankruptcy Code, subject to the terms of the DIP Credit Agreement, as described herein.

C.      <u>The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens that Are Senior to the Liens Securing the Existing Agreements</u>

34.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. See 11 U.S.C. § 364(d)(1).

35.     When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

•       whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

•       whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;

•       whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

•       whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed.).

36.    The DIP Financing satisfies each of these factors.  First, as described above, the Debtors and their advisors undertook a focused process appropriate to the circumstances and explored financing proposals with various participants both in and outside the capital structure of the Borrower.  Buschmann Decl. ¶¶ 14-17.  As the Debtors' business prospects worsened, the Debtors' investment banker, board members and management concluded that any viable financing would need to come from the Prepetition Lenders.  *See* Buschmann Decl. ¶ 15.  The Debtors conducted arms'-length negotiations with the DIP Lenders, and the ultimate form of agreement reflects the most favorable terms on which the Debtors were able to obtain an agreement on financing.  The Debtors are not able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting liens senior in priority to those securing the Prepetition Lenders, and the Prepetition Lenders agreed to such priming provided that the Debtors obtain simultaneous approval of the DIP Financing so that the Prepetition Lenders would be adequately protected during these cases.  *See* Buschmann Decl. ¶¶ 15-17.

37.    Second, the Debtors need the funds to be provided under the DIP Financing to preserve the value of their estates for the benefit of all creditors and other parties in interest. While the Debtors do not seek to draw on the DIP Facility immediately, absent the DIP Financing, the Debtors' available liquidity will likely be significantly eroded during the Cases. *See* Buschmann Decl. ¶ 12.  Obtaining DIP Financing that can be drawn on when needed during the Availability Period to minimize interest expense and preserve the Debtors' going concern value through the pendency of these Cases is in the best interests of all stakeholders.  *See* Buschmann Decl. ¶¶ 18-19.  Additionally, the Bonding Carve-Out, as discussed below, allows the Debtors the ability to fulfill certain governmental bonding requirements, subject to regulatory approval.  Finally, as discussed above, the proposed DIP Financing allows the Debtors to

-33-

continue to utilize the Securitization Facility, which is critical to the continued operations of the Debtors.

38.     Third, as discussed above, the terms of the proposed DIP Financing are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Cases.

39.     Fourth, as described in greater detail above and in the Buschmann Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arms'-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment.  The DIP Financing is on the most favorable terms available to the Debtors under current market conditions and the Debtors' financial condition.  In light of all these factors, therefore, it is clear that the Debtors should be authorized to enter into the DIP Financing and grant first priority senior priming liens.

D.     The Interests of the Prepetition Lender Parties and the Prepetition Second Lien Noteholder Parties Are Adequately Protected

40.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B).  What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest or granting of replacement liens or administrative claims.  *See, e.g*., *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and development.'") (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5963, 6295); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of

each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession.  *See Martin*, 761 F.2d at 474; *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

   41. Courts in this district and others have approved similar forms of adequate protection to that being provided to the Prepetition Secured Parties.  *See, e.g.*, *In re Bakers Footwear Group, Inc.*, Case No. 12-49658-705 (CER) (Bankr. E.D. Mo. Oct. 5, 2012); *In re Duke and King Acquisition Corp.*, Case No. 10-38652 (GFK) (Bankr. D. Minn. Jan. 24, 2011) (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Otter Tail AG Enters., LLC*, 2009 Bankr. LEXIS 5352, at *10–11 (Bankr. D. Minn. Nov. 20, 2009) (granting, *inter alia*, adequate protection liens for the use of cash collateral); *In re Schwing America, Inc.*, Case No. 09-36760 (NCD) (Bankr. D. Minn. Oct. 2, 2009) (granting replacement liens in authorizing postpetition financing on an interim basis); *In re Polaroid Corp.*, Case No. 08-46617 (GFK) (Bankr. D. Minn. Jan. 27, 2009) (authorizing replacement liens to prepetition

secured creditors for the use of cash collateral); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *26–27 (Bankr. D. Neb. Nov. 18, 2009) (granting adequate protection liens and superpriority claims pursuant to 507(b) to prepetition lenders); *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 12, 2012) (granting, *inter alia*, first and second lien adequate protection liens); *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) (granting, *inter alia*, DIP Liens, adequate protection liens and superpriority claims to secure DIP obligations); *In re NewPage Corp.*, Case No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011).

42.    Further, the Prepetition Lender Parties have consented to the terms of the DIP Financing and their treatment thereunder, and the Prepetition Second Lien Noteholder Parties are deemed to have consented under the terms of the ICA on the basis of the adequate protection being provided to them.  Moreover, all Prepetition Secured Parties will be adequately protected through the provision of replacement liens, administrative claims and, in the case of the Prepetition Lenders, current cash payments of all reasonable fees and expenses and monthly cash payments in an amount equal to interest on the debt under the Prepetition Credit Agreement at the non-default contract rate thereunder.  Accordingly, the Court should find that the adequate protection provided to the Prepetition Lenders is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral

43.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—

>> (A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

44.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.  First, as explained above, the Prepetition Secured Parties have consented to the use of their Cash Collateral.  Second, as described above, the Debtors are providing the Prepetition Lenders with replacement liens on the Prepetition Secured Parties' collateral, including Cash Collateral, and superpriority administrative claims. The interests of the Prepetition Secured Parties are thus adequately protected from diminution under the DIP Financing.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### III.    The Debtors Should Be Authorized to Pay the Fees in Connection with the DIP Financing

45.    As described above, the Debtors have agreed, subject to Court approval and effectiveness of the DIP Credit Agreement, to pay certain fees to the DIP Agent and the DIP Lenders in connection with the DIP Financing.  Specifically, the Debtors will pay:  (a) a commitment fee on initial commitments to the DIP Loans, earned, due and payable upon the Effective Date of the DIP Credit Agreement, (b) an unused commitment fee on any undrawn commitments, payable monthly in arrears accruing from the Effective Date of the DIP Credit Agreement until the Availability End Date, (c) a commitment termination fee payable on any amounts cancelled at the Borrower's option during the Availability Period and on any amounts permanently cancelled as a result of the expiration of the Availability Period and (d) a

prepayment fee payable on any amounts prepaid at the Borrower's option during the Availability Period. The fees payable to the DIP Agent and the DIP Lenders and other obligations under the DIP Credit Agreement represent the most favorable terms on which the DIP Lenders would agree to make the DIP Financing available. *See* Buschmann Decl. ¶ 19. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute these Cases, and paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates and creditors and other parties in interest.

## IV.    The Scope of the Fees Carve-Out Is Appropriate

46.    The DIP Financing subjects the security interests and administrative expense claims of the DIP Lenders to the Fees Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their professionals in certain circumstances during an event of default under the terms of the debtor's postpetition financing. *See Ames*, 115 B.R. at 40. The DIP Financing does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of the U.S. Trustee's fees and professional fees of the Debtors and

the Creditors' Committee notwithstanding the grant of superpriority claims and DIP and

adequate protection liens.

47.     Courts in this district and others routinely approve of carve-outs agreed to by the

debtors and their DIP financing lenders.  *See, e.g.*, *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS

5837, at *18 (Bankr. E.D. Mo. May 28, 2010); *In re Genmar Holdings, Inc.*, Case No. 09-43537

(DDO) (Bankr. D. Minn. June 4, 2009); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at

*18–19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.*, Case No. 12-

36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re The Great Atl. & Pac. Tea Co.*, Case No.

10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011).

## V.     The Scope of the Bonding Carve-Out Is Appropriate

48.     The security interests and superpriority administrative expense claims granted by

the Debtors are further subject to the $75 million Bonding Carve-Out, which entitles certain

governmental authorities that are or would be beneficiaries of surety bonds, letters of credit or

other financial assurances making any demand, request or requirement for any surety bond, letter

of credit or other financial assurance pursuant to applicable law, in each case, to the extent such

surety bond, letter of credit or other financial assurance is to satisfy or replace an amount for

which a Debtor is self-bonded (a "**Bonding Request**") to receive a claim (a "**Bonding

Superpriority Claim**") having priority over any or all administrative expenses of the kind

specified in section 503(b) of the Bankruptcy Code (including the Fees Carve-Out) to satisfy

such Bonding Request.

49.     The Bonding Carve-Out is intended, subject to the agreement of the applicable

regulators, to allow the Debtors to fulfill certain governmental bonding requirements in respect

of reclamation obligations in Wyoming without obtaining costly third-party surety bonds and/or

posting additional collateral to assure performance of the obligations.  Courts have approved

similar carve-outs for companies in comparable circumstances.  *See, e.g.*, *In re Alpha Nat'l Res.,*

*Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va. Sept. 17, 2015) (approving superpriority DIP

financing with $100 million bonding carve-out); *In re Energy Future Holdings Corp.*, Case No.

14-10979 (CSS) (Bankr. D. Del. June 6, 2014) (approving superpriority DIP financing with a

$1.1 billion carve-out for reclamation obligations owed to the Railroad Commission of Texas).

**VI.    The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)**

50.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364
> of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this
> section of a priority or a lien, does not affect the validity of any debt so incurred,
> or any priority or lien so granted, to an entity that extended such credit in good
> faith, whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such priority or
> lien, were stayed pending appeal.

11 U.S.C. § 364(e).

51.    As explained in detail herein and in the Buschmann Declaration, the DIP

Documents are the result of the Debtors' reasonable and informed determination that the DIP

Lenders offered the most favorable terms on which to obtain needed postpetition financing, and

of arms'-length, good faith negotiations between the Debtors and the DIP Lenders.  *See*

Buschmann Decl. ¶ 19.  The terms and conditions of the DIP Documents are fair and reasonable,

and the proceeds of the DIP Financing will be used only for purposes that are permissible under

the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP

Documents other than as described herein.  Accordingly, the Court should find that the DIP

Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VII.  Modification of the Automatic Stay Is Warranted for the DIP Lenders and DIP Agent

52.     The DIP Documents contemplate, upon entry of the Final Order, that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court.

53.     Stay modification provisions of this sort are ordinary features of DIP financing and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re Bakers Footwear Group, Inc.*, Case No. 12-49658-705 (CER) (Bankr. E.D. Mo. Nov. 5, 2012); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *31–32 (Bankr. D. Neb. Nov. 18, 2009); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at *19 (Bankr. W.D. Mo. July 14, 2009); *In re Alpha Nat'l Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va. Sept. 17, 2015); *In re Patriot Coal Corp.*, Case No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015); *In re James River Coal Co.*, Case No. 14-31848 (KRH) (Bankr. E.D. Va. May 9, 2014); *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012); *In re Roomstore, Inc.*, Case No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008).

## VIII.  The Debtors Require Immediate Approval of the DIP Financing

54.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

55.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly after the Petition Date.  The Prepetition Lenders, the sole viable source of financing for the Debtors, offered the DIP Financing in connection with their agreement to allow the use of their Cash Collateral.  *See* Buschmann Decl. ¶¶ 16, 19.  As described above and in the Buschmann Declaration, because the Debtors' unencumbered cash is insufficient to meet the Debtors' liquidity needs in these Cases, access to Cash Collateral is an essential lifeline to ensure the Debtors' ability to continue to operate their businesses and reorganize for the benefit of all stakeholders.  Moreover, seeking postpetition financing at a later date in these Cases could prove to be more expensive, or even impossible.

56.    Prior to the Petition Date, the Debtors were already facing demands on free cash as a result of addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations, including requiring prepayment or operating on a purchase-order basis.  *See* Buschmann Decl. ¶ 12.  In order to avoid any business disruption and ensure a smooth transition into chapter 11, the Debtors must signal to all of their constituents and counterparties that the Debtors have access to liquidity to, among other things, continue the operation of their businesses, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working

capital and operational needs, all of which is required to preserve and maintain the Debtors'

enterprise value for the benefit of all parties in interest.

57.     The importance of a debtor's ability to secure interim approval of postpetition

financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized

in this district and others in similar circumstances.  *See, e.g.*, *In re Bakers Footwear Group, Inc.*,

Case No. 12-49658-705 (CER) (Bankr. E.D. Mo. Nov. 5, 2012) (authorizing secured postpetition

financing on a superpriority basis); *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS 5837, at *10

(Bankr. E.D. Mo. May 28, 2010) (authorizing secured postpetition financing on a superpriority

basis); *In re Genmar Holdings, Inc.*, Case No. 09-43537 (DDO) (Bankr. D. Minn. June 4, 2009)

(approving debtor in possession financing with granting of senior lien); *In re Premium Protein

Prods., LLC*, 2009 Bankr. LEXIS 5285, at *6–9 (Bankr. D. Neb. Nov. 18, 2009) (authorizing

debtor to incur postpetition secured indebtedness on an interim basis); *In re Trilogy Dev. Co.*,

2009 Bankr. LEXIS 5178, at *7 (Bankr. W.D. Mo. July 14, 2009) (authorizing postpetition

secured financing with superpriority DIP liens priming prepetition secured construction loan); *In

re Va. United Methodist Homes of Williamsburg, Inc.*, Case No. 13-31098 (KRH) (Bankr. E.D.

Va. Mar. 6, 2013) (approving postpetition financing on an interim basis); *In re AMF Bowling

Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Nov. 14, 2012) (same); *In re

Patriot Coal Corp.*, Case No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman

Kodak Co.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (same); *In re Roomstore,

Inc.*, Case No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011) (same); *In re Bear Island Paper

Co., L.L.C.*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010) (same); *In re Lyondell

Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same).  Accordingly, for

the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate

and irreparable harm to the Debtors' estates and is consistent with, and warranted under,
Bankruptcy Rules 4001(b)(2) and (c)(2).

### Waiver of Stay Under Bankruptcy Rule 6004(h)

58.     The Debtors also request that, to the extent applicable to the relief requested in
this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that
"[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until
the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R.
Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is
necessary for the Debtors to operate their businesses without interruption and to preserve value
for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day
stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein
justifies immediate relief.

### Notice

59.     Notice of this Motion has been provided to the DIP Agent and its counsel, counsel
to the DIP Lenders, the Prepetition Agent and its counsel, the Prepetition Second Lien Notes
Trustee, the Debtors' 30 largest unsecured creditors, the Office of the United States Trustee for
the Eastern District of Missouri (the "**U.S. Trustee**"), the Internal Revenue Service, the
Securities and Exchange Commission, the United States Department of the Interior, the United
States Department of Labor and the United States Attorney's Office for the Eastern District of
Missouri (collectively, the "**Notice Parties**").  In light of the nature of the relief requested, the
Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that this Court:

(a)     approve on an interim and final basis the DIP Financing described herein;

-44-

(b)     authorize on an interim and final basis the use of Cash Collateral and the other

Prepetition Collateral and the grant of adequate protection to the Prepetition

Lenders on the terms described herein; and

(c)     grant the Debtors such other and further relief as is just and proper.

Dated:   January 11, 2016
         St. Louis, Missouri

Respectfully submitted,

BRYAN CAVE LLP

/s/ Brian C. Walsh
Lloyd A. Palans, #22650MO
Brian C. Walsh, #58091MO
Cullen K. Kuhn, #53151MO
Laura Uberti Hughes, #60732MO
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000
Fax: (314) 259-2020
lapalans@bryancave.com
brian.walsh@bryancave.com
ckkuhn@bryancave.com
laura.hughes@bryancave.com

*Proposed Local Counsel to the Debtors and
Debtors in Possession*

-and-

DAVIS POLK & WARDWELL LLP

Marshall S. Huebner
Brian M. Resnick
Michelle M. McGreal
Kevin J. Coco

450 Lexington Avenue
New York, New York 10017
(212) 450-4000
Fax:    (212) 607-7983
marshall.huebner@davispolk.com
brian.resnick@davispolk.com
michelle.mcgreal@davispolk.com
kevin.coco@davispolk.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

-46-

## SCHEDULE 1
## Debtor Entities

| | | | |
|---|---|---|---|
| 1. | ACI Terminal, LLC | 37. | ICG Eastern, LLC |
| 2. | Allegheny Land Company | 38. | ICG Eastern Land, LLC |
| 3. | Apogee Holdco, Inc. | 39. | ICG Illinois, LLC |
| 4. | Arch Coal, Inc. | 40. | ICG Knott County, LLC |
| 5. | Arch Coal Sales Company, Inc. | 41. | ICG Natural Resources, LLC |
| 6. | Arch Coal West, LLC | 42. | ICG Tygart Valley, LLC |
| 7. | Arch Development, LLC | 43. | International Coal Group, Inc. |
| 8. | Arch Energy Resources, LLC | 44. | Jacobs Ranch Coal LLC |
| 9. | Arch Reclamation Services, Inc. | 45. | Jacobs Ranch Holdings I LLC |
| 10. | Arch Western Acquisition Corporation | 46. | Jacobs Ranch Holdings II LLC |
| 11. | Arch Western Acquisition, LLC | 47. | Juliana Mining Company, Inc. |
| 12. | Arch Western Bituminous Group, LLC | 48. | King Knob Coal Co., Inc. |
| 13. | Arch Western Finance, LLC | 49. | Lone Mountain Processing, Inc. |
| 14. | Arch Western Resources, LLC | 50. | Marine Coal Sales Company |
| 15. | Arch of Wyoming, LLC | 51. | Melrose Coal Company, Inc. |
| 16. | Ark Land Company | 52. | Mingo Logan Coal Company |
| 17. | Ark Land KH, Inc. | 53. | Mountain Coal Company, L.L.C. |
| 18. | Ark Land LT, Inc. | 54. | Mountain Gem Land, Inc. |
| 19. | Ark Land WR, Inc. | 55. | Mountain Mining, Inc. |
| 20. | Ashland Terminal, Inc. | 56. | Mountaineer Land Company |
| 21. | Bronco Mining Company, Inc. | 57. | Otter Creek Coal, LLC |
| 22. | Catenary Coal Holdings, Inc. | 58. | Patriot Mining Company, Inc. |
| 23. | Catenary HoldCo, Inc. | 59. | P.C. Holding, Inc. |
| 24. | Coal-Mac, Inc. | 60. | Powell Mountain Energy, LLC |
| 25. | CoalQuest Development LLC | 61. | Prairie Coal Company, LLC |
| 26. | Cumberland River Coal Company | 62. | Prairie Holdings, Inc. |
| 27. | Energy Development Co. | 63. | Saddleback Hills Coal Company |
| 28. | Hawthorne Coal Company, Inc. | 64. | Shelby Run Mining Company, LLC |
| 29. | Hobet Holdco, Inc. | 65. | Simba Group, Inc. |
| 30. | Hunter Ridge, Inc. | 66. | Thunder Basin Coal Company, L.L.C. |
| 31. | Hunter Ridge Coal Company | 67. | Triton Coal Company, LLC |
| 32. | Hunter Ridge Holdings, Inc. | 68. | Upshur Property, Inc. |
| 33. | ICG, Inc. | 69. | Vindex Energy Corporation |
| 34. | ICG, LLC | 70. | Western Energy Resources, Inc. |
| 35. | ICG Beckley, LLC | 71. | White Wolf Energy, Inc. |
| 36. | ICG East Kentucky, LLC | 72. | Wolf Run Mining Company |