## Exhibit B

**Buschmann Declaration**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **In re:** | Chapter 11<br>Case No. [ ] |
| **ARCH COAL, INC.,** *et al.,* | **(Joint Administration Proposed)** |
| **Debtors.**[1] | **Hearing Date and Time:**<br>TBD |
| | **Hearing Location:**<br>TBD |

**DECLARATION OF MARK BUSCHMANN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507(b) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363(c)(2), 364 AND 507(b) AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

I, Mark Buschmann, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1. I am a Partner of PJT Partners LP ("**PJT Partners**"), a provider of financial advisory services that maintains offices at 280 Park Avenue, New York, New York 10017. I am authorized to make this declaration (the "**Declaration**") on behalf of PJT Partners. I submit this Declaration in support of *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (a) to Obtain Postpetition Financing pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507(b) and (b) to Utilize Cash Collateral pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Creditors*

---

[1] The Debtors are listed on Schedule 1 attached hereto. The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

*pursuant to 11 U.S.C. §§ 361, 362, 363(c)(2), 364 and 507(b) and (III) Scheduling a Final Hearing pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**DIP Motion**"),[2] filed by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") on January 11, 2016 (the "**Petition Date**").

## QUALIFICATIONS

2. I hold a Bachelor of Arts in Economics and German Literature from Dartmouth College and a Master of Business Administration with a concentration in finance from the Kellogg Graduate School of Management at Northwestern University.

3. Prior to joining Blackstone Advisory Partners L.P., which in 2015 became part of PJT Partners, I worked in the Financial Institutions Group of Salomon Smith Barney, where I executed various mergers and acquisitions and financing assignments. I have considerable experience advising distressed companies, including advising both debtors and creditors in chapter 11 restructurings. During the past 14 years I have worked on more than 20 financings for troubled companies, including numerous debtor-in-possession financings. In addition, I have experience representing distressed coal and commodities companies.

4. Members of my team and I have been working closely with the Debtors since our engagement in February 2015, as the Company's investment banker. In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives and restructuring options. I have participated in negotiations between the Debtors and their creditors and other interested parties. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions and impact of various proposed transactions and restructurings.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

2

The PJT Partners team (including myself) has worked closely with the Debtors and their management, analyzing the Debtors' financial position and assisting in analyzing the various proposed strategic alternatives. Finally, I have participated in meetings with the Debtors' board of directors to keep the board apprised of the restructuring process and provide advice regarding strategic alternatives, including a case under chapter 11.

5. Through this process, PJT Partners has become intimately familiar with the Debtors' businesses, affairs, assets and contractual arrangements.

6. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, experience and information concerning the Debtors, my review of relevant business records and information provided to me by the Debtors and their professionals and PJT Partners employees working under my supervision.

7. I am not being compensated specifically for this testimony other than through payments received by PJT Partners as a professional proposed to be retained by the Debtors. If called upon to testify, I would testify competently to the facts set forth herein.

**THE DEBTORS' NEED FOR DIP FINANCING AND USE OF CASH COLLATERAL**

8. As is described in further detail in the Declaration of John T. Drexler, Senior Vice President and Chief Financial Officer of Arch Coal, Inc., in support of the Debtors' Chapter 11 Proceedings and First Day Pleadings filed substantially contemporaneously herewith (the "**Drexler Declaration**"), the market for coal has declined significantly in recent years due to a combination of increasing competition from natural gas, new regulations, and weakening demand, both domestically and internationally. Since 2011, the prices of metallurgical and steam coal, the Debtors' primary products, have fallen by approximately 70%. Coal, as a share of U.S. Energy generation, has fallen by roughly 10% since 2008 alone, and additional declines are anticipated.

3

9. The Debtors also have a highly leveraged capital structure that includes, as of the Petition Date: (i) secured indebtedness of approximately $2.3 billion, principally comprised of (a) a first lien term loan credit facility (the "**Term Loan**"), under which there are approximately $1.89 billion in obligations outstanding (the "**Term Loan Obligations**"), secured by a first priority lien on substantially all of the Debtors' assets, and (b) $350 million in aggregate principal amount of 8.00% senior secured second lien notes due 2019 (the "**Second Lien Notes**"), secured by a second priority lien on the same assets as the Term Loan, and (ii) $2.9 billion in unsecured notes outstanding, comprised of four tranches: (a) $375 million in aggregate principal amount of 9.875% senior unsecured notes due 2019; (b) $1 billion in aggregate principal amount of 7.00% senior unsecured notes due 2019; (c) $500 million in aggregate principal amount of 7.25% senior unsecured notes due in 2020; and (d) $1 billion in aggregate principal amount of 7.25% senior unsecured notes due 2021 (collectively, the "**Senior Unsecured Notes**").

10. PJT Partners was engaged by the Debtors in order to explore strategic alternatives to address these challenges, including through changes in the Debtors' capital structure or a chapter 11 filing. As is described more fully in the Drexler Declaration, the Debtors proposed two private debt exchange offers (the "**Exchange Offers**") through which they offered to exchange the Prepetition Senior Unsecured Notes for a combination of (i) new 6.25% Trust Certificates due in 2021, backed by up to $404 million in incremental term loans and revolving loans under the Prepetition Credit Agreement, (ii) a cash payment, (iii) new 8.0% 1.5 lien notes due in 2022, and (iv) new 12.0% second lien notes due in 2023. The Exchange Offers did not close and were ultimately permitted to expire in accordance with their terms on October 26, 2015.

4

11. In light of the continuing significant deterioration in the coal markets, and increasingly dour projections for the Company's financial results, as a result therefrom, PJT Partners, in partnership with the Company's management and its other advisors, began exploring other alternatives, including a chapter 11 filing.

12. In my experience, an essential ingredient of a successful chapter 11 case is securing postpetition, or "debtor-in-possession" ("**DIP**") financing. The Company's case is no exception. Projections prepared by the Company suggest that, absent DIP financing, the Debtors will not be cash flow positive during the first 13 weeks of the case. In fact, absent DIP financing, the Debtors' liquidity is anticipated to decline by in excess of $175 million during the first nine months of 2016. These projections assume that the continued deterioration in the coal markets subsides. If the Company does not obtain DIP financing now and coal markets deteriorate further, the Company would find itself in the difficult position of needing to seek postpetition financing from a much weaker position than it finds itself in today. Obtaining financing under such conditions could be challenging or impossible and, at a minimum, would likely result in terms less favorable than those of the proposed DIP facility. The Debtors' regulators also require them to post significant surety bonds (or qualify for continued self-bonding) in connection with their continued operations. If the Debtors' cash position deteriorates significantly, there is no guarantee that those state authorities will permit the Company's mining operations to continue. Finally, the Company's counterparties are likely to view DIP financing as an important assurance of the Company's ongoing performance. Because many of the Company's vendors require prepayment or operate on a purchase-order basis, DIP financing is critical. The Debtors seek approval to enter into the proposed DIP facility on an interim basis. Obtaining interim approval on the first day of these cases will allow the Company

5

to communicate to its counterparties, vendors, and regulators that the Debtors are entering chapter 11 on strong financial footing and will continue operating without interruption.

### THE DEBTORS' NEGOTIATIONS FOR DIP FINANCING AND USE OF CASH COLLATERAL

13. In October 2015, PJT Partners, in partnership with the Debtors' other advisors, began discussions with respect to DIP financing with advisors to an ad hoc committee of holders of a majority of the Term Loans (the "**Ad Hoc Committee**"). On November 19, 2015, certain of the members of the Ad Hoc Committee (the "**Ad Hoc Committee Lenders**") executed Non-Disclosure Agreements ("**NDAs**") in order to ensure that confidential information could be shared freely and to promote an efficient process.

14. PJT Partners also reviewed two restructuring proposals from other participants in the Company's capital structure. One of these proposals was premised on what, in my opinion, were unrealistic assumptions for the Company's performance and would, under the best of circumstances, have required the Company to operate with little liquidity. The other proposal contemplated a restructuring similar to the Exchange Offers, which the Company's advisors (including myself) viewed as unrealistic at that time. These discussions did not progress beyond a preliminary stage.

15. The Company and its advisors ultimately concluded that it would not be possible to obtain postpetition financing from a source other than the Ad Hoc Committee Lenders. The Term Loans are secured by substantially all of the Debtors' assets, and as market conditions continued to decline throughout 2015, it became clear that any DIP financing would necessarily be required to prime the Prepetition Lender Liens, which PJT Partners confirmed would not be acceptable to the Ad Hoc Committee. As of January 8, 2016, the Term Loans were trading in the secondary market at less than 45 cents on the dollar, the Second Lien Notes were trading at less

6

than 5 cents on the dollar, and the Senior Unsecured Notes were trading at a penny on the dollar or less. In these circumstances, the PJT Partners team (including myself) concluded that DIP financing on a junior lien basis would not be available.

16. Difficult market conditions also made alternative providers of financing less willing to engage with the Company. In addition, due to decreasing revenues, it became increasingly unlikely that the Debtors' operations could be sustained through access to current cash flows alone. The Ad Hoc Committee Lenders were willing to consent to the Debtors' continued use of their cash collateral during these cases provided that the Debtors obtain simultaneous approval of DIP financing in order to, among other things, provide them with adequate protection. Given the Company's insubstantial unencumbered assets, it would have been difficult for the Company to otherwise provide the Ad Hoc Committee Lenders with adequate protection of their interests. Finally, another source of financing may have insisted upon a lien on the receivables that are currently securitized through the Company's receivables securitization facility, which is the Company's sole source of letters of credit and which the Company has negotiated to continue, on favorable terms, during these cases. Nevertheless, PJT Partners and the Company's legal advisors contacted two potential alternative providers of DIP financing, both of whom were uninterested in providing postpetition financing to the Company.

17. The negotiations with the Ad Hoc Committee Lenders were at arms-length and were hard-fought. Numerous term sheets were exchanged over the course of approximately two months, and negotiations over terms and structure continued into the days leading up to the Petition Date. In fact, a final term sheet reflecting the terms of the proposed DIP financing was agreed upon by the Ad Hoc Committee Lenders and the Company only on January 4, 2016. The Debtors' management team was intimately involved throughout this process, and the Company's

7

board was kept well-informed. Ultimately, the Debtors' management, advisors (including myself) and board of directors concluded that the proposal from the Ad Hoc Committee Lenders was the most advantageous proposal for financing possible under the circumstances.

18. As set forth in detail in the DIP Motion, the Debtors were able to obtain an agreement on the terms and conditions of a $275 million term loan facility (the "**DIP Facility**") with the Ad Hoc Committee Lenders. The proposed DIP Facility includes a delayed draw feature that permits the Debtors to borrow under the facility as late as four months after the Petition Date, thereby minimizing interest expense. Obligations under the proposed DIP Facility will be secured by a first priority priming lien on substantially all of the Debtors' assets, subject to certain limited and customary exceptions. The proposed DIP Facility also requires that the Debtors satisfy certain milestones for progress in the chapter 11 case, and provides for adequate protection to holders of the Company's secured indebtedness in exchange for their consent to the use of their collateral, including cash collateral. Another significant feature of the proposed DIP Facility is that it permits the Debtors to incur up to $75 million of superpriority claims in connection with the Debtors' self-bonded obligations to certain governmental authorities, particularly self-bonded reclamation obligations to the Wyoming Department of Environmental Quality.

## THE TERMS OF THE DIP FACILITY ARE FAIR AND REASONABLE AND SHOULD BE APPROVED

19. Based on my experience and my specific involvement in the negotiation of the proposed DIP Facility, I believe that the process undertaken by the Debtors was appropriate under the circumstances and produced the best available financing. *First*, as discussed above, the negotiations with the Ad Hoc Committee Lenders were at arms-length and in good faith. The Company's management team and legal and financial advisors were actively involved

8

throughout the process. *Second*, I also believe that the proposed DIP Facility is fairly priced and an appropriate facility for the Debtors at this time. In addition, the delayed draw feature will minimize the interest expense under the proposed DIP Facility. The pricing, fees and covenants provided for in the proposed DIP Facility are similar to, or more favorable than, those in comparable cases in recent years, particularly in the severely distressed coal industry. Given the Debtors' capital structure and current projections, no more favorably priced DIP financing was available. *Third*, the proposed DIP Facility also provides the Debtors with consent to their continued use of cash collateral, without which it would be difficult to continue operations. The Ad Hoc Committee Lenders were willing to consent to the use of cash collateral provided that the Debtors obtain simultaneous approval of the DIP Facility. *Fourth*, and finally, the carve-out for a super-priority $75 million reclamation bonding claim will support the Debtors' continued operations and ensure that they are able to meet their regulatory obligations.

20. Given the Debtors' current projections and their relative lack of unencumbered assets, immediate access to cash collateral is necessary for continued operations. Access to cash collateral is likely to become even more acute if the coal markets continue to deteriorate. Moreover, it is uncertain whether, absent DIP financing, the Debtors would be able to satisfy applicable reclamation bonding requirements or successfully continue the Securitization Facility postpetition. Based on these conditions, I believe that the Debtors would suffer immediate and irreparable harm if the DIP Facility is not approved.

[*Signature page follows.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  January 11, 2016

_/s/ Mark Buschmann_
Mark Buschmann

# SCHEDULE 1
## Debtor Entities

1. ACI Terminal, LLC
2. Allegheny Land Company
3. Apogee Holdco, Inc.
4. Arch Coal, Inc.
5. Arch Coal Sales Company, Inc.
6. Arch Coal West, LLC
7. Arch Development, LLC
8. Arch Energy Resources, LLC
9. Arch Reclamation Services, Inc.
10. Arch Western Acquisition Corporation
11. Arch Western Acquisition, LLC
12. Arch Western Bituminous Group, LLC
13. Arch Western Finance LLC
14. Arch Western Resources, LLC
15. Arch of Wyoming, LLC
16. Ark Land Company
17. Ark Land KH, Inc.
18. Ark Land LT, Inc.
19. Ark Land WR, Inc.
20. Ashland Terminal, Inc.
21. Bronco Mining Company, Inc.
22. Catenary Coal Holdings, Inc.
23. Catenary HoldCo, Inc.
24. Coal-Mac, Inc.
25. CoalQuest Development LLC
26. Cumberland River Coal Company
27. Energy Development Co.
28. Hawthorne Coal Company, Inc.
29. Hobet Holdco, Inc.
30. Hunter Ridge, Inc.
31. Hunter Ridge Coal Company
32. Hunter Ridge Holdings, Inc.
33. ICG, Inc.
34. ICG, LLC
35. ICG Beckley, LLC
36. ICG East Kentucky, LLC
37. ICG Eastern, LLC
38. ICG Eastern Land, LLC
39. ICG Illinois, LLC
40. ICG Knott County, LLC
41. ICG Natural Resources, LLC
42. ICG Tygart Valley, LLC
43. International Coal Group, Inc.
44. Jacobs Ranch Coal LLC
45. Jacobs Ranch Holdings I LLC
46. Jacobs Ranch Holdings II LLC
47. Juliana Mining Company, Inc.
48. King Knob Coal Co., Inc.
49. Lone Mountain Processing, Inc.
50. Marine Coal Sales Company
51. Melrose Coal Company, Inc.
52. Mingo Logan Coal Company
53. Mountain Coal Company, L.L.C.
54. Mountain Gem Land, Inc.
55. Mountain Mining, Inc.
56. Mountaineer Land Company
57. Otter Creek Coal, LLC
58. Patriot Mining Company, Inc.
59. P.C. Holding, Inc.
60. Powell Mountain Energy, LLC
61. Prairie Coal Company, LLC
62. Prairie Holdings, Inc.
63. Saddleback Hills Coal Company
64. Shelby Run Mining Company, LLC
65. Simba Group, Inc.
66. Thunder Basin Coal Company, L.L.C.
67. Triton Coal Company, L.L.C.
68. Upshur Property, Inc.
69. Vindex Energy Corporation
70. Western Energy Resources, Inc.
71. White Wolf Energy, Inc.
72. Wolf Run Mining Company