# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ARCH COAL, INC.,** *et al.*, | **Case No. 16-40120-705** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DISCLOSURE STATEMENT FOR DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION UNDER <u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 607-7983
Marshall S. Huebner
Brian M. Resnick
Michelle M. McGreal
Kevin J. Coco

*Counsel to the Debtors
and Debtors in Possession*

BRYAN CAVE LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
Lloyd A. Palans
Brian C. Walsh
Cullen K. Kuhn
Laura Uberti Hughes

*Local Counsel to the Debtors
and Debtors in Possession*

Dated: June 14, 2016

---

[1] The Debtors are listed on Schedule 1 attached hereto. The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

# PRELIMINARY STATEMENT[2]

### The Plan

On June 14, 2016, Arch Coal filed this Amended Disclosure Statement and the related Plan with the United States Bankruptcy Court for the Eastern District of Missouri.  The Plan is supported by more than 80% of the Consenting Lenders (as defined in the Restructuring Support Agreement dated as of January 10, 2016, as has been amended from time to time in accordance with the terms thereof, the **RSA**").  Beginning on the Petition Date, the Debtors sought to obtain support for the plan contemplated by the original RSA from holders of General Unsecured Claims, to whom the RSA offered the option of an enhanced distribution in the form of common stock and warrants issued by Reorganized Arch Coal.  When it became clear that the distributions set forth in the original RSA would not meet with wide acceptance among holders of General Unsecured Claims, the Debtors filed a plan on May 5, 2016 that provided holders of General Unsecured Claims will receive the distributions they are entitled to under the Bankruptcy Code.

Since that time, the Debtors have continued to seek to obtain support for a plan that would provide holders of General Unsecured Claims with enhanced distributions and would also be supported by more than 80% of the Consenting Lenders, in accordance with the RSA.  However, the Debtors, the Ad Hoc Committee Lenders and the Creditors' Committee have been unable to reach consensus regarding plan distributions to General Unsecured Creditors.  Accordingly, the Plan that the Debtors have filed provides that holders of General Unsecured Claims will receive their pro rata share of the Debtors' unencumbered assets in the form of (i) cash, subject to reductions for certain fees and, potentially, adequate protection claims and (ii) shares of Prairie Holdings, Inc., which is the Debtor that owns a 49% interest in Knight Hawk Holdings, LLC, but only if it is judicially determined that Prairie Holdings' interests in Knight Hawk Holdings, LLC are unencumbered.

Further, as discussed in detail in this Amended Disclosure Statement, the Plan is premised on a global settlement and compromise of certain claims and causes of action that could be asserted by the Debtors against certain of the First Lien Lenders for actions taken in connection with the Debtors' prepetition exchange offers and certain of the Debtors' employees.  The consideration for the global settlement is to be provided by the holders of First Lien Credit Facility Claims, who will waive the Prepetition Lender Adequate Protection Claim in respect of any diminution in the value of the Prepetition Collateral from the Petition Date through and including June 22, 2016 and, potentially, through the Effective Date, subject to certain exceptions.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Debtors' Amended Joint Plan of Reorganization (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "**Plan**"); *provided*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

The Debtors will continue to pursue a resolution among their creditors regarding distributions to holders of General Unsecured Claims in an effort to reach an agreement on a fully consensual plan of reorganization.

***Reorganized Arch Coal***

The commencement of Arch's Chapter 11 Cases was precipitated by the convergence of several dramatic changes in the market and regulatory environment for coal.  Prior to the Petition Date, the Debtors took numerous actions to adapt to these evolving market conditions and to position themselves for future success.  However, as market headwinds persisted, it became clear that material changes to Arch's balance sheet were necessary.  The Plan that the Debtors are proposing would achieve such a balance sheet restructuring, significantly reducing its debt and further advancing Arch's efforts to position itself for long-term success.

The same challenges that have affected Arch have caused the distress of virtually every major U.S. coal company and the commencement of chapter 11 cases by several of the largest companies in the industry.  However, despite recent changes in power generation markets, the Company expects there to continue to be a sizable domestic market for U.S. thermal coal for the foreseeable future.  Moreover, the Company expects high-quality, low-cost U.S. metallurgical coals to continue to play a significant role in global markets given a positive outlook for steel demand, particularly in the developing world. Arch believes that contraction of U.S. coal supply will lead to a smaller but healthier industry, in which companies with low-cost production in the most strategic market segments and coal supply basins, such as Arch, will be positioned to survive and prosper.

Arch benefits from a highly competitive metallurgical franchise in Appalachia, a leading thermal position in the Powder River Basin and complementary thermal bituminous assets in the Western Bituminous and Illinois Basin regions.  The Company is bolstered by its experienced, highly skilled and well-trained workforce; its established asset base of large, modern and efficient mining complexes; and its lengthy and proven track record of industry leadership in both mine safety and environmental stewardship.  These qualities have enabled Arch to move efficiently through the Chapter 11 Cases and will enable a reorganized Arch to operate successfully upon emergence from bankruptcy.  Arch is confident that, upon emergence, it will be poised to prosper and grow in the quickly evolving coal marketplace.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION AND CERTAIN OTHER DOCUMENTS AND INFORMATION. THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT

FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING, THREATENED OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED BY ANY PARTY AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC

PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE IX OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

# TABLE OF CONTENTS

PAGE

ARTICLE I

INTRODUCTION .................................................................................................................1

A.   Purpose of the Disclosure Statement ...................................................................1
B.   Disclosure Statement Enclosures .........................................................................2
  1.   Order Approving the Disclosure Statement .............................................2
  2.   Ballot........................................................................................................2
  3.   Notice .......................................................................................................2
C.   Confirmation of the Plan......................................................................................2
  1.   Requirements ...........................................................................................2
  2.   Approval of the Plan and Confirmation Hearing ....................................2
  3.   Only Impaired Classes Vote ....................................................................3
D.   Treatment and Classification of Claims and Interests; Impairment....................3
  1.   Treatment of DIP Facility Claims; Administrative Expense Claims and
       Priority Tax Claims..................................................................................3
  2.   Classification of Other Claims and Interests ...........................................6
E.   Voting Procedures and Voting Deadline ............................................................10
F.   Confirmation Hearing ........................................................................................12

ARTICLE II

GENERAL INFORMATION REGARDING THE DEBTORS..................................................13

A.   The Debtors' Business, Management and Employees.........................................13
  1.   Overview.................................................................................................13
  2.   Management.............................................................................................14
  3.   The Debtors' Employees.........................................................................16
  4.   Knight Hawk ...........................................................................................16
B.   Arch Coal's Stock ..............................................................................................16
C.   Options and Other Securities with Values Keyed to Common Stock ................17
D.   Pension Plans .....................................................................................................17
E.   The Debtors' Prepetition Capital Structure........................................................17
F.   Summary of Events Leading to the Chapter 11 Filings......................................19

      1.      Market Challenges Facing the Coal Industry.................................................19

      2.      Environmental and Governmental Regulation.............................................20

G.      Prepetition Restructuring Initiatives ...............................................................21

      1.      Improved Operational Efficiencies .............................................................21

      2.      Restructuring the Portfolio..........................................................................21

      3.      Pension Plans ...............................................................................................22

      4.      Exchange Offers...........................................................................................22

      5.      Preparation for Chapter 11 Filing ...............................................................24

      6.      Chapter 11 Filing .........................................................................................27

## ARTICLE III

THE CHAPTER 11 CASES ...........................................................................................28

A.      Commencement of the Chapter 11 Cases ........................................................28

B.      Automatic Stay.................................................................................................28

C.      "First Day" Motions and Related Applications ...............................................28

D.      Retention of Professionals and Appointment of the Creditors' Committee ......................30

      1.      Retention of Debtors' Professionals ............................................................30

      2.      Appointment of Creditors' Committee and Retention of Creditors'
              Committee Professionals..............................................................................30

E.      Significant Events During the Chapter 11 Cases.............................................31

      1.      Negotiations With Lenders and Unsecured Creditors; Amended and
              Restated Restructuring Support Agreement.................................................31

      2.      Summary of Claims Process, Bar Dates and Claims Filed...........................32

      3.      Exclusivity ...................................................................................................32

      4.      Operational Changes ....................................................................................33

      5.      Wyoming Reclamation Bonding..................................................................33

      6.      Employee Compensation .............................................................................34

F.      9019 Settlement ..............................................................................................35

## ARTICLE IV

SUMMARY OF THE PLAN..........................................................................................36

A.      Considerations Regarding the Plan..................................................................37

B.      Classification and Treatment of Claims and Interests .....................................39

1.  Treatment of DIP Facility Claims; Administrative Expense Claims and Priority Tax Claims .................................................................................40

2.  Treatment of Claims Against and Interests in the Debtors ..................................43

3.  Treatment of Intercompany Claims ..................................................46

C.  Acceptance or Rejection of the Plan ..................................................46

1.  Voting of Claims ..................................................46

2.  Presumed Acceptance of Plan ..................................................46

3.  Presumed Rejection of Plan ..................................................47

4.  Acceptance by Impaired Classes ..................................................47

5.  Elimination of Vacant Classes ..................................................47

6.  Consensual Confirmation ..................................................47

7.  Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ..................................................47

8.  Severability; Reservation of Rights ..................................................47

D.  Implementation of the Plan ..................................................48

1.  Continued Organizational Existence ..................................................48

2.  Section 1145 Exemption ..................................................48

3.  Authorization of New Common Stock ..................................................49

4.  Authorization of New Prairie Holdings Stock ..................................................49

5.  Cancellation of Existing Securities and Related Agreements, the Indentures and the Credit Agreement ..................................................49

6.  Financing and Restructuring Transactions ..................................................50

E.  Provisions Governing Distributions ..................................................52

1.  Disbursing Agent ..................................................52

2.  Timing and Delivery of Distributions ..................................................52

3.  Manner of Payment Under Plan ..................................................55

4.  Undeliverable or Non-Negotiated Distributions ..................................................56

5.  Claims Paid or Payable by Third Parties ..................................................56

F.  Filing of Administrative Expense Claims ..................................................57

1.  Professional Fee Claims ..................................................57

2.  Administrative Expense Claims ..................................................58

G.  Disputed Claims ..................................................59

1.  Objections to Claims ..................................................59

2.  Resolution of Disputed Claims ..................................................59

3.    Estimation of Claims and Interests ................................................................59

4.    Payments and Distributions for Disputed Claims ..........................................60

5.    Distributions After Allowance ........................................................................61

6.    No Amendments to Claims ..............................................................................62

7.    No Interest .......................................................................................................62

H.    Executory Contracts and Unexpired Leases ..............................................................62

1.    Rejection of Executory Contracts and Unexpired Leases ..............................62

2.    Schedules of Executory Contracts and Unexpired Leases ..............................63

3.    Categories of Executory Contracts and Unexpired Leases to Be Assumed .........64

4.    Assumption and Rejection Procedures and Resolution of Treatment
      Objections .......................................................................................................68

5.    Rejection Claims .............................................................................................70

6.    Assignment ......................................................................................................70

7.    Approval of Assumption, Rejection, Retention or Assignment of
      Executory Contracts and Unexpired Leases ...................................................70

8.    Modifications, Amendments, Supplements, Restatements or Other
      Agreements ......................................................................................................71

I.    Provisions Regarding Governance of the Reorganized Debtors ...............................72

1.    Organizational Action .....................................................................................72

2.    Organizational Documents ..............................................................................72

3.    Directors and Officers of the Reorganized Debtors ........................................73

4.    New Stockholders' Agreements ......................................................................74

J.    Effect of Confirmation ..............................................................................................74

1.    Vesting of Assets .............................................................................................74

2.    Release of Liens ..............................................................................................75

3.    Releases and Discharges .................................................................................75

4.    Discharge and Injunction ................................................................................75

5.    Term of Injunction or Stays ............................................................................78

6.    Exculpation ......................................................................................................79

7.    Release by the Debtors ....................................................................................79

8.    Voluntary Releases by the Holders of Claims and Interests ...........................80

9.    Injunction .........................................................................................................81

10.   Setoff and Recoupment ...................................................................................82

x

|       | 11. | Avoidance Actions .................................................................................... | 82 |
|       | 12. | Preservation of Causes of Action ............................................................. | 82 |
|       | 13. | Compromise and Settlement of Claims and Controversies ..................... | 83 |
| K.    |     | Conditions Precedent to Confirmation and Effectiveness of the Plan ............... | 83 |
|       | 1.  | Conditions to Confirmation ..................................................................... | 83 |
|       | 2.  | Conditions to Effectiveness ..................................................................... | 84 |
|       | 3.  | Waiver of Conditions to Confirmation or Effectiveness ......................... | 85 |
| L.    |     | Modification, Revocation or Withdrawal of the Plan ....................................... | 85 |
|       | 1.  | Plan Modifications .................................................................................... | 85 |
|       | 2.  | Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of Confirmation or Effective Date ........................................................... | 86 |
| M.    |     | Retention of Jurisdiction by the Bankruptcy Court .......................................... | 86 |
| N.    |     | Miscellaneous ................................................................................................... | 88 |
|       | 1.  | Exemption from Transfer Taxes and Recording Fees .............................. | 88 |
|       | 2.  | Expedited Tax Determination ................................................................... | 89 |
|       | 3.  | Payment of Statutory Fees ....................................................................... | 89 |
|       | 4.  | Dissolution of the Creditors' Committee ................................................ | 89 |
|       | 5.  | Plan Supplement ....................................................................................... | 89 |
|       | 6.  | Claims Against Other Debtors ................................................................. | 89 |
|       | 7.  | Substantial Consummation ...................................................................... | 90 |
|       | 8.  | Section 1125 of the Bankruptcy Code ..................................................... | 90 |
|       | 9.  | Severability ............................................................................................... | 90 |
|       | 10. | Governing Law .......................................................................................... | 90 |
|       | 11. | Binding Effect ........................................................................................... | 90 |
|       | 12. | Notices ...................................................................................................... | 91 |
|       | 13. | Reservation of Rights ............................................................................... | 93 |
|       | 14. | Further Assurances ................................................................................... | 93 |
|       | 15. | Case Management Order ........................................................................... | 93 |

ARTICLE V

| VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN ................................... | 93 |
| A.    |     | General ............................................................................................................... | 93 |
| B.    |     | Parties in Interest Entitled to Vote .................................................................. | 94 |

C.      Classes Impaired and Entitled to Vote Under the Plan.....................................95

D.      Voting Procedures and Requirements.............................................................95

        1.      Ballots..................................................................................................96

        2.      Submitting Ballots..............................................................................96

        3.      Voting..................................................................................................97

        4.      Releases Under the Plan.....................................................................99

E.      Acceptance of Plan........................................................................................100

F.      Confirmation Without Necessary Acceptances; Cramdown ...........................100

G.      Classification..................................................................................................101

ARTICLE VI

FEASIBILITY AND BEST INTERESTS OF CREDITORS...................................................102

A.      Best Interests Test..........................................................................................102

B.      Liquidation Analysis.......................................................................................102

C.      Application of the Best Interests Test.............................................................103

D.      Feasibility.......................................................................................................103

ARTICLE VII

EFFECT OF CONFIRMATION ..................................................................................104

A.      Binding Effect of Confirmation.....................................................................104

B.      Good Faith .....................................................................................................105

ARTICLE VIII

SECURITIES LAW MATTERS...................................................................................105

A.      Bankruptcy Code Exemptions from Registration Requirements for the New
        Common Stock and New Prairie Holdings Stock..........................................105

        1.      Issuance of New Common Stock and New Prairie Holdings Stock...................105

        2.      Subsequent Transfers of New Stock Covered by the Section 1145(a)(1)
                Exemption..........................................................................................105

ARTICLE IX

CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING...............................106

A.      Certain Bankruptcy and Securities Law Considerations ...............................107

B.      Factors Affecting the Debtors' Business, Operations and Financial Condition .............113

1.      Risks Related to Debtors' Operations................................................................113

2.      Risks Related to Reorganized Prairie Holdings.................................................130

ARTICLE X

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..........................................134

A.      Introduction..............................................................................................................134

B.      Certain U.S. Federal Income Tax Consequences to the Debtors....................................135

1.      Distribution of New Prairie Holdings Stock by Prairie Holdings to Holders
        of Prairie Holdings GUC Claims .....................................................................135

2.      Cancellation of Debt and Reduction of Attributes............................................136

3.      Section 382 Limitation on Net Operating Losses ..............................................136

4.      Dissolution or Transfer of Prairie Coal Company .............................................137

C.      Certain U.S. Federal Income Tax Consequences to the Holders of Claims and
        Interests ...................................................................................................................138

1.      Consequences to Holders of Secured Claims, Other Priority Claims and
        Unsecured Claims .............................................................................................138

2.      Consequences to Holders of Interests in Arch Coal ..........................................143

3.      Information Reporting and Backup Withholding ................................................143

ARTICLE XI

RECOMMENDATION..................................................................................................................144

## <u>Appendices and Schedules</u>

Appendix A     Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

Appendix B     Liquidation Analysis

Appendix C     Financial Projections

Appendix D     Valuation Analysis

Schedule 1     Debtor Entities

# ARTICLE I

# INTRODUCTION

## A.    Purpose of the Disclosure Statement

On January 11, 2016 (the "**Petition Date**"), Arch Coal and those of its subsidiaries that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-Debtor wholly-owned subsidiaries, "**Arch**" or the "**Company**"),[3] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. sections 101 - 1532 (the "**Bankruptcy Code**").  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors have filed their Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  A copy of the Plan has been filed contemporaneously herewith and forms a part of this Disclosure Statement.

**Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan;** *provided***, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.**

The Plan contemplates the reorganization of the Debtors and the resolution of all outstanding Claims against, and Interests in, the Debtors.  The Debtors believe the Plan will treat their creditors in an economic and fair manner.  As discussed further in Article IVA, in developing the Plan, the Debtors considered various issues relating to how the distributable value should be allocated among the creditors of the various Debtors, including, without limitation, (i) whether the elements necessary to obtain an order of substantive consolidation are satisfied in the Chapter 11 Cases; (ii) the value of the Estates on a consolidated and a non-consolidated basis, and the proper method of determining such value; (iii) the value of any unencumbered assets after giving effect to (a) the Prepetition Lender Adequate Protection Claims, (b) all DIP Facility Claims and (c) a fair allocation of all Administrative Expense Claims and Priority Claims; (iv) the projected recoveries of Creditors on a consolidated basis with and without implementation of substantive consolidation, in whole or in part; and (v) the nature and treatment of Intercompany Claims.  The Debtors believe that the Plan strikes a fair and equitable balance between these competing interests.

The Debtors submit this disclosure statement (as may be amended, altered, modified, revised or supplemented from time to time, the "**Disclosure Statement**") pursuant to section

---

[3] All wholly owned domestic direct and indirect subsidiaries of Arch Coal have commenced chapter 11 cases except for Arch Receivable Company, LLC ("**Arch Receivable**"), a special purpose, bankruptcy-remote indirect subsidiary of Arch Coal that is party to the Securitization Facility (as defined herein). The Debtors have seven non-Debtor foreign subsidiaries.

1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to holders of Claims against, and Interests in, the Debtors who will have the right to vote on the Plan so they can make informed decisions in doing so.  Holders entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases.  This Disclosure Statement also contains information regarding significant events that have occurred during the Chapter 11 Cases. In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the holders of Claims entitled to vote under the Plan for their votes to be counted.

**B.**      **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are the following:

1.      Order Approving the Disclosure Statement.  A copy of the order approving the Disclosure Statement (the "**Disclosure Statement Approval Order**") and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to the Plan and scheduling the Confirmation Hearing.

2.      Ballot.  A ballot (the "**Ballot**") for voting to accept or reject the Plan, if you are the record holder of a Claim in a Class entitled to vote on the Plan (each, a "**Voting Class**").

3.      Notice.  A notice setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "**Notice**").

**C.**      **Confirmation of the Plan**

1.      Requirements.  The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.      Approval of the Plan and Confirmation Hearing.  To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.      **Only Impaired Classes Vote.** Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders do not need to vote on such plan.

Under the Plan, holders of Claims in Classes 1C-71C, 1D-70D and 1E are impaired and are entitled to vote on the Plan.

Under the Plan, holders of Claims and Interests in Classes 1F-71F and 1-2G are impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan.

Under the Plan, holders of Claims and Interests in Classes 1A-71A, 1B-71B and 3G-71G are unimpaired and therefore deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1C-71C, 1D-70D and 1E.

## D.      Treatment and Classification of Claims and Interests; Impairment

1.      Treatment of DIP Facility Claims; Administrative Expense Claims and Priority Tax Claims

        (a)    DIP Facility Claims

Pursuant to the DIP Order, all DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment and (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Credit Agreement and the DIP Order, plus the establishment of an agreed-upon reserve in respect of Contingent indemnification obligations arising under the DIP Facility as to which a claim has been asserted as of the Effective Date. Except to the extent that a holder of a DIP Facility Claim agrees in its sole discretion to less favorable treatment, on or before the Effective Date, the DIP Agent, for the benefit of the applicable DIP Lenders and itself, shall be paid in Cash 100% of the then-outstanding amount of the DIP Facility Claims other than Contingent DIP Obligations. Contemporaneously with the foregoing payment, (i) the commitments under the DIP Facility shall automatically terminate, (ii) except with respect to the Contingent DIP Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Facility as provided below), the DIP Facility and the "Loan Documents" referred to therein shall be deemed canceled, (iii) all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all Collateral subject to such Liens shall be automatically released, in each case without further action by the

3

DIP Agent or the DIP Lenders and (iv) all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Facility Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (i) the Contingent DIP Obligations shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and (ii) the DIP Facility and the "Loan Documents" referred to therein shall continue in full force and effect after the Effective Date with respect to any obligations thereunder governing (A) the Contingent DIP Obligations and (B) the relationships among the DIP Agent and the DIP Lenders, as applicable, including but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders), reinstatement obligations pursuant to Section 12.05 of the DIP Credit Agreement and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agent and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facility in accordance with the terms thereof. The Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agent or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

(b)   Contingent Securitization Obligations

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Contingent Securitization Obligations shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and the Securitization Documents shall continue in full force and effect with respect to any obligations thereunder governing the Contingent Securitization Obligations. An agreed-upon reserve shall be established in respect of Contingent indemnification obligations arising under the Securitization Facility as to which a claim has been asserted.

After the Effective Date, the Reorganized Debtors shall continue to reimburse the Securitization Parties for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the Securitization Parties after the Effective Date in accordance with the Securitization Documents and the Securitization Order.

(c)   Administrative Expense Claims

Except to the extent that the applicable holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with the Reorganized Debtors, each Allowed Administrative Expense Claim shall be paid in full in Cash (i) on or as soon as reasonably practicable after the Effective Date (for Claims Allowed as of the Effective Date), (ii) on or as

soon as practicable after the date such Claim is Allowed (or upon such other terms as may be agreed upon by such holder and the applicable Reorganized Debtor) or (iii) as otherwise ordered by the Bankruptcy Court.

Allowed Administrative Expense Claims regarding assumed agreements, obligations incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and non-ordinary course obligations approved by the Bankruptcy Court shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such Claims.

(d)   Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Reorganized Debtors, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to Section 7.1 of the Plan.

(e)   Prepetition Lender Adequate Protection Claim

The portion of the Prepetition Lender Adequate Protection Claim that accrued between the Petition Date and June 22, 2016 shall be deemed to have been waived pursuant to the Plan; *provided,* that such waiver shall be null and void *ab initio* if (i) the Creditors' Committee or any creditor is granted standing to pursue any action on behalf of the Debtors' estates and (ii) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction is entered that precludes the Debtors from settling any such action on behalf the Debtors' estates. The portion of the Prepetition Lender Adequate Protection Claim that accrues between June 23, 2016 and the Effective Date shall either (x) reduce the amount of Cash and New Prairie Holdings Stock distributed to holders of General Unsecured Claims as set forth in Article 3 of the Plan or, otherwise, (y) be deemed to have been waived.

(f)   Priority Tax Claims

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such holder agree to less favorable treatment with the Reorganized Debtors, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Reorganized Debtors shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

2.      Classification of Other Claims and Interests

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the DIP Order), or required by applicable non-bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.  For the purpose of classification and treatment under the Plan, (i) any Claim, other than a Prairie Holdings Claim, in respect of which one Debtor is the primary obligor and one or more additional Debtors are guarantors shall be treated as a single Claim against the primary obligor and (ii) any Claim, other than a Prairie Holdings Claim, in respect of which multiple Debtors are jointly liable shall be treated as a single Claim against only one of the jointly liable Debtors.

### Summary of Classification and Treatment of
### Claims and Interests in the Debtors

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one chart.  The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflects the Debtors' views as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

6

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of The Plan," below.

| Class | Designation | Plan Treatment of Allowed Claims | Status | Projected Recovery Under the Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| 1A-71A | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall be entitled to payment in full in Cash; or other treatment that will render the Claim Unimpaired. | Unimpaired | 100% | $702,000 |
| 1B-71B | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall be entitled to Payment in full in Cash; Reinstatement of the legal, equitable and contractual rights of the holder of such Claim; a distribution of the proceeds of the sale or disposition of the Collateral securing such Claim, in each case, solely to the extent of the value of the holder's secured interest in such Collateral; return of Collateral securing such Claim; or other treatment that will render the Claim Unimpaired. | Unimpaired | 100% | $41,471,814 |
| 1C-71C | First Lien Credit Facility Secured Claims | Each holder of an Allowed First Lien Credit Facility Secured Claim shall be entitled to receive its Ratable Share of (i) total Cash payment equal to $114,796,527.78 *less* the amount of the Adequate Protection Payments; (ii) $326.5 million in principal amount of New First Lien Debt; and (ii) 100% of the New Common Stock, subject to dilution pursuant to the Management Incentive Plan. | Impaired | 37% - 60% | $1,886,125,000 |

| Class | Designation | Plan Treatment of Allowed Claims | Status | Projected Recovery Under the Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| 1D-70D | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim (including First Lien Credit Facility Deficiency Claims) shall be entitled to receive its Ratable Share of $33.4 million in Cash *less* (a) Excess Lender Challenge Fees and (b) a fair allocation of all payments made in respect of DIP Facility Claims, Administrative Expense Claims and Priority Claims, in each case, whether paid during the course of the Chapter 11 Cases or pursuant to the Plan; *provided*, that if (a) the Creditors' Committee or any Creditor is granted standing to pursue any action on behalf of the Debtors' estates, (b) holders of General Unsecured Claims do not vote to approve the Plan or (c) the Creditors' Committee objects to confirmation of the Plan, such Cash distribution shall also be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided, further*, that the holders of First Lien Credit Facility Deficiency Claims against Arch Coal shall waive their distributions on account of First Lien Credit Facility Deficiency Claims and all Cash that would have otherwise been distributed on account of First Lien Credit Facility Deficiency Claims shall be retained by the Debtors. | Impaired | 0.7% | $4,493,000,000 - $4,931,000,000 |

| Class | Designation | Plan Treatment of Allowed Claims | Status | Projected Recovery Under the Plan | Estimated Allowed Claims |
|-------|-------------|----------------------------------|--------|-----------------------------------|--------------------------|
| 1E | Prairie Holdings GUC Claims | If a Knight Hawk Encumbrance Order has been entered, no distribution.  Otherwise, each holder of an Allowed Prairie Holdings GUC Claim (including First Lien Credit Facility Claims against Prairie Holdings) shall be entitled to receive its Ratable Share of the New Prairie Holdings Stock; *provided*, that the New Prairie Holdings Stock to be distributed to holders of Allowed Prairie Holdings GUC Claims (other than First Lien Credit Facility Claims against Prairie Holdings) shall be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided*, *further*, that (i) each holder of a First Lien Credit Facility Claim shall be deemed to contribute any New Prairie Holdings Stock received on account of such claim to Reorganized Arch Coal; and (ii) each holder of a Prairie Holdings GUC Claim (other than First Lien Credit Facility Claims) may elect to receive Cash in the amount equal to [  ]% of its Prairie Holdings GUC Claim in lieu of the New Prairie Holdings Stock that they would have otherwise received on account of such claim.  Such elections will be honored beginning with the electing holder of the lowest amount of Prairie Holdings GUC | Impaired | 0% - 2% | $5,237,038,628 |

| Class | Designation | Plan Treatment of Allowed Claims | Status | Projected Recovery Under the Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| | | Claims and proceeding to electing holders of successively higher amounts of Prairie Holdings GUC Claims until the Prairie Holdings GUC Cash is exhausted, with the New Prairie Holdings Shares that would have been distributed to such electing holders instead distributed to Reorganized Arch Coal. | | | |
| 1F-71F | Section 510(b) Claims | No distribution. | Impaired | 0% | $0 |
| 1G | Interests in Arch Coal | No distribution. | Impaired | N/A | N/A |
| 2G | Interests in Prairie Holdings | If a Knight Hawk Encumbrance Order has been entered, Reinstated. Otherwise, canceled. | Impaired | N/A | N/A |
| 3G-71G | Interests in Subsidiary Debtors other than Prairie Holdings | Reinstated or canceled. | Unimpaired | N/A | N/A |

**E.     Voting Procedures and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. To ensure your vote is counted, you must complete, date, sign and promptly mail the ballot enclosed with the notice or complete your ballot using the online portal maintained by the Solicitation and Claims Agent, in each case indicating your decision to accept or reject the Plan in the boxes provided.

The Ballot also contains an election to opt out of the release provisions contained in Section 11.8 of the Plan. Holders of Claims who are deemed to accept or deemed to reject the Plan will not receive Ballots, but will receive a notice affording them the opportunity to opt out of the releases contained in Section 11.8 of the Plan (the "**Opt Out Notice**"). Unless you indicate your decision to opt out of the releases described in Section 11.8 of the Plan on the Ballot or Opt Out Notice, you will be deemed to consent to such releases.

TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AND CLAIMS AGENT NO LATER THAN 11:59 P.M. (PREVAILING CENTRAL TIME) ON [●] [●], 2016 (THE "**VOTING DEADLINE**").

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(i)      any Ballot or Master Ballot (as defined in the Disclosure Statement Approval Order) received after the Voting Deadline (unless extended by the Debtors);

(ii)      any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the holder;

(iii)      any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

(iv)      any Ballot cast for a Claim designated by the Debtors as contingent, unliquidated or disputed or as zero or unknown in amount and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline (as such terms are defined in the Disclosure Statement Approval Order);

(v)      any Ballot cast for Claim that has been disallowed (for voting purposes or otherwise);

(vi)      any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and a rejection, of the Plan;

(vii)      any Ballot (other than a Master Ballot) that casts part of its vote in the same Class to accept the Plan and part to reject the Plan;

(viii)      any form of Ballot or Master Ballot other than the official form sent by Prime Clerk LLC ("**Prime Clerk**" or the "**Solicitation and Claims Agent**"), or a copy thereof;

(ix)      any Ballot received that the Solicitation and Claims Agent cannot match to an existing database record;

(x)      any Ballot or Non-Voting Notice sent directly to any of the Debtors, their agents (other than the Solicitation Agent), any indenture trustee (unless specifically instructed to do so) or the Debtors' financial or legal advisors or to any other party other than the Solicitation and Claims Agent;

(xi)   any Ballot or Master Ballot that is submitted by facsimile, email or any electronic means other than the online electronic ballot portal maintained by the Solicitation and Claims Agent; or

(xii)   any Ballot or Master Ballot that does not contain an original signature, unless such Ballot or Master Ballot was submitted via the online electronic ballot portal maintained by the Solicitation and Claims Agent.

In order for the Plan to be accepted by an impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE OR COMPLETE YOUR BALLOT USING THE ONLINE PORTAL MAINTAINED BY THE SOLICITATION AND CLAIMS AGENT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT AT 844-242-7478 OR, FOR INTERNATIONAL CALLERS, 929-477-8086 OR AT ARCHBALLOTS@PRIMECLERK.COM.  THE SOLICITATION AND CLAIMS AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

## F.   Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [●], 2016 at [●] (prevailing Central Time) in the United States Bankruptcy Court for the Eastern District of Missouri, Thomas F. Eagleton U.S. Courthouse, 111 S. 10th Street, Courtroom 7 South, St. Louis,  Missouri 63102 (the "**Confirmation Hearing**").  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before [●], 2016 at [●] (prevailing Central Time) in the manner described in the Notice accompanying this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by way of announcement of such continuance in open Court or otherwise, without further notice to parties in interest.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

# ARTICLE II

# GENERAL INFORMATION REGARDING THE DEBTORS

**A.      The Debtors' Business, Management and Employees**

1.      Overview

Arch is a leading producer and marketer of coal in the United States, with large, low-cost operations and high-quality coal reserves in each of the major coal-producing regions of the country.

Arch's principal business is the mining, preparation and marketing of high-quality metallurgical and thermal (or steam) coal. Metallurgical coal is sold primarily to steel mills and independent coke producers for the manufacture of steel. Steam coal products are sold to power generators to produce electricity, steam, or both.

Arch supplies different qualities of coal to a variety of domestic and international customers located in 36 U.S. states and 20 countries throughout North America, Europe, Asia and South America. The Company's principal customers are domestic and foreign utilities (including approximately 160 power plants in the United States), steel producers and other industrial facilities. Arch sold 128 million tons of coal in 2015.

The Company was founded in 1969 as Arch Mineral Corporation and initially produced coal primarily from the eastern United States. Through a series of acquisitions beginning in the late 1990s, the Company expanded its holdings into the western United States.

Today, Arch conducts mining operations at ten active mine complexes. For reporting purposes, the Company organizes its production units into three segments:  the Powder River Basin segment, with operations in Wyoming; the Appalachia segment, with active operations in West Virginia, Kentucky, and Virginia; and the Bituminous Thermal segment, with operations in Colorado and Illinois. In 2015, 84% of the coal Arch produced and sold based on volume was from the Powder River Basin. The Appalachia segment accounted for approximately 10% of Arch's sales by volume in 2015, including all of its metallurgical coal, which typically receives a significant premium to thermal coal in the marketplace. Operations in Colorado and Illinois comprised the remaining 6% of sales by volume.

The U.S. coal industry is intensely competitive. Arch's principal domestic competitors include Alliance Resource Partners, L.P., Alpha Natural Resources, Inc., Cloud Peak Energy Inc., CONSOL Energy Inc., Foresight Energy LP, Murray Energy Corporation, Peabody Energy Corporation, and Walter Energy, Inc. Arch competes with these companies on the basis of coal quality, delivered costs to the customer and reliability of supply.

This operating environment has become more competitive due to weaker economic conditions globally; an increase in the availability of competing fuels and a decrease in their price – particularly natural gas and the impact of increasingly stringent environmental and other government regulations.

13

The Company has an extraordinary and dedicated workforce that has continued to meet performance metrics and enabled Arch to continue to achieve its high standards of safety, environmental protection and productivity despite exceedingly difficult markets. The Company is also an industry leader in workplace safety and environmental compliance. In 2015, the Company's safety performance was three times better than the industry average based on lost-time safety incident rates. Its safety performance in 2015 was the best on record in Company history (measured by total incident rate), and 10% better than the already low rate achieved in 2014. The Debtors also set a new Company record for performance in the area of environmental compliance in 2015, achieving a 50% improvement when compared to full year 2014. Four complexes completed the first quarter of 2016 without a single reportable incident or environmental violation. Moreover, the Company has completed seven months with no Surface Mining Control Reclamation Act (SMCRA) violations. Additionally, in 2015, the Company achieved significant reductions in cash cost per ton in its Powder River Basin and Appalachia operations.

2.      Management

The Debtors' current management team is composed of highly capable and experienced professionals. Information regarding Arch's executive officers is as follows:

| Name | Position |
| --- | --- |
| John W. Eaves | Chairman and Chief Executive Officer |
| Kenneth D. Cochran | Senior Vice President, Operations |
| John T. Drexler | Senior Vice President and Chief Financial Officer |
| Robert G. Jones | Senior Vice President – Law, General Counsel and Secretary |
| Allen R. Kelley | Vice President, Human Resources |
| Paul A. Lang | President and Chief Operating Officer |
| Deck S. Slone | Senior Vice President, Strategy and Public Policy |
| John A. Ziegler, Jr. | Chief Commercial Officer |

*John W. Eaves*. Mr. Eaves was elected Chairman of the Board in April 2015 and currently serves as Chairman and Chief Executive Officer. Mr. Eaves served as President and Chief Operating Officer from 2006 until he was elected as Chief Executive Officer in April 2012. From 2002 to 2006, Mr. Eaves served as Executive Vice President and Chief Operating Officer. Mr. Eaves currently serves on the boards of COALOGIX and the National Mining Association, and is a past chairman of the National Coal Council.

*Kenneth D. Cochran*. Mr. Cochran has served as Senior Vice President – Operations since August 2012. From May 2011 to August 2012, Mr. Cochran served as Group President of Western Operations, which included Thunder Basin Coal Company and the Arch Western Bituminous Group. He served as President and General Manager of Thunder Basin Coal Company from 2005 to April 2011. Prior to joining Arch Coal in 2005, Mr. Cochran spent 20

14

years with TXU Corporation. Mr. Cochran currently serves on the boards of Millennium Bulk Terminals-Longview LLC and Knight Hawk Holdings, LLC.

*John T. Drexler*. Mr. Drexler has served as Senior Vice President and Chief Financial Officer since 2008 and as principal accounting officer since January 2016. Mr. Drexler served as Vice President, Finance and Accounting from 2006 to 2008. From 2005 to 2006, Mr. Drexler served as Director of Planning and Forecasting. Prior to 2005, Mr. Drexler held several other positions within Arch's finance and accounting department.

*Robert G. Jones*. Mr. Jones has served as Senior Vice President – Law, General Counsel and Secretary since 2008. Mr. Jones served as Vice President – Law, General Counsel and Secretary from 2000 to 2008.

*Allen R. Kelley*. Mr. Kelley was appointed Vice President, Human Resources in March 2014. From 2008 to March 2014, Mr. Kelley served as Vice President – Enterprise Risk Management. From 2005 to 2008, Mr. Kelley served as Director of Internal Audit. Prior to 2005, Mr. Kelley held various finance and accounting positions within the corporate and operations functions of Arch Coal, Inc.

*Paul A. Lang*. Mr. Lang was elected President and Chief Operating Officer in April 2015. He has served as Executive Vice President and Chief Operating Officer since April 2012 and was Executive Vice President, Operations from August 2011 to April 2012. Mr. Lang served as Senior Vice President, Operations from 2006 through August 2011, as President of Western Operations from 2005 through 2006, and as President and General Manager of Thunder Basin Coal Company from 1998 to 2005. Mr. Lang is a director of Arch Coal, Inc., Advanced Emissions Solutions, Inc. and Knight Hawk Holdings, LLC. Mr. Lang also serves on the development board of the Mining Department of the Missouri University of Science & Technology and is chairman of the University of Wyoming's School of Energy Resources Council.

*Deck S. Slone*. Mr. Slone has served as Senior Vice President – Strategy and Public Policy since June 2012. Mr. Slone served as Vice President, Government, Investor and Public Affairs from 2008 to June 2012. Mr. Slone served as Vice President – Investor Relations and Public Affairs from 2001 to 2008. Mr. Slone is a director of Millennium Bulk Terminals-Longview, and serves as co-chair of the Coal Utilization Research Council, as National Coal Council Policy Committee chair and as a member of the steering committee of the Consortium for Clean Coal Utilization at Washington University in St. Louis.

*John A. Ziegler, Jr*. Mr. Ziegler was appointed Chief Commercial Officer in March 2014. Mr. Ziegler served as Vice President – Human Resources from April 2012 to March 2014. From October 2011 to April 2012, Mr. Ziegler served as Senior Director, Compensation and Benefits. From 2005 to October 2011, Mr. Ziegler served as Vice President, Contract Administration, President of Sales, and Senior Vice President, Sales and Marketing and Marketing Administration. Mr. Ziegler joined Arch Coal in 2002 as Director – Internal Audit. Prior to joining Arch Coal, Mr. Ziegler held various finance and accounting positions with bioMerieux and Ernst & Young.

15

3.    The Debtors' Employees

Arch employs approximately 4,125 full- and part-time employees. These employees include miners, engineers, truck drivers, mechanics, managers, executives and administrative staff.

None of Arch's employees is represented by a union. Arch provides funded and unfunded non-contributory defined benefit pension plans covering certain of its salaried and hourly employees, as described below, as well as postretirement medical and life insurance coverage for eligible employees. The amount of these benefits is generally based on the employee's age and compensation, and Arch funds the cost of all postretirement benefits as they are paid.

4.    Knight Hawk

The Plan contemplates the possibility that interests in Debtor Prairie Holdings, Inc. ("**Prairie Holdings**") may be distributed to holders of Prairie Holdings GUC Claims.  Prairie Holdings is the sole owner of a 49% membership interest in Knight Hawk Holdings, LLC ("**Knight Hawk**"), a joint venture with CBR Investments, LLC ("**CBR**"), which owns the remaining 51% membership interest.  Knight Hawk operates coal mining operations in southern Illinois.  CBR is controlled by the families of its founding partners—Steve Carter, F.D. Robertson, James Bunn and James Bunn, Jr.—with the Carter family owning 50% of CBR's membership interest in Knight Hawk and the Bunn and Robertson families owning the remaining 50%.  One of Knight Hawk's competitive advantages is its dock, Lone Eagle, on the Mississippi River, from which 80% of the coal produced by Knight Hawk is shipped. Access to the Mississippi River allows Knight Hawk to competitively access markets throughout the Midwest and Southeast United States, as well as international opportunities through the Gulf Coast. In support of Lone Eagle Dock, Knight Hawk contracts an independent truck fleet as well as the ability to load rail cars on the Canadian National in a limited fashion.  At present, Knight Hawk has the capacity to produce and deliver up to 6.5 million tons of Illinois Basin coal per year and its proven reserves provide for a mining life of more than 25 years.

As discussed below, there is a dispute as to whether Prairie Holdings' 49% membership interest in Knight Hawk (the "**Knight Hawk Interest**") is encumbered under the First Lien Credit Facility. If the Knight Hawk Interest is unencumbered, it would constitute the Debtors' most valuable unencumbered asset. The treatment of Claims against Prairie Holdings under the Plan varies based on the judicial determination regarding such encumbrance.

**B.    Arch Coal's Stock**

Arch Coal is the direct or indirect parent of each of the Debtors. Arch Coal's common stock has historically been publicly traded on the New York Stock Exchange (the "**NYSE**") under the ticker symbol "ACI." On the Petition Date, the NYSE determined that Arch was no longer suitable for listing pursuant to Section 8.02.01D of the NYSE continued listing standards, and trading of the Company's common stock was suspended. Arch's common stock is now traded under the ticker symbol "ACIIQ" on the OTC Pink marketplace, operated by OTC Markets Group Inc.

16

As of the Petition Date, Arch Coal had 26,000,000 authorized shares of common stock, $0.01 par value, of which 21,298,872 were outstanding as of the Petition Date.

**C.  Options and Other Securities with Values Keyed to Common Stock**

As of the Petition Date, Arch Coal had 655,753 outstanding non-qualified stock options, as well as 385,246 time-based restricted stock units outstanding.

**D.  Pension Plans**

Arch Coal sponsors a defined benefit pension plan, the Arch Coal, Inc. Retirement Account Plan (the "**Arch Pension Plan**").  The Arch Pension Plan is a qualified defined benefit pension plan in which approximately 6,600 of the Debtors' employees and former employees participate. The Arch Pension Plan is closed to new participants and was frozen effective as of December 31, 2014 as to future service benefit accruals.

Debtor Cumberland River Coal Company ("**Cumberland**") sponsors a defined benefit pension plan, the Cumberland River Coal Company Pension Plan ("**Cumberland Pension Plan**," and collectively with the Arch Pension Plan, the "**Pension Plans**").  Approximately 670 of the Debtors' former employees participate in the Cumberland Pension Plan. The Cumberland Pension Plan was frozen effective as of February 15, 2015 as to future benefit accruals.

The Pension Plans are covered by Title IV of ERISA.  The Plan provides that the Debtors shall assume and continue the Pension Plans, pay all required PBGC premiums in accordance with 29 U.S.C. § 1307, satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with the applicable provisions of ERISA.  The PBGC has filed contingent proofs of claim against the Debtors  (collectively, the "**PBGC Claims**"), including estimated claims for unfunded benefit liabilities on a termination basis owed to the Arch Pension Plan in the amount of $81,800,000 and the Cumberland Pension Plan in the amount of $16,200,000.  Upon the Effective Date, PBGC will be deemed to have withdrawn the PBGC Claims with prejudice.

The Plan provides that no provision of the Plan, the Confirmation Order or section 1141 of the Bankruptcy Code shall be construed to discharge, release or relieve any party, in any capacity, from liabilities under any law or regulatory provision with respect to the Pension Plans. The Plan also provides that the PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code.

**E.  The Debtors' Prepetition Capital Structure**

Arch Coal, as borrower, and substantially all of the other Debtors, as guarantors, entered into an Amended and Restated Credit Agreement dated as of June 14, 2011 (as amended, supplemented or modified from time to time, the "**First Lien Credit Agreement**"), originally by

17

and among the Debtors, Bank of America, N.A.,[4] as the original term loan administrative agent (solely in its capacity as such, the "**Original First Lien Agent**"), PNC National Association, as the original revolver administrative agent and collateral agent, and the lenders party thereto (solely in their capacity as such, the "**First Lien Lenders**").  The First Lien Credit Agreement provided for a $1.9 billion secured term loan facility due in 2018 (the "**Term Loan**"). Obligations arising under the Term Loan were guaranteed by substantially all of the Subsidiary Debtors and were secured by first-priority liens on substantially all of the Debtors' assets.

The First Lien Credit Agreement also provided for up to $250 million in revolving loans. On November 11, 2015, Arch terminated all revolving credit commitments under the First Lien Credit Agreement, and no revolving loans remain outstanding.

Arch Coal also issued several series of unsecured notes: (i) $1 billion of 7.000% senior unsecured notes due 2019; (ii) $375 million of 9.875% senior unsecured notes due 2019; (iii) $500 million of 7.25% senior unsecured notes due 2020 (the "**2020 Notes**"); and (iv) $1 billion of 7.25% senior unsecured notes due 2021. The senior unsecured notes are guaranteed by substantially all of the Subsidiary Debtors.

In addition, Arch Coal issued $350 million of 8.00% senior secured second lien notes due 2019.  These notes are secured by the same assets that secure indebtedness under the First Lien Credit Agreement, but on a second-priority basis, and are guaranteed by substantially all of the Subsidiary Debtors.

Prior to the Petition Date, the Debtors' outstanding letters of credit were issued under a $200 million accounts receivable securitization facility (the "**Securitization Facility**") with PNC Bank, National Association, as administrator (solely in its capacity as such, the "**Administrator**") and letter of credit bank (solely in its capacity as such, the "**LC Bank**") on behalf of a syndicate of purchasers and letter of credit providers (together with the administrator and the LC Bank, the "**Securitization Parties**").  The letters of credit were collateralized by a combination of eligible accounts receivable (including collections, proceeds and certain other interests related thereto, the "**Receivables**") and cash.  As of the Petition Date, approximately $178 million in letters of credit were outstanding under the Securitization Facility, which were secured by eligible accounts receivable and approximately $97 million of cash collateral.

The Securitization Facility operated through the true sale of the Receivables by certain of the Debtors to Arch Coal's wholly owned special purpose entity, Arch Receivable, which in turn obtained letters of credit secured by the Receivables pool.  Under the Securitization Facility, the transfer of the Receivables had also been perfected by filing UCC financing statements.  To the extent these transfers are recharacterized as an extension of credit rather than true sales, the Debtors party to the Securitization Facility granted first lien security interests and liens on the Receivables in favor of the Administrator and the Securitization Parties.  As described in greater detail in Article IIG.5(c) below, subsequent to the Petition Date, the Debtors obtained Bankruptcy Court approval to continue the Securitization Facility, as amended.

---

[4] As discussed further below, Bank of America, N.A. was subsequently replaced as administrative agent by Wilmington Trust, National Association.

**F.      Summary of Events Leading to the Chapter 11 Filings**

1.      Market Challenges Facing the Coal Industry

The Debtors' operational success is closely linked to global demand for coal-fueled electricity and steel. Over the past several years, a confluence of economic challenges and regulatory hurdles has hobbled the coal industry. In domestic thermal markets, the industry has experienced falling coal demand and an associated decline in coal prices, precipitated by flat U.S. power demand, a surge in low-cost natural gas availability and increasingly burdensome environmental regulations. In metallurgical markets, the industry has suffered from slowing global economic growth, a related decline in global steel production, the start-up of significant new coal mine capacity in Australia and a strong U.S. dollar that has undermined the competitiveness of U.S. producers. As a result of these challenges, several major U.S. coal companies have filed for Chapter 11 protection in the last several years, and virtually all are in distress.

The Debtors' revenue is largely dependent on coal prices, which have declined sharply in the face of the foregoing developments. In December 2015, the price of metallurgical coal fell to its lowest point since 2004, down more than 75% from its previous high in 2011. The price of steam coal has followed a similar trajectory. Domestically, thermal coal consumption in the United States fell by approximately 300 million tons between 2008 and 2015.

A key factor in the declining demand for coal is the availability of inexpensive natural gas. Significant quantities of natural gas have become available at economically competitive prices due to technological advancements allowing the extraction of natural gas from large shale deposits in the United States. As a result, prices for natural gas have fallen dramatically, spurred by a glut of production from shale fields in Pennsylvania, West Virginia and Ohio, among other regions. In 2015, for the first time ever, natural gas surpassed coal as the largest source of electricity in the United States in certain months, and it is expected to surpass coal for the full year in 2016. Coal accounted for approximately 33% of U.S. energy generation by megawatt hour in 2015, down from 42% in 2011 and 48% in 2008. Based on government forecasts, coal is expected to account for approximately 31% of U.S. energy generation in 2016.

Demand for metallurgical coal depends on the strength of the global economy and, in particular, the demand for steel. Weak economic growth, particularly in Europe and in China, has lowered demand for construction materials and other steel products, which has reduced demand for metallurgical coal. Additionally, excess steel production within China has affected international steel prices and affected demand for the seaborne trade of metallurgical coal. Domestic metallurgical markets have also come under pressure due to increased steel imports and reduced steel demand by oil and gas producers has also eroded metallurgical coal demand in the United States. Increases in metallurgical coal supply in Australia and elsewhere in recent years have exacerbated the global imbalance.

In the face of these competitive pressures, U.S. coal producers have been especially disadvantaged. The strength of the U.S. dollar reached an 11-year high in March 2015. A strong dollar benefits foreign producers, whose input costs are generally denominated in local

19

currencies. Australia, whose currency has been particularly weak, has especially benefited from the strong U.S. dollar, given its significant coal reserves and established infrastructure. Consequently, U.S. producers have been forced to close mines and reduce production in an effort to remain competitive.

2.      Environmental and Governmental Regulation

These macroeconomic trends have been compounded by an increasingly unfavorable regulatory environment. In particular, the promulgation of new emissions regulations have made it more costly for electric generating companies to use coal as an energy source. Other regulations, such as those governing mining and reclamation, have imposed even more direct costs on the coal industry.

(a)   Regulation of Power Plants

In 2011, the U.S. Environmental Protection Agency (the "**EPA**") issued Mercury and Air Toxics Standards ("**MATS**"), which set limits on the amount of mercury and other emissions that oil-and coal-fueled power plants may release. Although the Supreme Court struck down the regulations in June 2015 – requiring the agency to perform a cost-benefit analysis before issuing the final rule – electric generators had already taken steps to comply by retiring older, smaller generation units or setting in motion their retirements, concluding that retrofitting these facilities to meet the new regulations would be cost-prohibitive.

In August 2015, the EPA proposed new rules to limit emissions from new and existing power plants. Among these rules is the Clean Power Plan, which requires by 2030 that carbon emissions be reduced by 32% from 2005 levels. If implemented as currently proposed, the Clean Power Plan could reduce demand for coal in the United States still further, depending on how states elect to comply. In February 2016, the United States Supreme Court ordered the EPA to halt enforcement of the Clean Power Plan until the matter is fully adjudicated.

As a result of EPA regulations, nearly 400 coal-fueled electricity-generating units have been retired or converted to natural gas, and this trend is predicted to continue. Overall, 23% of existing U.S. coal units are expected to retire or convert by 2025 when compared to 2011 levels. These regulations also disincentivize the construction of new coal-fueled units.

In addition to imposing strict regulations on coal-fueled power plants, federal and state governments have in recent years subsidized the development and use of alternative energy sources through tax credits. While these alternative sources remain a relatively small percentage of the U.S. power generation mix, they are expanding steadily and have also served to erode coal's market share.

(b)   Regulation of Coal Mining

Federal, state and local authorities similarly regulate the U.S. coal mining industry with respect to employee safety and the environment, including the protection of air quality, water quality, wetlands and other environmental resources. Reclamation – the restoration of land and environmental values to a mining site after the coal is extracted – is required during production

20

and after mining has been complete. Regulations also govern how materials used and generated by mining operations must be managed.  The cost of compliance with these regulations directly impacts the cost of coal extraction and the ability to secure mining permits.

## G.    Prepetition Restructuring Initiatives

In the years leading up to the Petition Date, Arch's management team took many actions to adjust to the challenges of the rapidly evolving coal marketplace. The Company cut costs, pursued efficiency improvements, optimized its asset base, focused on high-return opportunities, bolstered its liquidity profile and took steps to deleverage its balance sheet.

### 1.    Improved Operational Efficiencies

From an operational perspective, the Company took steps to reduce coal production to match market expectations while trimming operating costs –through salary and wage reductions as well as lower capital expenditures per ton.  At the same time, Arch executed its aggressive process improvement program, optimized material usage, implemented a predictive maintenance initiative and cut parts and supplies expense through renegotiated supplier terms. As a result, the Company achieved a reduction in the cash cost of coal from the Powder River Basin by $0.32/ton in 2015, compared with 2014, and reduced the cost of coal from its Appalachia segment by $7.30/ton over the same period.

The reduction in the price of coal was accompanied by a reduction in the Company's selling, general and administrative expense. In total the Company cut SG&A spending by 26% between 2013 and 2015.

In addition, the Company has endeavored to increase operating efficiencies. Over the 12 months preceding the Petition Date, the Company adjusted operating schedules and reduced shift work and contract labor throughout its operating portfolio to better align with market demand.

### 2.    Restructuring the Portfolio

In recent years, the Company has evaluated opportunities and has made careful decisions to cultivate a mining portfolio tailored to meet the needs of two very complex and dynamic coal markets. The acquisition of International Coal Group in 2011 expanded the Company's metallurgical coal asset base and enhanced its suite of metallurgical coal qualities. This transaction allowed for more robust participation in domestic and international metallurgical markets. Subsequently, the Company took additional steps to optimize its mining portfolio and monetize assets that were not essential to future growth plans. Since the beginning of 2012, the Company divested, closed or idled eight mining complexes, which included the sale of the Canyon Fuels operations in 2013 for approximately $435 million. The Company also divested a highwall miner manufacturing unit, ADDCAR Systems, LLC, for $21 million; its Hazard, Kentucky subsidiary for $26 million; and several other idled properties. The sale of these assets was consistent with the Company's efforts to realign the portfolio around the highest-return opportunities. During that same period, the Company reduced its workforce by nearly 3,000 employees.

In addition, Arch made efforts to preserve liquidity by decreasing capital expenditures in 2014 to $147 million – down nearly $250 million from 2012 levels. Arch further reduced capital spending levels in 2015 to $119 million and believes that level is sustainable going forward. The Company also reduced the annual cash dividend rate by more than 90%, before eliminating the dividend entirely in the first quarter of 2015.

3.    Pension Plans

The Company has taken other steps as well. On December 31, 2014, the Arch Pension Plan was frozen to future benefit accruals.  On February 15, 2015, the Cumberland Pension Plan was also frozen to future benefit accruals.  These plans are well-funded, with plan assets exceeding 90% of plan obligations on a present value basis as of December 31, 2015.

As a result of these extensive efforts, the Company achieved a significant operational restructuring and further enhanced its position to benefit from an upturn in the demand for coal. However, in light of the ongoing challenging market conditions, it became clear that material changes to its balance sheet were necessary.

4.    Exchange Offers

In February 2015, the Company retained Davis Polk & Wardwell LLP as its legal advisor and PJT Partners, Inc. (then known as Blackstone Advisory Services L.P.) ("**PJT**") as its investment banker to begin exploring the possibility for an out-of-court restructuring with certain of its unsecured noteholders in order to de-lever its balance sheet and improve liquidity.  As a result thereof, on July 2, 2015, Arch launched two private debt exchange offers (the "**Exchange Offers**"), one to exchange all of its outstanding 2020 Notes for new 6.25% Trust Certificates due 2021 and a cash payment, and one to exchange its other outstanding unsecured notes for new 6.25% Trust Certificates, newly issued 8.00% Senior Secured Notes due 2022 and/or 12.00% Senior Secured Second Lien Notes due 2023.  Each of the 6.25% Trust Certificates represented a fractional undivided interest in a Delaware statutory trust whose assets would have been (i) up to $150 million in incremental first lien term loans issued under the First Lien Credit Agreement and (ii) up to $254 million in first lien revolving loans issued under the First Lien Credit Agreement.  In order to effectuate the exchange offers, Bank of America would have had to execute certain documents, including an amendment and joinder to the First Lien Credit Agreement and a new intercreditor agreement.

Simultaneously with the launch of the Exchange Offers, the Company entered into a lock-up and support agreement with holders of approximately 56.9% of the aggregate principal amount of outstanding 2020 Notes, pursuant to which the Company committed to, among other things, launch and consummate the Exchange Offer for the 2020 Notes, and such holders committed to, among other things, support and participate in such Exchange Offer (the "**Support Agreement**"), in each case, subject to and in accordance with the terms thereof.  The Exchange Offers and the Support Agreement were initially scheduled to expire on July 30, 2015 and August 30, 2015, respectively; however, the Company extended these dates multiple times through October 26, 2015.

On July 28, 2015, a group of lenders holding more than 50% of the Term Loans under the First Lien Credit Agreement (the "**Directing Lenders**") delivered a letter to the Original First Lien Agent directing it not to execute or approve documentation relating to the Exchange Offers that would be required for the Exchange Offers to close (the "**Direction Letter**"). The Direction Letter included other assertions regarding the Exchange Offers, including that the Exchange Offers were impermissible under the Credit Agreement and the existence of a default under the First Lien Credit Agreement.

After receiving the Direction Letter, Bank of America, N.A. resigned as the Original First Lien Agent. The First Lien Lenders then appointed Wilmington Trust, National Association as the new administrative agent pursuant to the First Lien Credit Agreement (solely in its capacity as such, the "**First Lien Agent**").

On September 16, 2015, GSO Special Situations Master Fund LP and certain entities related thereto (collectively, "**GSO**") sued the First Lien Agent and the Directing Lenders in the Commercial Division of the Supreme Court of the State of New York, County of New York (the "**State Court**") (Index No. 653110/2015). None of the Debtors were party to the lawsuit.

GSO's complaint alleged that the Directing Lenders were improperly attempting to block the Exchange Offers. GSO sought a declaration from the State Court that the Exchange Offers were permissible under the First Lien Credit Agreement and that the Directing Lenders had no basis for directing the Original First Lien Agent to refrain from approving the necessary documents, as well as a permanent injunction to preclude the Directing Lenders from taking further action to block the Exchange Offers. Upon filing, GSO also sought a temporary restraining order and preliminary injunction on the same bases.

On October 16, 2015, the State Court denied the GSO's request for a temporary restraining order and preliminary injunction, holding that GSO had not made the required showing of irreparable harm. On October 21, 2015, GSO appealed the State Court's decision. On November 16, 2015, the parties filed a stipulation that the State Court action be discontinued without prejudice and the notice of appeal filed by GSO be withdrawn.

On October 26, 2015, the Exchange Offers and the Support Agreement would have expired in accordance with their terms. As a result of the position of the Directing Lenders, the intervening litigation, market conditions at the time and various other factors, Arch concluded that the conditions to the Exchange Offers had not and would not be satisfied and that the Exchange Offers would not be consummated. Accordingly, Arch elected to terminate the Exchange Offers.

As of the expiration of the Exchange Offers on October 26, 2015, more than 90% of the outstanding principal amount of the 2020 Notes had been tendered. Of the other unsecured notes, 51.97% of the aggregate principal amount of 7.000% senior unsecured notes due 2019, 47.97% of the 9.875% senior unsecured notes due 2019, and 48.19% of the senior unsecured notes due 2021, representing just less than 50% of such notes in the aggregate, had been tendered.

23

Had the Exchange Offers closed at this level of participation, the 2019 through 2021 maturities of a portion of the Company's debt would have been extended to 2021 through 2023. However, the Company would have remained significantly leveraged.  Based on the Company's pro forma analysis, and after giving effect to the Exchange Offers, Arch would have had outstanding overall debt of more than $4.2 billion and annual interest expense of approximately $291 million.

5.    Preparation for Chapter 11 Filing

While the Debtors had hoped to avoid a chapter 11 filing through the ongoing rationalization of operations and consummation of the Exchange Offers and other transactions, market conditions further deteriorated significantly during the latter half of 2015.  As coal prices continued to decline, it became increasingly clear to the Debtors that revenues from operations would not be able to support the Debtors' existing capital structure—even assuming the Exchange Offers had closed and Arch's overall debt and annual interest expenses were reduced to more than $4.2 billion and approximately $291 million, respectively—and that a restructuring under chapter 11 was likely to be necessary.

During this period, as a chapter 11 filing became more likely, the Debtors entered into discussions with various of their financial creditors to discuss potential debtor-in-possession ("**DIP**") financing.  In connection therewith, the Debtors entered into nondisclosure agreements with certain of the First Lien Lenders holding in excess of 50% of the Term Loan (the "**Ad Hoc Committee Lenders**").

(a)    Debtor-in-Possession Financing and Use of Cash Collateral

Ultimately, the Debtors secured a $275 million DIP term loan facility (as amended, supplemented or modified from time to time, the "**DIP Facility**") from the Ad Hoc Committee Lenders.  The DIP Facility, which was approved by the Bankruptcy Court on a final basis on February 25, 2016 [ECF No. 415] (the "**Final DIP Order**"), provides for a super-priority senior secured debtor-in-possession credit facility consisting of term loans (collectively, the "**DIP Term Loan**") in the aggregate principal amount of up to $275 million that may be funded in not more than two draws not later than four months after the effective date of the DIP Facility (such four-month period, the "**Availability Period**").  Any portion of the DIP Term Loan commitment that has not been funded on or prior to the end of the Availability Period will be permanently cancelled. The DIP Facility includes a $75 million carve-out from the first priority lien granted for the benefit of the DIP Facility lenders on all encumbered and unencumbered assets of the Debtors for super-priority claims relating to certain of the Debtors' self-bonding obligations. The DIP Facility was subsequently amended to, among other things, extend the availability period to borrow under the DIP Facility from four months to six months, with a corresponding extension to the period during which the 1% voluntary prepayment fee is applicable.

In addition to approving the DIP Facility, the Final DIP Order authorized, among other things, the Debtors' continued used of cash collateral and provided the First Lien Lenders and First Lien Agent with adequate protection for the Debtors' use of such cash collateral and other prepetition collateral in an amount equal to the aggregate diminution in the value of the First Lien Lenders' and First Lien Agent's  interest in the prepetition collateral (including cash

collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the prepetition collateral, the priming of the First Lien Lenders' and First Lien Agent's security interests and liens in the prepetition collateral pursuant to the Final DIP Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition Lender Adequate Protection Claim**").  In consideration of the Prepetition Lender Adequate Protection Claim, the Final DIP Order granted the First Lien Lenders and First Lien Agent superpriority claims and senior liens, as well as payments of fees, expenses and cash, each as set forth in the Final DIP Order.

Paragraph 19 of the Final DIP Order provided any party in interest, including the Creditors' Committee, until the later of (i) April 30, 2016, (ii) any such later date as has been agreed to, in writing, by the Prepetition Agent, acting at the direction of the Required Lenders (as defined in the First Lien Credit Agreement), and (iii) any such later date as has been ordered by the Bankruptcy Court upon a motion filed and served within any applicable period of time set forth in this paragraph (the "**Challenge Period**") to file an adversary proceeding or contested matter (A) challenging the amount, validity, perfection, enforceability, priority or extent of any stipulated debt or security interests thereunder or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses. The Challenge Period was extended from time to time with respect to the Creditors' Committee and GSO.  With respect to GSO, the Challenge Period expired on May 27, 2016.  With respect to the Creditors' Committee, the Challenge Period was extended until June 14, 2016, on which date the Creditors' Committee filed (i) the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing and Authority to Prosecute Claims on Behalf of the Debtors' Estates* and (ii) the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing and Authority to Prosecute Claims Against the Debtors' Executive Officers on Behalf of the Debtors' Estates*, [ECF Nos. [964] and [963]] (together, the "**Standing Motions**").

On March 28, 2016, April 26, 2016 and June 10, 2016, the DIP Facility was amended to extend certain milestones in conformity with amendments to the RSA as discussed below.

(b)  Restructuring Support Agreement

Following negotiations among the Debtors and the Ad Hoc Committee Lenders, the Debtors and certain of the First Lien Lenders (the "**Consenting Lenders**") entered into the Restructuring Support Agreement dated as of January 10, 2016 (the "**RSA**"), pursuant to which the parties thereto agreed, in accordance with the terms thereof, to support a plan of reorganization on the terms set forth in Exhibit A to the RSA.  Notably, the RSA provided that holders of General Unsecured Claims would have the right to elect to receive a distribution in the form of common stock and warrants issued by Reorganized Arch Coal, which right could be withdrawn by the Debtors and the Majority Consenting Lenders if holders of at least $1.6125 billion in General Unsecured Claims did not agree to support the Plan by February 25, 2016 (the "**Withdrawal Option**").

The RSA also contained certain milestones to ensure that the Debtors move forward with the restructuring contemplated therein on a specified timeline, including, but not limited to:

(a) obtain entry by the Bankruptcy Court approving the Debtors to assume the RSA, no later than February 25, 2016;

(b) file the Plan and this Disclosure Statement, no later than April 10, 2016;

(c) obtain entry by the Bankruptcy Court approving this Disclosure Statement, no later than sixty calendar days after the filing of the Plan;

(d) obtain entry by the Bankruptcy Court confirming the Plan, no later than ninety days after the entry approving this Disclosure Statement; and

(e) cause substantial consummation of the Plan to occur no later than fifteen days after the entry of the Bankruptcy Court's order confirming the Plan.

The RSA was amended on February 25, 2016 to (i) provide a limited waiver to the milestone that required the Debtors to obtain the Bankruptcy Court's approval of the assumption of the RSA until April 10, 2016, (ii) allow the sale of Debtor ICG Knott County, LLC and the subsequent dismissal of its Chapter 11 Case and (iii) extend the Withdrawal Option by 45 days.

The RSA was subsequently amended on March 28, 2016 to, among other things, (i) provide a limited waiver of the milestone for the Debtors to obtain the Bankruptcy Court's approval of the assumption of the RSA until May 13, 2016 (or such later date as may be agreed to in writing by the Majority Consenting Lenders), (ii) provide a limited waiver of the milestone for the Debtors to file the Plan and this Disclosure Statement until April 26, 2016 (or such later date as may be agreed to in writing by the Majority Consenting Lenders), provided that the Debtors obtain the Bankruptcy Court's approval of this Disclosure Statement no later than June 10, 2016 (or such later date as may be agreed to in writing by the Majority Consenting Lenders) and (iii) extend the Withdrawal Option to April 22, 2016 or such other date as may be agreed to in writing by the Company and the Majority Consenting Lenders.

The RSA was further amended on April 26, 2016 to, among other things, (i) provide a limited waiver of the milestone for the Debtors to obtain the Bankruptcy Court's approval of the assumption of the RSA until June 10, 2016 (or such later date as may be agreed to in writing by the Majority Consenting Lenders), (ii) provide a limited waiver of the milestone for the Debtors to file the Plan and this Disclosure Statement until May 5, 2016 (or such later date as may be agreed to in writing by the Majority Consenting Lenders), provided that the Debtors obtain the Bankruptcy Court's approval of this Disclosure Statement no later than June 10, 2016 (or such later date as may be agreed to in writing by the Majority Consenting Lenders) and (iii) extend the Withdrawal Option to June 10, 2016 or such other date as may be agreed to in writing by the Company and the Majority Consenting Lenders.

The RSA was further amended on May 5, 2016, to remove the right of holders of General Unsecured Claims to elect to receive a distribution in the form of common stock and warrants

issued by Reorganized Arch Coal, and on June 10, 2016 to, among other things, provide a limited waiver of the milestone for the Debtors to obtain the Bankruptcy Court's approval of the assumption of the RSA and the Disclosure Statement; provided that the Debtors obtain such approvals by June 23, 2016 (or such later date as may be agreed to in writing by the Majority Consenting Lenders).

The Debtors' failure to comply with the milestones would allow the Consenting Lenders to terminate the RSA.

(c) Securitization Facility

Concurrently with the foregoing negotiations, the Debtors sought to secure the right to preserve the Securitization Facility on a postpetition basis and prevent it from terminating automatically as a result of the commencement of the Chapter 11 Cases. Termination of the Securitization Facility would have caused considerable harm to the Debtors. Upon termination, the proceeds of outstanding Receivables would have ceased to be remitted to the Debtors upon collection. Instead, such proceeds would have been trapped at Arch Receivable and used to cash collateralize outstanding letters of credit and pay certain related fees and expenses. Moreover, termination of the Securitization Facility could have caused the LC Bank to deliver non-renewal notices, which could have entitled the beneficiaries of outstanding letters of credit to draw on such letters of credit unless the Debtors were able to secure replacements. Once the cash was in the hands of a letter-of-credit beneficiary, the beneficiary may have been able to hold the cash until it determined that all the obligations supported by the letters of credit were satisfied. In the event of such termination, the Debtors did not believe any alternative source of letter-of-credit financing would have been available on terms as favorable as the Securitization Facility.

Following extensive, good-faith negotiations, the Debtors, Arch Receivable, the Administrator and the Securitization Parties reached agreement on the terms of amended and restated versions of the agreements that set forth the terms of the Securitization Facility (the "**Securitization Facility Amendments**"). Pursuant to the Securitization Facility Amendments, which were approved by the Bankruptcy Court on a final basis on February 25, 2016 [ECF No. 412], the Securitization Parties have continued the Securitization Facility under a revised schedule of fees payable to the Administrator and the Securitization Parties. The Debtors are no longer eligible to borrow amounts under the facility but are limited to requesting letters of credit. Continuing this facility prevented the need for the Debtors to use either existing cash liquidity or higher cost DIP financing to support the Debtors' letters of credit.

6.    Chapter 11 Filing

On December 15, 2015, the Debtors elected to exercise the 30-day grace period under its 7.000% senior unsecured notes due 2019; its 9.875% senior unsecured notes due 2019 and its 7.25% senior unsecured notes due 2021. On January 11, 2016, before the expiration of the grace period on January 14, 2016, the Debtors commenced the Chapter 11 Cases to pursue and consummate an in-court restructuring.

27

# ARTICLE III

# THE CHAPTER 11 CASES

## A.      Commencement of the Chapter 11 Cases

As set forth above, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors and debtors in possession.  By order entered January 13, 2016 [ECF No. 67], the Debtors' cases are being jointly administered for procedural purposes only.  No trustee or examiner has been appointed in the Chapter 11 Cases.

## B.      Automatic Stay

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modification as permitted by order of the Bankruptcy Court, the automatic stay remains in effect until the Effective Date of the Plan.

## C.       "First Day" Motions and Related Applications

On the Petition Date, the Debtors filed a number of "**first-day**" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets and minimize the effects of the commencement of the Chapter 11 Cases.[5]  On January 13 and 14, 2016 (except where noted otherwise below), the Bankruptcy Court entered orders providing various customary first-day relief, including:

1. authorizing (i) the Debtors to (a) pay prepetition wages, salaries, employee benefits and other compensation and (b) maintain employee benefits programs and pay related administrative obligations, (ii) current and former employees to proceed with outstanding workers' compensation claims and (iii) financial institutions to honor and process related checks and transfers [ECF No. 54];

2. authorizing, on an interim basis, the (i) Debtors to continue to maintain existing cash management system, fuel card programs, bank accounts and business forms and (ii) financial

---

[5] In addition to the "first-day" motions, the Debtors filed certain other motions that are described more fully herein.

institutions to honor and process related checks and transfers [ECF No. 56] (such order, the
"**Cash Management Order**");[6]

3.  directing joint administration of Chapter 11 Cases [ECF No. 67];

4.  confirming the protections of sections 362, 365 and 525 of the Bankruptcy Code and
    approving procedures to address violations of the Bankruptcy Code [ECF No. 70];

5.  authorizing (i) payment of certain prepetition claims of critical vendors, (ii) payment of
    503(b)(9) claims to certain critical vendors and (iii) financial institutions to honor and
    process related checks and transfers [ECF No. 71];

6.  (i) extending the time to file schedules of assets and liabilities, schedules of executory
    contracts and unexpired leases and statements of financial affairs, (ii) waiving the
    requirements to file equity lists and provide notice to equity security holders and (iii)
    authorizing the debtors to file a consolidated list of the Debtors' 30 largest unsecured
    creditors [ECF No. 76];

7.  (i) granting administrative expense status to debtors' undisputed obligations to vendors
    arising from the postpetition delivery of goods ordered prepetition, (ii) authorizing Debtors to
    pay those obligations in the ordinary course of business, (iii) authorizing Debtors to return
    goods and (iv) authorizing financial institutions to honor and process related checks and
    transfers [ECF No. 77];

8.  authorizing the Debtors to (i) enter into, perform under, roll over, adjust, modify, settle,
    terminate and engage in certain derivative contracts and (ii) pledge collateral under certain
    derivative contracts [ECF No. 84];

9.  authorizing (i) Debtors to continue and renew their liability, property, casualty and other
    insurance programs and honor all obligations in respect thereof and (ii) financial institutions
    to honor and process related checks and transfers [ECF No. 85];

10. authorizing (i) the Debtors to pay prepetition obligations owed to foreign creditors and (ii)
    financial institutions to honor and process related checks and transfers [ECF No. 86];

11. authorizing (i) Debtors to honor prepetition obligations to customers and to otherwise
    continue customer practices and (ii) financial institutions to honor and process related checks
    and transfers [ECF No. 88];

12. authorizing the Debtors to enter into and perform under coal contracts in the ordinary course
    of business [ECF No. 89];

13. authorizing (i) the Debtors to continue and renew surety bond program and (ii) financial
    institutions to honor and process related checks and transfers  [ECF No. 90];

---

[6] The Cash Management Order was entered on a final basis on April 8, 2016 [ECF No. 671].

14. (i) prohibiting utilities from altering, refusing or discontinuing service, (ii) deeming utility companies adequately assured of future performance and (iii) establishing procedures for determining requests for additional adequate assurance [ECF No. 91];

15. establishing notification procedures and approving restrictions on certain transfers of equity interests in the Debtors' estates [ECF No. 92];

16. authorizing (i) the Debtors to pay certain prepetition claims of shippers, warehousemen and service providers and (ii) financial institutions to honor and process related checks and transfers [ECF No. 93];

17. authorizing (i) Debtors to pay certain prepetition taxes, governmental assessments and fees and (ii) financial institutions to honor and process related checks and transfers [ECF No. 94]; and

18. establishing certain notice, case management and administrative procedures [ECF No. 155] (order entered January 21, 2016).

**D.  Retention of Professionals and Appointment of the Creditors' Committee**

1.  Retention of Debtors' Professionals

Pursuant to orders entered on February 24, 2015, the Debtors were authorized to retain (i) Davis Polk & Wardwell LLP as their bankruptcy counsel [ECF No. 401], (ii) Bryan Cave LLP as their local bankruptcy counsel [ECF No. 389], (iii) FTI Consulting Inc. as their restructuring financial advisor [ECF No. 402] and (v) Ernst & Young LLP as their auditor [ECF No. 403]. Pursuant to an order entered on January 15, 2016 [ECF No. 102], the Debtors were authorized to retain Prime Clerk LLC as notice, claims and solicitation agent in the Chapter 11 Cases. Pursuant to an order entered on March 23, 2016 [ECF No. 602], the Debtors were authorized to retain PJT Partners LP as their investment banker in the Chapter 11 Cases.

2.  Appointment of Creditors' Committee and Retention of Creditors' Committee Professionals

On January 25, 2016, the Office of the United States Trustee for the Eastern District of Missouri (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "**Creditors' Committee**") pursuant to section 1102(a) of the Bankruptcy Code [ECF No. 184]. The members of the Creditors' Committee (the "**Committee Members**") are: (i) Kinder Morgan, Inc., (ii) UMB Bank, National Association, (iii) GSO Capital Partners, LP, (iv) Nelson Brothers, LLC, (v) Bennett Management Corporation, (vi) Wyoming Machinery Corporation and (vii) Pension Benefit Guaranty Corporation.

Pursuant to orders entered March 21, 2016, the Creditors' Committee was authorized to retain (i) Kramer Levin Naftalis & Frankel LLP as its counsel [ECF No. 590], (ii) Spencer Fane LLP as its local counsel [ECF No. 588]; (iii) Blackacre LLC as its coal consultant [ECF No. 589]; and (iv) Jefferies LLC as its investment banker [ECF No. 591]. Pursuant to an order entered April 7, 2016, the Creditors' Committee was authorized to retain Berkeley Research Group, LLC as its financial advisor [ECF No. 670].

Since the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases, and the Creditors' Committee has been an active participant in the Chapter 11 Cases. The Debtors have kept the Creditors' Committee informed of, and have conferred with the Creditors' Committee on, matters relating to the Debtors' business operations and the Plan and have sought the concurrence of the Creditors' Committee to the extent that its constituency would be affected by proposed actions and transactions outside of the ordinary course of the Debtors' businesses. The Creditors' Committee has actively participated with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

**E.     Significant Events During the Chapter 11 Cases**

In addition to the first-day relief sought and received in the Chapter 11 Cases, the Debtors have sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Estates. Material events since the commencement of the Chapter 11 Cases are summarized below and include:

1.     Negotiations With Lenders and Unsecured Creditors; Amended and Restated Restructuring Support Agreement

Beginning before the Petition Date, the Debtors sought to obtain support for the plan contemplated by the original RSA from the holders of Notes Claims and General Unsecured Claims, to whom the RSA offered the option of a recovery that the parties to the RSA considered to be an enhanced distribution in the form of common stock and warrants issued by Reorganized Arch Coal. In time, it became clear that this proposed distribution would not be widely accepted by holders of Notes Claims and General Unsecured Claims. Accordingly, the Debtors and the Majority Consenting Lenders agreed to amend the RSA to remove the proposed distribution of common stock and warrants and, on May 5, 2016, the Debtors filed a plan of reorganization and accompanying disclosure statement providing that holders of Notes Claims and General Unsecured Claims would receive the distribution to which they are entitled under the Bankruptcy Code.

After the May 5 filing, the Debtors continued to focus on reaching consensus on a plan of reorganization among their creditors, and engaged in frequent dialogue with the Ad Hoc Committee Lenders and the Creditors' Committee to narrow the areas of legal and factual disagreement and to mediate an agreement on distributions to holders of Notes Claims and General Unsecured Claims. However, the Debtors, the Ad Hoc Committee Lenders and the Creditors' Committee have been unable to reach consensus regarding plan distributions to General Unsecured Creditors. Accordingly, the Plan provides that holders of General Unsecured Claims will receive their pro rata share of the Debtors' unencumbered assets in the form of (i) cash, subject to reductions for certain fees and, potentially, adequate protection claims and (ii) shares of Prairie Holdings, Inc., which is the Debtor that owns a 49% interest in Knight Hawk Holdings, LLC, but only if it is judicially determined that Prairie Holdings' interests in Knight Hawk Holdings, LLC are unencumbered.

2.      Summary of Claims Process, Bar Dates and Claims Filed

On March 9, 2016, the Debtors filed their schedules of assets and liabilities and statements of financial affairs ("**Schedules and SOFAs**").  Among other things, the Schedules and SOFAs set forth the claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.  Interested parties may review the Schedules and SOFAs and amendments thereto by visiting the Debtors' Case Information Website (located at *https://cases.primeclerk.com/archcoal/*).

On April 8, 2016, the Bankruptcy Court entered the Bar Date Order, which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "**Bar Date Notice**").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in the Debtors' Chapter 11 Cases is May 27, 2016 (the "**Bar Date**"), and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is July 11, 2016.  The Bar Date Notice will be published in *The Wall Street Journal, National Edition*; *St. Louis Post Dispatch*, *Charleston Gazette Mail*; *Morgantown Dominion Post*; *Huntington Herald-Dispatch*; *Coalfield Progress*; *The Dickenson Star*; *The Post*; *Lexington Herald-Leader*; *Owensboro Messenger-Inquirer*; *The State Journal-Register*; *Grand Junction Sentinel*; *Salt Lake City Tribune*; *Rawlins Daily Times*; *Gillette News-Record* and *Daily Mountain Eagle* as soon as practicable, and copies will be served on creditors and potential creditors appearing in the Debtors' Schedules.

The Debtors and their professionals are investigating claims filed against the Debtors to determine the validity of such claims.  The Debtors anticipate filing objections to claims that are filed in improper amounts or classifications or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

As described in detail below, the Plan contemplates the establishment of an Administrative Claims Bar Date, pursuant to the Disclosure Statement Approval Order and the Confirmation Order.

The projected recoveries set forth in this Disclosure Statement are based on certain assumptions, including the Debtors' estimates of the Claims that will eventually be Allowed in various classes.  There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the Debtors' estimates.

3.      Exclusivity

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan.  If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan.  Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods "for cause."

The Debtors' initial exclusivity period to file a chapter 11 plan would have expired on May 10, 2016.  On such date, the Debtors filed the *Motion for an Order Extending the Debtors' Exclusive Periods Within Which to File a Plan of Reorganization and Solicit Votes Thereon* [ECF No. 789] (the "**Exclusivity Motion**"), tolling the expiration of the exclusivity period until the Bankruptcy Court's ruling on the Exclusivity Motion.  The Exclusivity Motion is scheduled to be heard by the Bankruptcy Court on June 9, 2016.

4.      Operational Changes

The Company has transitioned into the Chapter 11 Cases with no interruption in operations or customer shipments. Since the Petition Date, Arch has expanded its cost-reduction activities and further streamlined its operating portfolio. The Company recently sold its idled Knott County complex in West Virginia and has shifted its Vindex operation in Maryland to strictly reclamation status. Additionally, the Company has further reduced its workforce by eliminating 230 positions at the Black Thunder operation in a continued effort to better match production and operating costs to demand.

5.      Wyoming Reclamation Bonding

The Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201 et seq. ("**SMCRA**"), is designed to protect society and the environment from the adverse effects of surface coal mining operations through, in part, compliance with environmental performance standards during the course of a permittee's mining operation.  30 U.S.C. §§ 1201-1202, 1265.  Additionally, SMCRA requires that permittees post a performance bond in an amount sufficient to assure the completion of their reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture for failing to perform all of the requirements of SMCRA. 30 U.S.C. § 1259(a).  Liability under the bond shall be for the duration of the surface coal mining and reclamation operation and for a period coincident with the operator's responsibilities in section 1265 of SMCRA.  30 U.S.C. § 1259 (b).

Prior to the Petition Date, Debtors Arch Western Resources, LLC, Thunder Basin Coal Company, L.L.C. and Energy Development Co. were authorized to self-bond in the State of Wyoming to assure performance of their approved reclamation plans.  As of December 31, 2015, the Debtors had self-bonded an aggregate of approximately $485.5 million of such obligations.

In connection with the commencement of the Chapter 11 Cases, the Debtors sought to secure a means of providing financial assurances to Wyoming without having to obtain additional third-party surety bonds or posting additional collateral, each of which, if achievable, would entail significant expense and directly impact the Debtors' liquidity position.

After extensive negotiations, the Debtors and the State of Wyoming, acting through the WDEQ, entered into a stipulation (the "**Wyoming Stipulation**") that granted Wyoming a $75 million Bonding Superpriority Claim to support the self-bonded obligations, and agreed to substitute approximately $17 million of the self-bonds with financial assurance in the form of third-party collateral support. In exchange, Wyoming agreed to a stay of any proceedings by Wyoming related to the Debtors' self-bonded status and that, so long as the stipulation is effective, Wyoming will not seek additional collateral in respect of the self-bonds, take certain

other adverse actions with respect to the Debtors' mining permits or licenses in Wyoming or seek to enforce the Debtors' obligations to make payments in respect of the self-bonds. The stipulation is effective until the earlier of May 1, 2017 and the date upon which a plan of reorganization in the Chapter 11 Cases is approved and becomes effective, subject to certain early termination events. The stipulation was approved by the Bankruptcy Court on February 29, 2016.

Since entry of the Wyoming Stipulation, the Debtors have had periodic meetings with representatives of Wyoming to discuss the status of the Debtors' reorganization and their proposed compliance with their reclamation bonding obligations in Wyoming upon the Effective Date. The Debtors are continuing to work with the State of Wyoming to re-evaluate their bonding liability and to determine the extent to which the Debtors will be permitted to self-bond upon the effectiveness of the Plan. If it is determined that the Reorganized Debtors are unable to self-bond following the Effective Date, either in whole or in part, the Debtors intend to obtain third-party financial assurances, such as commercial surety bonds or letters of credit, to fully secure their mine reclamation obligations in Wyoming. The Debtors believe that they have the financial resources to obtain such third-party financial assurances if necessary.

6.      Employee Compensation

In order for the Debtors to maintain their business operations and preserve the value of their assets, the Debtors must be able to incentivize all of their employees to maintain consistent financial and operational performance and continue to achieve industry-leading safety and environmental compliance rates. As part of the Debtors' first day relief, the Court entered an order (the "**First Day Wages Order**") [ECF No. 54] authorizing the Debtors to, among other things, pay wages, salary and benefits to their employees and continue their ordinary course incentive compensation plans for all employees other than certain senior officers.

The Plan provides that the Debtors and the Reorganized Debtors, (a) in their sole discretion, may (but have no obligation to) continue to honor, in the ordinary course of business, the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, healthcare benefits, disability benefits, deferred compensation benefits, travel benefits (including retiree travel benefits), vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for incentive compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time and (b) shall honor, in the ordinary course of business, (i) the change-in-control agreements among the Debtors and certain of their employees (as described in the Debtors' proxy statement dated March 20, 2015 pursuant to Section 14(a) of the Exchange Act) and (ii) all awards granted in respect of the annual incentive compensation program and the performance unit component of the long-term incentive performance plan as approved by the Debtors' board of directors prior to May 31, 2016.

F.      9019 Settlement

The Plan is premised on a global settlement and compromise of certain claims and causes of action that could potentially be asserted by or on behalf of the Debtors against the Directing Lenders and certain employees of the Debtors (the "**Global Settlement**").  In the course of discussions between the Debtors and the Creditors' Committee, representatives of the Creditors' Committee communicated their view that the Debtors (or another party on behalf of the Debtors, if granted standing to do so) could pursue the following actions:

- Actions against the Directing Lenders and the First Lien Agent on account of alleged harms that were caused to the Debtors' estates by the Direction Letter and other conduct relating to the Exchange Transactions (the "**Exchange Transactions Claims**"); and

- Avoidance actions against certain employees of the Debtors to recover certain prepetition compensation paid to those individuals (the "**Employee Claims**")

The Plan embodies, among other things, a settlement of the Exchange Transactions Claims and the Employee Claims, with the consideration for such settlement to be provided by the holders of First Lien Credit Facility Claims, who will waive the Prepetition Lender Adequate Protection Claim in respect of any diminution in the value of the Prepetition Collateral from the Petition Date through and including June 22, 2016 and, potentially, through the Effective Date[7] (the "**Diminution Waiver**").  The Debtors believe that the Exchange Transaction Claims and the Employee Claims to be without merit.  Moreover, in the course of negotiations with the Debtors regarding the Plan, the Ad Hoc Committee Lenders determined that pursuit of the Exchange Transactions Claims and the Employee Claims by the Creditors' Committee would be unlikely to realize any meaningful consideration for the Debtors' estates, would be costly, and would delay and threaten confirmation of the Plan and distract members of the Debtors' management team whose efforts are essential to the Debtors' restructuring and future operations.  Accordingly, to maximize the value of the enterprise of which the First Lien Lenders will become the 100% equity owners (subject to dilution pursuant to the Management Incentive Plan), the First Lien Lenders have agreed to provide the Diminution Waiver, pursuant to the Plan and contingent upon its effectiveness, as consideration for the settlement and release of the Exchange Transaction Claims and the Employee Claims.

The Debtors believe that between the Petition Date and June 22, 2016 there will have been substantial diminution in the value of the Prepetition Collateral, and that such diminution will most likely exceed the value of the Debtors' unencumbered assets, from which the holders of General Unsecured Claims might have otherwise been entitled to a distribution.[8] Furthermore, given the limitations in the Final DIP Order regarding the use of cash collateral for

---

[7] Pursuant to the Plan, the First Lien Lenders will waive the Prepetition Lender Adequate Protection Claim in full unless (a) the Creditors' Committee or any Creditor is granted standing to pursue any actions on behalf of the Debtors' estates, (b) holders of General Unsecured Claims do not vote to approve the Plan or (c) the Creditors' Committee objects to confirmation of the Plan.

[8] This is particularly true if the Knight Hawk Interest is determined to be encumbered.

fees incurred for litigation against the First Lien Agent or the First Lien Lenders, protracted litigation of the Exchange Transaction Claims would further diminish the unencumbered assets available to holders of General Unsecured Claims. Accordingly, the Debtors believe that it is in the best interests of their estates and creditors to release the First Lien Lenders (including the Directing Lenders) from all claims related to the Exchange Transactions and the Debtors' employees from all Avoidance Actions in exchange for the Diminution Waiver.

On June 14, 2016, the Creditors' Committee filed the Standing Motions, pursuant to which they sought standing to pursue the foregoing causes of action on behalf of the Debtors' estates. The Debtors intend to object to the Standing Motions, not least because the Global Settlement resolves all of the alleged claims.

## ARTICLE IV

## SUMMARY OF THE PLAN

The Debtors believe that the Plan provides the best and most prompt possible recovery to holders of Claims. The Debtors believe that (i) through the Plan, holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (ii) consummation of the Plan will maximize the recovery of the holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying Claims against, and interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of Claims or Interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN.  UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.      Considerations Regarding the Plan

The terms of the Plan are the result of an analysis by the Debtors concerning various issues relating to how the distributable value should be allocated among the creditors of the various Debtors, including, without limitation, (a) whether the elements necessary to obtain an order of substantive consolidation are satisfied in the Chapter 11 Cases; (b) the value of the Estates on a consolidated and a non-consolidated basis, and the proper method of determining such value; (c) the value of any unencumbered assets after giving effect to (i) the Prepetition Lender Adequate Protection Claims, (ii) all DIP Facility Claims and (iii) a fair allocation of all Administrative Expense Claims and Priority Claims; (d) the projected recoveries of Creditors on a consolidated basis with and without implementation of substantive consolidation, in whole or in part; and (e) the nature and treatment of Intercompany Claims.

With respect to substantive consolidation, the Debtors undertook a diligence process to ascertain whether substantive consolidation would be an appropriate remedy for some or all of the Debtors in the Chapter 11 Cases.  While an argument asserting that the Debtors should be substantively consolidated has merit, substantial effort, time and expense would be required to

fully prosecute substantive consolidation. With respect to a full deconsolidation of the Arch enterprise, there is also substantial effort, time and expense involved in ascribing an accurate value to recoveries that ranged from zero to low single digit percentages, which was the range of recovery at a vast majority of the Debtors.  Such low ranges of recovery are susceptible to wide variations based on even the slightest changes in assumptions.

Based upon the Debtors' analyses, the Plan provides that:

- Intercompany Claims and Interests in Subsidiary Debtors will not receive any distribution under the Plan;

- holders of a General Unsecured Claim against a Debtor other than Prairie Holdings will be treated as though each such holder has a single Claim against such Debtor's estate irrespective of any guarantees or joint liability with respect to such claim, and will receive their respective Ratable Share of $33.4 million in cash *less* (a) fees and expenses that are required, pursuant to the DIP Order, to be paid out of assets that are not encumbered under the First Lien Credit Facility and (b) a fair allocation of all payments made in respect of DIP Facility Claims, Administrative Expense Claims and Priority Claims, in each case, whether paid during the course of the Chapter 11 Cases or pursuant to the Plan; *provided*, that if (x) the Creditors' Committee or any Creditor is granted standing to pursue any action on behalf of the Debtors' estates, (y) holders of General Unsecured Claims do not vote to approve the Plan or (z) the Creditors' Committee objects to confirmation of the Plan, such Cash distribution shall also be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) of the Plan) in an amount to be determined by order of the Bankruptcy Court

The $33.4 million cash distribution to holders of Allowed General Unsecured Claims is not less than the value of the Debtors' unencumbered assets, excluding the assets of Prairie Holdings, without taking into account the First Lien Lenders' Adequate Protection Claims. These assets consist of:

- cash deposited in the Debtors' account at Huntington Bank in an amount that does not exceed $25 million

- cash deposited in the Debtors' various local bank accounts in an aggregate amount that does not exceed $1 million

- One third of the Debtors' equity interests in foreign subsidiaries, which the Debtors value at approximately $2.1 million

- Certain owned and leased real property, which the Debtors value at approximately $2 million

- Certain motor vehicles, which the Debtors value at approximately $3 million

38

- Other miscellaneous items, which the Debtors value at approximately $0.4 million

As discussed above, there is a dispute as to whether the Knight Hawk Interest is encumbered under the First Lien Credit Facility. The Plan requires that there be a judicial determination regarding such encumbrance prior to the Effective Date and provides that the treatment of Claims against Prairie Holdings under the Plan will differ based on such judicial determination.  Specifically, if a Final Order is entered determining that Prairie Holdings' 49% membership interest in Knight Hawk Holdings, LLC is encumbered under the First Lien Credit Facility, holders of Prairie Holdings GUC Claims will receive no distribution on account of such Claims, and holders of First Lien Credit Facility Claims will receive the economic value of the Knight Hawk Interest through their receipt of New Common Stock of Arch Coal.  Alternatively, if a Final Order is entered determining that Prairie Holdings' 49% membership interest is not encumbered, holders of Allowed Prairie Holdings GUC Claims will receive their recoveries on a non-consolidated basis in the form of New Prairie Holdings Stock, *provided* that holders of First Lien Credit Facility Claims will be deemed to contribute any such stock they receive to Reorganized Arch Coal and certain smaller holders of Prairie Holdings GUC Claims may have the option to receive cash in lieu of New Prairie Holdings Stock.

The Debtors believe that allocating the distributions on this basis strikes a fair and equitable balance among the various considerations described above.

## B.    Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified.  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors (except for certain claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that they have complied with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

39

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

    1.    Treatment of DIP Facility Claims; Administrative Expense Claims and Priority Tax Claims

        (a)  Treatment of DIP Facility Claims

Pursuant to the DIP Order, all DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment and (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under

the DIP Credit Agreement and the DIP Order, plus the establishment of an agreed-upon reserve in respect of Contingent indemnification obligations arising under the DIP Facility as to which a claim has been asserted as of the Effective Date.  Except to the extent that a holder of a DIP Facility Claim agrees in its sole discretion to less favorable treatment, on or before the Effective Date, the DIP Agent, for the benefit of the applicable DIP Lenders and itself, shall be paid in Cash 100% of the then-outstanding amount of the DIP Facility Claims other than Contingent DIP Obligations.  Contemporaneously with the foregoing payment, (i) the commitments under the DIP Facility shall automatically terminate, (ii) except with respect to the Contingent DIP Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Facility as provided below), the DIP Facility and the "Loan Documents" referred to therein shall be deemed canceled, (iii) all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all Collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and (iv) all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Facility Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (i) the Contingent DIP Obligations shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and (ii) the DIP Facility and the "Loan Documents" referred to therein shall continue in full force and effect after the Effective Date with respect to any obligations thereunder governing (A) the Contingent DIP Obligations and (B) the relationships among the DIP Agent and the DIP Lenders, as applicable, including but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders), reinstatement obligations pursuant to Section 12.05 of the DIP Credit Agreement and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agent and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facility in accordance with the terms thereof. The Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agent or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

(b)   Treatment of Contingent Securitization Obligations

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Contingent Securitization Obligations shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and the Securitization Documents shall continue in full force and effect with respect to any obligations thereunder governing the Contingent Securitization Obligations.  An agreed-upon reserve shall

41

be established in respect of Contingent indemnification obligations arising under the Securitization Facility as to which a claim has been asserted.

After the Effective Date, the Reorganized Debtors shall continue to reimburse the Securitization Parties for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the Securitization Parties after the Effective Date in accordance with the Securitization Documents and the Securitization Order.

(c)    Treatment of Administrative Expense Claims

(i)    Administrative Expense Claims

Except to the extent that the applicable holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with the Reorganized Debtors, each Allowed Administrative Expense Claim shall be paid in full in Cash (i) on or as soon as reasonably practicable after the Effective Date (for Claims Allowed as of the Effective Date), (ii) on or as soon as practicable after the date such Claim is Allowed (or upon such other terms as may be agreed upon by such holder and the applicable Reorganized Debtor) or (iii) as otherwise ordered by the Bankruptcy Court.

Allowed Administrative Expense Claims regarding assumed agreements, obligations incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and non-ordinary course obligations approved by the Bankruptcy Court shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such Claims.

(ii)    Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Reorganized Debtors, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to Section 7.1 of the Plan.

(iii)    Prepetition Lender Adequate Protection Claim

The portion of the Prepetition Lender Adequate Protection Claim that accrued between the Petition Date and June 22, 2016 shall be deemed to have been waived pursuant to the Plan; *provided,* that such waiver shall be null and void *ab initio* if (i) the Creditors' Committee or any creditor is granted standing to pursue any action on behalf of the Debtors' estates and (ii) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction is entered that precludes the Debtors from settling any such action on behalf the Debtors' estates. The portion of the Prepetition Lender Adequate Protection Claim that accrues between June 23, 2016 and the Effective Date shall either (x) reduce the amount of Cash and New Prairie Holdings Stock distributed to holders of General Unsecured Claims as set forth in Article 3 of the Plan or, otherwise, (y) be deemed to have been waived..

(d)    Treatment of Priority Tax Claims

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such holder agree to less favorable treatment with the Reorganized Debtors, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Reorganized Debtors shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

2.      Treatment of Claims Against and Interests in the Debtors

(a)   Other Priority Claims (Class 1A-71A)

Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 of the Plan) with the applicable Reorganized Debtor, each holder of an Allowed Other Priority Claim against any of the Debtors shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Claim, Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim shall otherwise be rendered Unimpaired, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) 20 calendar days after the date such Claim becomes Allowed and (iii) the date for payment provided by any applicable agreement between the Reorganized Debtors and the holder of such Claim.

(b)   Other Secured Claims (Class 1B-71B)

Except to the extent that the applicable Creditor agrees to less favorable treatment with the applicable Reorganized Debtor, each holder of an Allowed Other Secured Claim shall receive, at the sole option of the applicable Reorganized Debtor, and in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, one of the following treatments: (i) payment in Cash in the amount of such Allowed Other Secured Claim, (ii) Reinstatement of the legal, equitable and contractual rights of the holder relating to such Allowed Other Secured Claim, (iii) a distribution of the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim solely to the extent of the value of the holder's secured interest in such Collateral, (iv) a distribution of the Collateral securing such Allowed Other Secured Claim without representation or warranty by or recourse against the Debtors or Reorganized Debtors or (v) such other treatment as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  If an Other Secured Claim is satisfied under clause (i), (iii), (iv) or (v), the Liens securing such Other Secured Claim shall be deemed released without further action by any party.  Each holder of an Allowed Other Secured Claim

43

shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

Any distributions made pursuant to Section 3.2 of the Plan shall be made on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) 20 calendar days after the date such Claim becomes Allowed and (iii) the date for payment provided by any agreement between the applicable Debtor and the holder of such Claim.

(c)   First Lien Credit Facility Secured Claims (Class 1C-71C)

The First Lien Credit Facility Secured Claims are Allowed in the principal amount of $1,886,125,000 (plus accrued and unpaid interest as of the Petition Date), *plus* any other amounts and obligations payable under the First Lien Transaction Documents as of the Petition Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person or Entity.

On the Effective Date, each holder of an Allowed First Lien Credit Facility Secured Claim shall be entitled to receive its Ratable Share of (i) total Cash payment equal to $114,796,527.78 *less* the amount of the Adequate Protection Payments; (ii) $326.5 million in principal amount of New First Lien Debt; and (iii) 100% of the New Common Stock, subject to dilution pursuant to the Management Incentive Plan.

(d)   General Unsecured Claims (Class 1D-70D)

(i)      Each holder of an Allowed General Unsecured Claim (including First Lien Credit Facility Deficiency Claims) shall be entitled to receive its Ratable Share of $33.4 million in Cash *less* (a) Excess Lender Challenge Fees and (b) a fair allocation of all payments made in respect of DIP Facility Claims, Administrative Expense Claims and Priority Claims, in each case, whether paid during the course of the Chapter 11 Cases or pursuant to the Plan; *provided*, that if (a) the Creditors' Committee or any Creditor is granted standing to pursue any action on behalf of the Debtors' estates, (b) holders of General Unsecured Claims do not vote to approve the Plan or (c) the Creditors' Committee objects to confirmation of the Plan, such Cash distribution shall also be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided, further*, that the holders of First Lien Credit Facility Deficiency Claims against Arch Coal shall waive their distributions on account of First Lien Credit Facility Deficiency Claims and all Cash that would have otherwise been distributed on account of First Lien Credit Facility Deficiency Claims shall be retained by the Debtors.

44

(ii)     Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof), each holder of a General Unsecured Claim that is Disputed as of the Effective Date and becomes an Allowed General Unsecured Claim after the Effective Date, shall receive, on or as soon as reasonably practicable after the Distribution Date that is at least 20 calendar days after such General Unsecured Claim becomes an Allowed General Unsecured Claim, its Ratable Share of the consideration described above.

(iii)    Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 of the Plan), on any Interim Distribution Date upon which an Adjustment Distribution is to be distributed, the Disbursing Agent shall effect a distribution, so that each holder of an Allowed General Unsecured Claim shall have received, after giving effect to all prior distributions made to such Allowed Claim under the Plan, its Ratable Share of the consideration described above, on or as soon as reasonably practicable after such Interim Distribution Date.

(e)    Prairie Holdings GUC Claims (Class 1E)

If a Knight Hawk Encumbrance Order has been entered, no distribution.  Otherwise, each holder of an Allowed Prairie Holdings GUC Claim (including First Lien Credit Facility Claims against Prairie Holdings) shall be entitled to receive its Ratable Share of the New Prairie Holdings Stock; *provided*, that the New Prairie Holdings Stock to be distributed to holders of Allowed Prairie Holdings GUC Claims (other than First Lien Credit Facility Claims against Prairie Holdings) shall be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided*, *further*, that (i) each holder of a First Lien Credit Facility Claim shall be deemed to contribute any New Prairie Holdings Stock received on account of such claim to Reorganized Arch Coal; and (ii) each holder of a Prairie Holdings GUC Claim (other than First Lien Credit Facility Claims) may elect to receive Cash in the amount equal to [  ]% of its Prairie Holdings GUC Claim in lieu of the New Prairie Holdings Stock that they would have otherwise received on account of such claim.  Such elections will be honored beginning with the electing holder of the lowest amount of Prairie Holdings GUC Claims and proceeding to electing holders of successively higher amounts of Prairie Holdings GUC Claims until the Prairie Holdings GUC Cash is exhausted, with the New Prairie Holdings Shares that would have been distributed to such electing holders instead distributed to Reorganized Arch Coal.

(f)    Section 510(b) Claims (Class 1F-71F)

The holders of Section 510(b) Claims shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.  All Section 510(b) Claims shall be canceled and extinguished.

45

(g)   Interests in Arch Coal (Class 1G)

The holders of Interests in Arch Coal shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.  All Interests in Arch Coal shall be canceled and extinguished.

(h)   Interests in Prairie Holdings (Class 2G)

If a Knight Hawk Encumbrance Order has been entered, the Interests in Prairie Holdings shall be reinstated.  Otherwise, all Interests in Prairie Holdings shall be canceled and extinguished, and Arch Coal shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.

(i)   Interests in Subsidiary Debtors other than Prairie Holdings (Class 3G-71G)

The Interests in the Subsidiary Debtors other than Prairie Holdings shall be, in Reorganized Arch Coal's sole discretion, Reinstated or canceled on the Effective Date or as soon thereafter as reasonably practicable.

3.      Treatment of Intercompany Claims

In accordance with and giving effect to the provisions of section 1124(1) of the Bankruptcy Code, Intercompany Claims are Unimpaired by the Plan.  However, the Debtors retain the right to eliminate or adjust any Intercompany Claims as of the Effective Date by offset, cancellation, contribution or otherwise.  In no event shall Intercompany Claims be allowed as General Unsecured Claims or Prairie Holdings GUC Claims or entitled to any distribution of Cash, New Common Stock, New Prairie Holdings Stock and/or other equity securities of the Reorganized Debtors under the Plan.

**C.      Acceptance or Rejection of the Plan**

1.      Voting of Claims

Each holder of a Claim in an Impaired Class that is entitled to vote on the Plan as of the Voting Record Date pursuant to Article 3 of the Plan shall be entitled to vote to accept or reject the Plan as provided in the Approval Order or any other order of the Bankruptcy Court.

2.      Presumed Acceptance of Plan

Other Priority Claims (Class 1A-71A), Other Secured Claims (Class 1B-71B), and Interests in Subsidiary Debtors other than Prairie Holdings (Class 3G-71G) are Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and the votes of such holders will not be solicited.

3.        Presumed Rejection of Plan

Section 510(b) Claims (Class 1F-71F), Interests in Arch Coal (Class 1G) and, if a Knight Hawk Encumbrance Order has not been entered, Interests in Prairie Holdings (2G) shall not receive any distribution under the Plan on account of such Claims or Interests.  Pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have rejected the Plan, and the votes of such holders will not be solicited.

4.        Acceptance by Impaired Classes

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan.  First Lien Credit Facility Secured Claims, General Unsecured Claims and Prairie Holdings GUC Claims (Classes 1C-71C, 1D-70D and 1E) are Impaired, and the votes of holders of Claims in such Classes will be solicited.  If holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

5.        Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.        Consensual Confirmation

The Plan shall be deemed a separate chapter 11 plan for each Debtor.  To the extent that there is no rejecting Class of Claims in the chapter 11 plan of any Debtor, such Debtor shall seek Confirmation of its plan pursuant to section 1129(a) of the Bankruptcy Code.

7.        Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

Those Debtors whose plans contain a rejecting Class of Claims, if any, shall seek Confirmation of such plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any such rejecting Class or Classes.  Subject to Article 13 of the Plan, the Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

8.        Severability; Reservation of Rights

Subject to Article 13 of the Plan, the Debtors reserve the right to modify or withdraw the Plan, in consultation with the Majority Consenting Lenders, in its entirety or in part, for any

reason, including, without limitation, if the Plan as it applies to any particular Debtor is not confirmed.  In addition, and also subject to Article 13 of the Plan, should the Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw the Plan in its entirety, in part or as to a particular Debtor, in consultation with the Majority Consenting Lenders.  Without limiting the foregoing, if the Debtors withdraw the Plan as to any particular Debtor because the Plan as to such Debtor fails to be accepted by the requisite number and amount of Claims voting or due to the Bankruptcy Court, for any reason, denying Confirmation as to such Debtor, then at the option of such Debtor, in consultation with the Majority Consenting Lenders, (i) the Chapter 11 Case for such Debtor may be dismissed or (ii) such Debtor's assets may be sold to another Debtor, such sale to be effective at or before the Effective Date of the Plan of the Debtor transferee, and the sale price shall be paid to the seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by the Debtors and approved by the Bankruptcy Court.

**D.    Implementation of the Plan**

1.    Continued Organizational Existence

Except as otherwise provided in the Plan and subject to the Restructuring Transactions, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal Entity, each with all the powers of a limited liability company or a corporation, as applicable, under the laws of its respective jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law.

2.    Section 1145 Exemption

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the offering, issuance and distribution of the New Common Stock and the New Prairie Holdings Stock (if any) shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  In addition, any securities contemplated by the Plan and any and all agreements incorporated herein, including the New Common Stock and the New Prairie Holdings Stock (if any) shall be subject to compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such New Common Stock or New Prairie Holdings Stock (if any) and applicable regulatory approval, if any.  The New Common Stock and New Prairie Holdings Stock (if any) will be distributed pursuant to the Plan.

3.      Authorization of New Common Stock

On the Effective Date, the New Certificate of Incorporation shall have provided for sufficient shares of authorized New Common Stock to effectuate the issuances of New Common Stock contemplated by the Plan, including and in connection with the implementation of the Management Incentive Plan, and Reorganized Arch Coal shall issue or reserve for issuance a sufficient number of shares of New Common Stock to effectuate such issuances.  The shares of New Common Stock issued in connection with the Plan and the Management Incentive Plan shall be authorized without the need for further corporate action or without any further action by any Person or Entity, and once issued, shall be duly authorized and validly issued, fully paid and non-assessable.

Any share of New Common Stock issued to a Creditor of any Subsidiary Debtor shall be treated as (i) a contribution of cash by Reorganized Arch Coal to the applicable Debtor in the amount equal to the fair market value of such New Common Stock, followed by (ii) the issuance of New Common Stock by Reorganized Arch Coal to the applicable Debtor in return for such cash, followed by (iii) the transfer of the New Common Stock by the applicable Debtor to the applicable Creditor.

4.      Authorization of New Prairie Holdings Stock

Provided that a Knight Hawk Encumbrance Order has not been entered, on the Effective Date, the certificate of incorporation of Prairie Holdings shall have provided for sufficient shares of authorized New Prairie Holdings Stock to effectuate the issuances of New Prairie Holdings Stock contemplated by the Plan, and Reorganized Prairie Holdings shall issue or reserve for issuance a sufficient number of shares of New Prairie Holdings Stock to effectuate such issuances.  Any shares of New Prairie Holdings Stock issued in connection with the Plan shall be authorized without the need for further corporate action or without any further action by any Person or Entity, and once issued, shall be duly authorized and validly issued, fully paid and non-assessable.

5.      Cancellation of Existing Securities and Related Agreements, the Indentures and
        the Credit Agreement

On the Effective Date, except as otherwise specifically provided for in the Plan, all rights of any holder of Claims against, or Interests in, the Debtors, including options or warrants to purchase Interests, obligating the Debtors to issue, transfer or sell Interests of the Debtors, shall be canceled.  As a condition precedent to receiving any distribution on account of its Notes Claim, each record holder of Notes shall be deemed to have surrendered its Notes or other documentation underlying each Notes Claim, and all such surrendered Notes and other documentation shall be deemed to be cancelled pursuant to this Section, except to the extent otherwise provided herein.

Each Indenture shall terminate as of the Effective Date, except as necessary to (i) enforce the rights, Claims and interests of the applicable Indenture Trustee vis-a-vis any parties other than the Debtors (ii) to allow each Indenture Trustee to receive distributions under the Plan and to distribute them to the holders of the Notes in accordance with the terms of the Indentures and

49

(iii) to preserve any rights of the applicable Indenture Trustee as against any money or property distributable to the holders of Notes, including any priority in respect of payment and the right to exercise any charging lien.  Except for the foregoing, the Indenture Trustees and their respective agents shall be relieved of all further duties and responsibilities related to the Indentures and the Plan, except with respect to such other rights of such Indenture Trustees that, pursuant to the Indentures, survive the termination of the Indentures. Subsequent to the performance by each Indenture Trustee of its obligations pursuant to the Plan, each Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the applicable Indenture. Nothing contained herein shall impair the rights of any Indenture Trustee to assert any applicable charging lien.

Except as otherwise set forth herein, the First Lien Credit Agreement shall terminate as of the Effective Date, except as necessary to (i) enforce the rights, Claims and interests of the First Lien Agent and any predecessor thereof vis-a-vis the Lenders and any parties other than the Debtors, (ii) to allow the First Lien Agent to receive distributions under the Plan and to distribute them to the First Lien Lenders in accordance with the terms of the First Lien Credit Agreement and (iii) preserve any rights of the First Lien Agent and any predecessor thereof as against any money or property distributable to holders of First Lien Credit Facility Claims, including any priority in respect of payment and the right to exercise any charging lien; *provided*, *however*, that the obligation of the Debtors under Sections 5.9 and 11.3 of the First Lien Credit Agreement shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order; and *provided*, *further*, *however*, that the Debtors reserve all rights with respect to the application of such sections and any other section of the First Lien Credit Agreement to any predecessor of the First Lien Agent.  Except for the foregoing, the First Lien Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Credit Agreement and the Plan, except with respect to such other rights of the First Lien Agent that, pursuant to the First Lien Credit Agreement, survive the termination of the First Lien Credit Agreement. Subsequent to the performance by the First Lien Agent of its obligations pursuant to the Plan, the First Lien Agent and its agents shall be relieved of all further duties and responsibilities related to the First Lien Credit Agreement.

6.    Financing and Restructuring Transactions

(a)  New First Lien Credit Facility

On or before the Effective Date, Reorganized Arch Coal shall enter into the New First Lien Credit Facility, and, subject to the satisfaction of the DIP Facility Claims, the First Lien Credit Facility Secured Claims and the Other Secured Claims in accordance herewith, grant the Liens and security interests provided for in the New First Lien Credit Agreement.  The Reorganized Debtors that are the guarantors under the New First Lien Credit Facility shall issue the guarantees and grant the Liens and security interests as provided therein.  The New First Lien Credit Facility shall be (i) on terms and conditions substantially as set forth in the Plan Supplement, (ii) in accordance with the terms set forth in Exhibit A to the RSA and (iii) otherwise reasonably acceptable to the Majority Consenting Lenders.

(b)   Securitization Facility

On the Effective Date, the Securitization Facility shall either be reinstated on terms acceptable to the Securitization Parties in their sole discretion and reasonably acceptable to the Majority Consenting Lenders or be replaced with a new securitization facility on terms set forth in the Plan Supplement and otherwise reasonably acceptable to the Majority Consenting Lenders.

(c)   Certain Reclamation Obligations

In accordance with the *Stipulation and Order Concerning Debtors' Reclamation Bonding of their Surface Coal Mining Operations in Wyoming* [ECF No. 432], the $75 million superpriority claim of the  State of Wyoming and the Wyoming Department of Environmental Quality against each of Arch Western Resources, LLC, Thunder Basin Coal Company, L.L.C., Arch of Wyoming, LLC and Energy Development Co. shall terminate on the Effective Date.

(d)   Dissolution or Transfer of Prairie Coal Company, LLC

Provided that a Knight Hawk Encumbrance Order has not been entered, as determined by the Debtors in their sole discretion, on or prior to the Effective Date, either (i) the assets of Prairie Coal Company shall be transferred to a Reorganized Debtor other than Prairie Holdings and Prairie Coal Company shall be dissolved or (ii) the Interests in Prairie Coal Company shall be transferred by Prairie Holdings to another Reorganized Debtor that is designated by the Debtors in their sole discretion.

(e)   Restructuring Transactions

On the Effective Date, contemporaneously with the cancellation and discharge of all Claims pursuant to the Plan and the issuance of the New Common Stock, the Reorganized Debtors may effect corporate restructurings of their respective businesses, including actions acceptable to the Majority Consenting Lenders in their reasonable discretion to simplify, reorganize and rationalize the overall reorganized organizational structure of the Reorganized Debtors (together, the "**Restructuring Transactions**").  The Restructuring Transactions may include (i) dissolving companies or creating new companies, (ii) merging, dissolving, transferring assets or otherwise consolidating any of the Debtors in furtherance of the Plan, or engaging in any other transaction in furtherance of the Plan, (iii) executing and delivering appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, liquidation, domestication, continuation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (iv) executing and delivering appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (v) filing appropriate certificates or articles of merger, consolidation or dissolution or other filings or recordings pursuant to applicable state law; and (vi) taking any other action acceptable to the Majority Consenting Lenders in their reasonable discretion in connection with such organizational restructurings.  In each case in which the surviving, resulting or acquiring Entity in any of these transactions is a successor to a Reorganized Debtor, such surviving, resulting or acquiring Entity will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan, including the assumption of the surviving obligations

51

to the DIP Agent and the DIP Lenders as set forth herein, and paying or otherwise satisfying the applicable Allowed Claims. Implementation of any Restructuring Transactions shall not affect any performance obligations, distributions, discharges, exculpations, releases or injunctions set forth in the Plan.

**E.    Provisions Governing Distributions**

1.    Disbursing Agent

The Debtors or Reorganized Debtors may retain a Disbursing Agent to assist with the distributions to be made under the Plan as directed by the Debtors or Reorganized Debtors. The Disbursing Agent shall make all distributions required under the Plan, except as to a Creditor whose distribution is to be administered by a Servicer, which distributions shall be deposited with the appropriate Servicer for distribution to Creditors in accordance with the provisions of the Plan and the terms of the governing agreement. Distributions on account of such Claims shall be deemed completed upon delivery to the appropriate Servicer; *provided*, *however*, that if any Servicer is unable to make or consents to the Disbursing Agent making such distributions, the Disbursing Agent, with such Servicer's cooperation, shall make such distributions to the extent reasonably practicable to do so. The DIP Agent, the First Lien Agent and the applicable Indenture Trustee will each be considered a Servicer for the DIP Facility Claims, the First Lien Credit Facility Claims and the applicable Notes Claims, respectively.

Notwithstanding anything to the contrary herein, all distributions of New Prairie Holdings Stock (if any) related to or on account of the Notes shall be accomplished in accordance with the customary practices of the transfer agent for the New Prairie Holdings Stock (if any) and in accordance with any applicable procedures of DTC. Each Indenture Trustee shall cooperate in the administration of distributions in accordance with the Plan and the applicable Indenture. No Indenture Trustee shall be required to give any bond, surety or other security for the performance of its duties with respect to the administration and implementation of distributions.

The Reorganized Debtors shall be authorized, without further Bankruptcy Court approval, but not directed to, reimburse any Servicer for its reasonable, documented, actual and customary out-of-pocket expenses incurred in providing postpetition services directly related to distributions pursuant to the Plan.

2.    Timing and Delivery of Distributions

(a)    Timing

Subject to any reserves or holdbacks established pursuant to the Plan, and taking into account the matters discussed in Section 6.3 of the Plan, on the appropriate Distribution Date or as soon as practicable thereafter, holders of Allowed Claims against all Debtors shall receive the distributions provided for Allowed Claims in the applicable Classes as of such date.

If and to the extent there are Disputed Claims as of the Effective Date, distributions on account of such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in the Plan with respect to the

treatment of Allowed Claims on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after each such Claim is Allowed; *provided*, *however*, that distributions on account of the Claims set forth in Article 3 of the Plan shall be made as set forth therein and Professional Fee Claims shall be made as soon as reasonably practicable after such Claims are Allowed by the Bankruptcy Court or as provided in any other applicable order of the Bankruptcy Court. Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Final Distribution Date.

(b)  *De Minimis* Distributions

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor the Disbursing Agent shall have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Disbursing Agent from the relevant recipient at the addresses set forth in Section 15.12 of the Plan within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to Reorganized Arch Coal. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor any Disbursing Agent shall have any obligation to make a particular distribution to a specific holder of an Allowed Claim if such holder is also the holder of a Disputed Claim.

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor any Disbursing Agent shall have any obligation to make any distributions on any Interim Distribution Date unless the sum of all distributions authorized to be made to all holders of Allowed Claims on such Interim Distribution Date exceeds $100,000 in value.

(c)  Fractional Shares

Notwithstanding any other provision of the Plan, no fractional shares of New Common Stock or New Prairie Holdings Stock shall be distributed; *provided*, *however*, that any fractional shares of New Common Stock or New Prairie Holdings Stock shall be rounded down to the next whole number or zero, as applicable, and no consideration shall be provided in lieu of fractional shares that are rounded down.

(d)  Delivery of Distributions – Allowed Claims

Distributions shall only be made to the record holders of Allowed Claims as of the Distribution Record Date. On the Distribution Record Date, at the close of business for the relevant register, all registers maintained by the Debtors, Reorganized Debtors, any Servicers, the Disbursing Agent, the Indenture Trustees and each of the foregoing's respective agents, successors and assigns shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan. The Debtors, Reorganized Debtors, Servicers, Disbursing Agent, Indenture Trustees and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions

pursuant to or in any way arising from the Plan (or for any other purpose), any Claims that are transferred after the Distribution Record Date. Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Distribution Record Date, irrespective of the number of distributions made under the Plan or the date of such distributions. Furthermore, if a Claim is transferred 20 or fewer calendar days before the Distribution Record Date, the Disbursing Agent or applicable Servicer, as applicable, shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

If any dispute arises as to the identity of a holder of an Allowed Claim that is entitled to receive a distribution pursuant to the Plan, the Disbursing Agent or applicable Servicer may, in lieu of making such distribution to such Person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a distribution to a holder of an Allowed Claim may be made by the Disbursing Agent in its sole discretion: (i) to the address set forth on the first page of the Proof of Claim filed by such holder (or at the last known address of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) to the address set forth in any written notice of an address change delivered to the Disbursing Agent after the date of any related Proof of Claim, (iii) to the address set forth on the Schedules, if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of an address change or (iv) to the address of any counsel that has appeared in the Chapter 11 Cases on such holder's behalf. In the case of a holder whose Claim is governed by an agreement and administered by a Servicer, the applicable Servicer shall make the distribution to the address contained in the official records of such Servicer.

(e)   Delivery of Distributions – Allowed First Lien Credit Facility Claims

All distributions of Cash on account of First Lien Credit Facility Claims shall be deposited with the First Lien Agent, as Servicer, for distribution to holders of First Lien Facility Claims in accordance with the terms of the First Lien Transaction Documents. All distributions other than of Cash on account of First Lien Credit Facility Claims may, with the consent of the First Lien Agent, be made by the Disbursing Agent directly to holders of First Lien Credit Facility Claims in accordance with the terms of the Plan. The Reorganized Debtors shall reimburse the First Lien Agent for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan.

(f)   Delivery of Distributions – Allowed Notes Claims; Surrender of Canceled Instruments or Securities

Subject to the provisions of Section 5.5 of the Plan, as to any holder of an Allowed Notes Claim that is held in the name of, or by a nominee of, DTC, the Debtors and the Reorganized Debtors shall seek the cooperation of DTC to provide appropriate instructions to the applicable

54

Indenture Trustee and such distribution shall be made through a mandatory and/or voluntary exchange on or as soon as practicable on or after the Effective Date.

    3.      Manner of Payment Under Plan

        (a)  At the Disbursing Agent's option, any Cash payment may be made by check, wire transfer or any other customary payment method.

        (b)  The Disbursing Agent shall distribute New Common Stock, New Prairie Holdings Stock or Cash as required under the Plan.  Where the applicable Reorganized Debtor is a Reorganized Subsidiary Debtor, Reorganized Arch Coal shall be deemed to have made a direct capital contribution to the applicable Reorganized Subsidiary Debtor of an amount of Cash to be distributed to the Creditors of such Reorganized Debtor, but only at such time as, and to the extent that, such amounts are actually distributed to holders of Allowed Claims. Any distributions of New Common Stock, New Prairie Holdings Stock or Cash that revert to Reorganized Arch Coal or are otherwise canceled (such as to the extent any distributions have not been claimed within one year) shall revest solely in Reorganized Arch Coal, and no other Reorganized Debtor shall have (nor shall it be considered to ever have had) any ownership interest in the amounts distributed.

        (c)  Allocation of Plan Distributions Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

        (d)  Compliance Matters

In connection with the Plan, each Debtor, each Reorganized Debtor and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Debtor, each Reorganized Debtor and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms that the Debtors or the Reorganized Debtors, as applicable, believe are reasonable and appropriate.  For tax purposes, distributions received with respect to Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

The Debtors, the Reorganized Debtors and the Disbursing Agent, as applicable, reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

(e)   Foreign Currency Exchange Rate

As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (New York time), midrange spot rate of exchange for the applicable currency as published in the *Wall Street Journal*, National Edition, on the day after the Petition Date.

4.     Undeliverable or Non-Negotiated Distributions

If any distribution is returned as undeliverable, no further distributions to the applicable Creditor shall be made unless and until the Disbursing Agent or appropriate Servicer is notified in writing of such Creditor's then-current address, at which time the undelivered distribution shall be made to such Creditor without interest or dividends.  Undeliverable distributions shall be returned to Reorganized Arch Coal until such distributions are claimed.  All undeliverable distributions under the Plan that remain unclaimed for one year after attempted distribution shall indefeasibly revert to Reorganized Arch Coal.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 120 calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the holder of the relevant Allowed Claim within the 120-calendar-day period.  After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to Reorganized Arch Coal, notwithstanding any federal or state escheat laws to the contrary.

5.     Claims Paid or Payable by Third Parties

(a)   Claims Paid by Third Parties

To the extent a Creditor receives a distribution on account of a Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Creditor shall, within 30 calendar days of receipt thereof, repay and/or return the distribution to the applicable Reorganized Debtor, to the extent the Creditor's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such distribution under the Plan.

A Claim may be adjusted or expunged on the official claims register, without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Creditor receives payment in full or in part on account of such Claim; *provided*, *however*, that to the extent the non-Debtor party making the payment is

56

subrogated to the Creditor's Claim, the non-Debtor party shall have a 30-calendar-day grace period following payment in full to notify the Solicitation and Claims Agent of such subrogation rights.

(b)  Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agrees (or if and to the extent any such insurer is required by a court or other tribunal of competent jurisdiction) to satisfy any Claim, then immediately upon such court or other tribunal determination or insurers' agreement, such Claim may be expunged (to the extent of any agreed-upon or determined satisfaction) on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

## F.    Filing of Administrative Expense Claims

1.    Professional Fee Claims

(a)  Final Fee Applications

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 60 calendar days after the Confirmation Date. Such requests shall be filed with the Bankruptcy Court and served as required by the Interim Compensation Order; provided that if any Professional is unable to file its own request with the Bankruptcy Court, such Professional may deliver an original, executed copy and an electronic copy to the Debtors' attorneys and the Reorganized Debtors at least three Business Days before the deadline, and the Debtors' attorneys shall file such request with the Bankruptcy Court. The objection deadline relating to a Final Fee Application shall be 4:00 p.m. (prevailing Central Time) on the date that is 30 calendar days after the filing of such Final Fee Application, and a hearing on such Final Fee Application, if necessary, shall be held no later than 30 calendar days after the objection deadline. Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed or in accordance with any other applicable Order.

(b)  Payment of Interim Amounts

Professionals shall be paid pursuant to the Interim Compensation Order with respect to all calendar months ending before the Confirmation Date and, for the month in which the Confirmation Date occurred, the Confirmation Date and the days prior to the Confirmation Date.

(c)  Post-Confirmation Date Fees

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors may employ and pay all Professionals without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

2.      Administrative Expense Claims

(a)   A notice setting forth the Administrative Expense Claim Bar Date will be (i) filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (ii) posted on the Debtors' Case Information Website.  No other notice of the Administrative Expense Claim Bar Date will be provided.

(b)   All requests for payment of Administrative Expense Claims that accrued on or before the Effective Date (other than Professional Fee Claims, which are subject to the provisions of Section 7.1 of the Plan) must be filed with the Solicitation and Claims Agent and served on counsel for the Debtors and Reorganized Debtors by the Administrative Expense Claim Bar Date.  Any requests for payment of Administrative Expense Claims pursuant to Section 7.2 of the Plan that are not properly filed and served by the Administrative Expense Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.

(c)   The Reorganized Debtors, in their sole discretion, shall have exclusive authority to settle Administrative Expense Claims without further Bankruptcy Court approval.

(d)   Unless the Debtors or the Reorganized Debtors object to a timely filed and properly served Administrative Expense Claim by the Claims Objection Deadline, such Administrative Expense Claim shall be deemed allowed in the amount requested.  If the Debtors or the Reorganized Debtors object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

(e)   Notwithstanding the foregoing, requests for payment of Administrative Expense Claims need not be filed for Administrative Expense Claims that (i) are for goods or services provided to the Debtors in the ordinary course of business, (ii) previously have been Allowed by Final Order of the Bankruptcy Court, (iii) are for Cure amounts, (iv) are on account of postpetition taxes (including any related penalties or interest) owed by the Debtors or the Reorganized Debtors to any Governmental Unit or (v) the Debtors or Reorganized Debtors have otherwise agreed in writing do not require such a filing.

G.    **Disputed Claims**

1.    Objections to Claims

(a)    After the Effective Date, the Reorganized Debtors shall have the sole authority to object to all Claims against the Debtors; *provided*, *however*, that the Reorganized Debtors shall not be entitled to object to any Claim that has been expressly allowed by Final Order or under the Plan.  Any objections to Claims shall be filed on the Bankruptcy Court's docket on or before the Claims Objection Deadline.

(b)    Claims objections filed before, on or after the Effective Date shall be filed, served and administered in accordance with the Claims Objection Procedures Order; *provided*, *however*, that, on and after the Effective Date, filings and notices need only be served on the relevant claimants.

2.    Resolution of Disputed Claims

On and after the Effective Date, the Reorganized Debtors shall have the sole authority to litigate, compromise, settle, otherwise resolve or withdraw any objections to all Claims against the Debtors and to compromise and settle any such Claims without notice to or approval by the Bankruptcy Court or any other party.

3.    Estimation of Claims and Interests

The Debtors or Reorganized Debtors may determine, resolve and otherwise adjudicate all Contingent Claims, Unliquidated Claims and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' or Reorganized Debtors' choice having jurisdiction over the validity, nature or amount thereof.  The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any of the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim, and the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, *however*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the holder of such Claim has filed a motion

requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

    4.        Payments and Distributions for Disputed Claims

        (a)  No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, no payments or distributions shall be made for a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

        (b)  Disputed Claims Reserve

           (i)        On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall hold in reserve (the "**Disputed Claims Reserve**") the amount of Cash as would likely have been distributed to the holders of all Disputed Claims as if such Disputed Claims had been Allowed on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (A) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the nonduplicative Proof of Claim, or (if no proof of such Claim was filed) listed by the Debtors in the Schedules, (B) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court, or (C) the amount otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, and the holder of such Disputed Claim for distribution purposes. With respect to all Disputed Claims that are General Unsecured Claims and are unliquidated or contingent and for which no dollar amount is asserted on a Proof of Claim, the Debtors will reserve Cash equal to the amount reasonably determined by the Reorganized Debtors.

           (ii)      The Disbursing Agent may, at the direction of the Debtors or the Reorganized Debtors, adjust the Disputed Claims Reserve to reflect all earnings thereon (net of any expenses relating thereto, such expenses including any taxes imposed thereon or otherwise payable by the reserve), to be distributed on the Distribution Dates, as required by the Plan. The Disbursing Agent shall hold in the Disputed Claims Reserve all dividends, payments and other distributions made on account of, as well as any obligations arising from, the property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise. The taxes

60

imposed on the Disputed Claims Reserve (if any) shall be paid by the Disbursing Agent from the property held in the Disputed Claims Reserve, and the Reorganized Debtors shall have no liability for such taxes.

(iii)   After any reasonable determination by the Reorganized Debtors that the Disputed Claims Reserve should be adjusted downward in accordance with Section 8.4(b)(i) of the Plan, the Disbursing Agent shall, at the direction of the Debtors or the Reorganized Debtors, effect a distribution in the amount of such adjustment as required by the Plan (an "**Adjustment Distribution**"), and any date of such distribution shall be an Interim Distribution Date.

(iv)   After all Disputed Claims have become either Allowed Claims or Disallowed Claims and all distributions required pursuant to Section 8.4(c) of the Plan have been made, the Disbursing Agent shall, at the direction of the Reorganized Debtors, effect a final distribution of the Cash remaining in the Disputed Claims Reserve, if any.

(v)   It is expected that the Disbursing Agent will (A) make an election pursuant to United States Treasury Regulations section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section and (B) allocate taxable income or loss to the Disputed Claims Reserve with respect to any taxable year that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims).  The affected holders of the Disputed Claims shall be bound by such election, if made by the Disbursing Agent.  For federal income tax purposes, absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Disbursing Agent shall, to the extent permitted by applicable law, report consistently with the foregoing characterization for state and local income tax purposes. All affected holders of Disputed Claims shall report, for income tax purposes, consistently with the foregoing.

5.   Distributions After Allowance

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will, out of the Disputed Claims Reserve, distribute to the holder thereof the distribution, if any, to which such holder is entitled under the Plan in accordance with Section 6.2(a) of the Plan.  Subject to Section 8.6 of the Plan, all distributions made under this Section 8.4(c) on account of Allowed Claims will be made together with any dividends, payments or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the Disputed Claims Reserve as if such Allowed Claim had been an

Allowed Claim on the dates distributions were previously made to holders of Allowed Claims included in the applicable class under the Plan.

6.      No Amendments to Claims

A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, the Local Rules or applicable non-bankruptcy law.  On or after the Confirmation Date, the holder of a Claim (other than an Administrative Expense Claim or a Professional Fee Claim) must obtain prior authorization from the Bankruptcy Court or Reorganized Debtors to file or amend a Claim.  Any new or amended Claim (other than Rejection Claims) filed after the Confirmation Date without such prior authorization will not appear on the official claims register and will be deemed disallowed in full and expunged without any action required of the Debtors or the Reorganized Debtors and without the need for any court order.

7.      No Interest

Other than as provided by section 506(b) of the Bankruptcy Code or as specifically provided for in the Plan, the Confirmation Order, the DIP Order or with respect to the DIP Facility, postpetition interest shall not accrue or be paid on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Claim or Disputed Claim for the period from and after the Effective Date; *provided*, *however*, that nothing in Section 8.6 of the Plan shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

## H.      Executory Contracts and Unexpired Leases

1.      Rejection of Executory Contracts and Unexpired Leases

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each executory contract and unexpired lease to which any Debtor is a party shall be deemed automatically rejected by the Debtors effective as of the Effective Date, except for any executory contract or unexpired lease that (i) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date, (ii) is the subject of a motion to assume or reject pending on the Effective Date, (iii) is assumed, rejected or otherwise treated pursuant to Section 9.3 of the Plan, (iv) is listed on Schedule 9.2(a) or 9.2(b) of the Plan or (v) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline.  If an executory contract or unexpired lease either (x) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date or (y) is the subject of a motion to assume or reject pending on the Confirmation Date, then the listing of any such executory contract or unexpired lease on the aforementioned schedules shall be of no effect.

2.      Schedules of Executory Contracts and Unexpired Leases

(a)   Schedules 9.2(a) and 9.2(b) of the Plan shall be filed by the Debtors as specified in Section 15.5 of the Plan and shall represent the Debtors' then-current good-faith belief regarding the intended treatment of all executory contracts and unexpired leases listed thereon; *provided*, that the Debtors shall not seek to assume or reject any material executory contract or material unexpired lease of non-residential real property without the consent of the Consenting Lenders and consulting with the Creditors' Committee.  The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the Confirmation Hearing, or such earlier time as may be agreed in writing between the Debtors and the applicable counterparty, to (i) amend Schedules 9.2(a) and 9.2(b) to add, delete or reclassify any executory contract or unexpired lease or amend a proposed assignment and (ii) amend the Proposed Cure, in each case as to any executory contract or unexpired lease previously listed as to be assumed; *provided*, *however*, that if the Confirmation Hearing is adjourned, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments of the Confirmation Hearing; *provided*, *further* that (a) for Intercompany Contracts and agreements proposed to be rejected as of the above deadline, the Debtors reserve the right to make amendments at any time before Confirmation and (b) the Debtors may amend Schedules 9.2(a) and 9.2(b) of the Plan to add, delete or reclassify any executory contracts or unexpired leases or amend proposed assignments after such date to the extent agreed with the relevant counterparties.  Pursuant to sections 365 and 1123 of the Bankruptcy Code, and except for executory contracts and unexpired leases as to which a Treatment Objection is properly filed and served by the Treatment Objection Deadline, (x) each of the executory contracts and unexpired leases listed on Schedule 9.2(a) of the Plan shall be deemed assumed (and, if applicable, assigned) effective as of the Assumption Effective Date specified thereon, and the Proposed Cure specified in the notice mailed to each Assumption Party shall be the Cure and shall be deemed to satisfy fully any obligations the Debtors might have regarding such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code and (y) each of the executory contracts and unexpired leases listed on Schedule 9.2(b) of the Plan shall be deemed rejected effective as of the Rejection Effective Date specified thereon.

(b)   The Debtors shall file initial versions of Schedules 9.2(a) and 9.2(b) of the Plan and any amendments thereto with the Bankruptcy Court and shall serve all notices thereof only on the DIP Agent, the Consenting Lenders, the Creditors' Committee and the relevant Assumption Parties

63

and Rejection Parties.  For any executory contract or unexpired lease first listed on Schedule 9.2(b) later than the date that is 10 calendar days before the Voting Deadline, the Debtors shall use their best efforts to notify the DIP Agent, the Consenting Lenders, the Creditors' Committee and the applicable Rejection Party promptly of such proposed treatment via facsimile, email or telephone at any notice address or number included in the relevant executory contract or unexpired lease or as otherwise timely provided in writing to the Debtors by any such counterparty or its counsel.

(c)   For any executory contracts or unexpired leases first listed on Schedule 9.2(b) of the Plan later than the date that is 10 calendar days before the Voting Deadline, affected Rejection Parties shall have five calendar days from the date of such amendment to Schedule 9.2(b) of the Plan to object to Confirmation of the Plan.  For any executory contracts or unexpired leases first listed on Schedule 9.2(b) of the Plan later than the date that is five calendar days before the Confirmation Hearing, affected Rejection Parties shall have until the Confirmation Hearing to object to Confirmation of the Plan.

(d)   The listing of any contract or lease on Schedule 9.2(a) or 9.2(b) of the Plan is not an admission that such contract or lease is an executory contract or unexpired lease or that any Debtor has any liability thereunder.  The Debtors reserve the right to assert that any of the agreements listed on Schedule 9.2(a) or 9.2(b) of the Plan are not executory contracts or unexpired leases.

3.      Categories of Executory Contracts and Unexpired Leases to Be Assumed

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each of the executory contracts and unexpired leases within the following categories shall be deemed assumed as of the Effective Date (and the Proposed Cure for each, other than the Surety Bonds and the D&O Liability Insurance Policies, shall be zero dollars), except for any such executory contract or unexpired lease (i) that has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (ii) that is the subject of a motion to assume or reject pending on the Confirmation Date, (iii) that is listed on Schedule 9.2(a) or 9.2(b) of the Plan, (iv) that is otherwise expressly assumed or rejected pursuant to the terms of the Plan or (v) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline.

(a)   Customer Programs, Foreign Agreements, Insurance Plans, Intercompany Contracts, Surety Bonds and Workers' Compensation Plans

Subject to the terms of the first paragraph of Section 9.3 of the Plan, each Customer Program, Foreign Agreement, Insurance Plan, Intercompany Contract, Surety Bond and Workers' Compensation Plan shall be deemed assumed in its entirety effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each category of contracts listed in the

64

prior sentence. Nothing contained in Section 9.3(a) of the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Entity, including, without limitation, the insurer under any of the Insurance Plans. All Proofs of Claim on account of or in respect of any agreement covered by Section 9.3(a) of the Plan shall be deemed withdrawn automatically on the Effective Date without any further notice to or action by the Bankruptcy Court.

(i)      No Impairment of Rights Under Insurance Plans and Workers' Compensation Plans

Nothing in this Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order or any other document related to any of the foregoing (including, without limitation, Sections 9.4 and 9.7 of the Plan, any provision that purports to be preemptory or supervening or grants an injunction or release, or requires a party to opt out of any releases): (A) alters the rights and obligations of the Debtors, the Debtors' insurers and/or third party administrators (or any of their respective affiliates) under any Insurance Plans or Workers' Compensation Plans, (including, but not limited to, (i) any agreement to arbitrate disputes, (ii) any provisions regarding the provision, maintenance, use, nature and priority of collateral/security, (iii) any provisions regarding the payment of amounts within any deductible by the Debtors' insurers and/or third party administrators and the obligation of the Debtors to pay or reimburse the applicable insurer and/or third party administrator therefor; and (iv) any provision regarding notice of claims and settlements and the rights and duties with respect to the defense and settlement of claims); (B) modifies the coverage provided under any Insurance Plans  or Workers' Compensation Plans or the terms and conditions thereof except that on and after the Effective Date, the Reorganized Debtors shall become and remain liable in full for all of the Debtors' obligations under the Insurance Plans and Workers' Compensation Plans regardless of whether such obligations arise before or after the Effective Date without the requirement or need for any insurer and/or third party administrator to file an Administrative Claim or Treatment Objection; or (C) releases or impairs the claims or collateral of the insurers or third party administrators under the Insurance Plans and/or Workers' Compensation Plans. Any rights or obligations under the Insurance Plans and Workers' Compensation Plans shall be determined under the applicable Insurance Plans or Workers' Compensation Plans and applicable non-bankruptcy law.

(ii)      Continuance of Workers' Compensation Claims and Direct Actions

The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 11 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit:  (A) claimants with valid workers' compensation claims under any Workers' Compensation Plan or direct action claims covered by the Insurance Plans to proceed with their claims; (B) the Debtors' insurers and/or third party administrators to administer, handle, defend, settle, and/or pay, in the  ordinary course of business and without further order of this Bankruptcy Court, (i) all valid workers' compensation claims arising under the Workers' Compensation Plans, (ii) all claims where a claimant asserts a direct claim against any of the Debtors' insurers under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and

65

(iii) all costs in relation to each of the foregoing; and (C) the insurers and third party administrators to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Plans and/or Workers' Compensation Plans in such order as the insurer or third party administrator may determine.

(b)   Directors and Officers Insurance Policies and Agreements

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan (including Section 9.4 of the Plan) to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' aforementioned assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Debtors or the Debtors' insurers, regardless of when they arise, under the D&O Liability Insurance Policies.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

(c)   Certain Indemnification Obligations

Notwithstanding anything in the Plan (including Section 9.4 of the Plan), each Indemnification Obligation to a director, officer, manager or employee who was employed by any of the Debtors in such capacity on the Effective Date or immediately prior thereto shall be deemed assumed effective as of the Effective Date.  Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (i) remain in full force and effect, (ii) not be modified, reduced, discharged, impaired or otherwise affected in any way, (iii) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not Proofs of Claim have been filed with respect to such obligations and (iv) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

Notwithstanding anything contained in the Plan, the Reorganized Debtors, in their sole discretion, may (but have no obligation to) continue to honor each Indemnification Obligation to a director, officer, manager or employee that was no longer employed by any of the Debtors in such capacity on or immediately prior to the Effective Date, unless such obligation (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) is listed on Schedule 9.2(b) of the Plan or (iii) is otherwise expressly rejected pursuant to the terms of the

Plan or any Notice of Intent to Assume or Reject; *provided* that, for each such director, officer, manager or employee, the Reorganized Debtors shall be permitted to honor Indemnification Obligations solely to the extent of available coverage under the applicable D&O Liability Insurance Policy (and payable from the proceeds of such D&O Liability Insurance Policies).

(d)    Employee Benefits

As of the Effective Date, unless specifically listed on Schedule 9.2(a) or 9.2(b) or rejected or otherwise addressed by an order of the Bankruptcy Court (including, without limitation, by virtue of the Debtors having been granted the authority to terminate any such plan, policy, program or agreement or the Bankruptcy Court determining that the Debtors cannot successfully reorganize absent such termination), the Debtors and the Reorganized Debtors, in their sole discretion, may (but have no obligation to) honor, in the ordinary course of business, the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, healthcare benefits, disability benefits, deferred compensation benefits, travel benefits (including retiree travel benefits), vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for incentive compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time.  To the extent that the above-listed contracts, agreements, policies, programs and plans are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless a Treatment Objection is timely filed and properly served, each of them will be deemed assumed (as modified or terminated) as of the Effective Date with a Cure of zero dollars.  However, notwithstanding anything else herein, the assumed plans shall be subject to modification in accordance with the terms thereof at the discretion of the Reorganized Debtors.  Notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors shall honor, in the ordinary course of business, (i) the change-in-control agreements among the Debtors and certain of their employees (as described in the Debtors' proxy statement dated March 20, 2015 pursuant to Section 14(a) of the Exchange Act), as amended (the "**Change-in-Control Agreements**") and (ii) all awards granted in respect of the annual incentive compensation program and the performance unit component of the long-term incentive performance plan as approved by the Debtors' board of directors prior to May 31, 2016.  To the extent any of the agreements or awards in the foregoing sentence is an executory contract, it shall be deemed assumed (or, as applicable, deemed amended per the foregoing proviso and assumed) pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date with a Cure of zero dollars.

Notwithstanding anything to the contrary herein, (i) any claim by an employee of any of the Debtors under any of the Debtors' healthcare plans that arose on or prior to the Effective Date but that has not been paid on or prior to the Effective Date shall be honored by the Debtors or the Reorganized Debtors in the ordinary course of business after the Effective Date, and (ii) if the Debtors seek to modify or terminate any retiree benefits on or prior to the Effective Date, such modification or termination shall be subject to section 1114 of the Bankruptcy Code to the extent applicable.

(e) Pension Plans

On the Effective Date, the Debtors shall assume and continue the Pension Plans. On and after the Effective Date, the Debtors shall pay PBGC premiums in accordance with 29 U.S.C. § 1307, satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082 and administer the Pension Plans in accordance with the applicable provisions of ERISA.

 4. Assumption and Rejection Procedures and Resolution of Treatment Objections

 (a) Proposed Assumptions

 (i) As to any executory contract or unexpired lease to be assumed pursuant to any provision of the Plan or any Notice of Intent to Assume or Reject, unless an Assumption Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed assumed and, if applicable, assigned as of the applicable Assumption Effective Date proposed by the Debtors or Reorganized Debtors, without any further notice to or action by the Bankruptcy Court, and any obligation the Debtors or Reorganized Debtors may have to such Assumption Party with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code shall be deemed fully satisfied by the Proposed Cure, if any, which shall be the Cure.

 (ii) Any objection to the assumption or assignment of an executory contract or unexpired lease that is not timely filed and properly served shall be denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court), and any Claim relating to such assumption or assignment shall be forever barred from assertion and shall not be enforceable against any Debtor or Reorganized Debtor or their respective Estates or properties without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court, and any obligation the Debtors or the Reorganized Debtors may have under section 365(b) of the Bankruptcy Code (over and above any Proposed Cure) shall be deemed fully satisfied, released and discharged, notwithstanding any amount or information included in the Schedules or any Proof of Claim.

 (b) Proposed Rejections

 (i) As to any executory contract or unexpired lease to be rejected pursuant to any provision of the Plan or any Notice of Intent to

Assume or Reject, unless a Rejection Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed rejected as of the Rejection Effective Date proposed by the Debtors or Reorganized Debtors without any further notice to or action by the Bankruptcy Court.

(ii)     Any objection to the rejection of an executory contract or unexpired lease that is not timely filed and properly served shall be deemed denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court).

(c)   Resolution of Treatment Objections

(i)     On and after the Effective Date, the Reorganized Debtors may, in their sole discretion, settle Treatment Objections without any further notice to or action by the Bankruptcy Court or any other party (including by paying any agreed Cure amounts).

(ii)     For each executory contract or unexpired lease as to which a Treatment Objection is timely filed and properly served and that is not otherwise resolved by the parties after a reasonable period of time, the Debtors, in consultation with the Bankruptcy Court, shall schedule a hearing on such Treatment Objection and provide at least 21 calendar days' notice of such hearing to the relevant Assumption Party or Rejection Party.  Unless the Bankruptcy Court expressly orders or the parties agree otherwise, any assumption or rejection approved by the Bankruptcy Court notwithstanding a Treatment Objection shall be effective as of the Assumption Effective Date or Rejection Effective Date originally proposed by the Debtors or specified in the Plan.

(iii)     Any Cure shall be paid as soon as reasonably practicable following the entry of a Final Order resolving an assumption dispute and/or approving an assumption (and, if applicable, assignment), unless the Debtors or Reorganized Debtors file a Notice of Intent to Assume or Reject under Section 9.4(d) of the Plan.

(iv)     No Cure shall be allowed for a penalty rate or default rate of interest, each to the extent not proper under the Bankruptcy Code or applicable law.

(d)   Reservation of Rights

If a Treatment Objection is filed regarding any executory contract or unexpired lease sought to be assumed or rejected by any of the Reorganized Debtors, the Reorganized Debtors

reserve the right (i) to seek to assume or reject such agreement at any time before the assumption, rejection or assignment of, or Cure for, such agreement is determined by Final Order and (ii) to the extent a Final Order is entered resolving a dispute as to Cure or the permissibility of assignment (but not approving the assumption of the executory contract or unexpired lease sought to be assumed), to seek to reject such agreement within 14 calendar days after the date of such Final Order, in each case by filing with the Bankruptcy Court and serving upon the applicable Assumption Party or Rejection Party, as the case may be, a Notice of Intent to Assume or Reject.

5.      Rejection Claims

Any Rejection Claim must be filed with the Solicitation and Claims Agent by the Rejection Bar Date.  Any Rejection Claim for which a Proof of Claim is not properly filed and served by the Rejection Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective Estates or properties.  The Debtors or the Reorganized Debtors may contest any Rejection Claim in accordance with Section 8.1 of the Plan.

6.      Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned pursuant to the Plan shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.  Any assignment by the Reorganized Debtors of an executory contract or unexpired lease after the Effective Date shall be governed by the terms of the executory contract or unexpired lease and applicable non-bankruptcy law.

7.      Approval of Assumption, Rejection, Retention or Assignment of Executory Contracts and Unexpired Leases

(a)     Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease that is assumed (and/or assigned) pursuant to the Plan, shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms as of the applicable Assumption Effective Date, except as modified by the

70

provisions of the Plan, any order of the Bankruptcy Court authorizing or providing for its assumption (and/or assignment) or applicable federal law.

(b)   The provisions (if any) of each executory contract or unexpired lease assumed and/or assigned pursuant to the Plan that are or may be in default shall be deemed satisfied in full by the Cure, or by an agreed-upon waiver of the Cure.  Upon payment in full of the Cure, any and all Proofs of Claim based upon an executory contract or unexpired lease that has been assumed in the Chapter 11 Cases or under the terms of the Plan shall be deemed disallowed and expunged with no further action required of any party or order of the Bankruptcy Court.

(c)   Confirmation and consummation of the Plan and consummation of the Restructuring Transactions shall not constitute a change of control under any executory contract or unexpired lease assumed by the Debtors on or prior to the Effective Date, including the Change-in-Control Agreements.

8.      Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided by the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in remedy related to such premises, unless any of the foregoing agreements has been or is rejected pursuant to an order of the Bankruptcy Court or is otherwise rejected as part of the Plan.

Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (i) do not alter in any way the prepetition nature of the executory contracts and unexpired leases, or the validity, priority or amount of any Claims against the Debtors that may arise under the same, (ii) are not and do not create postpetition contracts or leases, (iii) do not elevate to administrative expense priority any Claims of the counterparties to the executory contracts and unexpired leases against any of the Debtors and (iv) do not entitle any Entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition executory contracts or unexpired leases and subsequent modifications, amendments, supplements or restatements.

71

I.      **Provisions Regarding Governance of the Reorganized Debtors**

1.      Organizational Action

(a)   On and after the Effective Date, the adoption, filing, approval and ratification, as necessary, of all limited liability company, corporate or related actions contemplated hereby for each of the Reorganized Debtors, including the Restructuring Transactions, shall be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may include: (i) the adoption and filing of an amendment to the New Certificate of Incorporation, (ii) the adoption of the New Bylaws, (iii) the adoption and filing of the Reorganized Subsidiary Debtors' Certificates of Incorporation and Reorganized Subsidiary Debtors' LLC Agreements, as applicable, (iv) the approval of the Reorganized Subsidiary Debtors' Bylaws and Reorganized Subsidiary Debtors' Operating Agreements, as applicable, (v) the election or appointment, as the case may be, of directors, officers, managers or managing members for the Reorganized Debtors, (vi) the issuance of the New Common Stock and the New Prairie Holdings Stock (if any), (vii) the Restructuring Transactions to be effectuated pursuant to the Plan and (viii) the qualification of any Reorganized Debtors as foreign corporations if and wherever the conduct of business by such entities requires such qualifications.

(b)   All matters provided for herein involving the organizational structure of any Debtor or any Reorganized Debtor, or any limited liability company or corporate action required by any Debtor or any Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder.

(c)   On or after the Effective Date, the appropriate officers of each Reorganized Debtor and members of the board of directors, board of managers or equivalent body of each Reorganized Debtor are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan in the name of and on behalf of such Reorganized Debtor and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

2.      Organizational Documents

(a)   The New Certificate of Incorporation and the New Bylaws shall be amended or deemed amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code including, among

other purposes, to authorize the New Common Stock.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates of incorporation, limited liability company agreements, or other analogous organizational documents, as applicable, as permitted by applicable law.

(b)  Subject to the Restructuring Transactions, the Reorganized Subsidiary Debtors' organizational documents in effect before the Effective Date shall remain in effect after the Effective Date, *provided* that, if a Knight Hawk Encumbrance Order has not been entered, the organizational documents of Prairie Holdings shall be amended or deemed amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code including, among other purposes, to authorize the New Prairie Holdings Stock.  After the Effective Date, any of the Reorganized Debtors may file amended and restated certificates of incorporation (or other formation documents, if applicable) with the Secretary of State in any appropriate jurisdiction.

3.      Directors and Officers of the Reorganized Debtors

(a)  Subject to the Restructuring Transactions, on the Effective Date, the management, control and operation of each Reorganized Debtor shall become the general responsibility of the board of directors, members or managing members, as applicable, of such Reorganized Debtor or other governing body as provided in the applicable governing documents.

(b)  On the Effective Date, the term of the members of the Board shall expire and such members shall be replaced by the New Board.  The New Board will initially consist of seven members:  (i) the Chief Executive Officer; and (ii) six directors selected by the Majority Consenting Lenders in consultation with the Chief Executive Officer, at least one of which shall be independent.  The classification and composition of the New Board shall be consistent with the New Stockholders' Agreement, the New Certificate of Incorporation and the New Bylaws.  In the Plan Supplement, to the extent known, the Debtors will disclose pursuant to section 1129(a)(5) of the Bankruptcy Code the identity and affiliations of the Persons proposed to serve on the New Board.  The New Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the New Certificate of Incorporation and the New Bylaws.

(c)  Subject to the Restructuring Transactions, and except as specified in the Plan Supplement, the managers, managing members and members of the boards of directors, as applicable, of the Subsidiary Debtors before the Effective Date shall continue to serve in their current capacities as of the Effective Date.  The classification and composition of the managers, managing members and members of the boards of directors,

73

as applicable, of the Reorganized Subsidiary Debtors shall be consistent with the Reorganized Subsidiary Debtors' LLC Agreements, the Reorganized Subsidiary Debtors' Certificates of Incorporation, the Reorganized Subsidiary Debtors' Bylaws and the Reorganized Subsidiary Debtors' Operating Agreements, as applicable. Each such director, manager or managing member, as applicable, shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the relevant Reorganized Debtor's constituent documents.

(d) Subject to the Restructuring Transactions and any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as otherwise specified in the Plan Supplement, the principal officers of each Debtor immediately before the Effective Date will be the officers of the corresponding Reorganized Debtor as of the Effective Date. Each such officer shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of such Reorganized Debtor's constituent documents.

4.      New Stockholders' Agreements

(a) On the Effective Date, Reorganized Arch Coal and each Person or Entity that receives New Common Stock under the Plan shall enter into or be deemed to have entered into the new stockholders' agreement substantially in the form included in the Plan Supplement by and among Reorganized Arch Coal and each Person or Entity that receives New Common Stock under the Plan.

(b) On the Effective Date, provided that a Knight Hawk Encumbrance Order has not been entered, Reorganized Prairie Holdings and each Person or Entity that receives New Prairie Holdings Stock under the Plan shall enter into or be deemed to have entered into the Prairie Holdings Stockholders' Agreement.

**J.      Effect of Confirmation**

1.      Vesting of Assets

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights and privileges related thereto) of each of the Debtors shall vest in each of the respective Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests. All Liens, Claims, encumbrances, charges and other interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order. Except as otherwise provided in the Plan or the

74

Confirmation Order, as of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and settle and compromise Claims and Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code with respect to the Debtors.

2.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, settled, discharged and compromised, and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns.  The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.

3.      Releases and Discharges

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by holders of Claims, constitute good-faith compromises and settlements of the matters covered thereby and are consensual.  Such compromises and settlements are made in exchange for consideration and are in the best interest of holders of Claims, are fair, equitable, reasonable and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the discharge, release, indemnification and exculpation provisions set forth in the Plan (i) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(e) of title 28 of the United States Code, (ii) is an essential means of implementing the Plan, (iii) is an integral and non-severable element of the transactions incorporated into the Plan, (iv) confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their Creditors, (v) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, (vi) is fair, equitable and reasonable and in exchange for good and valuable consideration and (vii) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

4.      Discharge and Injunction

(a)     Except as otherwise specifically provided in the Plan or the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts of, and Claims against, the Debtors and shall terminate all Interests in the Debtors, as well as all interests of any kind, nature or description

75

whatsoever in or against any of the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as otherwise specifically provided in the Plan or the Confirmation Order, upon the Effective Date, all existing Claims against the Debtors and Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Interests (and all representatives, trustees or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against, liabilities of and Interests in the Debtors, subject to the occurrence of the Effective Date.

(b)   Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise specifically provided in the Plan or the Confirmation Order, each holder (as well as any representatives, trustees or agents on behalf of each holder) of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons and Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, the Debtors.

(c)   Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims or Interests that arose prior to the Effective Date and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including, without limitation, a Section 510(b) Claim) against or Interest in the Debtors, the Reorganized Debtors or property of any Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to the Plan, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors or property of any Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to the Plan, (iii) creating, perfecting or enforcing

76

any Lien or encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors other than to enforce any right to a distribution pursuant to the Plan or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Debtors and Reorganized Debtors and their respective properties and interest in properties.

(d)   Nothing in the Plan or the Confirmation Order

    (i)   releases, discharges, exculpates, precludes, or enjoins the enforcement of:

        (1)   any liability or obligation to, or any Claim or any Cause of Action by, a Governmental Unit under any applicable Environmental Law to which any Reorganized Debtor is subject to the extent that it is the owner, lessee, permittee, controller, or operator of real property or a mining operation after the Effective Date (whether or not such liability, obligation, Claim, or cause of action is based in whole or part on acts or omissions prior to the Effective Date);

        (2)   the obligations under the Consent Decrees in United States et al. v. Arch Coal, Inc., et al., 2:11-cv-00133 (S.D. W.Va.) and United States et al. v. Arch Coal, Inc., et al., 2:15-cv-11838 (S.D. W.Va.);

        (3)   any liability to a Governmental Unit under Environmental Law, the Mine Act, any state mine safety law, ERISA or other applicable police or regulatory law, in each case, that is not a Claim;

        (4)   any liability or obligation under the Black Lung Benefits Act, 30 U.S.C. §§ 901-944;

        (5)   any Claim of a Governmental Unit under any Environmental Law, ERISA, or other applicable police or regulatory law, in each case, arising after the Effective Date;

        (6)   any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors, or any claim assertable by a Governmental Unit

against any Person or Entity other than the Debtors or Reorganized Debtors;

(7)     any liability under Environmental Law or ERISA on the part of any Entity other than the Debtors or Reorganized Debtors; or

(8)     any valid right of setoff or recoupment by any Governmental Unit.

Notwithstanding clauses (i) and (ii) hereof, and for the avoidance of doubt, any civil penalty payable under Section V of the Consent Decree in United States et al. v. Arch Coal, Inc. et al., 2:15-cv-11838 (S.D. W. Va.) may only be enforceable as a General Unsecured Claim under the Plan.

(ii)     shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside this Bankruptcy Court, any liability described in the preceding clause (i) hereof, or shall divest any tribunal of any jurisdiction it may have under Environmental Law, ERISA, or other applicable police or regulatory law to adjudicate any defense asserted under the Plan or the Confirmation Order; or

(iii)     authorizes the transfer or assignment of any (i) license, (ii) permit, (iii) registration, (iv) lease, (v) authorization, (vi) approval, (vii) agreement, or (viii) contract, in each case, with a Governmental Unit, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under non-bankruptcy laws and regulations.

(e)     No provision of the Plan, the Confirmation Order or section 1141 of the Bankruptcy Code shall be construed to discharge, release or relieve any party, in any capacity, from liabilities under any law or regulatory provision with respect to the Pension Plans. The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan, the Confirmation Order or section 1141 of the Bankruptcy Code.

5.     Term of Injunction or Stays

**Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.**

78

6.      Exculpation

**Pursuant to the Plan, and except as otherwise specifically provided in the Plan or the Confirmation Order, none of the Released Parties shall have or incur any liability to any holder of a Claim, Cause of Action or Interest for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the negotiation of any settlement or agreement, contract, instrument, release or document created or entered into in connection with the Plan or in the Chapter 11 Cases (including the Plan Supplement, the DIP Facility, the RSA and, in each case, any documents related thereto), the pursuit of confirmation of the Plan, the consummation of the Plan, the preparation and distribution of the Disclosure Statement, the offer, issuance and distribution of any securities issued or to be issued under or in connection with the Plan, any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the administration of the Plan or the property to be distributed under the Plan, except for any act or omission that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence. Each Released Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.**

7.      Release by the Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including Section 11.12 of the Plan) or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors and their Estates from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, their Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, their Estates or the Reorganized Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Exchange Offers, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the RSA, the DIP Facility, the Loan Documents (as defined in the First Lien Credit Agreement), the New First Lien Debt Facility Documents or, in each case, related agreements, instruments or other documents, or upon any other**

act or omission, transaction, agreement, event or other occurrence taking place on or
before the Effective Date related or relating to any of the foregoing, other than claims or
liabilities arising out of or relating to any act or omission of a Released Party that is
determined in a Final Order to have constituted willful misconduct, actual fraud or gross
negligence; *provided*, *however*, that if any Released Party directly or indirectly brings or
asserts any Claim or Cause of Action that has been released or is contemplated to be
released pursuant to the Plan in any way arising out of or related to any document or
transaction that was in existence prior to the Effective Date against any other Released
Party, then the release set forth in Section 11.7 of the Plan shall automatically and
retroactively be null and void *ab initio* with respect to the Released Party bringing or
asserting such Claim or Cause of Action; *provided further* that the immediately preceding
proviso shall not apply to (i) any action by a Released Party in the Bankruptcy Court (or
any other court determined to have competent jurisdiction), including any appeal
therefrom, to prosecute the amount, priority or secured status of any prepetition or
ordinary course administrative Claim against the Debtors, (ii) any release or
indemnification provided for in any settlement or granted under any other court order, (iii)
any action by the DIP Agent or DIP Lenders to enforce their rights under the DIP Facility
relating to Contingent DIP Obligations, or (iv) any action by the First Lien Agent or the
First Lien Lenders to enforce their rights under Sections 5.9 or 11.3 of the First Lien Credit
Agreement, *provided* that, in the case of (i) through (iv), the Debtors shall retain all defenses
related to any such action. Notwithstanding anything to the contrary in the foregoing, the
releases set forth in Section 11.7 of the Plan do not release any post-Effective Date
obligations of any of the Released Parties under the Plan, any of the Restructuring
Transactions, or any document, instrument, or agreement (including those set forth in the
Plan Supplement) executed to implement the Plan.

        8.      Voluntary Releases by the Holders of Claims and Interests

Except as otherwise specifically provided in the Plan or the Confirmation Order, on
and after the Effective Date, for good and valuable consideration, holders of Claims that (i)
are deemed to have accepted or rejected the Plan or vote to accept or reject the Plan and
(ii) are provided with a notice or Ballot, as applicable, providing them with the right to opt
out of the releases contained in Section 11.8 of the Plan and (iii) do not elect to exercise
such right shall be deemed to have conclusively, absolutely, unconditionally, irrevocably
and forever, released and discharged the Released Parties from any and all Claims,
interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and
liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or
unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort,
fraud, contract, violations of federal or state laws or otherwise, including those Avoidance
Actions, Causes of Action based on veil piercing or alter-ego theories of liability,
contribution, indemnification, joint liability or otherwise that such Entity would have been
legally entitled to assert (whether individually or collectively), based on or relating to, or in
any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the
Estates, the restructuring, the Chapter 11 Cases, the DIP Facility, the Loan Documents (as
defined in the First Lien Credit Agreement), the Exchange Offers, the purchase, sale or
rescission of the purchase or sale of any security of the Debtors or the Reorganized
Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or

Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Restructuring Support Agreement, the DIP Credit Agreement, the Plan Supplement, the New First Lien Debt Facility Documents or, in each case, related agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided* that any holder of a Claim that elects to opt out of the releases contained in Section 11.8 of the Plan shall not receive the benefit of the releases set forth in Section 11.8 of the Plan (even if for any reason otherwise entitled).  Notwithstanding anything to the contrary in the foregoing, the releases set forth in Section 11.8 of the Plan do not release any post-Effective Date obligations of any of the Released Parties under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

9.    Injunction

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold or may hold Claims, interests, Causes of Action, Interests or liabilities that: (i) are subject to compromise and settlement pursuant to the terms of the Plan; (ii) have been released pursuant to Section 11.7 of the Plan; (iii) have been released pursuant to Section 11.8 of the Plan; (iv) are subject to exculpation pursuant to Section 11.6 of the Plan, including exculpated claims (but only to the extent of the exculpation provided in Section 11.6 of the Plan); or (v) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from: (A) commencing or continuing in any manner any action or other proceeding of any kind, whether directly, derivatively or otherwise, including on account of any claims, interests, Causes of Action or liabilities that have been compromised or settled against any Released Party (or the property or estate of any Released Party) on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, interests, Causes of Action or liabilities; (B) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action, or liabilities; (C) creating, perfecting or enforcing any Lien, Claim, or encumbrance of any kind against any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action, or liabilities; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action or liabilities (unless such holder has filed a timely Proof of Claim with the Bankruptcy Court preserving the right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise); and (E) commencing or continuing in any manner

81

**any action or other proceeding of any kind against any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action, or liabilities released, settled or compromised pursuant to the Plan;** *provided* **that nothing contained herein shall preclude a Person or Entity from obtaining benefits directly and expressly provided to such Person or Entity pursuant to the terms of the Plan;** *provided***,** *further***, that nothing contained herein shall be construed to prevent any Person or Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.**

10.     Setoff and Recoupment

**The Debtors and the Reorganized Debtors may, but shall not be required to, set off or recoup against any Claim and any Cash distribution to be made on account of such Claim, any and all Claims, rights and Causes of Action of any nature that the Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law;** *provided***,** *however***, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim shall constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such Claims, rights and Causes of Action that the Debtors or the Reorganized Debtors may have against the holder of such Claim.**

11.     Avoidance Actions

On the Effective Date, the Reorganized Debtors shall be deemed to waive and release (a) all Avoidance Actions against officers, directors, employees or representatives of the Debtors or the Reorganized Debtors and (b) all Avoidance Actions other than the foregoing unless such Avoidance Action is listed on Schedule 11.11 of the Plan; *provided* that, except as expressly provided in Article 11 of the Plan or the Confirmation Order, the Reorganized Debtors shall retain the right to assert any Claims assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Creditor.  The Reorganized Debtors shall retain the right, after the Effective Date, to prosecute any of the Avoidance Actions listed on Schedule 11.11 of the Plan.

12.     Preservation of Causes of Action

(a)     Except as expressly provided in Article 11 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors, the Reorganized Debtors or the Estates may have or that the Reorganized Debtors may choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Estates to the Debtors.

82

    (b)  Except as set forth in Article 11 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

    (c)  Except as set forth in Article 11 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

    13.    Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Causes of Action and controversies relating to the contractual, legal and subordination rights that a holder of an Allowed Claim may have against any Debtor, or any distribution to be made on account of such an Allowed Claim. Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan and as a mechanism to effect a fair distribution of value to the Debtors' constituencies, except as set forth in the Plan, the provisions of the Plan shall also constitute a good-faith compromise of all Claims, Causes of Action and controversies by any Debtor against any other Debtor or against the Released Parties. In each case, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and the holders of such Claims and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, the Debtors may compromise and settle Claims against them and Causes of Action against other Entities and after the Effective Date, such right shall pass to the Reorganized Debtors.

## K.    Conditions Precedent to Confirmation and Effectiveness of the Plan

    1.    Conditions to Confirmation

Confirmation of the Plan will not occur unless each of the following conditions has been satisfied or waived in accordance with Section 12.3 of the Plan:

(a)   The Confirmation Order shall be entered; and

(b)   The Plan Supplement and all of the schedules, documents and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Debtors and the Majority Consenting Lenders.

2.   Conditions to Effectiveness

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Section 12.3 of the Plan:

(a)   The Confirmation Order shall have been entered and shall not be subject to a stay nor have been rescinded, vacated or reversed on appeal;

(b)   The New First Lien Debt Facility Documents shall have been duly executed and delivered by the Reorganized Debtors parties thereto, and all conditions precedent to the consummation of the New First Lien Debt Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New First Lien Debt Facility shall have occurred;

(c)   All documents and agreements necessary to implement the Plan, including the Plan Supplement, shall be in form and substance reasonably acceptable to the Majority Consenting Lenders and shall each have been executed;

(d)   Any amendments, modifications or supplements to the Plan (including the Plan Supplement) shall be reasonably acceptable to the Debtors and the Majority Consenting Lenders;

(e)   All reasonable and documented fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Lenders, the DIP Agent, the First Lien Agent and the agent under the New First Lien Debt Facility incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facility and New First Lien Debt Facility and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Petition Date), in each case, that are owed pursuant to the DIP Order, shall have been paid;

(f)   The Securitization Facility shall either be reinstated on terms acceptable to the Securitization Parties in their sole discretion and reasonably acceptable to the Majority Consenting Lenders or be replaced with a new securitization facility on terms set forth in the Plan Supplement

84

and otherwise reasonably acceptable to the Majority Consenting Lenders;

(g) The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and that are required by law, regulation or order;

(h) Each of the Certificate of Incorporation, the New Bylaws, the Reorganized Subsidiary Debtors' Certificates of Incorporation, the Reorganized Subsidiary Debtors' LLC Agreements, the Reorganized Subsidiary Debtors' Bylaws and the Reorganized Subsidiary Debtors' Operating Agreements, as applicable, will be in full force and effect as of the Effective Date;

(i) A Final Order is entered determining whether Prairie Holdings' 49% membership interest in Knight Hawk Holdings, LLC constitutes Pledged Collateral (as defined in the First Lien Credit Agreement); and

(j) The Effective Date shall be no later than 15 days after the Confirmation Date, unless such condition is waived by the Majority Consenting Lenders.

3.      Waiver of Conditions to Confirmation or Effectiveness

The Debtors, with the prior written consent of the Majority Consenting Lenders, may waive any of the conditions set forth in Section 12.1 or Section 12.2 of the Plan at any time, without any notice to other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan.  The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtors as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors, in their sole discretion).  The failure of the Debtors or the Majority Consenting Lenders to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**L.      Modification, Revocation or Withdrawal of the Plan**

1.      Plan Modifications

(a) Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date, *provided* that any such alteration, amendment or modification shall be reasonably

acceptable to the Majority Consenting Lenders.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement or the Confirmation Order relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)   After the Confirmation Date, but before the Effective Date, the Debtors, with the consent of the Majority Consenting Lenders, may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided* that such adjustments and modifications do not materially and adversely affect the treatment of holders of Claims or Interests.

2.      Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of Confirmation or Effective Date

The Debtors reserve the right to revoke, withdraw or delay consideration of the Plan before the Confirmation Date, either entirely or as to any one or more of the Debtors, and to file subsequent amended plans of reorganization.  If the Plan is revoked, withdrawn or delayed as to fewer than all of the Debtors, such revocation, withdrawal or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn or delayed.  If the Debtors revoke or withdraw the Plan in its entirety or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases effected by the Plan and any document or agreement executed pursuant hereto, shall be deemed null and void and (iii) nothing contained in the Plan shall (A) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person or Entity, (B) prejudice in any manner the rights of such Debtors or any other Person or Entity or (C) constitute an admission of any sort by the Debtors or any other Person or Entity.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting executory contracts or unexpired leases.

## M.      Retention of Jurisdiction by the Bankruptcy Court

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Cases for, among other things, the following purposes:

1. To hear and determine all matters relating to the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure amounts and Claims resulting therefrom;

2. To hear and determine any motion, adversary proceeding, application, contested matter or other matter pending on or commenced after the Confirmation Date in the Bankruptcy Court;

3. To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim against any of the Debtors;

4. To hear and determine matters relating to the DIP Facility and the DIP Order;

5. To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

6. To hear and determine all applications for compensation and reimbursement of Professional Fee Claims;

7. To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

8. To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing;

9. To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

10. To issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan;

11. To enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

12. To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

13. To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

14. To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Approval Order, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplement; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

15. To recover all assets of the Debtors and property of the Debtors' Estates, which shall be for the benefit of the Reorganized Debtors, wherever located;

16. To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

17. To hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

18. To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity;

19. To hear any other matter not inconsistent with the Bankruptcy Code; and

20. To enter a final decree closing the Chapter 11 Cases.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against the Debtors that arose prior to the Effective Date.

## N.    Miscellaneous

1.    Exemption from Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, Transfer or exchange of notes or equity securities under the Plan, the creation, the filing or recording of any mortgage, deed of trust or other security interest, the making, assignment, filing or recording of any lease or sublease, the transfer of title to or ownership of any of the Debtors' interests in any property, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the Plan Documents, the New Common Stock, the New Prairie Holdings Stock (if any) and any agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment in the United States.  The Confirmation Order shall direct the appropriate federal,

state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

2.    Expedited Tax Determination

The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of such Debtors or Reorganized Debtors for all taxable periods ending on or before the Effective Date.

3.    Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of title 28 of the United States Code and/or section 3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

4.    Dissolution of the Creditors' Committee

After the occurrence of the Effective Date, the Creditors' Committee's functions shall be restricted to, and shall not be heard on any issue except, applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.  Upon the resolution of all applications filed by the Creditors' Committee pursuant to sections 330 and 331 of the Bankruptcy Code, the Creditors' Committee shall dissolve, and the members thereof, in their capacities as such, shall be released and discharged from all rights, duties, responsibilities and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.

5.    Plan Supplement

Draft forms of certain Plan Documents and certain other documents, agreements, instruments, schedules and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement and filed from time to time.  Unless otherwise expressly provided in the Plan, the Debtors shall file the Plan Supplement five (5) days prior to the Voting Deadline and may alter, modify or amend any Plan Supplement document in accordance with Section 13.1 of the Plan.  Holders of Claims or Interests may obtain a copy of the Plan Supplement on the Debtors' Case Information Website or the Bankruptcy Court's Website.

6.    Claims Against Other Debtors

Nothing in the Plan or the Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim against any other Debtor.

7.      Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

8.      Section 1125 of the Bankruptcy Code

As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtors and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

9.      Severability

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

10.     Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or other federal law is applicable, or to the extent the Plan, an exhibit or a schedule hereto, a Plan Document or any settlement incorporated herein provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

11.     Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former holders of Claims against the Debtors or Interests in the Debtors and their respective heirs, executors, administrators, successors and assigns.

90

12.    Notices

To be effective, any notice, request or demand to or upon, as applicable, the Debtors, the Creditors' Committee or the United States Trustee must be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

If to the Debtors:

> Arch Coal, Inc.
> One CityPlace Drive, Suite 300
> St. Louis, Missouri 63141
> Attention:    Robert G. Jones (bjones@archcoal.com)
>                     Rosemary L. Klein (rklein@archcoal.com)

> with a copy to:

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attention:    Marshall S. Huebner (marshall.huebner@davispolk.com)
>                     Brian M. Resnick (brian.resnick@davispolk.com)
>                     Michelle M. McGreal (michelle.mcgreal@davispolk.com)
> Telephone:  (212) 450-4000
> Facsimile:  (212) 607-7983

If to the United States Trustee:

> Office of the United States Trustee
> 111 S. 10th St., Suite 6353
> St. Louis, Missouri 63102-1125
> Attention:    Leonora S. Long
> Telephone:  (314) 539-2976

If to the Consenting Lenders:

> Kaye Scholer LLP
> 250 West 55th Street
> New York, New York 10019
> Attention:    Mark F. Liscio (mark.liscio@kayescholer.com)
>                     Scott D. Talmadge (scott.talmadge@kayescholer.com)
> Telephone:  (212) 836-8000
> Facsimile:  (212) 836-8689

> -and-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:      Brian S. Hermann (bhermann@paulweiss.com)
                Sarah Harnett (sharnett@paulweiss.com)
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

If to the Reorganized Debtors:

Arch Coal, Inc.
One CityPlace Drive, Suite 300
St. Louis, Missouri 63141
Attention:      Robert G. Jones (bjones@archcoal.com)
                Rosemary L. Klein (rklein@archcoal.com)

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:      Marshall S. Huebner (marshall.huebner@davispolk.com)
                Brian M. Resnick (brian.resnick@davispolk.com)
                Michelle M. McGreal (michelle.mcgreal@davispolk.com)
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7983

If to the Creditors' Committee:

Kramer, Levin, Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10035
Attention:      Thomas Moers Mayer (tmayer@kramerlevin.com)
                Douglas Mannal (dmannal@kramerlevin.com)
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

If to the DIP Agent:

Seward & Kissel, LLP
One Battery Park Plaza
New York, New York 10004
Attention:      Ronald L. Cohen (cohen@sewkis.com)
                Laurie Binder (binder@sewkis.com)
                Michael Tenenhaus (tenenhaus@sewkis.com)
Telephone:  (212) 574-1200
Facsimile:  (212) 480-8421

13.     Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Before the Effective Date, none of the filing of the Plan, any statement or provision contained herein or the taking of any action by the Debtors related to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors of any kind, including as to the holders of Claims or Interests or as to any treatment or classification of any contract or lease.

14.     Further Assurances

The Debtors, the Reorganized Debtors and all holders of Claims receiving distributions hereunder and all other parties in interest may and shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

15.     Case Management Order

Except as otherwise provided herein, the Case Management Order shall remain in full force and effect, and all Court Papers (as defined in the Case Management Order) shall be filed and served in accordance with the procedures set forth in the Case Management Order; *provided* that on and after the Effective Date, Court Papers (as defined in the Case Management Order) need only be served on the attorneys for the Reorganized Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attention: Marshall S. Huebner and Michelle M. McGreal; *provided further* that final requests for payment of Professional Fee Claims filed pursuant to Section 7.1(a) of the Plan (and all Court Papers related thereto) shall also be served on (i) the Office of the United States Trustee for the Eastern District of Missouri, 111 S. 10th Street, Suite 6353, St. Louis, Missouri 63102-1125, Attention: Leonora S. Long and (ii) counsel to the Creditors' Committee, Kramer, Levin, Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10035, Attention: Thomas Moers Mayer and Douglas Mannal.

**ARTICLE V**

**VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN**

**A.     General**

The following is a brief summary of the Plan confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING FOR [●], 2016 AT [●] (PREVAILING CENTRAL TIME) BEFORE THE HONORABLE CHARLES E. RENDLEN, III, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF MISSOURI, THOMAS F. EAGLETON US COURTHOUSE, 111 S. 10TH STREET, COURTROOM 7 SOUTH, ST. LOUIS, MISSOURI 63102. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT (i) PRIOR TO THE CONFIRMATION HEARING BY POSTING NOTICE OF SAME ON THE DOCKET FOR THE CHAPTER 11 CASES AND (ii) AT THE CONFIRMATION HEARING WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [●], 2016 AT [●] (PREVAILING CENTRAL TIME) IN ACCORDANCE WITH THE CONFIRMATION HEARING NOTICE. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT APPROVAL ORDER, THE CONFIRMATION HEARING NOTICE AND THE VOTING PROCEDURES, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtors believe that section 1129 has been satisfied.

## B.    Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the Claims. Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes that receive no

94

distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

## C.    Classes Impaired and Entitled to Vote Under the Plan

The following Classes are impaired under the Plan and entitled to vote on the Plan:

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 1C-71C | First Lien Credit Facility Secured Claims | Impaired | Entitled to Vote |
| 1D-70D | General Unsecured Claims | Impaired | Entitled to Vote |
| 1E | Prairie Holdings GUC Claims | Impaired | Entitled to Vote |

In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted the plan, and thus the holders of Claims in such unimpaired Classes are not entitled to vote on the plan.  Because Classes 1A-71A, 1B-71B and 3G-71G are unimpaired under the Plan, the holders of Claims and Interests in these Classes are not entitled to vote.

In general, if the holder of an impaired Claim or impaired Interest will not receive any distribution under a plan in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected the plan, and thus the holders of Claims in such Classes are not entitled to vote on the Plan.  The holders of Claims and Interests in Classes 1F-71F and 1-2G are conclusively presumed to have rejected the Plan and are therefore not entitled to vote.

For a more detailed discussion of the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, please review the Disclosure Statement Approval Order.

## D.    Voting Procedures and Requirements

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.  On [ • ] [ • ], 2016, the Bankruptcy Court entered its Disclosure Statement Approval Order that, among other things, approved the form of this Disclosure Statement, approved procedures for soliciting votes on the Plan, approved the form of the solicitation documents and various other notices, set the Voting Record Date, the Voting

Deadline and the date of the Confirmation Hearing, and established the relevant objection deadlines and procedures associated with Confirmation of the Plan.

A copy of the Disclosure Statement Approval Order is hereby incorporated by reference as though fully set forth herein.  THE DISCLOSURE STATEMENT APPROVAL ORDER SHOULD BE READ IN CONJUNCTION WITH THIS ARTICLE V OF THE DISCLOSURE STATEMENT.

If you have any questions about (i) the procedures for voting your Claim or Interest or with respect to the packet of materials that you have received or (ii) the amount of your Claim or Interest, please contact the Debtors' Solicitation and Claims Agent at 844-242-7478 or, for international callers, 929-477-8086.  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtors' Case Information Website (located at *https://cases.primeclerk.com/archcoal/*) or by requesting a copy from the Debtors' Solicitation and Claims Agent, which can be reached at 844-242-7478 or, for international callers, 929-477-8086.

    1.    Ballots

The Disclosure Statement Approval Order sets [●], 2016 as the record date for voting on the Plan (the "**Record Date**").  Accordingly, only holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement, or (ii) the online electronic ballot portal.  If you are a holder of a Claim in Classes 1C-71C, 1D-70D and 1E and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Solicitation and Claims Agent at 844-242-7478 or, for international callers, 929-477-8086 or by email at *archballots@primeclerk.com*.

    2.    Submitting Ballots

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions below.

To be counted, all ballots must be properly executed, completed and delivered by: (1) first-class mail (using the reply envelope provided in the solicitation package or otherwise), (2) overnight courier, (3) personal delivery or (4) the online electronic ballot portal (as described on the Ballot), in each case so that they are actually received, in any case, NO LATER THAN **11:59 P.M. (PREVAILING CENTRAL TIME) ON [ • ] [ • ], 2016** (THE "**VOTING DEADLINE**") by the Solicitation and Claims Agent.  If you are submitting a Ballot via first-class mail, overnight courier or personal delivery, it should be sent to: Arch Coal Ballot Processing, c/o Prime Clerk, LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022.  Delivery of a ballot to the Solicitation and Claims Agent by facsimile or any other electronic means (other than as expressly provided herein) shall not be valid.

**IN THE CASE OF BENEFICIAL HOLDERS, IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, PLEASE RETURN YOUR**

**BENEFICIAL BALLOT TO YOUR NOMINEE SO THAT IT WILL BE RECEIVED BY THE NOMINEE IN SUFFICIENT TIME SO AS TO ENABLE THE NOMINEE TO PROCESS THE BENEFICIAL BALLOT, INCORPORATE THE RESULTS IN A MASTER BALLOT AND SUBMIT THE SAME TO THE DEBTORS' SOLICITATION AND CLAIMS AGENT BY THE VOTING DEADLINE.**

Ballots received after the Voting Deadline will not be counted by the Debtors in connection with the Debtors' request for Confirmation of the Plan. The method of delivery of Ballots to be sent to the Solicitation and Claims Agent is at the election and risk of each holder of a Claim or Interest. Except as otherwise provided in the Plan, such delivery will be deemed made only when the Ballot is <u>actually</u> <u>received</u> by the Solicitation and Claims Agent. In all cases, sufficient time should be allowed to assure timely delivery. For submissions via first-class mail, overnight courier or personal delivery, original executed Ballots are required. Delivery of a Ballot to the Solicitation and Claims Agent by facsimile, email or any other electronic means (other than as expressly provided herein) will not be accepted. No Ballot should be sent to the Debtors, their agents (other than the Solicitation and Claims Agent), any indenture trustee (unless specifically instructed to do so) or the Debtors' financial or legal advisors, or the Creditors' Committee or their financial or legal advisors, and if so sent will not be counted. If no holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

    3.      Voting

A holder of a Claim entitled to vote on the Plan may vote to accept or reject the Plan only if no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes). In addition, pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(7) and 3003(c)(2) and the Bar Date Order, any creditors whose Claims are not the subject of a timely-filed proof of claim, or a proof of claim deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or other order of the Bankruptcy Court, or otherwise deemed timely filed under applicable law and (a) are scheduled in the Debtors' Schedules as disputed, contingent or unliquidated; or (b) are not scheduled (such Claims, the "**Non-Voting Claims**"), will be denied treatment as creditors with respect to such claims for purposes of voting on the Plan and receiving distributions under the Plan.

For purposes of voting, the amount of a Claim used to calculate acceptance or rejection of the Plan under section 1126 of the Bankruptcy Code will be determined in accordance with the following hierarchy:

        a.  if an order has been entered by the Bankruptcy Court determining the amount of such Claim, whether pursuant to Bankruptcy Rule 3018 or otherwise, then in the amount prescribed by the order;

        b.  if no such order has been entered, then in the liquidated amount contained in a timely-filed Proof of Claim that is not the subject of a timely-filed objection; and

  c. if no such proof of claim has been timely filed, then in the liquidated, noncontingent and undisputed amount contained in the Debtors' Schedules.

  For purposes of voting, the following conditions will apply to determine the amount and/or classification of a Claim:

  a. if a claim is deemed "allowed" pursuant to an agreement with the Debtors or an order of the Bankruptcy Court, such claim shall be allowed for voting purposes in the "allowed" amount set forth in such agreement or in the Bankruptcy Court's order;

  b. if a claim for which a proof of claim has been timely filed is wholly contingent or unliquidated (as determined on the face of the claim or after reasonable review of the supporting documentation by the Debtors or the Solicitation Agent) or filed for unknown or undetermined amounts (other than in respect of any DIP Facility Claims), or if a claim is based on a pending litigation not subject to a judgment against any of the Debtors, and (i) no objection to it has been filed by the Voting Deadline and (ii) no order pursuant to Bankruptcy Rule 3018(a) temporarily allowing it for voting purposes in an amount greater than $1.00 has been entered by the Bankruptcy Court, in each case before the Voting Deadline, such claim shall be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00, and the Ballot mailed to the holder of such claim shall be marked as voting at $1.00;

  c. if the Debtors have filed an objection to a claim by the Voting Deadline, such claim shall be disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection;

  d. if a claim has been "disallowed" by agreement of the claim holder or order of the Bankruptcy Court at any time before the Voting Deadline, such claim shall also be disallowed for voting purposes;

  e. if a claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, such claim shall be temporarily allowed in the amount so estimated or allowed by the Bankruptcy Court for voting purposes only;

  f. if a claim is listed in the Schedules as contingent, unliquidated or disputed, or undetermined in amount or for $0.00, and a proof of claim was not (i) filed by the applicable bar date for the filing of proofs of claim established by the Bankruptcy Court or (ii) deemed timely filed by an order of the Bankruptcy Court before the Voting Deadline, then, unless the Debtors have consented in writing or the holder of such claim obtains an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes, such claim shall be disallowed for voting purposes and for purposes of allowance and distribution pursuant to Bankruptcy Rule 3003(c);

  g. Claims filed for $0.00 are not entitled to vote;

98

h. Claims filed in a currency other than U.S. dollars shall vote at $1.00;

i. if a claim is partially liquidated and partially unliquidated and (i) no objection to it has been filed by the Voting Deadline and (ii) no order pursuant to Bankruptcy Rule 3018(a) temporarily allowing it for voting purposes in an amount greater than $1.00 has been entered by the Bankruptcy Court, in each case before the Voting Deadline, such claim shall be allowed for voting purposes only in the liquidated amount;

j. if (a) the obligation underlying a claim against one of the Debtors is the subject of a guarantee of another Debtor and (b) such claim is an Unimpaired Claim, any claim filed in respect of such guarantee shall be disallowed for voting purposes;

k. if a proof of claim has been amended by a later-filed proof of claim, the later-filed amending claim will be entitled to vote to the extent consistent with the tabulation rules set forth in the Disclosure Statement Approval Order, and the earlier filed claim will not be entitled to vote, regardless of whether the Debtors have objected to such earlier filed claim;

l. if no votes to accept or reject the Plan are received for a particular class that is entitled to vote on the Plan, such class shall be deemed to have voted to accept the Plan;

m. for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular class shall be aggregated as if such creditor held one claim against the Debtors in such class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan; and

n. notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Voting Class claims (whether against the same or multiple Debtors), shall be provided with only one Solicitation Package and one ballot and be permitted to vote only a single claim, regardless of whether the Debtors have objected to such duplicate claims.

4.     Releases Under the Plan

Each Ballot and Opt Out Notice advises the recipient in bold and capitalized print that holders of Claims who (a) vote to accept or reject the Plan, if applicable, and (b) do not elect to opt out of the release provisions contained in Section 11.8 of the Plan shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all Causes of Action.  Holders who do not grant the releases contained in Section 11.8 of the Plan will not receive the benefit of the releases set forth in Section 11.8 of the Plan.

E.      **Acceptance of Plan**

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept a plan, except under certain circumstances. See "Confirmation Without Necessary Acceptances; Cramdown" below. A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is impaired unless the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation and does not otherwise alter the legal, equitable or contractual rights to which the claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or interest in such class. See "Best Interests Test" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below. See "Confirmation Without Necessary Acceptances; Cramdown" below.

F.      **Confirmation Without Necessary Acceptances; Cramdown**

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Claims in Classes 1F-71F, 1G and 2G are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes 71F, 1G and, if a Knight Hawk Encumbrance Order has not been entered, 2G will receive any property under the Plan.

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

    (a) <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

    (b) <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

    (c) <u>Equity Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

**G.      Classification**

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim

101

or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

### A.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

### B.    Liquidation Analysis

Amounts that a holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors (the "**Liquidation Analysis**"), which is attached hereto as Appendix B.

As described in Appendix B, the Debtors developed the Liquidation Analysis for the Debtors based on the unaudited book values as of December 31, 2015, unless otherwise noted in the Liquidation Analysis.  The recoveries may change based on further refinements of Allowed Claims, as the Debtors' claims objection and reconciliation process continues.

As described in the Liquidation Analysis, underlying the analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (ii) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors and Reorganized Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

## C.    Application of the Best Interests Test

The Debtors believe that the continued operation of the Debtors as a going concern satisfies the Best Interests Test for the Impaired Classes.  Notwithstanding the difficulties in quantifying recoveries to holders of Claims and Interests with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test.  As the Plan and Appendix B indicate, Confirmation of the Plan will provide each holder of an Allowed Claim in an Impaired Class with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

## D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors, with the assistance of PJT, have analyzed the ability of the Reorganized

103

Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.  As part of this analysis, the Debtors have prepared the financial projections, as set forth in Appendix C (the "**Financial Projections**").

As noted in Appendix C, the Financial Projections present information with respect to all the Reorganized Debtors.  These Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code."  Fresh start reporting may have a material impact on the analysis.

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results.  Therefore, the actual results achieved throughout the Projection Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material.  Also as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting," and its impact on the Reorganized Debtors' "Consolidated Balance Sheets" and prospective "Results of Operations" may be material.  All holders of Claims in the Impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by liquidation of the Debtors or the need for further restructuring.

## ARTICLE VII

## EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Confirmation will bind the Debtors and all holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is impaired under the Plan and whether or not any such holder of a Claim or Interest has accepted the Plan. Confirmation will have the effect of converting all Claims into rights to receive the treatment specified in Article IV hereof and cancelling all Interests in Arch Coal and Prairie Holdings.

**B.     Good Faith**

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code, and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

## SECURITIES LAW MATTERS

**A.     Bankruptcy Code Exemptions from Registration Requirements for the New Common Stock and New Prairie Holdings Stock**

1.     Issuance of New Common Stock and New Prairie Holdings Stock

The Plan provides for the offer, issuance, sale or distribution of the New Common Stock and, if a Knight Hawk Encumbrance Order is not entered, New Prairie Holdings Stock (together, the "**New Stock**").  The Debtors believe that the New Stock is a "security," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.  Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtors believe that the offer and sale of New Stock to the holders of First Lien Credit Facility Claims and Prairie Holdings GUC Claims, as applicable, satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

2.     Subsequent Transfers of New Stock Covered by the Section 1145(a)(1) Exemption

The New Stock issued pursuant to the Plan that are covered by the Section 1145(a)(1) exemption may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the New Stock are exempt from registration under the Securities Act and state securities laws unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i) persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

105

(ii) persons who offer to sell securities offered under a plan for the holders of such securities;

(iii) persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

        (A) with a view to distributing such securities; and

        (B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv) a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive New Stock pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Persons deemed to be underwriters may, however, be permitted to sell such New Stock without registration pursuant to the provisions of Rule 144 under the Securities Act.  These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Stock or any other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any particular person receiving New Stock or other securities under the Plan would be an "underwriter" with respect to such New Stock or other securities.

Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any Person to trade in the New Stock or other securities.  The Debtors recommend that potential recipients of the New Stock or other securities consult their own counsel concerning whether they may freely trade New Stock or other securities without registration under, or exemption from registration under, the Securities Act, the Securities Exchange Act of 1934 or similar state and federal laws.

**ARTICLE IX**

**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE

106

DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.    Certain Bankruptcy and Securities Law Considerations

### 1.    Plan Confirmation

The Debtors can make no assurances that the conditions to Confirmation will be satisfied or waived or that they will receive the requisite acceptances to confirm the Plan. Further, if the requisite acceptances are not received, the Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 2.    Objections to Classification of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the

Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder regardless of the Class as to which such holder is ultimately deemed to be a member.

3.      Failure to Consummate the Plan

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

4.      Undue Delay in Confirmation May Disrupt Operations of the Debtors

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed in the time frame currently contemplated, could adversely affect operations and relationships with the Debtors' customers, vendors, employees, regulators and partners. If Confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses. In addition, prolonged Chapter 11 Cases may make it more difficult to retain and attract management and other key personnel and would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses.

5.      Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims Under the Plan

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors, including with respect to the Disputed, Contingent and Unliquidated Claims. Should these underlying assumptions prove incorrect, the actual allowed amounts of Claims may vary from those estimated herein. Because distributions to holders of Unsecured Claims under the Plan are linked to the amount and value of Allowed General Unsecured Claims, any material increase in the amount of Allowed General Unsecured Claims over the amounts estimated by the Debtors would materially reduce the recovery to holders of General Unsecured Claims under the Plan.

6.      Plan Releases May Not Be Approved

There can be no assurance that the Plan releases, as provided in Article 11 of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

7.      The New First Lien Debt Will Include Covenants that Impose Restrictions on the
        Debtors' Finances and Business Operations

The New First Lien Debt will include restrictive covenants that could limit the Reorganized Debtors' ability to react to market conditions, satisfy any extraordinary capital needs, or otherwise restrict the Reorganized Debtors' financing and operations. There can be no assurance that the Reorganized Debtors will be able to comply with these covenants. If the Reorganized Debtors fail to comply with such covenants and terms, the Reorganized Debtors would be required to obtain waivers from the lenders under the New First Lien Debt, and if such waivers are not obtained, there could be a material adverse effect on the Reorganized Debtors' financial condition and future performance.

8.      Compliance with the DIP Facility

The DIP Facility is scheduled to mature on January 31, 2017 (the "**DIP Maturity Date**"). There can be no assurance that the Plan will be confirmed and consummated by the DIP Maturity Date, and there can be no assurance that the DIP Lenders would extend the DIP Maturity Date or forbear from exercising their rights and remedies under the DIP Facility, which may result in the inability of the Debtors to consummate the Plan.

In addition, the DIP Facility contains financial and other covenants regarding, among other things, the Debtors' liquidity. There can be no assurance that the Debtors will be able to comply with these covenants. If the Debtors fail to comply with such covenants and terms, the Debtors would be required to obtain waivers or forbearance from the lenders under the DIP Facility, and if such waivers or forbearance are not obtained, there could be a material adverse effect on the Debtors' financial condition and the Debtors may not be able to consummate the Plan.

9.      The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial
        Results

Actual financial results may differ materially from the Financial Projections. If the Reorganized Debtors do not achieve projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating their businesses consistent with the Financial Projections after the Effective Date. The Financial Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations; they do not guarantee the Reorganized Debtors' future financial performance.

10.     The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to
        the Numerous Assumptions Upon Which They Are Based

The Financial Projections are based on numerous assumptions including, without limitation, the timing, Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, coal industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. Particular uncertainties with respect to the Reorganized Debtors' operations and financial results arise from the risks and uncertainties relating to changes in the demand for Arch's coal by the domestic

electric generation industry; legislation and regulations relating to the Clean Air Act and other environmental initiatives; operational, geological, permit, labor and weather-related factors; fluctuations in the amount of cash Arch generates from operations; future integration of acquired businesses; and numerous other matters of national, regional and global scale, including those of a political, economic, business, competitive or regulatory nature. Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that might occur subsequent to the date hereof. Such events could have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Financial Projections. The Financial Projections, therefore, may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

11. As a Result of the Chapter 11 Cases, the Debtors' Historical Financial Information May Not Be Indicative of its Future Financial Performance

The Debtors' capital structure will be significantly altered under any plan of reorganization ultimately confirmed by the Bankruptcy Court. Under fresh start reporting rules that may apply to the Debtors upon the effective date of a plan of reorganization, the Debtors' assets and liabilities would be adjusted to fair values and its accumulated deficit would be restated to zero. Accordingly, if fresh start reporting rules apply, the Debtors' financial condition and results of operations following its emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in its historical financial statements. In connection with the Chapter 11 Cases and the development of a plan of reorganization, it is also possible that additional restructuring and related charges may be identified and recorded in future periods. Such charges could be material to the Debtors' consolidated financial position and results of operations in any given period.

12. Due to Fresh Start Reporting Rules, the Reorganized Debtors' Financial Statements Will Not Be Comparable to the Debtors' Historical Financial Statements

Due to fresh start reporting rules, the Reorganized Debtors' consolidated financial statements will not be comparable to their consolidated historical financial statements.

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors will be subject to the fresh start reporting rules required by the Financial Accounting Standards Board Accounting Standards Codification Topic 852, Reorganizations. Accordingly, the Reorganized Debtors' consolidated financial condition and results of operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in Arch Coal's or the Debtors' consolidated historical financial statements.

In addition, the Financial Projections do not currently reflect the full impact of fresh start reporting, which may have a material impact on the Financial Projections.

13. Applicable Securities Laws May Restrict Transfers or Sales of the New Common Stock and New Prairie Holdings Stock

The Plan provides that, to the maximum extent allowable, the New Common Stock and New Prairie Holdings Stock will be issued pursuant to the exemption from registration set forth in section 1145(a) of the Bankruptcy Code and will therefore be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities.

Shares of the New Common Stock and New Prairie Holdings Stock that are not issued pursuant to section 1145(a) of the Bankruptcy Code will be deemed "restricted securities" and may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Therefore, holders of such New Common Stock and New Prairie Holdings Stock will not be entitled to have their shares registered and will be required to agree not to resell them except in accordance with the exemption from registration provided by Rule 144 under the Securities Act, when available. Rule 144 permits the public resale of restricted securities if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. However, Reorganized Arch Coal and Reorganized Prairie Holdings have no current plans to make the information required by Rule 144 publicly available for the foreseeable future. This will eliminate the ability of a holder of shares that are restricted securities who is an "affiliate" of Reorganized Arch Coal and Reorganized Prairie Holdings to avail themselves of Rule 144.

To the extent that the shares of the New Common Stock and New Prairie Holdings Stock are issued under the Plan and are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by a holder thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

(i) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

(ii) offers to sell securities offered under a plan for the holders of such securities;

111

(iii)    offers to buy such securities from the holders of such securities, if the offer to buy is:

(A)    with a view to distributing such securities; and

(B)    under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv)    is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that any Persons who receive New Common Stock or New Prairie Holdings Stock pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales of such New Common Stock or New Prairie Holdings Stock by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Such Persons would be permitted to sell New Common Stock, New Prairie Holdings Stock or other securities without registration if they comply with the provisions of Rule 144 under the Securities Act. These rules permit the public sale of securities received by such Person if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. However, Reorganized Arch Coal and Reorganized Prairie Holdings have no current plans to make the information required by Rule 144 publicly available for the foreseeable future.  This will eliminate the ability of a holder of New Common Stock or New Prairie Holdings Stock issued pursuant to section 1145(a) of the Bankruptcy Code who is an "underwriter" pursuant to section 1145(b) of the Bankruptcy Code to avail themselves of Rule 144.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock, New Prairie Holdings Stock or any other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock, New Prairie Holdings Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock, New Prairie Holdings Stock or other securities.

See Article VIII, "Securities Law Matters," for additional information regarding restrictions on resale of the New Common Stock and New Prairie Holdings Stock.

14.    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims Under the Plan

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from these estimates.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of

Claims may vary from those estimated herein. Because certain distributions under the Plan are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to certain holders of Allowed Claims under the Plan.

**B.    Factors Affecting the Debtors' Business, Operations and Financial Condition**

      1.    Risks Related to Debtors' Operations

           (a)   Coal Prices Are Subject to Change Based on a Number of Factors, and Coal Prices Are Currently Experiencing a Historic Level of Depression. If Coal Prices Remain Depressed, or If There Is a Further Decline in Prices, It Could Materially and Adversely Affect the Debtors' Profitability and the Value of the Debtors' Coal Reserves

The Debtors' profitability and the value of their coal reserves depend upon the prices received for the Debtors' coal. The contract prices the Debtors may receive in the future for coal depend upon factors beyond their control, including the following:

- the domestic and foreign supply of and demand for coal;

- the domestic and foreign demand for electricity and steel;

- the quantity and quality of coal available from competitors;

- competition for production of electricity from non-coal sources, including the price and availability of alternative fuels;

- domestic and foreign air emission standards for coal-fueled power plants and the ability of coal-fueled power plants to meet these standards;

- adverse weather, climatic or other natural conditions, including unseasonable weather patterns;

- domestic and foreign economic conditions, including economic slowdowns and the exchange rate of U.S. dollars for foreign currency;

- domestic and foreign legislative, regulatory and judicial developments, environmental regulatory changes or changes in energy policy and energy conservation measures that would adversely affect the coal industry, such as legislation limiting carbon emissions or providing for increased funding and incentives for alternative energy sources;

- the proximity to, capacity of and cost of transportation and port facilities; and

- market price fluctuations for sulfur dioxide or nitric oxide emission allowances.

Due to a number of factors outside the Debtors' control, including decelerating demand for coal used in electricity (due to low natural gas prices and regulations), an oversupplied market and increased competition particularly from non-U.S. suppliers taking advantage of a strong dollar, the Debtors have experienced a sustained and significant downturn in coal pricing over the last several years. The global metallurgical coal market remains challenged and has shown no meaningful improvement over the last several years. The Debtors are also experiencing higher than normal uncommitted volumes due to prolonged, depressed market conditions.  Pricing may be adversely affected or the Debtors may need to reduce production as a result of their uncommitted volume levels.  If coal prices remain depressed, or if there is a further decline in the prices the Debtors receive for their future coal sales contracts, it could materially and adversely affect the Debtors by decreasing profitability and the value of coal reserves.

> (b)   Unfavorable Economic and Market Conditions Have Adversely Affected and May Continue to Affect the Debtors' Revenues and Profitability

The Debtors' profitability depends, in large part, on conditions in the markets that it serves, which fluctuate in response to various factors beyond the Debtors' control. The prices at which the Debtors sell coal are largely dependent on prevailing market prices. The Debtors have experienced significant price pressure over the past several years and expect that the price for the Debtors' coal will continue to be depressed, as the demand for, and price of, coal remains subject to pressure for a variety of reasons, including reductions in domestic and international demand for metallurgical and thermal coal. These conditions, among other factors, have led to the Debtors' filing of the Bankruptcy Petitions.

Global economic downturns have also had and in the future could have a negative impact on the Debtors. These conditions have, in the past, led to extreme volatility of security prices, severely limited liquidity and credit availability, and resulted in declining valuations of assets. If there are downturns in economic conditions, the Debtors' customers' and the Debtors' businesses, financial conditions or results of operations could be adversely affected. During unfavorable economic conditions the Debtors are focused on cost control and capital discipline, but there can be no assurance that these actions, or any other actions that they may take, will be sufficient to offset any adverse effect these conditions may have on the Debtors' business, financial condition or results of operations.

> (c)   Competition Could Put Downward Pressure on Coal Prices and, as a Result, Materially and Adversely Affect the Debtors' Revenues and Profitability

The Debtors compete with numerous other domestic and foreign coal producers for domestic and international sales. Overcapacity and increased production within the coal industry, both domestically and internationally, and decelerating steel demand in China have reduced, and could further, materially reduce coal prices, and therefore materially reduce the Debtors' revenues and profitability. In addition, the Debtors' ability to ship their coal to international customers depends on port capacity, which is limited. Increased competition within the coal industry for international sales could result in the Debtors not being able to obtain throughput capacity at port facilities, or the rates for such throughput capacity to increase to a point where it is not economically feasible to export the Debtors' coal.

114

In addition to competing with other coal producers, the Debtors compete generally with producers of other fuels, such as natural gas. Natural gas pricing has declined significantly in recent years. The decline in the price of natural gas has caused demand for coal to decrease and to adversely affect the price of the Debtors' coal. Sustained periods of low natural gas prices have also contributed to utilities phasing out or closing existing coal-fired power plants, and continued low prices could reduce construction of any new coal-fired power plants. This trend has, and could continue to have, a material adverse effect on demand and prices for the Debtors' coal.

> (d) Any Change in the Coal Consumption of Electric Power Generators Could Result in Less Demand and Lower Prices for Coal, Which Could Materially and Adversely Affect the Debtors' Revenues and Results of Operations

Thermal coal accounted for 95% of the Debtors' coal sales by volume during 2015. The majority of these sales were to electric power generators. The amount of coal consumed for electric power generation is affected primarily by the overall demand for electricity, the availability, quality and price of competing fuels for power generation and governmental regulations. Gas-fueled generation has the potential to displace coal-fueled generation, particularly from older, less efficient coal-powered generators, and this has occurred to date. The Debtors expect that many of the new power plants needed in the United States to meet increasing demand for electricity generation will be fueled by natural gas because gas-fired plants are cheaper to construct and permits to construct these plants are easier to obtain, as natural gas is seen as having a lower environmental impact than coal-fueled generation. In addition, state and federal mandates for increased use of electricity from renewable energy sources also have an impact on the market for the Debtors' coal. Several states have enacted legislative mandates requiring electricity suppliers to use renewable energy sources to generate a certain percentage of power. There have been numerous proposals to establish a similar uniform, national standard, although none of these proposals have been enacted to date. Possible advances in technologies and incentives, such as tax credits, to enhance the economics of renewable energy sources could make these sources more competitive with coal. Any reduction in the amount of coal consumed by electric power generators could reduce the price of coal that the Debtors mine and sell, thereby reducing the Debtors' revenues and materially and adversely affecting their business and results of operations.

> (e) The Debtors' Coal Mining Operations Are Subject to Operating Risks That Are Beyond the Debtors Control, Which Could Result in Materially Increased Operating Expenses and Decreased Production Levels and Could Materially and Adversely Affect the Debtors Profitability

The Debtors mine coal at underground and surface mining operations. Certain factors beyond the Debtors' control, including those listed below, could disrupt the Debtors' coal mining operations, adversely affect production and shipments and increase the Debtors' operating costs:

- poor mining conditions resulting from geological, hydrologic or other conditions that may cause instability of highwalls or spoil piles or cause damage to nearby infrastructure or mine personnel;

- a major incident at the mine site that causes all or part of the operations of the mine to cease for some period of time;

- mining, processing and plant equipment failures and unexpected maintenance problems;

- adverse weather and natural disasters, such as heavy rains or snow, flooding and other natural events affecting operations, transportation or customers;

- unexpected or accidental surface subsidence from underground mining;

- accidental mine water discharges, fires, explosions or similar mining accidents;

- delays or closures by third-party transportation on coal shipments; and

- competition and/or conflicts with other natural resource extraction activities and production within the Debtors' operating areas, such as coalbed methane extraction or oil and gas development.

    If any of these conditions or events occurs, particularly at the Debtors' Black Thunder mining complex, which accounted for approximately 78% of the coal volume the Debtors sold in 2015, the Debtors' coal mining operations may be disrupted, and they could experience a delay or halt of production or shipments, or the Debtors' operating costs could increase significantly. In addition, if the Debtors' insurance coverage is limited or excludes certain of these conditions or events, then the Debtors may not be able to recover any of the losses the Debtors may incur as a result of such conditions or events, some of which may be substantial.

      (f)   A Decline in Demand for Metallurgical Coal Would Limit the Debtors' Ability to Sell the Debtors' Coal into Higher-Priced Metallurgical Markets and Could Substantially Affect the Debtors' Business

    Portions of the Debtors' coal reserves possess quality characteristics that enable us to mine, process and market them as either metallurgical coal or high quality steam coal, depending on the prevailing conditions in the metallurgical and steam coal markets. The Debtors decide whether to mine, process and market these coals as metallurgical or steam coal based on management's assessment as to which market is likely to provide the Debtors with a higher margin. The Debtors consider a number of factors when making this assessment, including the difference between the current and anticipated future market prices of steam coal and metallurgical coal and the increased costs incurred in producing coal for sale in the metallurgical market instead of the steam market. The global metallurgical coal market remains challenged and has shown no meaningful improvement over the last several quarters, due to, among other things, reduced steel production. A further decline in, or prices remaining depressed in, the metallurgical

116

market relative to the steam market could cause the Debtors, as well as their competitors, to shift coal from the metallurgical market to the steam market, thereby reducing the Debtors' revenues and profitability and increasing the availability of coal to customers in the steam market.

(g)  The Debtors' Inability to Acquire Additional Coal Reserves or the Debtors' Inability to Develop Coal Reserves in an Economically Feasible Manner May Adversely Affect the Debtors' Business

The Debtors' profitability depends substantially on the Debtors' ability to mine and process, in a cost-effective manner, coal reserves that possess the quality characteristics desired by their customers. As the Debtors mine, their coal reserves decline. As a result, the Debtors' future success depends upon the Debtors' ability to acquire additional coal that is economically recoverable. If the Debtors fail to acquire or develop additional coal reserves, the Debtors' existing reserves will eventually be depleted. The Debtors may not be able to obtain replacement reserves when they require them. If available, replacement reserves may not be available at favorable prices, or the Debtors may not be capable of mining those reserves at costs that are comparable with their existing coal reserves. The Debtors' ability to obtain coal reserves in the future could also be limited by the availability of cash the Debtors generate from their operations or available financing, restrictions under the Debtors' existing or future financing arrangements (including under the Debtors' DIP Credit Agreement), competition from other coal producers, the lack of suitable acquisition or lease-by-application ("**LBA**"), opportunities or the inability to acquire coal properties or LBAs on commercially reasonable terms, and restrictions on making acquisitions as a result of the Debtors' Chapter 11 Cases. If the Debtors are unable to acquire replacement reserves, their future production may decrease significantly and their operating results may be negatively affected. In addition, the Debtors may not be able to mine future reserves as profitably as they do at their current operations.

On January 15, 2016, the federal government ordered a moratorium on new leases for coal mined from federal lands as part of a review of the government's management of federally-owned coal.  The delay in the LBA process caused by the moratorium could prevent the Debtors from obtaining replacement reserves when they require them.  Also, the outcome of the government's review is uncertain and could have a material and adverse impact on the Debtors' business in any number of ways including by limiting their ability to mine reserves under ongoing or future applications, by increasing the costs or time frame associated with obtaining leases under the LBA program, by making it uneconomical for the Debtors to participate in the programs or by preventing the Debtors from obtaining replacement reserves if the LBA program were to be terminated.

(h)  Inaccuracies in the Debtors' Estimates of Their Coal Reserves Could Result in Decreased Profitability from Lower Than Expected Revenues or Higher Than Expected Costs

The Debtors' future performance depends on, among other things, the accuracy of their estimates of proven and probable coal reserves. The Debtors base their estimates of reserves on engineering, economic and geological data assembled, analyzed and reviewed by internal and third-party engineers and consultants. The Debtors update their estimates of the quantity and quality of proven and probable coal reserves annually to reflect the production of coal from the

reserves, updated geological models and mining recovery data, the tonnage contained in new lease areas acquired and estimated costs of production and sales prices. There are numerous factors and assumptions inherent in estimating the quantities and qualities of, and costs to mine, coal reserves, including many factors beyond the Debtors' control, including the following:

- quality of the coal;

- geological and mining conditions, which may not be fully identified by available exploration data and/or may differ from the Debtors' experiences in areas where they currently mine;

- the percentage of coal ultimately recoverable;

- the assumed effects of regulation, including the issuance of required permits, taxes, including severance and excise taxes and royalties, and other payments to governmental agencies;

- assumptions concerning the timing for the development of the reserves;

- assumptions concerning physical access to the reserves; and

- assumptions concerning equipment and productivity, future coal prices, operating costs, including for critical supplies such as fuel, tires and explosives, capital expenditures and development and reclamation costs.

As a result, estimates of the quantities and qualities of economically recoverable coal attributable to any particular group of properties, classifications of reserves based on risk of recovery, estimated cost of production, and estimates of future net cash flows expected from these properties as prepared by different engineers, or by the same engineers at different times, may vary materially because of changes in the above factors and assumptions. Actual production recovered from identified reserve areas and properties, and revenues and expenditures associated with the Debtors' mining operations, may vary materially from estimates. Any inaccuracy in the Debtors' estimates related to their reserves could result in decreased profitability from lower than expected revenues and/or higher than expected costs.

(i) Failure to Obtain or Renew Surety Bonds on Acceptable Terms Could Affect the Debtors' Ability to Secure Reclamation and Coal Lease Obligations and, Therefore, the Debtors' Ability to Mine or Lease Coal, and a Loss or Reduction in the Debtors' Ability to Self-Bond Could Have a Material Adverse Effect on the Debtors' Business and Results of Operations

Federal and state laws require the Debtors to obtain surety bonds or post letters of credit to secure performance or payment of certain long-term obligations, such as mine closure or reclamation costs, federal and state workers' compensation costs, coal leases and other obligations. The costs of surety bonds have fluctuated in recent years while the market terms of

118

such bonds have generally become more unfavorable to mine operators. These changes in the terms of the bonds have been accompanied at times by a decrease in the number of companies willing to issue surety bonds. Because the Debtors are required by state and federal law to have these bonds in place before mining can commence or continue, the Debtors' failure to maintain surety bonds, letters of credit or other guarantees or security arrangements would materially and adversely affect their ability to mine or lease coal.

In addition, (i) surety providers Lexon Insurance Company, Ironshore Indemnity, Inc. and Bond Safeguard Insurance Company assert that the surety bonds and general agreements of indemnity between such surety providers and the Debtors in place as of the Effective Date may not be assumed by the Debtors pursuant to the Plan unless the applicable surety provider consents to such assumption and (ii) surety providers Arch Insurance Company, Westchester Fire Insurance Co., Indemnity National Insurance Co., and Zurich North America assert that the surety bonds between the such surety providers and the Debtors in place as of the Effective Date may not be assumed by the Debtors pursuant to the Plan unless the applicable surety provider consents to such assumption. If such consents are required, and the Debtors are unable to obtain such consents or replace such surety bonds, the Debtors may not be able to consummate the Plan.

The Debtors use self-bonding to secure performance of certain obligations in Wyoming. Self-bonding allows the Debtors to mine without posting any other third-party financial assurance such as a surety bond or letter of credit. As of December 31, 2015, the Debtors have self-bonded an aggregate of approximately $485.5 million. The Land Quality Division of the Wyoming Department of Environmental Quality periodically reevaluates the amount of the bond, so this amount is subject to change.

On February 29, 2016, the Bankruptcy Court approved a stipulation between certain Subsidiary Debtors and the State of Wyoming, pursuant to which those subsidiaries granted Wyoming a $75 million superpriority claim to support the self-bonded obligations and agreed to substitute approximately $17 million of the self-bonds with financial assurance in the form of third-party collateral support. In exchange, Wyoming agreed to a stay of any proceedings related to the subsidiaries' self-bonded status and that, so long as the stipulation is effective, Wyoming will not seek additional collateral in respect of the self-bonds, take certain other adverse actions with respect to the subsidiaries' mining permits or licenses in Wyoming or seek to enforce the subsidiaries' obligations to make payments in respect of the self-bonds. The stipulation is effective until the earlier of May 1, 2017 and the date upon which a plan of reorganization in the Chapter 11 Cases is approved and becomes effective, subject to certain early termination events.

The Debtors' self-bonding obligations may increase as their bankruptcy process continues, and, upon their emergence from bankruptcy or otherwise, the Debtors may not continue to qualify to self-bond or self-bonding programs may be terminated. Alternative forms of financial assurance such as surety bonds and letters of credit may not be available to the Debtors. The Debtors' ability to emerge from bankruptcy is contingent upon reaching an agreement with Wyoming regarding the Debtors' ability to self-bond upon emergence. To the extent the Debtors are unable to maintain their current level of self-bonding, owing to legislative or regulatory changes, their financial condition upon emergence from bankruptcy or otherwise,

119

their costs would increase, and it could have a material adverse effect on their financial condition and results of operations.

(j)   Increases in the Costs of Mining and Other Industrial Supplies, Including Steel-Based Supplies, Diesel Fuel and Rubber Tires, or the Inability to Obtain a Sufficient Quantity of Those Supplies, Could Negatively Affect the Debtors' Operating Costs or Disrupt or Delay Their Production

The Debtors' coal mining operations use significant amounts of steel, diesel fuel, explosives, rubber tires and other mining and industrial supplies. The cost of roof bolts the Debtors use in their underground mining operations depends on the price of scrap steel. The Debtors also use significant amounts of diesel fuel and tires for trucks and other heavy machinery, particularly at their Black Thunder mining complex. If the prices of mining and other industrial supplies, particularly steel-based supplies, diesel fuel and rubber tires, increase, the Debtors' operating costs could be negatively affected. In addition, if the Debtors are unable to procure these supplies, their coal mining operations may be disrupted or they could experience a delay or halt in their production.

(k)   Disruptions in the Quantities of Coal Produced by the Debtors' Contract Mine Operators or Purchased from Other Third Parties Could Temporarily Impair the Debtors' Ability to Fill Customer Orders or Increase the Debtors' Operating Costs

The Debtors use independent contractors to mine coal at certain of their mining complexes, including select operations in their Appalachian segment. In addition, the Debtors purchase coal from third parties that the Debtors sell to their customers. Operational difficulties at contractor-operated mines or mines operated by third parties from whom the Debtors purchase coal, changes in demand for contract miners from other coal producers and other factors beyond the Debtors' control could affect the availability, pricing and quality of coal produced for or purchased by us. Disruptions in the quantities of coal produced for or purchased by the Debtors could impair the ability to fill their customer orders or require the Debtors to purchase coal from other sources in order to satisfy those orders. If the Debtors are unable to fill a customer order or if the Debtors are required to purchase coal from other sources in order to satisfy a customer order, they could lose existing customers, and the Debtors' operating costs could increase.

(l)   The Debtors' Profitability Depends upon the Long-Term Coal Supply Agreements They Have with Their Customers. Changes in Purchasing Patterns in the Coal Industry Could Make It Difficult for the Debtors to Extend Their Existing Long-Term Coal Supply Agreements or to Enter into New Agreements in the Future

The success of the Debtors' businesses depends on the ability to retain their current customers, renew their existing customer contracts and solicit new customers. The Debtors' ability to do so generally depends on a variety of factors, including the quality and price of their products, the Debtors' ability to market these products effectively, the Debtors' ability to deliver on a timely basis and the level of competition that they face. If current customers do not honor

120

current contract commitments, or if they terminate agreements or exercise *force majeure* provisions allowing for the temporary suspension of performance, the Debtors' revenues will be adversely affected. Changes in the coal industry may cause some of the Debtors' customers not to renew, extend or enter into new long-term coal supply agreements or enter into agreements to purchase fewer tons of coal or on different terms or prices than in the past. In addition, uncertainty caused by federal and state regulations, including the Clean Air Act, could deter the Debtors' customers from entering into long-term coal supply agreements.  Also, the availability and price of competing fuels, such as natural gas, could influence the volume of coal a customer is willing to purchase under contract.

The Debtors' long-term coal supply agreements typically contain force majeure provisions allowing the parties to temporarily suspend performance during specified events beyond their control. Most of the Debtors' long-term coal supply agreements also contain provisions requiring them to deliver coal that satisfies certain quality specifications, such as heat value, sulfur content, ash content, hardness and ash fusion temperature. These provisions in the Debtors' long-term coal supply agreements could result in negative economic consequences to them, including price adjustments, purchasing replacement coal in a higher-priced open market, the rejection of deliveries or, in the extreme, contract termination. The Debtors' profitability may be negatively affected if they are unable to seek protection during adverse economic conditions or if they incur financial or other economic penalties as a result of these provisions of their long-term supply agreements.

       (m)  The Debtors' Ability to Collect Payments from the Debtors' Customers Could Be Impaired if Their Creditworthiness Deteriorates and the Debtors' Financial Position Could Be Materially and Adversely Effected by the Bankruptcy of Any of the Debtors' Significant Customers

The Debtors' ability to receive payment for coal sold and delivered depends on the continued creditworthiness of their customers. If the Debtors determine that a customer is not creditworthy, the Debtors may be able to withhold delivery under the customer's coal sales contract. If this occurs, the Debtors may decide to sell the customer's coal on the spot market, which may be at prices lower than the contracted price, or the Debtors may be unable to sell the coal at all. Furthermore, the bankruptcy of any of the Debtors' significant customers could materially and adversely affect their financial position.

In addition, the Debtors' customer base may change with deregulation as utilities sell their power plants to their nonregulated affiliates or third parties that may be less creditworthy, thereby increasing the risk the Debtors bear for customer payment default. Some power plant owners may have credit ratings that are below investment grade or may become below investment grade after the Debtors enter into contracts with them. In addition, competition with other coal suppliers could force the Debtors to extend credit to customers and on terms that could increase the risk of payment default. Customers in other countries may also be subject to other pressures and uncertainties that may affect their ability to pay, including trade barriers, exchange controls and local economic and political conditions.

121

     (n)  A Defect in Title or the Loss of a Leasehold Interest in Certain Property Could Limit the Debtors' Ability to Mine Their Coal Reserves or Result in Significant Unanticipated Costs

The Debtors conduct a significant part of their coal mining operations on properties that they lease. A title defect or the loss of a lease could adversely affect the Debtors' ability to mine the associated coal reserves. The Debtors may not verify title to their leased properties or associated coal reserves until they have committed to developing those properties or coal reserves. The Debtors may not commit to develop property or coal reserves until they have obtained necessary permits and completed exploration. As such, the title to property that the Debtors intend to lease or coal reserves that they intend to mine may contain defects prohibiting the Debtors' ability to conduct mining operations. Similarly, the Debtors' leasehold interests may be subject to superior property rights of other third parties. In order to conduct the Debtors' mining operations on properties where these defects exist, the Debtors may incur unanticipated costs. In addition, some leases require the Debtors to produce a minimum quantity of coal and require the Debtors to pay minimum production royalties. The Debtors' inability to satisfy those requirements may cause the leasehold interest to terminate.

     (o)  The Availability, Reliability and Cost-Effectiveness of Transportation Facilities and Fluctuations in Transportation Costs Could Affect the Demand for the Debtors' Coal or Impair Their Ability to Supply Coal to Their Customers

The Debtors depend upon barge, ship, rail, truck and belt transportation systems, as well as seaborne vessels and port facilities, to deliver coal to the Debtors' customers. Disruptions in transportation services due to weather-related problems, mechanical difficulties, strikes, lockouts, bottlenecks, route closures and other events beyond the Debtors' control could impair the Debtors' ability to supply coal to their customers. Since the Debtors do not have long-term contracts with all transportation providers they utilize, decreased performance levels over longer periods of time could cause the Debtors' customers to look to other sources for their coal needs. In addition, increases in transportation costs, including the price of gasoline and diesel fuel, could make coal a less competitive source of energy when compared to alternative fuels or could make coal produced in one region of the United States less competitive than coal produced in other regions of the United States or abroad. If the Debtors experience disruptions in their transportation services or if transportation costs increase significantly and the Debtors are unable to find alternative transportation providers, their coal mining operations may be disrupted, the Debtors could experience a delay or halt of production or their profitability could decrease significantly.

In addition, a growing portion of the Debtors' coal sales in recent years has been into export markets, and the Debtors are actively seeking additional international customers. The Debtors' ability to maintain and grow their export sales revenue and margins depends on a number of factors, including the existence of sufficient and cost-effective export terminal capacity for the shipment of coal to foreign markets. At present, there is limited terminal capacity for the export of coal into foreign markets. The Debtors' access to existing and future terminal capacity may be adversely affected by regulatory and permit requirements, environmental and other legal challenges, public perceptions and resulting political pressures,

operational issues at terminals and competition among domestic coal producers for access to limited terminal capacity, among other factors. If the Debtors are unable to maintain terminal capacity, or are unable to access additional future terminal capacity for the export of their coal on commercially reasonable terms, or at all, the Debtors' results could be materially and adversely affected.

From time to time the Debtors enter into "take or pay" contracts for rail and port capacity related to their export sales. These contracts require the Debtors to pay for a minimum quantity of coal to be transported on the railway or through the port regardless of whether the Debtors sell and ship any coal. If the Debtors fail to acquire sufficient export sales to meet their minimum obligations under these contracts, the Debtors are still obligated to make payments to the railway or port facility, which could have a negative impact on the Debtors cash flows, profitability and results of operations.

(p)   The Loss of, or Significant Reduction in, Purchases by the Debtors' Largest Customers Could Adversely Affect the Debtors' Profitability

For the year ended December 31, 2015, the Debtors derived approximately 18% of their total coal revenues from sales to their three largest customers and approximately 39% of the Debtors' total coal revenues from sales to their ten largest customers. The Debtors are currently discussing the extension of coal sales agreements with some of these customers. However, the Debtors may be unsuccessful in obtaining coal supply agreements with those customers, and some or all of these customers could discontinue purchasing coal from the Debtors. If any of those customers, particularly any of the Debtors' three largest customers, were to significantly reduce the quantities of coal it purchases from the Debtors, or if the Debtors are unable to sell coal to those customers on terms as favorable to the Debtors, it may have an adverse impact on the results of the Debtors' business.

(q)   The Debtors May Incur Losses as a Result of Certain Marketing, Trading and Asset Optimization Strategies

The Debtors seek to optimize their coal production and leverage their knowledge of the coal industry through a variety of marketing, trading and other asset optimization strategies. The Debtors maintain a system of complementary processes and controls designed to monitor and control their exposure to market and other risks as a consequence of these strategies. These processes and controls seek to balance the Debtors' ability to profit from certain marketing, trading and asset optimization strategies with their exposure to potential losses. While the Debtors employ a variety of risk monitoring and mitigation techniques, those techniques and accompanying judgments cannot anticipate every potential outcome or the timing of such outcomes. In addition, the processes and controls that the Debtors use to manage their exposure to market and other risks resulting from these strategies involve assumptions about the degrees of correlation or lack thereof among prices of various assets or other market indicators. These correlations may change significantly in times of market turbulence or other unforeseen circumstances. As a result, the Debtors may experience volatility in their earnings as a result of their marketing, trading and asset optimization strategies.

123

(r)    International Growth in the Debtors' Operations Adds New and Unique Risks to Their Business

The Debtors have recently opened offices in China, Singapore and the United Kingdom. The international expansion of the Debtors' operations increases their exposure to country and currency risks. In addition, the Debtors' international offices are selling their coal to new customers and customers in new countries, whose business practices and reputations are not as well known to the Debtors. The Debtors are also challenged by political risks by expanding internationally, including the potential for expropriation of assets and limits on the repatriation of earnings. In the event that the Debtors are unable to effectively manage these new risks, the Debtors' results of operations, financial position or cash flow could be adversely affected by these activities.

(s)    If the Debtors Sustain Cyberattacks or Other Security Breaches That Disrupt Their Operations, or That Result in the Unauthorized Release of Proprietary or Confidential Information, the Debtors Could Be Exposed to Significant Liability, Reputational Harm, Loss of Revenue, Increased Costs or Other Risks

The Debtors may be subject to security breaches that could result in unauthorized access to their facilities or to information they are trying to protect. Unauthorized physical access to one or more of the Debtors' facilities or locations, or electronic access to the Debtors' proprietary or confidential information could result in, among other things, unfavorable publicity, litigation by parties affected by such breach, disruptions to their operations, loss of customers, and financial obligations for damages related to the theft or misuse of such information, any of which could have a substantial impact on the Debtors' results of operations, financial condition or cash flows.

(t)    Extensive Environmental Regulations, Including Existing and Potential Future Regulatory Requirements Relating to Air Emissions, Affect the Debtors' Customers and Could Reduce the Demand for Coal as a Fuel Source and Cause Coal Prices and Sales of the Debtors' Coal to Materially Decline

Coal contains impurities, including, but not limited to sulfur, mercury, chlorine and other elements or compounds, many of which are released into the air when coal is burned. The operations of the Debtors' customers are subject to extensive environmental regulation particularly with respect to air emissions. For example, the federal Clean Air Act and similar state and local laws extensively regulate the amount of sulfur dioxide, particulate matter, nitrogen oxides, and other compounds emitted into the air from electric power plants, which are the largest end-users of the Debtors' coal. A series of more stringent requirements relating to particulate matter, ozone, haze, mercury, sulfur dioxide, nitrogen oxide and other air pollutants are expected to be proposed or become effective in coming years. The Clean Power Plan, under review by U.S. courts, would severely limit emissions of carbon dioxide which would adversely affect the Debtors' ability to sell coal.  In addition, concerted conservation efforts that result in reduced electricity consumption could cause coal prices and sales of the Debtors' coal to materially decline.

Considerable uncertainty is associated with these air emissions initiatives. The content of regulatory requirements in the United States is in the process of being developed, and many new regulatory initiatives remain subject to review by federal or state agencies or the courts. Stringent air emissions limitations are either in place or are likely to be imposed in the short to medium term, and these limitations will likely require significant emissions control expenditures for many coal-fueled power plants. As a result, these power plants may switch to other fuels that generate fewer of these emissions or may install more effective pollution control equipment that reduces the need for low-sulfur coal, possibly reducing future demand for coal and a reduced need to construct new coal-fueled power plants. Any switching of fuel sources away from coal, closure of existing coal-fired plants, or reduced construction of new plants could have a material adverse effect on demand for and prices received for the Debtors' coal. Alternatively, less stringent air emissions limitations, particularly related to sulfur, to the extent enacted could make low-sulfur coal less attractive, which could also have a material adverse effect on the demand for and prices received for the Debtors' coal.

(u)    The Demand for the Debtors' Products or Their Securities, as Well as the Number and Quantity of Viable Financing Alternatives, May Be Significantly Impacted by Increased Regulation or Other Scrutiny of Topics Related to Coal Combustion

Global climate issues and topics related to greenhouse gas emissions, such as the impact of fossil fuel combustion, continue to attract increasing public scrutiny. Legislative or regulatory efforts at the international, federal, state or local level to control emissions from the combustion of coal may result in electricity generators increasingly using fuel sources other than coal or closures of coal-fueled power plants. In addition, certain banks and other financing sources have taken actions to limit available financing for the development of new coal-fueled power plants, which also may adversely impact the future global demand for coal. Further, there have been recent efforts by members of the general financial and investment communities, such as investment advisors, sovereign wealth funds, public pension funds, universities and other groups, to divest themselves and to promote the divestment of securities issued by companies involved in the fossil fuel extraction market, such as coal producers. Those entities also have been pressuring lenders to limit financing available to such companies. These efforts may adversely affect the market for the Debtors' securities and the Debtors' ability to access capital and financial markets in the future.

Any future laws, regulations or other policies of the nature described above may adversely impact the Debtors' business in material ways. The degree to which any particular law, regulation or policy impacts the Debtors will depend on several factors, including the substantive terms involved, the relevant time periods for enactment and any related transition periods. The Debtors routinely attempt to evaluate the potential impact on them of any proposed laws, regulations or policies, which requires that they make several material assumptions. From time to time, the Debtors determine that the impact of one or more such laws, regulations or policies, if adopted and ultimately implemented as proposed, may result in materially adverse impacts on their operations, financial condition or cash flow; however, the Debtors often are not able to reasonably quantify such impacts. In general, however, it is likely that any future laws, regulations or other policies aimed at reducing greenhouse gas emissions will negatively impact demand for the Debtors' coal.

(v)  The Debtors' Failure to Obtain and Renew Permits Necessary for Their Mining Operations Could Negatively Affect the Debtors' Business

Mining companies must obtain numerous permits that impose strict regulations on various environmental and operational matters in connection with coal mining. These include permits issued by various federal, state and local agencies and regulatory bodies. The permitting rules, and the interpretations of these rules, are complex, change frequently and are often subject to discretionary interpretations by the regulators, all of which may make compliance more difficult or impractical, and may possibly preclude the continuance of ongoing operations or the development of future mining operations. The public, including nongovernmental organizations, anti-mining groups and individuals, have certain statutory rights to comment upon and submit objections to requested permits and environmental impact statements prepared in connection with applicable regulatory processes, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge the issuance of permits, the validity of environmental impact statements or performance of mining activities. Accordingly, required permits may not be issued or renewed in a timely fashion or at all, or permits issued or renewed may be conditioned in a manner that may restrict the Debtors' ability to efficiently and economically conduct their mining activities, any of which would materially reduce the Debtors' production, cash flow and profitability.

(w)  Federal or State Regulatory Agencies Have the Authority to Order Certain of the Debtors' Mines to Be Temporarily or Permanently Closed Under Certain Circumstances, Which Could Materially and Adversely Affect the Debtors' Ability to Meet Their Customers' Demands

Federal or state regulatory agencies have the authority under certain circumstances following significant health and safety incidents, such as fatalities, to order a mine to be temporarily or permanently closed. If this occurred, the Debtors may be required to incur capital expenditures to reopen the mine. In the event that these agencies order the closing of the Debtors' mines, the Debtors' coal sales contracts generally permit them to issue force majeure notices which suspend their obligations to deliver coal under these contracts. However, the Debtors' customers may challenge their issuances of force majeure notices. If these challenges are successful, the Debtors may have to purchase coal from third-party sources, if it is available, to fulfill these obligations, incur capital expenditures to reopen the mines and/or negotiate settlements with the customers, which may include price reductions, the reduction of commitments or the extension of time for delivery or terminate customers' contracts. Any of these actions could have a material adverse effect on the Debtors' business and results of operations.

(x)  Extensive Environmental Regulations Impose Significant Costs on the Debtors' Mining Operations, and Future Regulations Could Materially Increase Those Costs or Limit the Debtors' Ability to Produce and Sell Coal

The coal mining industry is subject to increasingly strict regulation by federal, state and local authorities with respect to environmental matters such as:

126

- limitations on land use;

- mine permitting and licensing requirements;

- reclamation and restoration of mining properties after mining is completed;

- management of materials generated by mining operations;

- the storage, treatment and disposal of wastes;

- remediation of contaminated soil and groundwater;

- air quality standards;

- water pollution;

- protection of human health, plant life and wildlife, including endangered or threatened species;

- protection of wetlands;

- the discharge of materials into the environment;

- the effects of mining on surface water and groundwater quality and availability; and

- the management of electrical equipment containing polychlorinated biphenyls.

The costs, liabilities and requirements associated with the laws and regulations related to these and other environmental matters may be costly and time-consuming and may delay commencement or continuation of exploration or production operations. The Debtors cannot assure you that they have been or will be at all times in compliance with the applicable laws and regulations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of cleanup and site restoration costs and liens, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from the Debtors' operations. The Debtors may incur material costs and liabilities resulting from claims for damages to property or injury to persons arising from their operations. If the Debtors are pursued for sanctions, costs and liabilities in respect of these matters, the Debtors' mining operations and, as a result, their profitability could be materially and adversely affected.

New legislation or administrative regulations or new judicial interpretations or administrative enforcement of existing laws and regulations, including proposals related to the protection of the environment that would further regulate and tax the coal industry, may also require the Debtors to change operations significantly or incur increased costs. Such changes could have a material adverse effect on the Debtors' financial condition and results of operations.

127

      (y)  If the Assumptions Underlying the Debtors' Estimates of Reclamation and Mine Closure Obligations Are Inaccurate, the Debtors' Costs Could Be Greater Than Anticipated

SMCRA and counterpart state laws and regulations establish operational, reclamation and closure standards for all aspects of surface mining, as well as most aspects of underground mining. The Debtors base their estimates of reclamation and mine closure liabilities on permit requirements, engineering studies and the Debtors' engineering expertise related to these requirements. The Debtors' management and engineers periodically review these estimates. The estimates can change significantly if actual costs vary from the Debtors' original assumptions or if governmental regulations change significantly. The Debtors are required to record new obligations as liabilities at fair value under generally accepted accounting principles. In estimating fair value, the Debtors considered the estimated current costs of reclamation and mine closure and applied inflation rates and a third-party profit, as required. The third-party profit is an estimate of the approximate markup that would be charged by contractors for work performed on the Debtors' behalf. The resulting estimated reclamation and mine closure obligations could change significantly if actual amounts change significantly from the Debtors' assumptions, which could have a material adverse effect on the Debtors' results of operations and financial condition.

      (z)  The Debtors' Operations May Impact the Environment or Cause Exposure to Hazardous Substances, and the Debtors' Properties May Have Environmental Contamination, Which Could Result in Material Liabilities to the Debtors

The Debtors' operations currently use hazardous materials and generate limited quantities of hazardous wastes from time to time. The Debtors could become subject to claims for toxic torts, natural resource damages and other damages as well as for the investigation and cleanup of soil, surface water, groundwater, and other media. Such claims may arise, for example, out of conditions at sites that the Debtors currently own or operate, as well as at sites that the Debtors previously owned or operated, or at sites that the Debtors may acquire. The Debtors' liability for such claims may be joint and several with other owners or operators, so that the Debtors may be held responsible for more than their share of the contamination or other damages, or even for the entire share.

The Debtors maintain extensive coal refuse areas and slurry impounds at a number of their mining complexes. Such areas and impounds are subject to extensive regulation. Slurry impounds can fail, which could release large volumes of coal slurry into the surrounding environment. Structural failure of an impoundment can result in extensive damage to the environment and natural resources, such as bodies of water that the coal slurry reaches, as well as liability for related personal injuries and property damages, and injuries to wildlife. Some of the Debtors' impounds overlie mined-out areas, which can pose a heightened risk of failure and of damages arising out of failure. If one of the Debtors' impounds were to fail, the Debtors could be subject to substantial claims for the resulting environmental contamination and associated liability, as well as for fines and penalties.

Drainage flowing from or caused by mining activities can be acidic with elevated levels of dissolved metals, a condition referred to as "acid mine drainage," which the Debtors refer to as AMD. The treating of AMD can be costly. Although the Debtors do not currently face material costs associated with AMD, it is possible that the Debtors' could incur significant costs in the future.

These and other similar unforeseen impacts that the Debtors' operations may have on the environment, as well as exposures to hazardous substances or wastes associated with the Debtors' operations, could result in costs and liabilities that could materially and adversely affect the Debtors.

> (aa) Judicial Rulings That Restrict How the Debtors May Dispose of Mining Wastes Could Significantly Increase Their Operating Costs, Discourage Customers from Purchasing the Debtors' Coal and Materially Harm the Debtors' Financial Condition and Operating Results

To dispose of mining overburden generated by the Debtors' Appalachian surface mining operations, the Debtors often need to obtain permits to construct and operate valley fills and surface impoundments. Some of these permits are Clean Water Act § 404 permits issued by the Army Corps of Engineers (the "**Corps**"). Two Subsidiary Debtors were identified in an existing lawsuit, which challenged the issuance of such permits and asked that the Corps be ordered to rescind them. Two Subsidiary Debtors intervened in the suit to protect their interests in being allowed to operate under the issued permits, and the claims against one of the subsidiaries was thereafter dismissed. On February 13, 2009, the U.S. Court of Appeals for the Fourth Circuit ruled on appeals from decisions rendered prior to the Debtors' intervention, which may have a favorable impact on the Debtors' permits. The matter is pending before the U.S. District Court for the Southern District of West Virginia on Mingo Logan's motion for summary judgment. If the matter is resolved ultimately in a manner that is adverse to the interests of Arch Coal's operating subsidiaries, such subsidiaries' operating results may be adversely impacted.

> (bb) Changes in the Legal and Regulatory Environment Could Complicate or Limit the Debtors' Business Activities, Increase the Debtors' Operating Costs or Result in Litigation

The conduct of the Debtors' businesses is subject to various laws and regulations administered by federal, state and local governmental agencies in the United States. These laws and regulations may change, sometimes dramatically, as a result of political, economic or social events or in response to significant events.  Environmental and other nongovernmental organizations and activists, many of which are well-funded, continue to exert pressure on regulators and other government bodies to enact more stringent laws and regulations.  Changes in the legal and regulatory environment in which the Debtors operate may impact the Debtors' results, increase their costs or liabilities, complicate or limit their business activities or result in litigation.  Such legal and regulatory environment changes may include changes in such items as: the processes for obtaining or renewing permits; self-bonding programs; federal lease by application programs; costs associated with providing healthcare benefits to employees; health and safety standards; accounting standards; taxation requirements; and competition laws.

For example, in April 2010, the EPA issued comprehensive guidance regarding the water quality standards that EPA believes should apply to certain new and renewed Clean Water Act permit applications for Appalachian surface coal mining operations. Under the EPA's guidance, applicants seeking to obtain state and federal Clean Water Act permits for surface coal mining in Appalachia must perform an evaluation to determine if a reasonable potential exists that the proposed mining would cause a violation of water quality standards. According to the EPA Administrator, the water quality standards set forth in the EPA's guidance may be difficult for most surface mining operations to meet. Additionally, the EPA's guidance contains requirements for the avoidance and minimization of environmental and mining impacts, consideration of the full range of potential impacts on the environment, human health and local communities, including low-income or minority populations, and provision of meaningful opportunities for public participation in the permit process. The EPA's guidance is subject to several pending legal challenges related to its legal effect and sufficiency including consolidated challenges pending in the United States Court of Appeals for the District of Columbia led by the National Mining Association. The Debtors may be required to meet these requirements in the future in order to obtain and maintain permits that are important to their Appalachian operations. The Debtors cannot give any assurance that they will be able to meet these or any other new standards.

In response to the April 2010 explosion at Massey Energy Company's Upper Big Branch Mine and the ensuing tragedy, the Debtors expect that safety matters pertaining to underground coal mining operations will continue to be the topic of new legislation and regulation, as well as the subject of heightened enforcement efforts. For example, federal and West Virginia state authorities have announced special inspections of coal mines to evaluate several safety concerns, including the accumulation of coal dust and the proper ventilation of gases such as methane. In addition, both federal and West Virginia state authorities have announced that they are considering changes to mine safety rules and regulations that could potentially result in additional or enhanced required safety equipment, more frequent mine inspections, stricter and more thorough enforcement practices and enhanced reporting requirements. Any new environmental, health and safety requirements may increase the costs associated with obtaining or maintaining permits necessary to perform the Debtors' mining operations or otherwise may prevent, delay or reduce their planned production, any of which could adversely affect the Debtors' financial condition, results of operations and cash flows.

Further, mining companies are entitled a tax deduction for percentage depletion, which may allow for depletion deductions in excess of the basis in the mineral reserves. The deduction is currently being reviewed by the federal government for repeal. If repealed, the inability to take a tax deduction for percentage depletion could have a material impact on the Debtors' financial condition, results of operations, cash flows and future tax payments.

2.    Risks Related to Reorganized Prairie Holdings

(a)    In the event that the New Prairie Holdings Stock is distributed to holders of Prairie Holdings GUC Claims (the "**Prairie Holdings Spin-Off**"), Reorganized Prairie Holdings may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent company, and it may experience increased costs after the Prairie Holdings Spin-Off.

130

Reorganized Prairie Holdings has historically operated as part of Arch's corporate organization, and Arch Coal has provided it with various corporate functions. Following the Spin-Off, Arch Coal will have no obligation to provide it with assistance. Accordingly, following the Spin-Off, Reorganized Prairie Holdings will need to provide internally or obtain from unaffiliated third parties the services we currently receive from Arch Coal. Reorganized Prairie Holdings may be unable to develop or replace these services in a timely manner or on terms and conditions as favorable as those we receive from Arch Coal. Moreover, following the Spin-Off, Reorganized Prairie Holdings will also be responsible for the additional costs associated with being an independent company, including, if Reorganized Prairie Holdings is a reporting company, costs related to corporate governance, investor and public relations and public reporting. Because Reorganized Prairie Holdings has historically operated as part of the wider Arch organization, it may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently, or may incur additional costs that could adversely affect its business.

(b)   It has not yet been determined whether Reorganized Prairie Holdings will be a reporting company under the Securities Exchange Act, and if it is not a reporting company, the liquidity of New Prairie Holdings Stock may be significantly limited and holders of New Prairie Holdings Stock may be required to maintain their investment for an indefinite period of time.

In the event of the Prairie Holdings Spin-Off, Reorganized Prairie Holdings may have 2,000 or more holders of record of its common stock or 500 or more non-accredited holders of record of its common stock, which would require it to become a reporting company under the Exchange Act.  Becoming a reporting company would impose substantial reporting and compliance costs on Reorganized Prairie Holdings, which could adversely impact the value of New Prairie Holdings Stock.  Consequently, if Reorganized Prairie Holdings is not required to become a reporting company, it is not anticipated that Reorganized Prairie Holdings will voluntarily elect to be a reporting company.  However, if Reorganized Prairie Holdings is not a reporting company it may adversely impact the liquidity and trading price of the New Prairie Holdings Stock.  For example, if Reorganized Prairie Holdings is not a reporting company, its governing and constituent documents will contain restrictions on holders' ability to transfer the New Prairie Holdings Stock designed to ensure that the number of holders of the securities does not exceed the threshold at which Reorganized Prairie Holdings would be required to become a reporting company under the Exchange Act,  and such documents will restrict sales, transfers or other dispositions of New Prairie Holdings Stock that would result in the number of holders exceeding such thresholds.

(c)   No market for New Prairie Holdings Stock currently exists and a liquid trading market may not develop or be sustained after the Spin-Off. Following the Prairie Holdings Spin-Off, the trading price of New Prairie Holdings Stock may fluctuate significantly.

There is currently no public market for New Prairie Holdings Stock.  If Reorganized Prairie Holdings is not a reporting company, it will not be listed on any public exchange, and it is anticipated that there will be no active trading market for the New Prairie Holdings Stock.  If

Reorganized Prairie Holdings is a reporting company, it may apply to list New Prairie Holdings Stock on a public exchange, but may not meet the requirements to do so. Regardless, an active trading market for New Prairie Holdings Stock may not develop as a result of the Prairie Holdings Spin-Off or may not be sustained in the future. The lack of an active market may make it more difficult for holders of New Prairie Holdings Stock to sell their shares and could lead to the share price being depressed or volatile.

Moreover, if Reorganized Prairie Holdings is not a reporting company, its governing and constituent documents will contain restrictions on holders' ability to transfer the New Prairie Holdings Stock designed to ensure that the number of holders of the securities does not exceed the threshold at which Reorganized Prairie Holdings would be required to become a reporting company under the Exchange Act. Among other things, the governing and constituent documents of Reorganized Prairie Holdings will require notice to Reorganized Prairie Holdings of any proposed transfer of its common stock and will restrict such transfer if Reorganized Prairie Holdings determines that the transfer would, if effected, result in Reorganized Prairie Holdings potentially having 2,000 or more holders of record of its common stock or 500 or more non-accredited holders of record of its common stock (in each case as determined under the Exchange Act). As a result, there can be no assurance that any liquid trading market for the New Prairie Holdings Stock will exist in the future and holders of New Prairie Holdings Stock may be required to maintain their investment for an indefinite period of time. The liquidity of any market for the New Prairie Holdings Stock will depend on, among other things, the number of holders of the New Prairie Holdings Stock, Reorganized Prairie Holdings' financial performance, whether the New Prairie Holdings Stock becomes listed on a securities exchange or trading system, and the market for similar securities, none of which can be determined or predicted. The Debtors therefore cannot make assurances regarding the development of an active trading market or, if a market develops, the liquidity or pricing characteristics of that market.

Moreover, the Debtors cannot predict the prices at which New Prairie Holdings Stock may trade, if at all, after the Prairie Holdings Spin-Off. The price of New Prairie Holdings Stock may fluctuate widely, depending on many factors, some of which may be beyond the control of Reorganized Prairie Holdings, including:

- actual or anticipated fluctuations in the operating results of Reorganized Prairie Holdings due to factors related to the business and industry of Reorganized Prairie Holdings;

- market demand for coal and electricity;

- geologic conditions, weather and other inherent risks of coal mining that are beyond the control of Reorganized Prairie Holdings;

- competition, both within the coal industry and with producers of competing energy sources;

- excess production and production capacity;

- the ability of Reorganized Prairie Holdings to acquire or develop coal reserves in an economically feasible manner;

- success or failure of the business strategies of Reorganized Prairie Holdings;

132

- Reorganized Prairie Holdings' quarterly or annual earnings, or those of other companies in its industry;

- Reorganized Prairie Holdings' ability to obtain financing as needed;

- announcements by Reorganized Prairie Holdings or its competitors of significant acquisitions or dispositions;

- changes in accounting standards, policies, guidance, interpretations or principles;

- to the extent Reorganized Prairie Holdings is a reporting company, the failure of securities analysts to cover New Prairie Holdings Stock after the Prairie Holdings Spin-Off;

- changes in earnings estimates by securities analysts or the ability of Reorganized Prairie Holdings to meet those estimates;

- the operating and stock price performance of other comparable companies;

- investor perception of Reorganized Prairie Holdings and the coal industry;

- overall market fluctuations;

- results from any material litigation or government investigation;

- changes in laws and regulations (including tax laws and regulations) affecting the business of Reorganized Prairie Holdings;

- changes in capital gains taxes and taxes on dividends affecting holders of New Prairie Holdings Stock; and

- general economic conditions and other external factors.

Stock markets in general have experienced volatility that has often been unrelated to the operating performance of a particular company. In the event that Reorganized Prairie Holdings is a reported company, these broad market fluctuations could adversely affect the trading price of New Prairie Holdings Stock.

(d)   Reorganized Prairie Holdings is a holding company and relies on dividends and other payments, advances and transfers of funds from its joint venture subsidiary to meet its obligations and pay any dividends.

Reorganized Prairie Holdings will be a holding company. Reorganized Prairie Holdings has no operations of its own and derives all of its revenues and cash flow from its joint venture subsidiary. Reorganized Prairie Holdings depends on its joint venture subsidiary for dividends and other payments to generate the funds necessary to meet its financial obligations. The earnings from, or other available assets of, its subsidiary may not be sufficient to pay dividends or make distributions or loans to enable it to make payments when such payments are due.

(e)   The Debtors cannot assure that Reorganized Prairie Holdings will pay dividends on New Prairie Holdings Stock.

Following the Prairie Holdings Spin-Off, the timing, declaration, amount and payment of future dividends to holders of New Prairie Holdings Stock will fall within the discretion of the

133

board of directors of Reorganized Prairie Holdings. The board's decisions regarding the payment of future dividends will depend on many factors, including the financial condition of Reorganized Prairie Holdings, earnings, capital requirements of Reorganized Prairie Holdings' business and covenants associated with any debt obligations, as well as legal requirements, regulatory constraints, industry practice and other factors that the Board of Reorganized Prairie Holdings deems relevant. There can be no assurance that Reorganized Prairie Holdings will pay a dividend in the future or continue to pay any dividend if Reorganized Prairie Holdings does commence paying dividends, and there can be no assurance that, in the future, the combined annual dividends paid on Arch common stock, if any, and New Prairie Holdings Stock, if any, after the Prairie Holdings Spin-Off will equal the annual dividends on Arch Coal common stock prior to the Prairie Holdings Spin-Off.

      (f)   Provisions in the Amended and Restated Articles of Incorporation and Amended and Restated Bylaws of Reorganized Prairie Holdings and of Delaware law may prevent or delay an acquisition of Reorganized Prairie Holdings, which could decrease the trading price of New Prairie Holdings Stock.

Several provisions of Reorganized Prairie Holdings' Amended and Restated Articles of Incorporation, Amended and Restated Bylaws and Delaware law may discourage, delay or prevent a merger or acquisition that holders of New Prairie Holdings Stock may consider favorable.

These and other provisions of Reorganized Prairie Holdings' Amended and Restated Articles of Incorporation, Amended and Restated Bylaws and Delaware law may discourage, delay or prevent certain types of transactions involving an actual or a threatened acquisition or change in control of Reorganized Prairie Holdings, including unsolicited takeover attempts, even though the transaction may offer holders of New Prairie Holdings Stock the opportunity to sell their shares of New Prairie Holdings Stock at a price above the prevailing market price.

## ARTICLE X

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan as they relate to the Debtors and to beneficial owners of Claims (each, a "**Holder**") entitled to vote on the Plan.  This summary is intended for general information purposes only, is not a complete analysis of all potential federal income tax consequences that may be relevant to any particular Holder and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws.

This discussion is based on the Internal Revenue Code, United States Treasury Regulations promulgated thereunder, judicial decisions and published rulings and administrative pronouncements of the IRS, all as in effect on the date of this Disclosure Statement.  These authorities may change, possibly with retroactive effect, resulting in federal income tax

134

consequences different from those discussed below.  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below.  There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This summary does not apply to Holders that are not United States persons for U.S. federal income tax purposes or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass through entities, tax exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies and regulated investment companies).  Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders based upon their particular circumstances.  Holders are urged to consult their tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Plan, as well as any tax consequences arising under any state, local or foreign tax laws, or any other federal tax laws.

Non-U.S. Holders, particularly those who will acquire New Common Stock or New Prairie Holdings Stock in connection with the Plan, are urged to consult their tax advisors regarding the United States federal income tax consequences to them of the exchanges contemplated by the Plan and the subsequent disposition of New Common Stock or New Prairie Holdings Stock.  In particular, Arch Coal and Prairie Holdings believe that they each may be and may remain for the foreseeable future a U.S. real property holding corporation ("**USRPHC**") as defined in the Internal Revenue Code, in which case certain non-U.S. Holders may be subject to U.S. federal income tax with respect to gain on disposition of New Common Stock or New Prairie Holdings Stock under the Foreign Investment in Real Property Tax Act ("**FIRPTA**").  If New Common Stock or New Prairie Holdings Stock is regularly traded on an established securities market, gain on a disposition of New Common Stock or New Prairie Holdings Stock by a non-U.S. Holder generally will not be subject to withholding under FIRPTA, but will be subject to U.S. federal income tax if the non-U.S. Holder owns or is treated as owning five percent or more of the fair market value of the New Common Stock or New Prairie Holdings Stock during a specified testing period.

**This discussion is limited to the federal tax issues addressed herein.  Additional issues may exist that are not addressed in this discussion and that could affect the federal tax treatment of consummation of the Plan.  Holders are urged to seek their own advice based on their particular circumstances from an independent tax advisor.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors**

1.       Distribution of New Prairie Holdings Stock by Prairie Holdings to Holders of Prairie Holdings GUC Claims

Provided a Knight Hawk Encumbrance Order has not been entered, Holders of Prairie Holdings GUC Claims will receive New Prairie Holdings Stock unless they elect and are eligible to receive Cash in lieu of such stock.  Prairie Holdings will not recognize a gain or loss on the distribution of New Prairie Holdings Stock to Holders of Prairie Holdings GUC Claims.

2.      Cancellation of Debt and Reduction of Attributes

The discharge of a debt obligation for an amount less than the remaining amount due on the obligation (as determined for U.S. federal income tax purposes) generally will give rise to cancellation of indebtedness ("**COD**") income that must be included in the debtor's income, subject to certain exceptions.  In particular, under Section 108 of the Internal Revenue Code, COD income will not be included in a debtor's income if the discharge of the debt obligation occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**").  As a result of the Plan, the amount of the Debtors' aggregate outstanding indebtedness will be substantially reduced.  Therefore, the Debtors expect that the consummation of the Plan will produce a significant amount of COD income.

Under the Internal Revenue Code, a debtor that excludes COD from income under the Bankruptcy Exception generally must reduce certain tax attributes by a corresponding amount. Attributes subject to reduction include consolidated attributes (such as consolidated net operating losses ("**NOLs**"), NOL carryforwards and certain other losses, credits and carryforwards) attributable to the debtor, attributes that arose in separate return limitation years of the debtor and the debtor's adjusted tax basis in its assets (including stock of subsidiaries).  A debtor's adjusted tax basis in its assets generally may not be reduced below the amount of its liabilities remaining immediately after the discharge of indebtedness.  A debtor with COD income may elect first to reduce the adjusted tax basis of its depreciable assets under section 108(b)(5) of the Internal Revenue Code.  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax.

3.      Section 382 Limitation on Net Operating Losses

Section 382 of the Internal Revenue Code generally imposes an annual limitation on the use of NOLs (and certain other tax attributes) if a corporation or a consolidated group with NOLs (a "**loss corporation**") undergoes an "ownership change."  In general, an ownership change occurs if the percentage of the value of the loss corporation's stock (including the parent corporation in a consolidated group) owned by one or more direct or indirect "five-percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five-percent shareholders at any time during the applicable testing period.  The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent ownership change of the corporation.  The Debtors expect that the consummation of the Plan will result in an ownership change for both Arch Coal and Prairie Holdings on the Effective Date.

In general, the amount of the annual limitation on a loss corporation's use of its pre-change NOLs (and certain other tax attributes) is equal to the product of the long-term tax-exempt rate in effect on the date of the ownership change and the value of the loss corporation's outstanding stock immediately before the ownership change, which value is determined under

special rules if the ownership change occurs in a case brought under the Bankruptcy Code (the "**Section 382 Limitation**").

In certain cases however, unless the corporation elects otherwise, a special exception under section 382(*l*)(5) of the Internal Revenue Code will prevent application of the annual limitation provided that at least 50% of the stock of the debtor is owned by the shareholders and certain qualified creditors immediately following the reorganization. Under this rule, NOL carryforwards would be subject to a one-time reduction and a second ownership change within two years following the first ownership change would eliminate the Debtors' ability to utilize any NOLs from periods before the first ownership change. A debtor may elect not to apply section 382(*l*)(5) to an ownership change that otherwise satisfies its requirements. This election must be made on the debtor's federal income tax return for the taxable year in which the ownership change occurs.

If the exchanges contemplated by the Plan do not qualify under section 382(*l*)(5) or if the Reorganized Debtors elect not to apply that provision, the Reorganized Debtors' use of their NOLs to offset taxable income earned after consummation of the Plan will be subject to the Section 382 Limitation. However, in that case, section 382(*l*)(6) of the Internal Revenue Code provides that the value of the Reorganized Debtors' stock, for the purpose of calculating its Section 382 Limitation, generally will be determined by reference to the net equity value of the stock immediately after the ownership change has occurred (rather than immediately before the ownership change, as is the case under the general rule for non-bankruptcy ownership changes). In addition, under an applicable IRS notice, a corporation whose assets in the aggregate have a fair market value greater than their adjusted tax basis (a "**Net Unrealized Built-in Gain**") is permitted to increase its annual Section 382 Limitation during the five years immediately after the ownership change by an amount determined with reference to the depreciation and depletion deductions that a purchaser of the Debtors' assets would have been permitted to claim if it had acquired the Debtors' assets in a taxable transaction.

The Debtors do not expect to have a significant amount of NOLs after the required reduction due to excluded COD income (described in "— Cancellation of Debt and Reduction of Attributes" above). The Debtors have not yet determined whether Arch Coal or Prairie Holdings will be eligible for or rely on the special rule under section 382(*l*)(5) or the special rule under section 382(*l*)(6).

4.      Dissolution or Transfer of Prairie Coal Company

On or prior to the Effective Date, either (i) Prairie Coal Company will transfer its assets to another Reorganized Debtor, and Prairie Coal Company will be dissolved, or (ii) the Interests in Prairie Coal Company will be transferred by Prairie Holdings to another Reorganized Debtor. In either case, it is not anticipated that Prairie Holdings will recognize any material gain or loss as a result of such transfer.

137

**C.    Certain U.S. Federal Income Tax Consequences to the Holders of Claims and Interests**

    1.    Consequences to Holders of Secured Claims, Other Priority Claims and Unsecured Claims

        (a)   Other Priority Claims

The receipt of Cash by a Holder of Other Priority Claims generally will be treated as a taxable exchange of such Holder's Claims for Cash.  Such Holders generally will recognize gain or loss equal to the difference between: (x) Cash received in exchange for the Claims and (y) the Holder's adjusted tax basis, if any, in the Claims.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  The U.S. federal income tax consequences of the receipt of Cash allocable to accrued interest may be relevant and are summarized below.

        (b)   Other Secured Claims

The Holders of Other Secured Claims may recognize income, gain or loss for U.S. federal income tax purposes with respect to the discharge of their Claims, depending on whether their Claims are Reinstated or, if not Reinstated, on the outcome of their negotiations with the Debtors.  A Holder whose Claim is Reinstated pursuant to the Plan generally will not realize income, gain or loss unless either (i) such Holder is treated as having received interest, damages or other income in connection with the Reinstatement or (ii) such Reinstatement is considered a "significant modification" of the Claim.  Holders of Other Secured Claims that are Reinstated are urged to consult their own tax advisors to determine whether or not a "significant modification" has occurred and its impact to such Holder.  A Holder who receives Cash or other property in exchange for its Claim pursuant to the Plan will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash or the fair market value of the other property received in exchange for its Claim and (ii) the Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  The U.S. federal income tax consequences of the receipt of Cash or other property allocable to accrued interest may be relevant and are summarized below.

        (c)   First Lien Credit Facility Claims

Holders of First Lien Credit Facility Claims will receive New First Lien Debt, shares of New Common Stock and Cash in exchange for the portions of their Claims that are First Lien Credit Facility Secured Claims.  Provided a Knight Hawk Encumbrance Order has not been entered, Holders of First Lien Credit Facility Claims will receive New Prairie Holdings Stock in

exchange for their Claims against Prairie Holdings, and will be deemed to contribute the New Prairie Holdings Stock to Reorganized Arch Coal. If a Knight Hawk Encumbrance Order has been entered, Holders of First Lien Credit Facility Claims will not receive any consideration in exchange for their Claims against Prairie Holdings.

The United States federal income tax consequences to Holders of First Lien Credit Facility Claims depend, in part, on whether such Claims and New First Lien Debt constitute "securities" of the Debtors or Reorganized Debtors for United States federal income tax purposes. Whether an instrument constitutes a security for United States federal income tax purposes is determined based on all the facts and circumstances, but most authorities have held that the term of a debt instrument at the time of its issuance is an important factor in determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security. Given the five-year term of the New First Lien Debt, for purposes of this discussion, the Debtors have assumed that the New First Lien Debt will not constitute securities of the Debtors for United States federal income tax purposes. Holders of First Lien Credit Facility Claims are urged to consult their tax advisors to determine whether, given their particular circumstances, their Claims and the New First Lien Debt constitute securities of the Debtors.

With respect to First Lien Credit Facility Claims that are treated as securities of the Debtors, the exchange should be treated as a recapitalization under section 368(a)(1)(E) of the Internal Revenue Code. A Holder of such Claims will realize gain or loss in an amount equal to the difference between (i) the sum of (a) the issue price of the Holder's interest in the New First Lien Debt, (b) the fair market value of the New Common Stock and (c) the amount of Cash received (each excluding any amounts allocated to accrued but unpaid interest, as discussed below) and (ii) the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date. A Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss. A Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New First Lien Debt and (b) the amount of Cash received as part of the exchange. A Holder's adjusted tax basis in the New Common Stock received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, plus the fair market value of any New Prairie Holdings Stock such Holder is deemed to contribute to Arch Coal, and reduced by the sum of (i) the issue price of the Holder's interest in the New First Lien Debt and (ii) the amount of Cash received as part of the exchange. A Holder's holding period in the New Common Stock will include the holding period in its Claim surrendered. A Holder's adjusted tax basis in its interest in the New First Lien Debt will equal the issue price of the Holder's interest in the New First Lien Debt. A Holder's holding period in its interest in the New First Lien Debt will commence on the day after the date received.

The discussion above generally assumes that the exchange of First Lien Credit Facility Claims for New First Lien Debt, shares of New Common Stock and Cash is properly treated as a recapitalization under section 368(a)(1)(E) of the Internal Revenue Code. Holders of First Lien

Credit Facility Claims are urged to consult their tax advisors regarding the proper characterization of the exchange and the resulting United States federal income tax consequences to them.

A Holder of Claims that are not treated as securities (including First Lien Credit Facility Claims that are Prairie Holdings GUC Claims) of the Debtors generally will be treated as exchanging its Claims for the consideration received for such Claims pursuant to the Plan in a taxable exchange. Accordingly, such a Holder generally will recognize gain or loss equal to the difference between (i) the sum of the fair market value of any shares of New Common Stock, the issue price of any interest in the New First Lien Debt, the amount of any Cash and the fair market value of any shares of New Prairie Holdings Stock received (each excluding any amounts treated as attributable to accrued but unpaid interest on such Claims), and (ii) the Holder's adjusted tax basis in such Claims. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. The U.S. federal income tax consequences of the receipt of Cash or other property allocable to accrued interest may be relevant and are summarized below. A Holder's adjusted tax basis in any New Common Stock received in exchange for its Claim will equal the fair market value of such stock plus the fair market value of any New Prairie Holdings Stock such Holder is deemed to contribute to Arch Coal. A Holder's adjusted tax basis in its interest in the New First Lien Debt, if any, will equal the issue price of the Holder's interest in the New First Lien Debt.

(d)    General Unsecured Claims and Prairie Holdings GUC Claims That Are Not First Lien Credit Facility Deficiency Claims

Holders of General Unsecured Claims that are not First Lien Credit Facility Deficiency Claims will receive Cash in exchange for their Claims. Provided a Knight Hawk Encumbrance Order has not been entered, Holders of Prairie Holdings GUC Claims that are not First Lien Credit Facility Deficiency Claims generally will receive New Prairie Holdings Stock in exchange for their Claims, except certain Holders may elect to receive Cash in lieu of the New Prairie Holdings Stock they would have otherwise received on account of such Claims. If a Knight Hawk Encumbrance Order has been entered, Holders of such Prairie Holdings GUC Claims will not receive any consideration in exchange for their Claims.

The receipt of Cash and New Prairie Holdings Stock, if any, by a Holder of General Unsecured Claims or Prairie Holdings GUC Claims that are not First Lien Credit Facility Deficiency Claims generally will be treated as a taxable exchange of such Holder's Claims. Such Holders generally will recognize gain or loss equal to the difference between: (i) the sum of the Cash and the fair market value of any New Prairie Holdings Stock received in exchange for the Claims (each excluding any amounts treated as attributable to accrued but unpaid interest on such Claims) and (ii) the Holder's adjusted tax basis, if any, in the Claims. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. The

140

U.S. federal income tax consequences of the receipt of Cash and New Prairie Holdings Stock, if any, allocable to accrued interest may be relevant and are summarized below.  A Holder's adjusted tax basis in any New Prairie Holdings Stock received in exchange for its Claim will equal the fair market value of such stock.  A Holder's holding period in any New Prairie Holdings Stock received in exchange for its Claim will begin on the day following the receipt of such stock.

(e)   Consequences to Holders of New First Lien Debt

*Original Issue Discount*.  All stated interest on the New First Lien Debt will be treated as original issue discount ("**OID**") for United States federal income tax purposes because some of the interest on the New First Lien Debt will not be unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate.  Holders of the New First Lien Debt will generally be required to include OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis) over the term of the New First Lien Debt in advance of the receipt of cash payments attributable to that income.

The amount of OID required to be included in income will generally equal the sum of the "daily portions" of OID with respect to the New First Lien Debt for each day during the taxable year or portion of the taxable year in which the holder held such New First Lien Debt ("**accrued OID**").  The daily portion is determined by allocating to each day in each "accrual period" a pro rata portion of the OID allocable to that accrual period.  The "accrual period" for the New First Lien Debt may be of any length and may vary in length over the term of the New First Lien Debt, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period.  The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the excess, if any, of (i) the product of the New First Lien Debt's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the aggregate of all qualified stated interest allocable to the accrual period.  OID allocable to a final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price of the New First Lien Debt at the beginning of the final accrual period.  The adjusted issue price of the New First Lien Debt at the beginning of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period, and reduced by any payments previously made on the New First Lien Debt.  Under these rules, Holders of New First Lien Debt generally will include in income increasingly greater amounts of OID in successive accrual periods.

A Holder's adjusted tax basis in the New First Lien Debt will be increased by the amount of OID included in the holder's gross income and will be decreased by the amount of any payments received by the holder with respect to the note, whether the payments are denominated as principal or interest.

*Sale, Retirement or Other Taxable Disposition*.  A Holder of New First Lien Debt will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New First Lien Debt equal to the difference between the amount realized upon the disposition (less a portion allocable to any accrued OID that has not yet been included in income by the

141

Holder, which generally will be taxable as ordinary income) and the Holder's adjusted tax basis in the New First Lien Debt. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the New First Lien Debt for more than one year as of the date of disposition. Holders are urged to consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(f)   Accrued but Unpaid Interest

To the extent that any Claim is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor and has any accrued but unpaid interest thereon, any distribution received by the Holder of such Claim shall be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest (including any accrued original issue discount). Any such amount attributable to accrued but unpaid interest should be taxable to the Holder as interest income, if such amount has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest (including any original issue discount) was previously included in the Holder's gross income but was not paid in full by the Debtors.

(g)   Market Discount

A Holder that purchased its Claim from a prior Holder with market discount (in excess of a de minimis threshold) will be subject to the market discount rules of the Internal Revenue Code. Under those rules, assuming that the Holder has not made an election to accrue the market discount into income on a current basis, any gain recognized on the exchange of the Claim generally would be characterized as ordinary income to the extent of the market discount accrued on such Claim as of the date of the exchange.

(h)   Net Investment Income Tax

Subject to certain limitations and exceptions, Holders who are individuals, estates or certain trusts must pay a 3.8% surtax on all or part of that Holder's "net investment income," which includes, among other items, dividends, interest (including original issue discount) and capital gains from the sale or other taxable disposition of stock or debt. Holders are urged to consult their own tax advisors regarding the effect, if any, of this legislation on their receipt and ownership of New Common Stock, New Prairie Holdings Stock and/or New First Lien Debt issued pursuant to the Plan.

(i)   FATCA

Provisions commonly referred to as "FATCA" impose withholding of 30% on payments of dividends on the New Common Stock and New Prairie Holdings Stock, interest on the New First Lien Debt and, beginning in 2019, on proceeds of sales or redemptions of the New Common Stock, New Prairie Holdings Stock and New First Lien Debt to "foreign financial institutions" (which is broadly defined for this purpose and in general includes investment

142

vehicles) and certain other non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied, or an exemption applies. If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution generally will be entitled to a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). Holders are urged to consult their tax advisers regarding the effects of FATCA.

        2.        Consequences to Holders of Interests in Arch Coal

Holders of Interests in Arch Coal, which are being cancelled under the Plan, generally will be entitled to claim a worthless stock deduction (assuming that the Holder held the stock as a capital asset and the taxable year that includes the Plan is the same taxable year in which the stock first became worthless) in an amount equal to the Holder's adjusted tax basis in the stock. A worthless stock deduction is a deduction allowed to a Holder of a corporation's stock (that is a capital asset in the hands of such Holder) for the taxable year in which such stock becomes worthless, for the amount of the loss resulting therefrom. A worthless stock deduction is treated as a loss from the sale or exchange of a capital asset. Holders of Interests in Arch Coal are urged to consult their tax advisors regarding the proper characterization of the exchange and the resulting United States federal income tax consequences to them.

        3.        Information Reporting and Backup Withholding

Distributions or payments made pursuant to the Plan may be subject to backup withholding unless the Holder to which distribution or payment is made: (i) is included in certain exempt categories of persons (which generally include corporations) and, when required, demonstrates that fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Amounts withheld under the backup withholding rules are not additional taxes and may be refunded or credited against the Holder's U.S. federal income tax liability, provided required information is furnished to the IRS.

Each Debtor and Disbursing Agent will withhold all amounts required by law to be withheld from payments of interest. Each Debtor and Disbursing Agent will comply with all applicable reporting requirements of the Internal Revenue Code.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

# ARTICLE XI

## RECOMMENDATION

The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates and their creditors.  The Plan provides for an equitable distribution to holders of Claims.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to holders of Claims in certain Classes.  **Consequently, the Debtors urge all eligible holders of impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Solicitation and Claims Agent on or before the Voting Deadline.**

Dated: _____, 2016

Arch Coal, Inc. (for itself and on behalf of all Debtors)

By: _____
    Name:
    Title:

144

**Appendix A**

Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ARCH COAL, INC.**, *et al.*, | **Case No. 16-40120-705** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7983
Marshall S. Huebner
Brian M. Resnick
Michelle M. McGreal
Kevin J. Coco

*Counsel to the Debtors*
*and Debtors in Possession*


BRYAN CAVE LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: (314) 259-2000
Facsimile:  (314) 259-2020
Lloyd A. Palans
Brian C. Walsh
Cullen K. Kuhn
Laura Uberti Hughes

*Local Counsel to the Debtors*
*and Debtors in Possession*

Dated: June 14, 2016

---

[1] The Debtors and their respective employer tax identification numbers are listed in Schedule A hereto.

## TABLE OF CONTENTS

PAGE

### ARTICLE 1
DEFINITIONS AND RULES OF INTERPRETATION                                                1

Section 1.1.   Definitions ....................................................................................... 1
Section 1.2.   Rules of Interpretation........................................................................ 22
Section 1.3.   Computation of Time .......................................................................... 23
Section 1.4.   References to Monetary Figures ......................................................... 23
Section 1.5.   Exhibits; Schedules; Plan Supplement ............................................... 23

### ARTICLE 2
TREATMENT OF DIP FACILITY CLAIMS; ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY
TAX CLAIMS                                                                             23

Section 2.1.   Treatment of DIP Facility Claims ........................................................ 23
Section 2.2.   Treatment of Contingent Securitization Obligations .............................. 24
Section 2.3.   Treatment of Administrative Expense Claims........................................ 25
Section 2.4.   Treatment of Priority Tax Claims ........................................................ 25

### ARTICLE 3
CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS                             26

Section 3.1.   Classes and Treatment of Claims Against and Interests in the Debtors.... 26
Section 3.2.   Treatment of Claims Against and Interests in the Debtors....................... 30
Section 3.3.   Treatment of Intercompany Claims ...................................................... 33

### ARTICLE 4
ACCEPTANCE OR REJECTION OF THE PLAN                                                    33

Section 4.1.   Voting of Claims................................................................................. 33
Section 4.2.   Presumed Acceptance of Plan.............................................................. 33
Section 4.3.   Presumed Rejection of Plan................................................................. 33
Section 4.4.   Acceptance by Impaired Classes.......................................................... 33
Section 4.5.   Elimination of Vacant Classes ............................................................. 34
Section 4.6.   Consensual Confirmation .................................................................... 34
Section 4.7.   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ........ 34
Section 4.8.   Severability; Reservation of Rights ...................................................... 34

### ARTICLE 5
IMPLEMENTATION OF THE PLAN                                                             35

Section 5.1.   Continued Organizational Existence...................................................... 35
Section 5.2.   Section 1145 Exemption...................................................................... 35
Section 5.3.   Authorization of New Common Stock.................................................... 35
Section 5.4.   Authorization of New Prairie Holdings Stock ......................................... 36

Section 5.5.    Cancellation of Existing Securities and Related Agreements, the
Indentures and the Credit Agreement ............................................................ 36
Section 5.6.    Financing and Restructuring Transactions ............................................. 37

## ARTICLE 6
PROVISIONS GOVERNING DISTRIBUTIONS                                                                            38

Section 6.1.    Disbursing Agent ..................................................................................... 38
Section 6.2.    Timing and Delivery of Distributions ..................................................... 39
Section 6.3.    Manner of Payment Under Plan .............................................................. 41
Section 6.4.    Undeliverable or Non-Negotiated Distributions ..................................... 42
Section 6.5.    Claims Paid or Payable by Third Parties ................................................ 43

## ARTICLE 7
FILING OF ADMINISTRATIVE EXPENSE CLAIMS                                                                       43

Section 7.1.    Professional Fee Claims .......................................................................... 43
Section 7.2.    Administrative Expense Claims ............................................................... 44

## ARTICLE 8
DISPUTED CLAIMS                                                                                               45

Section 8.1.    Objections to Claims ............................................................................... 45
Section 8.2.    Resolution of Disputed Claims ............................................................... 45
Section 8.3.    Estimation of Claims and Interests ......................................................... 45
Section 8.4.    Payments and Distributions for Disputed Claims ................................... 46
Section 8.5.    No Amendments to Claims ...................................................................... 47
Section 8.6.    No Interest .............................................................................................. 48

## ARTICLE 9
EXECUTORY CONTRACTS AND UNEXPIRED LEASES                                                                      48

Section 9.1.    Rejection of Executory Contracts and Unexpired Leases ........................ 48
Section 9.2.    Schedules of Executory Contracts and Unexpired Leases ....................... 48
Section 9.3.    Categories of Executory Contracts and Unexpired Leases to Be
Assumed .................................................................................................. 50
Section 9.4.    Assumption and Rejection Procedures and Resolution of Treatment
Objections ............................................................................................... 53
Section 9.5.    Rejection Claims .................................................................................... 55
Section 9.6.    Assignment ............................................................................................ 55
Section 9.7.    Approval of Assumption, Rejection, Retention or Assignment of
Executory Contracts and Unexpired Leases ............................................. 55
Section 9.8.    Modifications, Amendments, Supplements, Restatements or Other
Agreements .............................................................................................. 56

ii

## ARTICLE 10
PROVISIONS REGARDING GOVERNANCE OF THE REORGANIZED DEBTORS                          56

Section 10.1.    Organizational Action ........................................................................56
Section 10.2.    Organizational Documents ...............................................................57
Section 10.3.    Directors and Officers of the Reorganized Debtors...........................58
Section 10.4.    New Stockholders' Agreements .........................................................58

## ARTICLE 11
EFFECT OF CONFIRMATION                                                               59

Section 11.1.    Vesting of Assets................................................................................59
Section 11.2.    Release of Liens .................................................................................59
Section 11.3.    Releases and Discharges ....................................................................59
Section 11.4.    Discharge and Injunction...................................................................60
Section 11.5.    Term of Injunction or Stays ...............................................................62
Section 11.6.    Exculpation .......................................................................................62
Section 11.7.    Release by the Debtors .......................................................................63
Section 11.8.    Voluntary Releases by the Holders of Claims and Interests................64
Section 11.9.    Injunction ..........................................................................................65
Section 11.10.   Setoff and Recoupment .....................................................................65
Section 11.11.   Avoidance Actions .............................................................................66
Section 11.12.   Preservation of Causes of Action.......................................................66
Section 11.13.   Compromise and Settlement of Claims and Controversies .................66

## ARTICLE 12
CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN              67

Section 12.1.    Conditions to Confirmation ...............................................................67
Section 12.2.    Conditions to Effectiveness ...............................................................67
Section 12.3.    Waiver of Conditions to Confirmation or Effectiveness .....................68

## ARTICLE 13
MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN                              69

Section 13.1.    Plan Modifications .............................................................................69
Section 13.2.    Revocation or Withdrawal of the Plan and Effects of Non-
                 Occurrence of Confirmation or Effective Date ..................................69

## ARTICLE 14
RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT                                70

## ARTICLE 15
MISCELLANEOUS                                                                        71

Section 15.1.    Exemption from Transfer Taxes and Recording Fees..........................71
Section 15.2.    Expedited Tax Determination .............................................................72
Section 15.3.    Payment of Statutory Fees .................................................................72

Section 15.4.      Dissolution of the Creditors' Committee............................................72
Section 15.5.      Plan Supplement.......................................................................72
Section 15.6.      Claims Against Other Debtors.......................................................73
Section 15.7.      Substantial Consummation ...........................................................73
Section 15.8.      Section 1125 of the Bankruptcy Code..............................................73
Section 15.9.      Severability ............................................................................73
Section 15.10.     Governing Law ........................................................................73
Section 15.11.     Binding Effect .........................................................................74
Section 15.12.     Notices..................................................................................74
Section 15.13.     Reservation of Rights .................................................................76
Section 15.14.     Further Assurances ....................................................................76
Section 15.15.     Case Management Order ..............................................................76

**Schedules**

Schedule A:                 Debtor Entities

Schedule 9.2(a):            Executory Contracts and Unexpired Leases To Be Assumed
Schedule 9.2(b):            Executory Contracts and Unexpired Leases To Be Rejected
Schedule 11.11              Retained Avoidance Actions

## INTRODUCTION

Pursuant to section 1121(a) of the Bankruptcy Code,[2] the Debtors in the above-captioned jointly administered Chapter 11 Cases respectfully propose the Plan. The Debtors are the proponents of the Plan under section 1129 of the Bankruptcy Code. A complete list of the Debtors is set forth in Schedule A to the Plan.

The Plan contemplates the reorganization of the Debtors and the resolution of all outstanding Claims against, and Interests in, the Debtors.

Pursuant to section 1125(b) of the Bankruptcy Code, votes to accept or reject a plan of reorganization cannot be solicited from holders of Claims or Interests entitled to vote on a plan until a disclosure statement has been approved by a bankruptcy court and distributed to such holders. On [●], the Bankruptcy Court entered the Approval Order that, among other things, approved the Disclosure Statement, set voting procedures and scheduled the Confirmation Hearing. The Disclosure Statement that accompanies the Plan contains, among other things, a discussion of the Debtors' history, businesses, properties and operations, projections for those operations, risk factors associated with the Debtors' businesses and the Plan, and a summary and analysis of the Plan and certain related matters.

## ARTICLE 1
### DEFINITIONS AND RULES OF INTERPRETATION

**Section 1.1.    Definitions**

Unless the context requires otherwise, the following terms used in the Plan shall have the following meanings:

1.    "**7.000%/7.250% Senior Notes Indenture**" means that certain indenture, dated as of June 14, 2011, by and among Arch Coal, Inc., as issuer, UMB Bank National Association, as trustee, and certain of the Subsidiary Debtors as guarantors, as the same may be amended, supplemented, revised or modified from time to time.

2.    "**7.000% Senior Notes**" means those certain 7.000% senior notes due 2019 issued in the aggregate principal amount of $1,000,000,000 pursuant to the 7.000%/7.250% Senior Notes Indenture.

3.    "**7.000% Senior Notes Guarantee Claim**" means a Claim asserted against a Subsidiary Debtor by a holder of, and on account of, a 7.000% Senior Note Due 2019.

4.    "**7.000% Senior Notes Parent Claim**" means a Claim asserted against Arch Coal by a holder of, and on account of, a 7.000% Senior Note Due 2019.

5.    "**7.000% Senior Notes Trustee**" means UMB Bank National Association, solely in its capacity as indenture trustee under the 7.000%/7.250% Senior Notes Indenture.

---

[2] Capitalized terms shall have the meanings ascribed to them in Section 1.1 of the Plan.

6.  "**7.250% Senior Notes Due 2020**" means those certain 7.250% senior notes due 2020 issued in the aggregate principal amount of $500,000,000 pursuant to the 7.250% Senior Notes Indenture.

7.  "**7.250% Senior Notes Due 2020 Guarantee Claim**" means a Claim asserted against a Subsidiary Debtor by a holder of, and on account of, a 7.250% Senior Note Due 2020.

8.  "**7.250% Senior Notes Indenture**" means that certain indenture, dated as of August 9, 2010, by and among Arch Coal, as issuer, U.S. Bank National Association, as trustee, and certain of the Subsidiary Debtors as guarantors, as the same may be amended, supplemented, revised or modified from time to time.

9.  "**7.250% Senior Notes Due 2020 Parent Claim**" means a Claim asserted against Arch Coal by a holder of, and on account of, a 7.250% Senior Note Due 2020.

10. "**7.250% Senior Notes Due 2020 Trustee**" means U.S. Bank National Association, solely in its capacity as indenture trustee under the 7.250% Senior Notes Indenture.

11. "**7.250% Senior Notes Due 2021**" means those certain 7.250% senior notes due 2021 issued in the aggregate principal amount of $1,000,000,000 pursuant to the 7.000%/7.250% Senior Notes Indenture.

12. "**7.250% Senior Notes Due 2021 Guarantee Claim**" means a Claim asserted against a Subsidiary Debtor by a holder of, and on account of, a 7.250% Senior Note Due 2021.

13. "**7.250% Senior Notes Due 2021 Parent Claim**" means a Claim asserted against Arch Coal by a holder of, and on account of, a 7.250% Senior Note Due 2021.

14. "**7.250% Senior Notes Due 2021 Trustee**" means UMB Bank National Association, solely in its capacity as indenture trustee under the 7.000%/7.250% Senior Notes Indenture.

15. "**9.875% Senior Notes**" means those certain 9.875% senior notes due 2019 issued in the aggregate principal amount of $375,000,000 pursuant to the 9.875% Senior Notes Indenture.

16. "**9.875% Senior Notes Guarantee Claim**" means a Claim asserted against a Subsidiary Debtor by a holder of, and on account of, a 9.875% Senior Note Due 2019.

17. "**9.875% Senior Notes Indenture**" means that certain indenture, dated as of November 21, 2012, by and among Arch Coal, as issuer, UMB Bank National Association, as trustee, and substantially all of the Subsidiary Debtors as guarantors, as the same may be amended, supplemented, revised or modified from time to time.

18. "**9.875% Senior Notes Parent Claim**" means a Claim asserted against Arch Coal by a holder of, and on account of, a 9.875% Senior Note Due 2019.

2

19.   "**9.875% Senior Notes Trustee**" means UMB Bank National Association, solely in its capacity as indenture trustee under the 9.875% Senior Notes Indenture.

20.   "**Adequate Protection Payments**" means any and all adequate protection payments that have been made to the First Lien Secured Parties on or prior to the Effective Date pursuant to paragraph 13(c)(iii) of the DIP Order.

21.   "**Adjustment Distribution**" has the meaning set forth in Section 8.4(b)(iii) of the Plan.

22.   "**Administrative Expense Claim**" means a Claim against any of the Debtors for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, Professional Fee Claims (but excluding, for the avoidance of doubt, DIP Facility Claims, the Prepetition Lender Adequate Protection Claim and Contingent Securitization Obligations).

23.   "**Administrative Expense Claim Bar Date**" means the date that is 30 calendar days after the Effective Date.

24.   "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

25.   "**Allowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor (i) that has been listed by such Debtor in the Schedules (as such Schedules may be amended by the Debtors from time to time) as liquidated in amount and not disputed or contingent, and for which no contrary or superseding Proof of Claim has been timely filed or that the Debtors do not timely object to in accordance with Section 8.1 of the Plan, (ii) that has been expressly allowed by Final Order or under the Plan, (iii) that has been compromised, settled or otherwise resolved pursuant to the Claims Settlement Procedures Order, the Bankruptcy Rules, Local Rules, another Final Order of the Bankruptcy Court or Section 8.2 of the Plan or (iv) that the Debtors do not timely object to in accordance with Section 8.1 of the Plan; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein.  Unless otherwise specified under the Plan, under the Bankruptcy Code, by order of the Bankruptcy Court or as otherwise agreed by the Debtors, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees or charges on such Claims from and after the Petition Date.

26.   "**Approval Order**" means the *Order (i) Approving Disclosure Statement; (ii) Approving Solicitation and Notice Materials; (iii) Approving Forms of Ballots; (iv) Establishing Solicitation and Voting Procedures; (v) Establishing Procedures for Allowing and Estimating Certain Claims for Voting Purposes; (vi) Scheduling a Confirmation Hearing and (vii) Establishing Notice and Objection Procedures*, entered by the Bankruptcy Court on [●], together with any supplemental order(s) that may be entered by the Bankruptcy Court in connection therewith.

27.   "**Arch Coal**" means Arch Coal, Inc.

3

28.    "**Arch Receivable**" means Arch Receivable Company, LLC.

29.    "**Arch Sales**" means Arch Coal Sales Company, Inc.

30.    "**Assumption Effective Date**" means the date upon which the assumption of an executory contract or unexpired lease under the Plan is deemed effective, which in no case shall be later than the Effective Date unless otherwise agreed by the relevant Assumption Party.

31.    "**Assumption Party**" means a counterparty to an executory contract or unexpired lease to be assumed and/or assigned by the applicable Debtor under the Plan.

32.    "**Avoidance Actions**" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

33.    "**Ballot**" means the voting form distributed to each holder of an Impaired Claim entitled to vote on the Plan, on which the holder is to indicate acceptance or rejection of the Plan in accordance with the Voting Instructions and make any other elections or representations required pursuant to the Plan or the Approval Order.

34.    "**Bankruptcy Code**" means title 11 of the United States Code, as now in effect or hereafter amended, to the extent applicable to the Chapter 11 Cases.

35.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Missouri, Eastern Division, and, with respect to withdrawal of any reference under section 157 of title 28 of the United States Code and/or order of a district court pursuant to section 157(a) of title 28 of the United States Code with respect to the Chapter 11 Cases, the United States District Court for the Eastern District of Missouri.

36.    "**Bankruptcy Court's Website**" means *www.moeb.uscourts.gov*.

37.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, each as now in effect or as hereafter amended, to the extent applicable to the Chapter 11 Cases.

38.    "**Bar Date Order**" means the *Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on April 8, 2016 [ECF No. 674], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

39.    "**Beneficial Ballots**" means the ballots upon which Beneficial Holders shall indicate to Nominees their acceptance or rejection of the Plan in accordance with the Voting Instructions.

40.     "**Beneficial Holder**" means, with respect to any security, the Entity having the Beneficial Ownership of such security.

41.     "**Beneficial Ownership**" means, with respect to any security, "beneficial ownership" of such security as determined pursuant to Rule 13d-3 of the Exchange Act.

42.     "**Board**" means, as of any date prior to the Effective Date, Arch Coal's then-existing board of directors, including any duly formed committee thereof.

43.     "**Business Day**" means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

44.     "**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

45.     "**Case Management Order**" means the *Order Establishing Certain Notice, Case Management and Administrative Procedures*, entered by the Bankruptcy Court on January 21, 2016 [ECF No. 155], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

46.     "**Cause of Action**" means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, Claims, including alter-ego claims and claims under chapter 5 of the Bankruptcy Code as well as any claims or rights created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases on the Petition Date, counterclaims, crossclaims, affirmative defenses and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity or otherwise in any court, tribunal, forum or proceeding, under any local, state, federal, foreign, statutory, regulatory or other law or rule.

47.     "**Change-in-Control Agreement**" has the meaning set forth in Section 9.3(d) of the Plan.

48.     "**Chapter 11 Cases**" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on or after the Petition Date (and not otherwise dismissed), currently pending in the Bankruptcy Court with the case numbers as set forth in Schedule A to the Plan, that are jointly administered in the case styled *In re Arch Coal, Inc., et al.*, Case No. 16-40120-705.

49.     "**Claim**" means a "claim" as defined in section 101(5) of the Bankruptcy Code.

50.     "**Claims Objection Procedures Order**" means the *Order Establishing Procedures for Claims Objections*, entered by the Bankruptcy Court on [●], 2016 [ECF No. [●]], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

51.     "**Claims Settlement Procedures Order**" means the *Order Authorizing and Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action*, entered by the Bankruptcy Court on April 8, 2016 [ECF No. 673], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

52.     "**Claims Objection Deadline**" means 11:59 p.m. (prevailing Central Time) on the 365th calendar day after the Effective Date, subject to further extensions and/or exceptions as may be ordered by the Bankruptcy Court.

53.     "**Class**" means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

54.     "**Collateral**" means any property or interest in property of any Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance and is not otherwise invalid under the Bankruptcy Code or other applicable law.

55.     "**Confirmation**" means confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

56.     "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court on its docket.

57.     "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

58.     "**Confirmation Order**" means the order of the Bankruptcy Court entered pursuant to section 1129 of the Bankruptcy Code confirming the Plan in form and substance reasonably acceptable to the Majority Consenting Lenders.

59.     "**Consenting Lenders**" has the meaning given to it in the Restructuring Support Agreement.

60.     "**Contingent**" means, when used in reference to a Claim, any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event that has not yet occurred as of the date on which such Claim is sought to be estimated or on which an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

61. "**Contingent DIP Obligations**" means all of the Debtors' obligations under the DIP Documents and the DIP Order that are Contingent and/or Unliquidated (including, without limitation, those set forth in Article 5 and Section 13.03 of the DIP Credit Agreement), other than DIP Facility Claims that are paid in full in Cash on or prior to the Effective Date and Contingent indemnification obligations as to which a claim has been asserted on or prior to the Effective Date.

62. "**Contingent Securitization Obligations**" means all of the Debtors' obligations under the Securitization Documents and the Securitization Order that are Contingent and/or Unliquidated as of the Effective Date other than Contingent indemnification obligations as to which a claim has been asserted on or prior to the Effective Date.

63. "**Creditor**" means any holder of a Claim against any of the Debtors.

64. "**Creditors' Committee**" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as constituted from time to time.

65. "**Cure**" means a distribution made by the Reorganized Debtors following the Effective Date pursuant to an executory contract or unexpired lease assumed under section 365 or 1123 of the Bankruptcy Code (i) in an amount equal to the Proposed Cure (including if such Proposed Cure is zero dollars) or (ii) if a Treatment Objection is filed with respect to the applicable Proposed Cure, then in an amount equal to the unpaid monetary obligations owing by the applicable Debtor and required to be paid pursuant to section 365(b) of the Bankruptcy Code, as may be (x) determined by Final Order or (y) otherwise agreed upon by such Debtor and the applicable Assumption Party.

66. "**Customer Programs**" means the Debtors' customer programs and practices, including, without limitation, prepayment, true-up and invoice correction programs, as to which the Debtors were authorized to honor prepetition obligations and to otherwise continue in the ordinary course of business by the *Order Authorizing (i) the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and (ii) Financial Institutions to Honor and Process Related Checks and Transfers*, entered by the Bankruptcy Court on January 14, 2016 [ECF No. 88], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

67. "**D&O Liability Insurance Policies**" means all insurance policies for directors', managers' and officers' liability (including employment practices liability and fiduciary liability) maintained by the Debtors prior to the Effective Date, including as such policies may extend to employees, and any such policies that are "tail" policies.

68. "**Debtors**" means each of the entities listed in Schedule A of the Plan. To the extent that the context requires any reference to the Debtors after the Effective Date, Debtors shall mean the Reorganized Debtors.

69. "**Debtors' Case Information Website**" means *https://cases.primeclerk.com/archcoal*.

70. "**DIP Agent**" means Wilmington Trust, National Association, solely in its capacity as administrative agent and collateral agent under the DIP Facility.

71. "**DIP Credit Agreement**" means that certain Debtor In Possession Credit Agreement, dated as of January 21, 2016, among, *inter alia*, Arch Coal as Borrower, the guarantors party thereto, the lenders party thereto from time to time and the DIP Agent, as approved by the Bankruptcy Court pursuant to the DIP Order, including any amendments, restatements, modifications or extensions thereof.

72. "**DIP Facility**" means the credit facility under the DIP Credit Agreement.

73. "**DIP Documents**" has the meaning set forth in the DIP Order.

74. "**DIP Facility Claim**" means a Claim of the DIP Agent or any DIP Lender against a Debtor arising out of or related to the DIP Facility, including, without limitation, the Superpriority Claims and Claims secured by the DIP Liens granted pursuant to, and each as defined in, the DIP Order.

75. "**DIP Lender**" means any lender under the DIP Credit Agreement as of the Effective Date.

76. "**DIP Liens**" has the meaning set forth in the DIP Order.

77. "**DIP Order**" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b),364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Agent and the Prepetition Lenders pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)*, entered by the Bankruptcy Court on February 25, 2016 [ECF No. 415], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

78. "**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor that (i) has been disallowed by a Final Order of the Bankruptcy Court, (ii) is listed in the Schedules as "$0," or as contingent, disputed or unliquidated and as to which a deadline by which to file a proof of claim has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, (iii) has been agreed to be equal to "$0" or to be disallowed or expunged pursuant to the Claims Settlement Procedures Order, the Bankruptcy Rules, the Local Rules or otherwise or (iv) is not listed on the Schedules and as to which a deadline by which to file a proof of claim has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court.

79. "**Disbursing Agent**" means Reorganized Arch Coal or any Person or Entity designated or retained by the Reorganized Debtors, in their sole discretion and without the need for any further order of the Bankruptcy Court, to serve as disbursing agent under the Plan.

8

80.    "**Disclosure Statement**" means the disclosure statement relating to the Plan, including all exhibits, appendices and schedules thereto, as amended, supplemented or modified from time to time, in each case as approved by the Approval Order.

81.    "**Disputed**" means, when used in reference to a Claim, any Claim against any of the Debtors or any portion thereof that is neither an Allowed Claim nor a Disallowed Claim.

82.    "**Disputed Claims Reserve**" has the meaning set forth in Section 8.4(b)(i) of the Plan.

83.    "**Distribution Date**" means any of (i) the Initial Distribution Date, (ii) each Interim Distribution Date and (iii) the Final Distribution Date.

84.    "**Distribution Record Date**" means the Confirmation Date or, with respect to securities held by DTC, the Initial Distribution Date.

85.    "**DTC**" means the Depository Trust Company.

86.    "**Effective Date**" means the Business Day selected by the Debtors, in consultation with the Majority Consenting Lenders, that is (i) on or after the Confirmation Date and on which date no stay of the Confirmation Order is in effect and (ii) on or after the date on which the conditions to effectiveness of the Plan specified in Section 12.2 of the Plan have been either satisfied or waived as set forth herein.

87.    "**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

88.    "**Environmental Law**" means all federal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law, all judicial and administrative orders, agreements and determinations and all common law concerning pollution or protection of the environment, or environmental impacts on human health and safety, including, without limitation, Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right to Know Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Resource Conservation and Recovery Act; the Safe Drinking Water Act; the Surface Mining Control and Reclamation Act; the Toxic Substances Control Act; the Clean Air Act and any state or local equivalents.

89.    "**ERISA**" means the Employee Retirement Income Security Act of 1974, 29, U.S.C. § 1001, *et seq*., as amended, and the regulations promulgated thereunder.

90.    "**Estate**" means, individually, the estate of each of the Debtors and collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.  These Estates are jointly administered for procedural purposes only pursuant to the *Order Directing Joint Administration of Chapter 11 Cases* entered on January 13, 2016 [ECF No. 67].

91.    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

92.    "**Exchange Offers**" means those certain private debt exchange offers launched by Arch Coal and certain of its subsidiaries on July 2, 2015."

93.    "**Excess Lender Challenge Fees**" means all amounts in excess of $250,000 paid (a) for professional fees and expenses incurred for (i) any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise, including any investigation in connection with litigation or threatened litigation) against any of the DIP Agent, the DIP Lenders, the Prepetition Agent (as defined in the DIP Order) or any other Prepetition Lender Party (as defined in the DIP Order) or for the purpose of objecting to or challenging the amount, validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by the DIP Agent, the DIP Lenders, the Prepetition Agent or any other Prepetition Lender Party or (ii) asserting any defense, claim, cause of action, counterclaim, or offset with respect to the DIP Obligations (as defined in the DIP Order), the Prepetition Debt (as defined in the DIP Order) (including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise), the DIP Liens or the Prepetition Lender Liens (as defined in the DIP Order) or against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or any other Prepetition Lender Party or their respective Representatives; (b) to prevent, hinder or otherwise delay any of the DIP Agent's or the Prepetition Agent's assertion, enforcement or realization on the Prepetition Collateral (as defined in the DIP Order) or the Collateral securing the DIP Obligations in accordance with the DIP Documents, the Existing Loan Agreements , the Interim Order (as defined in the DIP Order) or the DIP Order other than to seek a determination that an Event of Default (as defined in the DIP Credit Agreement) has not occurred or is not continuing; (c) to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or any other Prepetition Lender Party under the Interim Order or the Final Order or under the DIP Documents or the Existing Loan Agreements.

94.    "**Existing Loan Agreements**" has the meaning given to it in the DIP Order.

95.    "**Final Distribution Date**" means a date selected by the Reorganized Debtors in their sole discretion that is no earlier than 20 calendar days after the date on which all Disputed General Unsecured Claims have become either Allowed Claims or Disallowed Claims.

96.    "**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the docket in the Chapter 11 Cases (or the docket of such other court) that is not subject to a stay and has not been modified, amended, reversed or vacated and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired.

97.   "**First Lien Agent**" means Wilmington Trust, N.A., solely in its capacity as successor term loan administrative agent, successor collateral agent and successor control agent under the First Lien Transaction Documents.

98.   "**First Lien Credit Agreement**" means the Credit Agreement dated as of June 14, 2011, as amended, restated, supplemented or otherwise modified from time to time, among Arch Coal , Wilmington Trust, N.A., as successor term loan administrative agent and successor collateral agent, the Lenders, and the other agents and parties thereto.

99.   "**First Lien Credit Facility Claim**" means a Claim of the First Lien Agent, any First Lien Lender or any other Secured Party (as such term is defined in the First Lien Credit Agreement) against a Debtor arising out of or related to the First Lien Transaction Documents including, for the avoidance of doubt, any Contingent and/or Unliquidated Claim.

100.   "**First Lien Credit Facility Deficiency Claim**" means any First Lien Credit Facility Claim or portion thereof that is not an Allowed First Lien Credit Facility Secured Claim.

101.   "**First Lien Credit Facility Secured Claim**" means the portion of any First Lien Credit Facility Claim that is a Secured Claim.

102.   "**First Lien Lender**" means any lender from time to time party to the First Lien Credit Agreement, solely in its capacity as such.

103.   "**First Lien Secured Parties**" means the First Lien Lenders and the First Lien Agent.

104.   "**First Lien Transaction Documents**" means the Loan Documents (as defined in the First Lien Credit Agreement) and the Intercreditor Agreement.

105.   "**Foreign Agreements**" means all executory contracts or unexpired leases as to which the Debtors were authorized to pay their prepetition debts in the ordinary course of business pursuant to the *Order Authorizing (i) the Debtors to Pay Prepetition Obligations Owed to Foreign Creditors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers*, entered by the Bankruptcy Court on January 14, 2016 [ECF No. 86], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

106.   "**General Unsecured Claim**" means any prepetition Claim against any of the Debtors other than Prairie Holdings that is not a DIP Facility Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, First Lien Credit Facility Secured Claim, Other Secured Claim, Intercompany Claim or Section 510(b) Claim, including, without limitation, any unsecured Claim under section 506(a)(1) of the Bankruptcy Code.

107.   "**Governmental Unit**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

108.   "**Impaired**" means, when used in reference to a Claim, any Claim against any of the Debtors that is impaired within the meaning of section 1124 of the Bankruptcy Code.

109. "**Indemnification Obligation**" means any obligation of any Debtor to indemnify directors, officers or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective articles or certificates of incorporation, corporate charters, bylaws, operating agreements or similar corporate documents or other applicable contract or law in effect as of the Effective Date.

110. "**Indentures**" means the Unsecured Notes Indentures and the Second Lien Notes Indenture.

111. "**Indenture Trustees**" means, collectively, the 7.000% Senior Notes Trustee, the 7.250% Senior Notes Due 2020 Trustee, the 7.250% Senior Notes Due 2021 Trustee, the 9.875% Senior Notes Trustee and the Second Lien Notes Trustee.

112. "**Initial Distribution Date**" means a date selected by the Reorganized Debtors that is on or as soon as reasonably practicable after the Effective Date, which shall be the date on which initial distributions under the Plan are made.

113. "**Insurance Plans**" means the Debtors' insurance policies and any agreements, documents or instruments relating thereto entered into before the Effective Date; *provided*, *however* that Insurance Plans do not include either Workers' Compensation Plans or D&O Liability Insurance Policies.

114. "**Intercompany Claim**" means any Claim by a Debtor against another Debtor, including, without limitation: (i) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (ii) any Claim not reflected in such book entries that is held by a Debtor against another Debtor and (iii) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

115. "**Intercompany Contract**" means a contract solely between two or more Debtors entered into before the Petition Date.

116. "**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated December 17, 2013, among Wilmington Trust, N.A., as successor to PNC Bank, National Association, as first lien agent, Wilmington Savings Fund Society, FSB, as successor to UMB Bank National Association, as second lien agent, Wilmington Trust, N.A., as successor to PNC Bank, National Association as control agent, Arch Coal, as borrower, and Wilmington Savings Fund Society, FSB, as successor to UMB Bank National Association, as trustee.

117. "**Interest**" means any equity security within the meaning of section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued, authorized or outstanding limited liability company membership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

12

118. "**Interim Compensation Order**" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals*, entered by the Bankruptcy Court on February 24, 2016 [ECF No. 399], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

119. "**Interim Distribution Date**" means the date that is no later than 180 calendar days after the Initial Distribution Date or the most recent Interim Distribution Date thereafter, which shall be the date on which interim distributions under the Plan are made, with such periodic Interim Distribution Dates occurring until the Final Distribution Date has occurred, it being understood that the Reorganized Debtors may increase the frequency of Interim Distribution Dates in their sole discretion as circumstances warrant.

120. "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

121. "**IRS**" means the Internal Revenue Service of the United States of America.

122. "**Knight Hawk Encumbrance Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the docket in the Chapter 11 Cases (or the docket of such other court) determining that Prairie Holdings' 49% membership interest in Knight Hawk Holdings, LLC constitutes Pledged Collateral (as defined in the First Lien Credit Agreement).

123. "**Lien**" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

124. "**Local Rules**" means the Local Rules of the United States Bankruptcy Court for the Eastern District of Missouri.

125. "**Management Incentive Plan**" means the management incentive plan that provides for the issuance of up to 10% of the New Common Stock on a fully diluted basis in the form of options and/or other equity based compensation to management and directors of Arch Coal as determined by the New Board.

126. "**Majority Consenting Lenders**" means the First Lien Lenders party to the Restructuring Support Agreement holding in the aggregate more than 66 2/3% of the aggregate principal amount of Loans (as defined in the First Lien Credit Agreement) held by the Consenting Lenders.

127. "**Master Ballots**" means the master ballots upon which the Nominees of Beneficial Holders shall reflect the acceptances and rejections of the Plan by their respective Beneficial Holders in accordance with the Voting Instructions.

128. "**Mine Act**" means the Federal Mine Safety and Health Act of 1977, as amended by the Miner Act of 2006.

129. "**New Board**" means the board of directors of Reorganized Arch Coal on the Effective Date as specified in Section 10.3 hereof.

130.  "**New Certificate of Incorporation**" means the certificate of incorporation of Reorganized Arch Coal, which shall be substantially in the form set forth in the Plan Supplement.

131.  "**New Common Stock**" means the shares of common stock, par value $.01 per share, of Reorganized Arch Coal to be authorized and issued hereunder or for purposes specified herein, which shall be entitled to a single vote per share on all matters on which the New Common Stock is entitled to vote.

132.  "**New First Lien Debt**" means $326.5 million in principal amount of new first lien debt subject to the terms set forth in the New First Lien Debt Facility Documents.

133.  "**New First Lien Debt Facility**" means the credit facility under the New First Lien Debt Documents.

134.  "**New First Lien Debt Facility Documents**" means all loan and security documents, intercreditor agreements and other documents and filings, in each case related to the New First Lien Debt Facility subject to the terms set forth in the Plan Supplement, which terms shall be (i) in accordance with the terms set forth in Exhibit A to the Restructuring Support Agreement and (ii) reasonably acceptable to the Majority Consenting Lenders and, if the Securitization Facility is reinstated, to the Securitization Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

135.  "**New First Lien Debt Facility Parties**" means the banks, financial institutions and other lenders party to the New First Lien Debt Facility from time to time, each solely in their capacity as such.

136.  "**New Prairie Holdings Stock**" means shares of common stock, par value $.01 per share, of Reorganized Prairie Holdings, to be authorized and issued hereunder or for purposes specified herein, which shall be entitled to a single vote per share on all matters on which the New Prairie Holdings Stock is entitled to vote.

137.  "**New Prairie Holdings Stockholders' Agreement**" means the stockholders' agreement, substantially in the form included in the Plan Supplement, which form shall be reasonably acceptable to the Majority Consenting Lenders, to be entered into or deemed to have been entered into, as of the Effective Date, by and among Reorganized Prairie Holdings and each Person or Entity that receives New Prairie Holdings Stock under this Plan.

138.  "**New Arch Coal Stockholders' Agreement**" means the stockholders' agreement substantially in the form included in the Plan Supplement, which form shall be reasonably acceptable to the Majority Consenting Lenders, to be entered into or deemed to have been entered into, as of the Effective Date, by and among Reorganized Arch Coal and each Person or Entity that receives New Common Stock under this Plan.

14

139. "**Nominee**" means any broker, dealer, commercial loans institution, financial institution or other nominee (or its mailing agent) in whose name securities are registered or held of record on behalf of a Beneficial Holder.

140. "**Notes**" means, collectively, the Unsecured Notes and the Second Lien Notes.

141. "**Notes Claims**" means, collectively, the Notes Parent Claims and the Notes Guarantee Claims.

142. "**Notes Guarantee Claims**" means, collectively, the Second Lien Notes Guarantee Claims, the 9.875% Senior Notes Guarantee Claims, the 7.000% Senior Notes Guarantee Claims, the 7.250% Senior Notes Due 2021 Guarantee Claim and the 7.250% Senior Notes Guarantee Claim.

143. "**Notes Parent Claims**" means, collectively, the Second Lien Notes Parent Claims, the 9.875% Senior Notes Parent Claims, the 7.000% Senior Notes Parent Claims, the 7.250% Senior Notes Due 2021 Parent Claim and the 7¼% Senior Notes Parent Due 2020 Claim.

144. "**Notice of Intent to Assume or Reject**" means a notice delivered by the Debtors or by the Reorganized Debtors pursuant to Article 9 of the Plan stating an intent to assume or reject an executory contract or unexpired lease and including a proposed Assumption Effective Date or Rejection Effective Date, as applicable, and, if applicable, a Proposed Cure and/or a statement of proposed assignment.

145. "**Ordinary Course Professionals Order**" means the *Order Approving Procedures for the Retention and Compensation of Certain Professionals of the Debtors, Retroactive to the Petition Date*, entered by the Bankruptcy Court on February 24, 2016 [ECF No. 400], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

146. "**Other Priority Claim**" means a Claim against any Debtor, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment pursuant to section 507(a) of the Bankruptcy Code.

147. "**Other Secured Claim**" means any Secured Claim against any Debtor or portion thereof, and for the avoidance of doubt, excluding DIP Facility Claims, Priority Claims, First Lien Credit Facility Secured Claims and Second Lien Notes Claims.

148. "**PBGC**" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, and an agency of the United States created by ERISA.

149. "**Pension Plans**" means the Arch Coal, Inc. Retirement Account Plan and the Cumberland River Coal Company Pension Plan, each of which is a single-employer defined benefit plan insured by the PBGC and covered by Title IV of ERISA.

150. "**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code.

151. "**Petition Date**" means January 11, 2016.

15

152. "**Plan**" means this Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, including the Plan Supplement and all exhibits, supplements, appendices and schedules to any of the foregoing, as any of them may be amended or modified from time to time hereunder or in accordance with applicable law.

153. "**Plan Documents**" means the agreements, instruments and documents to be executed, delivered, assumed and/or performed in conjunction with the consummation of the Plan on and after the Effective Date, including, without limitation, those contained in the Plan Supplement.

154. "**Plan Supplement**" means, collectively, the documents, agreements, instruments, schedules and exhibits and forms thereof, each in form and substance reasonably acceptable to the Majority Consenting Lenders, to be filed as specified in Section 15.5 of the Plan as the Plan Supplement, as each such document, agreement, instrument, schedule and exhibit and form thereof may be altered, restated, modified or replaced from time to time, including subsequent to the filing of any such documents, *provided* that any alteration, restatement, modification or replacement shall be reasonably acceptable to the Majority Consenting Lenders. Each such document, agreement, instrument, schedule or exhibit or form thereof is referred to herein as a "Plan Supplement." For the avoidance of doubt, Schedules 9.2(a) and 9.2(b) hereto shall not be deemed to be included in the "Plan Supplement."[3]

155. "**Prairie Coal Company**" means Prairie Coal Company, LLC, a wholly-owned subsidiary of Prairie Holdings.

156. "**Prairie Holdings**" means Prairie Holdings, Inc.

157. "**Prairie Holdings GUC Cash**" means Cash in an amount equal to $[ ] million.

158. "**Prairie Holdings Claim**" means any prepetition Claim against Prairie Holdings.

159. "**Prairie Holdings GUC Claim**" means any prepetition Claim against Prairie Holdings that is not a DIP Facility Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Intercompany Claim or Section 510(b) Claim, including, without limitation, any unsecured Claim under section 506(a)(1) of the Bankruptcy Code.

160. "**Priority Claims**" means, collectively, Priority Tax Claims and Other Priority Claims.

161. "**Prepetition Lender Adequate Protection Claim**" has the meaning given to it in the DIP Order.

---

[3] The Plan Supplement may include, among other documents, the following: (i) the organizational documents of the Reorganized Debtors; (ii) the form or material terms of the New First Lien Debt Facility Documents; and (iii) the identity and affiliations of each director and officer of the Reorganized Debtors.

162.  "**Priority Tax Claim**" means a Claim (whether secured or unsecured) of a Governmental Unit against any Debtor entitled to priority pursuant to section 507(a)(8) or specified under section 502(i) of the Bankruptcy Code.

163.  "**Professional**" means a person retained in the Chapter 11 Cases by separate Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise, but not including any person retained pursuant to the Ordinary Course Professionals Order.

164.  "**Professional Fee Claims**" means an Administrative Expense Claim of a Professional against any Debtor for compensation for services rendered or reimbursement of costs, expenses or other charges and disbursements incurred during the period from the Petition Date through and including the Confirmation Date.

165.  "**Proof of Claim**" means a proof of claim against a Debtor filed by a holder of a Claim against any Debtor in accordance with the Bar Date Order.

166.  "**Proposed Cure**" means, for a particular executory contract or unexpired lease, the consideration that the Debtors propose (which may be zero or some amount greater than zero) on a Notice of Intent to Assume or Reject as full satisfaction of the Debtors' obligations with respect to such executory contract or unexpired lease pursuant to section 365(b) of the Bankruptcy Code.

167.  "**Ratable Share**" means, as of a date certain:

   (i)   For an Allowed First Lien Credit Facility Secured Claim the ratio of such Allowed First Lien Credit Facility Secured Claim to the aggregate amount of all Allowed First Lien Credit Facility Secured Claims as of such date.

   (ii)  For an Allowed General Unsecured Claim, the ratio of such Allowed General Unsecured Claim to the aggregate amount of all Allowed General Unsecured Claims as of such date.

   (iii) For an Allowed Prairie Holdings GUC Claim, the ratio of such Allowed Prairie Holdings GUC Claim to the aggregate amount of all Allowed Prairie Holdings GUC Claims as of such date.

168.  "**Receivables Purchase Agreement**" means that certain Second Amended and Restated Receivables Purchase Agreement dated as of January 10, 2016 (as further amended, supplemented or otherwise modified from time to time) among Arch Receivable, as seller, Arch Sales, as initial servicer, PNC Bank, National Association as administrator and issuer of letters of credit thereunder and the other parties party thereto from time to time, as securitization purchasers.

169.  "**Reinstated**" or "**Reinstatement**" means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the holder thereof so as to leave such Claim or Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding and without giving effect to any contractual provision or applicable law that entitles a Creditor to demand or receive accelerated payment of a

17

Claim after the occurrence of a default, (A) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (B) reinstating the maturity of such Claim as such maturity existed before such default, (C) compensating the Creditor for any damages incurred as a result of any reasonable reliance by such Creditor on such contractual provision or such applicable law and (D) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Creditor; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, without limitation, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to accomplish Reinstatement.

170.   "**Rejection Bar Date**" means the deadline for filing Proofs of Claim arising from the rejection of an executory contract or unexpired lease pursuant to the Plan, which deadline shall be 30 calendar days after the Debtors serve notice of the entry of an order (including, without limitation, the Confirmation Order) approving the rejection of such executory contract or unexpired lease.

171.   "**Rejection Claim**" means a Claim against any Debtor under section 502(g) of the Bankruptcy Code.

172.   "**Rejection Effective Date**" means the date upon which the rejection of an executory contract or unexpired lease under the Plan is deemed effective.

173.   "**Rejection Party**" means a counterparty to an executory contract or unexpired lease to be rejected by the Debtors under the Plan.

174.   "**Released Parties**" means (i) the Debtors; (ii) the Reorganized Debtors; (iii) the DIP Agent; (iv) the DIP Lenders; (v) the First Lien Agent and the First Lien Lenders; (vi) the arranger and syndication agents under the First Lien Transaction Documents; (vii) the Securitization Parties; (viii) all parties to the Restructuring Support Agreement; (ix) the Creditors' Committee and its current and former members; (x) the Indenture Trustees; and (xi) as to each of the foregoing Entities in clauses (i) through (x), each such Entity's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and their current and former officers, directors, managers, partners, principals, shareholders, members, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other Professionals (in each case as to the foregoing Entities in clauses (a) through (xi), solely in their capacity as such).

175.   "**Reorganized Arch Coal**" means Arch Coal and any successor thereto, whether by merger, consolidation or otherwise, on and after the Effective Date.

18

176.  "**Reorganized Debtors**" means the Debtors and any successors thereto, whether by merger, consolidation or otherwise, on and after the Effective Date.

177.  "**Reorganized Prairie Holdings**" means Prairie Holdings and any successor thereto, whether by merger, consolidation or otherwise, on and after the Effective Date.

178.  "**Reorganized Subsidiary Debtors**" means the Reorganized Debtors other than Reorganized Arch Coal.

179.  "**Reorganized Subsidiary Debtors' Bylaws**" means the bylaws of the Reorganized Subsidiary Debtors that are corporations.

180.  "**Reorganized Subsidiary Debtors' Certificates of Incorporation**" means the certificates of incorporation of the Reorganized Subsidiary Debtors or, if any Reorganized Subsidiary Debtor is merged into another Entity pursuant to, as applicable, the Restructuring Transactions, then the surviving Entity of such merger.

181.  "**Reorganized Subsidiary Debtors' LLC Agreements**" means the limited liability company agreements of the Reorganized Subsidiary Debtors or, if any Reorganized Subsidiary Debtor is merged into another Entity pursuant to, as applicable, the Restructuring Transactions, then the surviving Entity of such merger.

182.  "**Reorganized Subsidiary Debtors' Operating Agreements**" means the operating agreements of the Reorganized Subsidiary Debtors that are limited liability companies.

183.  "**Restructuring Support Agreement**" means the restructuring support agreement (as amended, supplemented or otherwise modified from time to time) by and among Arch Coal, the Guarantors (as defined therein), and the Consenting Lenders party thereto from time to time, dated as of January 10, 2016.

184.  "**Restructuring Transactions**" means those transactions described in Section 5.6 of the Plan.

185.  "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements have been or may be supplemented, modified or amended from time to time.

186.  "**Second Lien Notes**" means those certain 8.000% Second Lien notes due 2019 issued in the aggregate principal amount of $350,000,000 pursuant to the Second Lien Notes Indenture.

187.  "**Second Lien Notes Claims**" means, collectively, the Second Lien Notes Parent Claims and the Second Lien Notes Guarantee Claims.

188.  "**Second Lien Notes Guarantee Claim**" means a Claim asserted against a Subsidiary Debtor by a holder of, and on account of, a Second Lien Note.

189. "**Second Lien Notes Indenture**" means that certain Indenture, dated as of December 17, 2013, by and among Arch Coal, Inc., as issuer, Wilmington Savings Fund Society, as trustee and collateral agent, and substantially all of the Subsidiary Debtors as guarantors, as the same may be amended, supplemented, revised or modified from time to time.

190. "**Second Lien Notes Parent Claim**" means a Claim asserted against Arch Coal by a holder of, and on account of, a Second Lien Note.

191. "**Second Lien Notes Trustee**" means Wilmington Savings Fund Society, solely in its capacities as indenture trustee and collateral agent under the Second Lien Indenture.

192. "**Securitization Documents**" shall have the meaning given to the term "Financing Agreements" in the Securitization Order.

193. "**Securitization Facility**" means the securitization facility contemplated by the Securitization Documents and approved by the Securitization Order.

194. "**Securitization Order**" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(d), 364(e) and 365 (i) Authorizing Certain Debtors to Continue Selling and Contributing Receivables and Related Rights Pursuant to a Securitization Facility, (ii) Modifying the Automatic Stay and (iii) Granting Related Relief*, entered by the Bankruptcy Court on February 25, 2016 [ECF No. 412], as it has been or is hereafter modified, amended, supplemented or extended from time to time during the pendency of the Chapter 11 Cases.

195. "**Securitization Parties**" means PNC Bank, National Association, solely in its capacity as administrator and issuer of letters of credit under the Receivables Purchase Agreement, and the other parties party to the Receivables Purchase Agreement from time to time, as securitization purchasers, solely in their capacity as such.

196. "**Section 510(b) Claim**" means a Claim or Cause of Action against any of the Debtors (i) arising from rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities or (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims or Causes of Action.

197. "**Secured Claim**" means a Claim against a Debtor or portion thereof (i) that is reflected in the Schedules as or asserted in a Proof of Claim to be a secured claim and that is secured by a Lien on Collateral, to the extent of the value of such Collateral, as determined in accordance with section 506(a) and, if applicable, section 1129(b) of the Bankruptcy Code or (ii) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

198.    "**Securities Act**" means the Securities Act of 1933, as amended.

199.    "**Servicer**" means an indenture trustee, owner trustee, pass-through trustee, subordination agent, agent, servicer or any other authorized representative of Creditors recognized by the Debtors or the Reorganized Debtors.

200.    "**Solicitation and Claims Agent**" means the Debtors' solicitation agent, Prime Clerk LLC, which is located at 830 3rd Avenue, 9th Floor, New York, New York 10022.

201.    "**Subsidiary Debtors**" means, collectively, each of the Debtors except Arch Coal.

202.    "**Surety Bonds**" means the surety bonds outstanding under the Debtors' Surety Bond Program, as defined in the *Debtors' Motion for Entry of an Order Authorizing (i) the Debtors to Continue and Renew Surety Bond Program and (ii) Financial Institutions to Honor and Process Related Checks and Transfers*, filed with the Bankruptcy Court on January 11, 2016 [ECF No. 22].

203.    "**Transfer**" means as to any security or the right to receive a security or to participate in any offering of any security (each, a "**security**" for purposes of this definition), the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in or other disposition of such security or the Beneficial Ownership thereof, the offer to make such a sale, transfer, constructive sale or other disposition, and each option, agreement, arrangement or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing.  The term "**constructive sale**" for purposes of this definition means a short sale with respect to such security, entering into or acquiring an offsetting derivative contract with respect to such security, entering into or acquiring a futures or forward contract to deliver such security, or entering into any transaction that has substantially the same effect as any of the foregoing.

204.    "**Treatment Objection**" means an objection to the Debtors' proposed assumption or rejection of an executory contract or unexpired lease pursuant to the provisions of the Plan (including an objection to the proposed Assumption Effective Date or Rejection Effective Date, the Proposed Cure and/or any proposed assignment, but not including an objection to any Rejection Claim) that is properly filed with the Bankruptcy Court and served in accordance with the Local Rules by the applicable Treatment Objection Deadline.

205.    "**Treatment Objection Deadline**" means the deadline for filing and serving a Treatment Objection, which deadline shall be 4:00 p.m. (prevailing Central Time) on, (i) for an executory contract or unexpired lease listed on Schedule 9.2(a) or 9.2(b) hereof, the 14th calendar day after the relevant schedule is filed and notice thereof is mailed, (ii) for an executory contract or unexpired lease the proposed treatment of which has been altered by an amended or supplemental Schedule 9.2(a) or 9.2(b), the 14th calendar day after such amended or supplemental schedule is filed and notice thereof is mailed, (iii) for an executory contract or unexpired lease for which a Notice of Intent to Assume or Reject is filed, the 14th calendar day after such notice is filed and mailed and (iv) for any other executory contract or unexpired lease, including any to be assumed or rejected by

21

category pursuant to Section 9.1 or Section 9.3 of the Plan (without being listed on Schedule 9.2(a) or 9.2(b)), the deadline for objections to Confirmation of the Plan established pursuant to the Approval Order or other applicable order of the Bankruptcy Court.

206.   "**Unimpaired**" means any Claim or Interest that is not Impaired.

207.   "**United States of America**" or "**United States**" means the United States of America and its federal agencies.

208.   "**United States Trustee**" means the United States Trustee for Region 13.

209.   "**Unliquidated**" means, when used in reference to a Claim, any Claim, the amount of liability for which has not been fixed, whether pursuant to an agreement, applicable law or otherwise, as of the date on which such Claim is sought to be estimated.

210.   "**Unencumbered Assets**" means any asset of a Debtor to the extent such asset was not subject to valid, perfected and non-avoidable Lien as of the Petition Date.

211.   "**Unsecured Notes**" means, collectively, the 9.875% Senior Notes, the 7.000% Senior Notes, the 7.250% Senior Notes Due 2020 and the 7.250% Senior Notes Due 2021.

212.   "**Unsecured Notes Indentures**" means, collectively, the 9.875% Senior Notes Indenture, the 7.000%/7.250% Senior Notes Indenture and the 7.250% Senior Notes Indenture.

213.   "**Voting Deadline**" means [●] (prevailing Central Time) on [●].

214.   "**Voting Instructions**" means the instructions for voting on the Plan contained in the Approval Order, Article V of the Disclosure Statement and the Ballots, the Master Ballots and the Beneficial Ballots.

215.   "**Voting Record Date**" means the record date for voting on the Plan, which shall be [●].

216.   "**Workers' Compensation Plan**" means each of the Debtors' policies, programs and plans for workers' compensation, and any agreements, documents or instruments relating thereto, including any qualified self-insurance plans entered into before the Effective Date.

**Section 1.2.   Rules of Interpretation**

Unless otherwise specified, all article, section, exhibit, schedule or Plan Supplement references in the Plan are to the respective article in, section in, exhibit to, schedule to or Plan Supplement to the Plan, as the same may be amended, waived or modified from time to time in accordance with the terms hereof or thereof.   The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular article, section, subsection or clause contained herein.   Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and any pronoun stated in the masculine, feminine or neuter gender shall include

the masculine, feminine and neuter gender. Captions and headings in the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof. Whenever the words "include," "includes" or "including" are used in the Plan, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. Any references herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions.

As to any reference in the Plan to a consent, approval or acceptance by any party, or to an issue, agreement, order or other document (or the terms thereof) that shall be reasonably acceptable to any such party, such consent, approval or acceptance shall not be unreasonably conditioned, delayed or withheld.

### Section 1.3.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

### Section 1.4.    References to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### Section 1.5.    Exhibits; Schedules; Plan Supplement

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein. Copies of such exhibits, schedules and Plan Supplement can be obtained by downloading such documents from the Debtors' Case Information Website or the Bankruptcy Court's Website.

## ARTICLE 2
### TREATMENT OF DIP FACILITY CLAIMS; ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

### Section 2.1.    Treatment of DIP Facility Claims

Pursuant to the DIP Order, all DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment and (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Credit Agreement and the DIP Order, plus the establishment of an agreed-upon reserve

in respect of Contingent indemnification obligations arising under the DIP Facility as to which a claim has been asserted as of the Effective Date. Except to the extent that a holder of a DIP Facility Claim agrees in its sole discretion to less favorable treatment, on or before the Effective Date, the DIP Agent, for the benefit of the applicable DIP Lenders and itself, shall be paid in Cash 100% of the then-outstanding amount of the DIP Facility Claims other than Contingent DIP Obligations. Contemporaneously with the foregoing payment, (i) the commitments under the DIP Facility shall automatically terminate, (ii) except with respect to the Contingent DIP Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Facility as provided below), the DIP Facility and the "Loan Documents" referred to therein shall be deemed canceled, (iii) all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all Collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and (iv) all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Facility Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (i) the Contingent DIP Obligations shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and (ii) the DIP Facility and the "Loan Documents" referred to therein shall continue in full force and effect after the Effective Date with respect to any obligations thereunder governing (A) the Contingent DIP Obligations and (B) the relationships among the DIP Agent and the DIP Lenders, as applicable, including but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders), reinstatement obligations pursuant to Section 12.05 of the DIP Credit Agreement and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agent and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facility in accordance with the terms thereof. The Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agent or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

### Section 2.2.    Treatment of Contingent Securitization Obligations

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Contingent Securitization Obligations shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and the Securitization Documents shall continue in full force and effect with respect to any obligations thereunder governing the Contingent Securitization Obligations. An agreed-upon reserve shall be established in respect of Contingent indemnification obligations arising under the Securitization Facility as to which a claim has been asserted.

After the Effective Date, the Reorganized Debtors shall continue to reimburse the Securitization Parties for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the Securitization Parties after the Effective Date in accordance with the Securitization Documents and the Securitization Order.

### Section 2.3.    Treatment of Administrative Expense Claims

(a)    Administrative Expense Claims

Except to the extent that the applicable holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with the Reorganized Debtors, each Allowed Administrative Expense Claim shall be paid in full in Cash (i) on or as soon as reasonably practicable after the Effective Date (for Claims Allowed as of the Effective Date), (ii) on or as soon as practicable after the date such Claim is Allowed (or upon such other terms as may be agreed upon by such holder and the applicable Reorganized Debtor) or (iii) as otherwise ordered by the Bankruptcy Court.

Allowed Administrative Expense Claims regarding assumed agreements, obligations incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and non-ordinary course obligations approved by the Bankruptcy Court shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such Claims.

(b)    Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Reorganized Debtors, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to Section 7.1 hereof.

(c)    Prepetition Lender Adequate Protection Claim

The portion of the Prepetition Lender Adequate Protection Claim that accrued between the Petition Date and June 22, 2016 shall be deemed to have been waived pursuant to the Plan; *provided,* that such waiver shall be null and void *ab initio* if (i) the Creditors' Committee or any creditor is granted standing to pursue any action on behalf of the Debtors' estates and (ii) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction is entered that precludes the Debtors from settling any such action on behalf the Debtors' estates. The portion of the Prepetition Lender Adequate Protection Claim that accrues between June 23, 2016 and the Effective Date shall either (x) reduce the amount of Cash and New Prairie Holdings Stock distributed to holders of General Unsecured Claims as set forth in Article 3 of the Plan or, otherwise, (y) be deemed to have been waived.

### Section 2.4.    Treatment of Priority Tax Claims

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such

holder agree to less favorable treatment with the Reorganized Debtors, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (i) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Reorganized Debtors shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

## ARTICLE 3
### CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the DIP Order), or required by applicable non-bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.  For the purpose of classification and treatment under the Plan, (i) any Claim, other than a Prairie Holdings Claim, in respect of which one Debtor is the primary obligor and one or more additional Debtors are guarantors shall be treated as a single Claim against the primary obligor and (ii) any Claim, other than a Prairie Holdings Claim, in respect of which multiple Debtors are jointly liable shall be treated as a single Claim against only one of the jointly liable Debtors.

### Section 3.1.    Classes and Treatment of Claims Against and Interests in the Debtors

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one chart.

The following table designates the classes of Claims against and Interests in the Debtors and specifies which of those classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan.[4]

| Class | Designation | Plan Treatment of Allowed Claims | Status | Voting Rights |
|-------|-------------|----------------------------------|--------|---------------|
| 1A-71A | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall be entitled to payment in full in Cash; or other treatment that will render the Claim Unimpaired. | Unimpaired | Deemed to Accept |
| 1B-71B | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall be entitled to Payment in full in Cash; Reinstatement of the legal, equitable and contractual rights of the holder of such Claim; a distribution of the proceeds of the sale or disposition of the Collateral securing such Claim, in each case, solely to the extent of the value of the holder's secured interest in such Collateral; return of Collateral securing such Claim; or other treatment that will render the Claim Unimpaired. | Unimpaired | Deemed to Accept |
| 1C-71C | First Lien Credit Facility Secured Claims | Each holder of an Allowed First Lien Credit Facility Secured Claim shall be entitled to receive its Ratable Share of (i) total Cash payment equal to $114,796,527.78 *less* the amount of the Adequate Protection Payments; (ii) $326.5 million in principal amount of New First Lien Debt; and (ii) 100% of the New Common Stock, subject to dilution pursuant to the Management Incentive Plan. | Impaired | Entitled to Vote |

---

[4] The information in the table is provided in summary form, and is qualified in its entirety by Section 3.2 below.

| Class | Designation | Plan Treatment of Allowed Claims | Status | Voting Rights |
|---|---|---|---|---|
| 1D-70D | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim (including First Lien Credit Facility Deficiency Claims) shall be entitled to receive its Ratable Share of $33.4 million in Cash *less* (a) Excess Lender Challenge Fees and (b) a fair allocation of all payments made in respect of DIP Facility Claims, Administrative Expense Claims and Priority Claims, in each case, whether paid during the course of the Chapter 11 Cases or pursuant to the Plan; *provided*, that if (a) the Creditors' Committee or any Creditor is granted standing to pursue any action on behalf of the Debtors' estates, (b) holders of General Unsecured Claims do not vote to approve the Plan or (c) the Creditors' Committee objects to confirmation of the Plan, such Cash distribution shall also be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided*, *further*, that the holders of First Lien Credit Facility Deficiency Claims against Arch Coal shall waive their distributions on account of First Lien Credit Facility Deficiency Claims and all Cash that would have otherwise been distributed on account of First Lien Credit Facility Deficiency Claims shall be retained by the Debtors. | Impaired | Entitled to Vote |
| 1E | Prairie Holdings GUC Claims | If a Knight Hawk Encumbrance Order has been entered, no distribution. Otherwise, each holder of an Allowed Prairie Holdings GUC Claim (including First Lien Credit Facility Claims against Prairie Holdings) shall be entitled to receive its Ratable Share of the New Prairie Holdings Stock; *provided*, that the New Prairie Holdings Stock to be distributed to holders of Allowed Prairie | Impaired | Entitled to Vote |

28

| Class | Designation | Plan Treatment of Allowed Claims | Status | Voting Rights |
|---|---|---|---|---|
| | | Holdings GUC Claims (other than First Lien Credit Facility Claims against Prairie Holdings) shall be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided*, *further*, that (i) each holder of a First Lien Credit Facility Claim shall be deemed to contribute any New Prairie Holdings Stock received on account of such claim to Reorganized Arch Coal; and (ii) each holder of a Prairie Holdings GUC Claim (other than First Lien Credit Facility Claims) may elect to receive Cash in the amount equal to [ ]% of its Prairie Holdings GUC Claim in lieu of the New Prairie Holdings Stock that they would have otherwise received on account of such claim. Such elections will be honored beginning with the electing holder of the lowest amount of Prairie Holdings GUC Claims and proceeding to electing holders of successively higher amounts of Prairie Holdings GUC Claims until the Prairie Holdings GUC Cash is exhausted, with the New Prairie Holdings Shares that would have been distributed to such electing holders instead distributed to Reorganized Arch Coal. Once the Prairie Holdings GUC Cash is exhausted, all remaining electing holders shall receive the treatment they would have received if not for the election. | | |
| 1F-71F | Section 510(b) Claims | No distribution. | Impaired | Deemed to Reject |
| 1G | Interests in Arch Coal | No distribution. | Impaired | Deemed to Reject |

29

| Class | Designation | Plan Treatment of Allowed Claims | Status | Voting Rights |
|-------|-------------|----------------------------------|--------|---------------|
| 2G | Interests in Prairie Holdings | If a Knight Hawk Encumbrance Order has been entered, Reinstated. Otherwise, canceled. | Impaired | Deemed to Reject |
| 3G-71G | Interests in Subsidiary Debtors other than Prairie Holdings | Reinstated or canceled. | Unimpaired | Deemed to Accept |

### Section 3.2.  Treatment of Claims Against and Interests in the Debtors

(a)  Other Priority Claims (Class 1A-71A)

Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof) with the applicable Reorganized Debtor, each holder of an Allowed Other Priority Claim against any of the Debtors shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Claim, Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim shall otherwise be rendered Unimpaired, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) 20 calendar days after the date such Claim becomes Allowed and (iii) the date for payment provided by any applicable agreement between the Reorganized Debtors and the holder of such Claim.

(b)  Other Secured Claims (Class 1B-71B)

Except to the extent that the applicable Creditor agrees to less favorable treatment with the applicable Reorganized Debtor, each holder of an Allowed Other Secured Claim shall receive, at the sole option of the applicable Reorganized Debtor, and in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, one of the following treatments: (i) payment in Cash in the amount of such Allowed Other Secured Claim, (ii) Reinstatement of the legal, equitable and contractual rights of the holder relating to such Allowed Other Secured Claim, (iii) a distribution of the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim solely to the extent of the value of the holder's secured interest in such Collateral, (iv) a distribution of the Collateral securing such Allowed Other Secured Claim without representation or warranty by or recourse against the Debtors or Reorganized Debtors or (v) such other treatment as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  If an Other Secured Claim is satisfied under clause (i), (iii), (iv) or (v), the Liens securing such Other Secured Claim shall be deemed released without further action by any party.  Each holder of an Allowed Other Secured Claim shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

Any distributions made pursuant to this Section 3.2 shall be made on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) 20 calendar days after the date

such Claim becomes Allowed and (iii) the date for payment provided by any agreement between the applicable Debtor and the holder of such Claim.

(c)      First Lien Credit Facility Secured Claims (Class 1C-71C)

The First Lien Credit Facility Secured Claims are Allowed in the principal amount of $1,886,125,000 (plus accrued and unpaid interest as of the Petition Date), *plus* any other amounts and obligations payable under the First Lien Transaction Documents as of the Petition Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person or Entity.

On the Effective Date, each holder of an Allowed First Lien Credit Facility Secured Claim shall be entitled to receive its Ratable Share of (i) total Cash payment equal to $114,796,527.78 *less* the amount of the Adequate Protection Payments; (ii) $326.5 million in principal amount of New First Lien Debt; and (iii) 100% of the New Common Stock, subject to dilution pursuant to the Management Incentive Plan.

(d)      General Unsecured Claims (Class 1D-70D)

(i)      Each holder of an Allowed General Unsecured Claim (including First Lien Credit Facility Deficiency Claims) shall be entitled to receive its Ratable Share of $33.4 million in Cash *less* (a) Excess Lender Challenge Fees and (b) a fair allocation of all payments made in respect of DIP Facility Claims, Administrative Expense Claims and Priority Claims, in each case, whether paid during the course of the Chapter 11 Cases or pursuant to the Plan; *provided*, that if (a) the Creditors' Committee or any Creditor is granted standing to pursue any action on behalf of the Debtors' estates, (b) holders of General Unsecured Claims do not vote to approve the Plan or (c) the Creditors' Committee objects to confirmation of the Plan, such Cash distribution shall also be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided*, *further*, that the holders of First Lien Credit Facility Deficiency Claims against Arch Coal shall waive their distributions on account of First Lien Credit Facility Deficiency Claims and all Cash that would have otherwise been distributed on account of First Lien Credit Facility Deficiency Claims shall be retained by the Debtors.

(ii)      Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof), each holder of a General Unsecured Claim that is Disputed as of the Effective Date and becomes an Allowed General Unsecured Claim after the Effective Date, shall receive, on or as soon as reasonably practicable after the Distribution Date that is at least 20 calendar days after such General Unsecured Claim becomes an Allowed General Unsecured Claim, its Ratable Share of the consideration described above.

(iii)      Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof), on any Interim Distribution Date upon which an Adjustment Distribution is to be distributed, the Disbursing Agent shall effect a distribution, so

31

that each holder of an Allowed General Unsecured Claim shall have received, after giving effect to all prior distributions made to such Allowed Claim under the Plan, its Ratable Share of the consideration described above, on or as soon as reasonably practicable after such Interim Distribution Date.

(e)    Prairie Holdings GUC Claims (Class 1E)

If a Knight Hawk Encumbrance Order has been entered, no distribution.  Otherwise, each holder of an Allowed Prairie Holdings GUC Claim (including First Lien Credit Facility Claims against Prairie Holdings) shall be entitled to receive its Ratable Share of the New Prairie Holdings Stock; *provided*, that the New Prairie Holdings Stock to be distributed to holders of Allowed Prairie Holdings GUC Claims (other than First Lien Credit Facility Claims against Prairie Holdings) shall be reduced by the Prepetition Lender Adequate Protection Claim (other than any portion of the Prepetition Lender Adequate Protection Claim that has been waived pursuant to Section 2.3(c) hereof) in an amount to be determined by order of the Bankruptcy Court; *provided*, *further*, that (i) each holder of a First Lien Credit Facility Claim shall be deemed to contribute any New Prairie Holdings Stock received on account of such claim to Reorganized Arch Coal; and (ii) each holder of a Prairie Holdings GUC Claim (other than First Lien Credit Facility Claims) may elect to receive Cash in the amount equal to [  ]% of its Prairie Holdings GUC Claim in lieu of the New Prairie Holdings Stock that they would have otherwise received on account of such claim.  Such elections will be honored beginning with the electing holder of the lowest amount of Prairie Holdings GUC Claims and proceeding to electing holders of successively higher amounts of Prairie Holdings GUC Claims until the Prairie Holdings GUC Cash is exhausted, with the New Prairie Holdings Shares that would have been distributed to such electing holders instead distributed to Reorganized Arch Coal.  Once the Prairie Holdings GUC Cash is exhausted, all remaining electing holders shall receive the treatment they would have received if not for the election.

(f)    Section 510(b) Claims (Class 1F-71F)

The holders of Section 510(b) Claims shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.  All Section 510(b) Claims shall be canceled and extinguished.

(g)    Interests in Arch Coal (Class 1G)

The holders of Interests in Arch Coal shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.  All Interests in Arch Coal shall be canceled and extinguished.

(h)    Interests in Prairie Holdings (Class 2G)

If a Knight Hawk Encumbrance Order has been entered, the Interests in Prairie Holdings shall be reinstated.  Otherwise, all Interests in Prairie Holdings shall be canceled and extinguished, and Arch Coal shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.

(i)    Interests in Subsidiary Debtors other than Prairie Holdings (Class 3G-71G)

32

The Interests in the Subsidiary Debtors other than Prairie Holdings shall be, in Reorganized Arch Coal's sole discretion, Reinstated or canceled on the Effective Date or as soon thereafter as reasonably practicable.

### Section 3.3.    Treatment of Intercompany Claims

In accordance with and giving effect to the provisions of section 1124(1) of the Bankruptcy Code, Intercompany Claims are Unimpaired by the Plan. However, the Debtors retain the right to eliminate or adjust any Intercompany Claims as of the Effective Date by offset, cancellation, contribution or otherwise. In no event shall Intercompany Claims be allowed as General Unsecured Claims or Prairie Holdings GUC Claims or entitled to any distribution of Cash, New Common Stock, New Prairie Holdings Stock and/or other equity securities of the Reorganized Debtors under the Plan.

## ARTICLE 4
### ACCEPTANCE OR REJECTION OF THE PLAN

### Section 4.1.    Voting of Claims

Each holder of a Claim in an Impaired Class that is entitled to vote on the Plan as of the Voting Record Date pursuant to Article 3 of the Plan shall be entitled to vote to accept or reject the Plan as provided in the Approval Order or any other order of the Bankruptcy Court.

### Section 4.2.    Presumed Acceptance of Plan

Other Priority Claims (Class 1A-71A), Other Secured Claims (Class 1B-71B), and Interests in Subsidiary Debtors other than Prairie Holdings (Class 3G-71G) are Unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and the votes of such holders will not be solicited.

### Section 4.3.    Presumed Rejection of Plan

Section 510(b) Claims (Class 1F-71F), Interests in Arch Coal (Class 1G) and, if a Knight Hawk Encumbrance Order has not been entered, Interests in Prairie Holdings (2G) shall not receive any distribution under the Plan on account of such Claims or Interests. Pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have rejected the Plan, and the votes of such holders will not be solicited.

### Section 4.4.    Acceptance by Impaired Classes

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan. First Lien Credit Facility Secured Claims, General Unsecured Claims and Prairie Holdings GUC Claims (Classes 1C-71C, 1D-70D and 1E) are Impaired, and the votes of holders of Claims

33

in such Classes will be solicited.  If holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

### Section 4.5.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### Section 4.6.    Consensual Confirmation

The Plan shall be deemed a separate chapter 11 plan for each Debtor.  To the extent that there is no rejecting Class of Claims in the chapter 11 plan of any Debtor, such Debtor shall seek Confirmation of its plan pursuant to section 1129(a) of the Bankruptcy Code.

### Section 4.7.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

Those Debtors whose plans contain a rejecting Class of Claims, if any, shall seek Confirmation of such plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any such rejecting Class or Classes.  Subject to Article 13 of the Plan, the Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### Section 4.8.    Severability; Reservation of Rights

Subject to Article 13 of the Plan, the Debtors reserve the right to modify or withdraw the Plan, in consultation with the Majority Consenting Lenders, in its entirety or in part, for any reason, including, without limitation, if the Plan as it applies to any particular Debtor is not confirmed.  In addition, and also subject to Article 13 of the Plan, should the Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw the Plan in its entirety, in part or as to a particular Debtor, in consultation with the Majority Consenting Lenders.  Without limiting the foregoing, if the Debtors withdraw the Plan as to any particular Debtor because the Plan as to such Debtor fails to be accepted by the requisite number and amount of Claims voting or due to the Bankruptcy Court, for any reason, denying Confirmation as to such Debtor, then at the option of such Debtor, in consultation with the Majority Consenting Lenders, (i) the Chapter 11 Case for such Debtor may be dismissed or (ii) such Debtor's assets may be sold to another Debtor, such sale to be effective at or before the Effective Date of the Plan of the Debtor transferee, and the sale price shall be paid to the seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by the Debtors and approved by the Bankruptcy Court.

# ARTICLE 5

## IMPLEMENTATION OF THE PLAN

### Section 5.1.    Continued Organizational Existence

Except as otherwise provided in the Plan and subject to the Restructuring Transactions, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal Entity, each with all the powers of a limited liability company or a corporation, as applicable, under the laws of its respective jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law.

### Section 5.2.    Section 1145 Exemption

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the offering, issuance and distribution of the New Common Stock and the New Prairie Holdings Stock (if any) shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act. In addition, any securities contemplated by the Plan and any and all agreements incorporated herein, including the New Common Stock and the New Prairie Holdings Stock (if any) shall be subject to compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such New Common Stock or New Prairie Holdings Stock (if any) and applicable regulatory approval, if any. The New Common Stock and New Prairie Holdings Stock (if any) will be distributed pursuant to the Plan.

### Section 5.3.    Authorization of New Common Stock

On the Effective Date, the New Certificate of Incorporation shall have provided for sufficient shares of authorized New Common Stock to effectuate the issuances of New Common Stock contemplated by the Plan, including and in connection with the implementation of the Management Incentive Plan, and Reorganized Arch Coal shall issue or reserve for issuance a sufficient number of shares of New Common Stock to effectuate such issuances. The shares of New Common Stock issued in connection with the Plan and the Management Incentive Plan shall be authorized without the need for further corporate action or without any further action by any Person or Entity, and once issued, shall be duly authorized and validly issued, fully paid and non-assessable.

Any share of New Common Stock issued to a Creditor of any Subsidiary Debtor shall be treated as (i) a contribution of cash by Reorganized Arch Coal to the applicable Debtor in the amount equal to the fair market value of such New Common Stock, followed by (ii) the issuance of New Common Stock by Reorganized Arch Coal to the applicable Debtor in return for such cash, followed by (iii) the transfer of the New Common Stock by the applicable Debtor to the applicable Creditor.

**Section 5.4.    Authorization of New Prairie Holdings Stock**

Provided that a Knight Hawk Encumbrance Order has not been entered, on the Effective Date, the certificate of incorporation of Prairie Holdings shall have provided for sufficient shares of authorized New Prairie Holdings Stock to effectuate the issuances of New Prairie Holdings Stock contemplated by the Plan, and Reorganized Prairie Holdings shall issue or reserve for issuance a sufficient number of shares of New Prairie Holdings Stock to effectuate such issuances.  Any shares of New Prairie Holdings Stock issued in connection with the Plan shall be authorized without the need for further corporate action or without any further action by any Person or Entity, and once issued, shall be duly authorized and validly issued, fully paid and non-assessable.

**Section 5.5.    Cancellation of Existing Securities and Related Agreements, the Indentures and the Credit Agreement**

On the Effective Date, except as otherwise specifically provided for in this Plan, all rights of any holder of Claims against, or Interests in, the Debtors, including options or warrants to purchase Interests, obligating the Debtors to issue, transfer or sell Interests of the Debtors, shall be canceled.  As a condition precedent to receiving any distribution on account of its Notes Claim, each record holder of Notes shall be deemed to have surrendered its Notes or other documentation underlying each Notes Claim, and all such surrendered Notes and other documentation shall be deemed to be cancelled pursuant to this Section, except to the extent otherwise provided herein.

Each Indenture shall terminate as of the Effective Date, except as necessary to (i) enforce the rights, Claims and interests of the applicable Indenture Trustee vis-a-vis any parties other than the Debtors (ii) to allow each Indenture Trustee to receive distributions under the Plan and to distribute them to the holders of the Notes in accordance with the terms of the Indentures and (iii) to preserve any rights of the applicable Indenture Trustee as against any money or property distributable to the holders of Notes, including any priority in respect of payment and the right to exercise any charging lien.  Except for the foregoing, the Indenture Trustees and their respective agents shall be relieved of all further duties and responsibilities related to the Indentures and the Plan, except with respect to such other rights of such Indenture Trustees that, pursuant to the Indentures, survive the termination of the Indentures. Subsequent to the performance by each Indenture Trustee of its obligations pursuant to the Plan, each Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the applicable Indenture. Nothing contained herein shall impair the rights of any Indenture Trustee to assert any applicable charging lien.

Except as otherwise set forth herein, the First Lien Credit Agreement shall terminate as of the Effective Date, except as necessary to (i) enforce the rights, Claims and interests of the First Lien Agent and any predecessor thereof vis-a-vis the Lenders and any parties other than the Debtors, (ii) to allow the First Lien Agent to receive distributions under the Plan and to distribute them to the First Lien Lenders in accordance with the terms of the First Lien Credit Agreement and (iii) preserve any rights of the First Lien Agent and any predecessor thereof as against any money or property distributable to holders of First Lien Credit Facility Claims, including any priority in respect of payment and the right to exercise any charging lien; *provided*, *however*, that

36

the obligation of the Debtors under Sections 5.9 and 11.3 of the First Lien Credit Agreement shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order; and *provided*, *further*, *however*, that the Debtors reserve all rights with respect to the application of such sections and any other section of the First Lien Credit Agreement to any predecessor of the First Lien Agent.  Except for the foregoing, the First Lien Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Credit Agreement and the Plan, except with respect to such other rights of the First Lien Agent that, pursuant to the First Lien Credit Agreement, survive the termination of the First Lien Credit Agreement. Subsequent to the performance by the First Lien Agent of its obligations pursuant to the Plan, the First Lien Agent and its agents shall be relieved of all further duties and responsibilities related to the First Lien Credit Agreement.

### Section 5.6.    Financing and Restructuring Transactions

(a)    New First Lien Credit Facility

On or before the Effective Date, Reorganized Arch Coal shall enter into the New First Lien Credit Facility, and, subject to the satisfaction of the DIP Facility Claims, the First Lien Credit Facility Secured Claims and the Other Secured Claims in accordance herewith, grant the Liens and security interests provided for in the New First Lien Credit Agreement.   The Reorganized Debtors that are the guarantors under the New First Lien Credit Facility shall issue the guarantees and grant the Liens and security interests as provided therein.  The New First Lien Credit Facility shall be (i) on terms and conditions substantially as set forth in the Plan Supplement, (ii) in accordance with the terms set forth in Exhibit A to the Restructuring Support Agreement and (iii) otherwise reasonably acceptable to the Majority Consenting Lenders.

(b)    Securitization Facility

On the Effective Date, the Securitization Facility shall either be reinstated on terms acceptable to the Securitization Parties in their sole discretion and reasonably acceptable to the Majority Consenting Lenders or be replaced with a new securitization facility on terms set forth in the Plan Supplement and otherwise reasonably acceptable to the Majority Consenting Lenders.

(c)    Certain Reclamation Obligations

In accordance with the *Stipulation and Order Concerning Debtors' Reclamation Bonding of their Surface Coal Mining Operations in Wyoming* [ECF No. 432], the $75 million superpriority claim of the State of Wyoming and the Wyoming Department of Environmental Quality against each of Arch Western Resources, LLC, Thunder Basin Coal Company, L.L.C., Arch of Wyoming, LLC and Energy Development Co. shall terminate on the Effective Date.

(d)    Dissolution or Transfer of Prairie Coal Company, LLC

Provided that a Knight Hawk Encumbrance Order has not been entered, as determined by the Debtors in their sole discretion, on or prior to the Effective Date, either (i) the assets of Prairie Coal Company shall be transferred to a Reorganized Debtor other than Prairie Holdings and Prairie Coal Company shall be dissolved or (ii) the Interests in Prairie Coal Company shall

37

be transferred by Prairie Holdings to another Reorganized Debtor that is designated by the Debtors in their sole discretion.

(e)    Restructuring Transactions

On the Effective Date, contemporaneously with the cancellation and discharge of all Claims pursuant to the Plan and the issuance of the New Common Stock, the Reorganized Debtors may effect corporate restructurings of their respective businesses, including actions acceptable to the Majority Consenting Lenders in their reasonable discretion to simplify, reorganize and rationalize the overall reorganized organizational structure of the Reorganized Debtors (together, the "**Restructuring Transactions**").  The Restructuring Transactions may include (i) dissolving companies or creating new companies, (ii) merging, dissolving, transferring assets or otherwise consolidating any of the Debtors in furtherance of the Plan, or engaging in any other transaction in furtherance of the Plan, (iii) executing and delivering appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, liquidation, domestication, continuation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (iv) executing and delivering appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (v) filing appropriate certificates or articles of merger, consolidation or dissolution or other filings or recordings pursuant to applicable state law; and (vi) taking any other action acceptable to the Majority Consenting Lenders in their reasonable discretion in connection with such organizational restructurings.  In each case in which the surviving, resulting or acquiring Entity in any of these transactions is a successor to a Reorganized Debtor, such surviving, resulting or acquiring Entity will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan, including the assumption of the surviving obligations to the DIP Agent and the DIP Lenders as set forth herein, and paying or otherwise satisfying the applicable Allowed Claims.  Implementation of any Restructuring Transactions shall not affect any performance obligations, distributions, discharges, exculpations, releases or injunctions set forth in the Plan.

## ARTICLE 6
### PROVISIONS GOVERNING DISTRIBUTIONS

**Section 6.1.    Disbursing Agent**

The Debtors or Reorganized Debtors may retain a Disbursing Agent to assist with the distributions to be made under the Plan as directed by the Debtors or Reorganized Debtors. The Disbursing Agent shall make all distributions required under this Plan, except as to a Creditor whose distribution is to be administered by a Servicer, which distributions shall be deposited with the appropriate Servicer for distribution to Creditors in accordance with the provisions of this Plan and the terms of the governing agreement. Distributions on account of such Claims shall be deemed completed upon delivery to the appropriate Servicer; *provided*, *however*, that if any Servicer is unable to make or consents to the Disbursing Agent making such distributions, the Disbursing Agent, with such Servicer's cooperation, shall make such distributions to the extent reasonably practicable to do so.  The DIP Agent, the First Lien Agent and the applicable

38

Indenture Trustee will each be considered a Servicer for the DIP Facility Claims, the First Lien Credit Facility Claims and the applicable Notes Claims, respectively.

Notwithstanding anything to the contrary herein, all distributions of New Prairie Holdings Stock (if any) related to or on account of the Notes shall be accomplished in accordance with the customary practices of the transfer agent for the New Prairie Holdings Stock (if any) and in accordance with any applicable procedures of DTC. Each Indenture Trustee shall cooperate in the administration of distributions in accordance with the Plan and the applicable Indenture. No Indenture Trustee shall be required to give any bond, surety or other security for the performance of its duties with respect to the administration and implementation of distributions.

The Reorganized Debtors shall be authorized, without further Bankruptcy Court approval, but not directed to, reimburse any Servicer for its reasonable, documented, actual and customary out-of-pocket expenses incurred in providing postpetition services directly related to distributions pursuant to the Plan.

### Section 6.2.    Timing and Delivery of Distributions

(a)      Timing

Subject to any reserves or holdbacks established pursuant to the Plan, and taking into account the matters discussed in Section 6.3 of the Plan, on the appropriate Distribution Date or as soon as practicable thereafter, holders of Allowed Claims against all Debtors shall receive the distributions provided for Allowed Claims in the applicable Classes as of such date.

If and to the extent there are Disputed Claims as of the Effective Date, distributions on account of such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in the Plan with respect to the treatment of Allowed Claims on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after each such Claim is Allowed; *provided*, *however*, that distributions on account of the Claims set forth in Article 3 of the Plan shall be made as set forth therein and Professional Fee Claims shall be made as soon as reasonably practicable after such Claims are Allowed by the Bankruptcy Court or as provided in any other applicable order of the Bankruptcy Court.  Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Final Distribution Date.

(b)      *De Minimis* Distributions

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor the Disbursing Agent shall have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Disbursing Agent from the relevant recipient at the addresses set forth in Section 15.12 hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim.  *De minimis* distributions for which no such request is timely received shall revert to Reorganized Arch Coal.  Upon such reversion, the relevant Allowed Claim (and any Claim on

account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor any Disbursing Agent shall have any obligation to make a particular distribution to a specific holder of an Allowed Claim if such holder is also the holder of a Disputed Claim.

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor any Disbursing Agent shall have any obligation to make any distributions on any Interim Distribution Date unless the sum of all distributions authorized to be made to all holders of Allowed Claims on such Interim Distribution Date exceeds $100,000 in value.

(c)     Fractional Shares

Notwithstanding any other provision of the Plan, no fractional shares of New Common Stock or New Prairie Holdings Stock shall be distributed; *provided*, *however*, that any fractional shares of New Common Stock or New Prairie Holdings Stock shall be rounded down to the next whole number or zero, as applicable, and no consideration shall be provided in lieu of fractional shares that are rounded down.

(d)     Delivery of Distributions – Allowed Claims

Distributions shall only be made to the record holders of Allowed Claims as of the Distribution Record Date.  On the Distribution Record Date, at the close of business for the relevant register, all registers maintained by the Debtors, Reorganized Debtors, any Servicers, the Disbursing Agent, the Indenture Trustees and each of the foregoing's respective agents, successors and assigns shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan.   The Debtors, Reorganized Debtors, Servicers, Disbursing Agent, Indenture Trustees and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from the Plan (or for any other purpose), any Claims that are transferred after the Distribution Record Date.  Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Distribution Record Date, irrespective of the number of distributions made under the Plan or the date of such distributions.  Furthermore, if a Claim is transferred 20 or fewer calendar days before the Distribution Record Date, the Disbursing Agent or applicable Servicer, as applicable, shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

If any dispute arises as to the identity of a holder of an Allowed Claim that is entitled to receive a distribution pursuant to the Plan, the Disbursing Agent or applicable Servicer may, in lieu of making such distribution to such Person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a distribution to a holder of an Allowed Claim may be made by the Disbursing Agent in its sole discretion:  (i) to the address set forth on the first page of the Proof of Claim filed by such holder (or at the last known address of such holder if no

40

Proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) to the address set forth in any written notice of an address change delivered to the Disbursing Agent after the date of any related Proof of Claim, (iii) to the address set forth on the Schedules, if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of an address change or (iv) to the address of any counsel that has appeared in the Chapter 11 Cases on such holder's behalf.  In the case of a holder whose Claim is governed by an agreement and administered by a Servicer, the applicable Servicer shall make the distribution to the address contained in the official records of such Servicer.

      (e)      Delivery of Distributions – Allowed First Lien Credit Facility Claims

All distributions of Cash on account of First Lien Credit Facility Claims shall be deposited with the First Lien Agent, as Servicer, for distribution to holders of First Lien Facility Claims in accordance with the terms of the First Lien Transaction Documents.  All distributions other than of Cash on account of First Lien Credit Facility Claims may, with the consent of the First Lien Agent, be made by the Disbursing Agent directly to holders of First Lien Credit Facility Claims in accordance with the terms of the Plan.  The Reorganized Debtors shall reimburse the First Lien Agent for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan.

      (f)      Delivery of Distributions – Allowed Notes Claims; Surrender of Canceled Instruments or Securities

Subject to the provisions of Section 5.5 of the Plan, as to any holder of an Allowed Notes Claim that is held in the name of, or by a nominee of, DTC, the Debtors and the Reorganized Debtors shall seek the cooperation of DTC to provide appropriate instructions to the applicable Indenture Trustee and such distribution shall be made through a mandatory and/or voluntary exchange on or as soon as practicable on or after the Effective Date.

### Section 6.3.    Manner of Payment Under Plan

      (a)      At the Disbursing Agent's option, any Cash payment may be made by check, wire transfer or any other customary payment method.

      (b)      The Disbursing Agent shall distribute New Common Stock, New Prairie Holdings Stock or Cash as required under the Plan.  Where the applicable Reorganized Debtor is a Reorganized Subsidiary Debtor, Reorganized Arch Coal shall be deemed to have made a direct capital contribution to the applicable Reorganized Subsidiary Debtor of an amount of Cash to be distributed to the Creditors of such Reorganized Debtor, but only at such time as, and to the extent that, such amounts are actually distributed to holders of Allowed Claims. Any distributions of New Common Stock, New Prairie Holdings Stock or Cash that revert to Reorganized Arch Coal or are otherwise canceled (such as to the extent any distributions have not been claimed within one year) shall revest solely in Reorganized Arch Coal, and no other Reorganized Debtor shall have (nor shall it be considered to ever have had) any ownership interest in the amounts distributed.

(c)      Allocation of Plan Distributions Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

(d)      Compliance Matters

In connection with the Plan, each Debtor, each Reorganized Debtor and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Debtor, each Reorganized Debtor and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms that the Debtors or the Reorganized Debtors, as applicable, believe are reasonable and appropriate.  For tax purposes, distributions received with respect to Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

The Debtors, the Reorganized Debtors and the Disbursing Agent, as applicable, reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

(e)      Foreign Currency Exchange Rate

As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (New York time), midrange spot rate of exchange for the applicable currency as published in the *Wall Street Journal*, National Edition, on the day after the Petition Date.

**Section 6.4.    Undeliverable or Non-Negotiated Distributions**

If any distribution is returned as undeliverable, no further distributions to the applicable Creditor shall be made unless and until the Disbursing Agent or appropriate Servicer is notified in writing of such Creditor's then-current address, at which time the undelivered distribution shall be made to such Creditor without interest or dividends.  Undeliverable distributions shall be returned to Reorganized Arch Coal until such distributions are claimed.  All undeliverable distributions under the Plan that remain unclaimed for one year after attempted distribution shall indefeasibly revert to Reorganized Arch Coal.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

42

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 120 calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the holder of the relevant Allowed Claim within the 120-calendar-day period.  After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to Reorganized Arch Coal, notwithstanding any federal or state escheat laws to the contrary.

### Section 6.5.    Claims Paid or Payable by Third Parties

(a)        Claims Paid by Third Parties

To the extent a Creditor receives a distribution on account of a Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Creditor shall, within 30 calendar days of receipt thereof, repay and/or return the distribution to the applicable Reorganized Debtor, to the extent the Creditor's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such distribution under the Plan.

A Claim may be adjusted or expunged on the official claims register, without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Creditor receives payment in full or in part on account of such Claim; *provided*, *however*, that to the extent the non-Debtor party making the payment is subrogated to the Creditor's Claim, the non-Debtor party shall have a 30-calendar-day grace period following payment in full to notify the Solicitation and Claims Agent of such subrogation rights.

(b)        Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agrees (or if and to the extent any such insurer is required by a court or other tribunal of competent jurisdiction) to satisfy any Claim, then immediately upon such court or other tribunal determination or insurers' agreement, such Claim may be expunged (to the extent of any agreed-upon or determined satisfaction) on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### ARTICLE 7
### FILING OF ADMINISTRATIVE EXPENSE CLAIMS

### Section 7.1.    Professional Fee Claims

(a)        Final Fee Applications

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 60 calendar days after the Confirmation Date.  Such requests shall be filed with the Bankruptcy Court and served as required by the Interim Compensation Order; *provided* that if any Professional is unable to file its own request with the

43

Bankruptcy Court, such Professional may deliver an original, executed copy and an electronic copy to the Debtors' attorneys and the Reorganized Debtors at least three Business Days before the deadline, and the Debtors' attorneys shall file such request with the Bankruptcy Court. The objection deadline relating to a Final Fee Application shall be 4:00 p.m. (prevailing Central Time) on the date that is 30 calendar days after the filing of such Final Fee Application, and a hearing on such Final Fee Application, if necessary, shall be held no later than 30 calendar days after the objection deadline. Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed or in accordance with any other applicable Order.

(b)     Payment of Interim Amounts

Professionals shall be paid pursuant to the Interim Compensation Order with respect to all calendar months ending before the Confirmation Date and, for the month in which the Confirmation Date occurred, the Confirmation Date and the days prior to the Confirmation Date.

(c)     Post-Confirmation Date Fees

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors may employ and pay all Professionals without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

**Section 7.2.     Administrative Expense Claims**

(a)     A notice setting forth the Administrative Expense Claim Bar Date will be (i) filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (ii) posted on the Debtors' Case Information Website. No other notice of the Administrative Expense Claim Bar Date will be provided.

(b)     All requests for payment of Administrative Expense Claims that accrued on or before the Effective Date (other than Professional Fee Claims, which are subject to the provisions of Section 7.1 of the Plan) must be filed with the Solicitation and Claims Agent and served on counsel for the Debtors and Reorganized Debtors by the Administrative Expense Claim Bar Date. Any requests for payment of Administrative Expense Claims pursuant to this Section 7.2 that are not properly filed and served by the Administrative Expense Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.

(c)     The Reorganized Debtors, in their sole discretion, shall have exclusive authority to settle Administrative Expense Claims without further Bankruptcy Court approval.

(d)     Unless the Debtors or the Reorganized Debtors object to a timely filed and properly served Administrative Expense Claim by the Claims Objection Deadline, such Administrative Expense Claim shall be deemed allowed in the amount requested. If the Debtors or the Reorganized Debtors object to an Administrative Expense Claim, the parties may confer to

44

try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

(e)    Notwithstanding the foregoing, requests for payment of Administrative Expense Claims need not be filed for Administrative Expense Claims that (i) are for goods or services provided to the Debtors in the ordinary course of business, (ii) previously have been Allowed by Final Order of the Bankruptcy Court, (iii) are for Cure amounts, (iv) are on account of postpetition taxes (including any related penalties or interest) owed by the Debtors or the Reorganized Debtors to any Governmental Unit or (v) the Debtors or Reorganized Debtors have otherwise agreed in writing do not require such a filing.

# ARTICLE 8
## DISPUTED CLAIMS

### Section 8.1.    Objections to Claims

(a)    After the Effective Date, the Reorganized Debtors shall have the sole authority to object to all Claims against the Debtors; *provided*, *however*, that the Reorganized Debtors shall not be entitled to object to any Claim that has been expressly allowed by Final Order or under the Plan.  Any objections to Claims shall be filed on the Bankruptcy Court's docket on or before the Claims Objection Deadline.

(b)    Claims objections filed before, on or after the Effective Date shall be filed, served and administered in accordance with the Claims Objection Procedures Order; *provided*, *however*, that, on and after the Effective Date, filings and notices need only be served on the relevant claimants.

### Section 8.2.    Resolution of Disputed Claims

On and after the Effective Date, the Reorganized Debtors shall have the sole authority to litigate, compromise, settle, otherwise resolve or withdraw any objections to all Claims against the Debtors and to compromise and settle any such Claims without notice to or approval by the Bankruptcy Court or any other party.

### Section 8.3.    Estimation of Claims and Interests

The Debtors or Reorganized Debtors may determine, resolve and otherwise adjudicate all Contingent Claims, Unliquidated Claims and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' or Reorganized Debtors' choice having jurisdiction over the validity, nature or amount thereof.  The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any of the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or

Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim, and the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, *however*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

### Section 8.4.    Payments and Distributions for Disputed Claims

(a)    No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, no payments or distributions shall be made for a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

(b)    Disputed Claims Reserve

(i)    On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall hold in reserve (the "**Disputed Claims Reserve**") the amount of Cash as would likely have been distributed to the holders of all Disputed Claims as if such Disputed Claims had been Allowed on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (A) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the nonduplicative Proof of Claim, or (if no proof of such Claim was filed) listed by the Debtors in the Schedules, (B) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court, or (C) the amount otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, and the holder of such Disputed Claim for distribution purposes. With respect to all Disputed Claims that are General Unsecured Claims and are unliquidated or contingent and for which no dollar amount is asserted on a Proof of Claim, the Debtors will reserve Cash equal to the amount reasonably determined by the Reorganized Debtors.

(ii)    The Disbursing Agent may, at the direction of the Debtors or the Reorganized Debtors, adjust the Disputed Claims Reserve to reflect all earnings thereon (net of any expenses relating thereto, such expenses including any taxes imposed thereon or otherwise payable by the reserve), to be distributed on the Distribution Dates, as required by the Plan. The Disbursing Agent shall hold in the Disputed Claims Reserve all dividends, payments and other distributions made on account of, as well as any obligations arising from, the property held in the

46

Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise.  The taxes imposed on the Disputed Claims Reserve (if any) shall be paid by the Disbursing Agent from the property held in the Disputed Claims Reserve, and the Reorganized Debtors shall have no liability for such taxes.

(iii)    After any reasonable determination by the Reorganized Debtors that the Disputed Claims Reserve should be adjusted downward in accordance with Section 8.4(b)(i) of the Plan, the Disbursing Agent shall, at the direction of the Debtors or the Reorganized Debtors, effect a distribution in the amount of such adjustment as required by the Plan (an "**Adjustment Distribution**"), and any date of such distribution shall be an Interim Distribution Date.

(iv)    After all Disputed Claims have become either Allowed Claims or Disallowed Claims and all distributions required pursuant to Section 8.4(c) of the Plan have been made, the Disbursing Agent shall, at the direction of the Reorganized Debtors, effect a final distribution of the Cash remaining in the Disputed Claims Reserve, if any.

(v)    It is expected that the Disbursing Agent will (A) make an election pursuant to United States Treasury Regulations section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section and (B) allocate taxable income or loss to the Disputed Claims Reserve with respect to any taxable year that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims).  The affected holders of the Disputed Claims shall be bound by such election, if made by the Disbursing Agent.  For federal income tax purposes, absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Disbursing Agent shall, to the extent permitted by applicable law, report consistently with the foregoing characterization for state and local income tax purposes.  All affected holders of Disputed Claims shall report, for income tax purposes, consistently with the foregoing.

(c)    Distributions After Allowance

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will, out of the Disputed Claims Reserve, distribute to the holder thereof the distribution, if any, to which such holder is entitled under the Plan in accordance with Section 6.2(a) of the Plan.  Subject to Section 8.6 of the Plan, all distributions made under this Section 8.4(c) on account of Allowed Claims will be made together with any dividends, payments or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the Disputed Claims Reserve as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to holders of Allowed Claims included in the applicable class under the Plan.

### Section 8.5.    No Amendments to Claims

A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, the Local Rules or applicable non-bankruptcy law.  On or after the Confirmation Date, the holder of a Claim (other than an Administrative Expense Claim or a

Professional Fee Claim) must obtain prior authorization from the Bankruptcy Court or Reorganized Debtors to file or amend a Claim. Any new or amended Claim (other than Rejection Claims) filed after the Confirmation Date without such prior authorization will not appear on the official claims register and will be deemed disallowed in full and expunged without any action required of the Debtors or the Reorganized Debtors and without the need for any court order.

### Section 8.6.    No Interest

Other than as provided by section 506(b) of the Bankruptcy Code or as specifically provided for in the Plan, the Confirmation Order, the DIP Order or with respect to the DIP Facility, postpetition interest shall not accrue or be paid on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Claim or Disputed Claim for the period from and after the Effective Date; *provided*, *however*, that nothing in this Section 8.6 shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

## ARTICLE 9
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Section 9.1.    Rejection of Executory Contracts and Unexpired Leases

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each executory contract and unexpired lease to which any Debtor is a party shall be deemed automatically rejected by the Debtors effective as of the Effective Date, except for any executory contract or unexpired lease that (i) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date, (ii) is the subject of a motion to assume or reject pending on the Effective Date, (iii) is assumed, rejected or otherwise treated pursuant to Section 9.3 of the Plan, (iv) is listed on Schedule 9.2(a) or 9.2(b) of the Plan or (v) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline. If an executory contract or unexpired lease either (x) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date or (y) is the subject of a motion to assume or reject pending on the Confirmation Date, then the listing of any such executory contract or unexpired lease on the aforementioned schedules shall be of no effect.

### Section 9.2.    Schedules of Executory Contracts and Unexpired Leases

(a)      Schedules 9.2(a) and 9.2(b) of the Plan shall be filed by the Debtors as specified in Section 15.5 of the Plan and shall represent the Debtors' then-current good-faith belief regarding the intended treatment of all executory contracts and unexpired leases listed thereon; *provided*, that the Debtors shall not seek to assume or reject any material executory contract or material unexpired lease of non-residential real property without the consent of the Consenting Lenders and consulting with the Creditors' Committee. The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the Confirmation Hearing, or such earlier time as may be agreed in writing between the Debtors and

48

the applicable counterparty, to (i) amend Schedules 9.2(a) and 9.2(b) to add, delete or reclassify any executory contract or unexpired lease or amend a proposed assignment and (ii) amend the Proposed Cure, in each case as to any executory contract or unexpired lease previously listed as to be assumed; *provided*, *however*, that if the Confirmation Hearing is adjourned, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments of the Confirmation Hearing; *provided*, *further* that (a) for Intercompany Contracts and agreements proposed to be rejected as of the above deadline, the Debtors reserve the right to make amendments at any time before Confirmation and (b) the Debtors may amend Schedules 9.2(a) and 9.2(b) to add, delete or reclassify any executory contracts or unexpired leases or amend proposed assignments after such date to the extent agreed with the relevant counterparties.  Pursuant to sections 365 and 1123 of the Bankruptcy Code, and except for executory contracts and unexpired leases as to which a Treatment Objection is properly filed and served by the Treatment Objection Deadline, (x) each of the executory contracts and unexpired leases listed on Schedule 9.2(a) shall be deemed assumed (and, if applicable, assigned) effective as of the Assumption Effective Date specified thereon, and the Proposed Cure specified in the notice mailed to each Assumption Party shall be the Cure and shall be deemed to satisfy fully any obligations the Debtors might have regarding such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code and (y) each of the executory contracts and unexpired leases listed on Schedule 9.2(b) shall be deemed rejected effective as of the Rejection Effective Date specified thereon.

(b)     The Debtors shall file initial versions of Schedules 9.2(a) and 9.2(b) and any amendments thereto with the Bankruptcy Court and shall serve all notices thereof only on the DIP Agent, the Consenting Lenders, the Creditors' Committee and the relevant Assumption Parties and Rejection Parties.  For any executory contract or unexpired lease first listed on Schedule 9.2(b) later than the date that is 10 calendar days before the Voting Deadline, the Debtors shall use their best efforts to notify the DIP Agent, the Consenting Lenders, the Creditors' Committee and the applicable Rejection Party promptly of such proposed treatment via facsimile, email or telephone at any notice address or number included in the relevant executory contract or unexpired lease or as otherwise timely provided in writing to the Debtors by any such counterparty or its counsel.

(c)     For any executory contracts or unexpired leases first listed on Schedule 9.2(b) later than the date that is 10 calendar days before the Voting Deadline, affected Rejection Parties shall have five calendar days from the date of such amendment to Schedule 9.2(b) to object to Confirmation of the Plan.  For any executory contracts or unexpired leases first listed on Schedule 9.2(b) later than the date that is five calendar days before the Confirmation Hearing, affected Rejection Parties shall have until the Confirmation Hearing to object to Confirmation of the Plan.

(d)     The listing of any contract or lease on Schedule 9.2(a) or 9.2(b) is not an admission that such contract or lease is an executory contract or unexpired lease or that any Debtor has any liability thereunder.  The Debtors reserve the right to assert that any of the agreements listed on Schedule 9.2(a) or 9.2(b) are not executory contracts or unexpired leases.

**Section 9.3.    Categories of Executory Contracts and Unexpired Leases to Be Assumed**

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each of the executory contracts and unexpired leases within the following categories shall be deemed assumed as of the Effective Date (and the Proposed Cure for each, other than the Surety Bonds and the D&O Liability Insurance Policies, shall be zero dollars), except for any such executory contract or unexpired lease (i) that has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (ii) that is the subject of a motion to assume or reject pending on the Confirmation Date, (iii) that is listed on Schedule 9.2(a) or 9.2(b), (iv) that is otherwise expressly assumed or rejected pursuant to the terms of the Plan or (v) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline.

(a)    Customer Programs, Foreign Agreements, Insurance Plans, Intercompany Contracts, Surety Bonds and Workers' Compensation Plans

Subject to the terms of the first paragraph of this Section 9.3, each Customer Program, Foreign Agreement, Insurance Plan, Intercompany Contract, Surety Bond and Workers' Compensation Plan shall be deemed assumed in its entirety effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each category of contracts listed in the prior sentence. Nothing contained in Section 9.3(a) shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Entity, including, without limitation, the insurer under any of the Insurance Plans.  All Proofs of Claim on account of or in respect of any agreement covered by this Section 9.3(a) shall be deemed withdrawn automatically on the Effective Date without any further notice to or action by the Bankruptcy Court.

(i)  No Impairment of Rights Under Insurance Plans and Workers' Compensation Plans

Nothing in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order or any other document related to any of the foregoing (including, without limitation, Sections 9.4 and 9.7 of the Plan, any provision that purports to be preemptory or supervening or grants an injunction or release, or requires a party to opt out of any releases): (A) alters the rights and obligations of the Debtors, the Debtors' insurers and/or third party administrators (or any of their respective affiliates) under any Insurance Plans or Workers' Compensation Plans, (including, but not limited to, (i) any agreement to arbitrate disputes, (ii) any provisions regarding the provision, maintenance, use, nature and priority of collateral/security, (iii) any provisions regarding the payment of amounts within any deductible by the Debtors' insurers and/or third party administrators and the obligation of the Debtors to pay or reimburse the applicable insurer and/or third party administrator therefor; and (iv) any provision regarding notice of claims and settlements and the rights and duties with respect to the defense and settlement of claims); (B) modifies the coverage provided under any Insurance Plans  or Workers' Compensation Plans or the terms and conditions thereof except that on and after the Effective Date, the Reorganized Debtors shall become and remain liable in full for all of the Debtors' obligations under the Insurance Plans and Workers' Compensation Plans regardless of whether such obligations arise before or after the Effective Date without the requirement or need

50

for any insurer and/or third party administrator to file an Administrative Claim or Treatment Objection; or (C) releases or impairs the claims or collateral of the insurers or third party administrators under the Insurance Plans and/or Workers' Compensation Plans. Any rights or obligations under the Insurance Plans and Workers' Compensation Plans shall be determined under the applicable Insurance Plans or Workers' Compensation Plans and applicable non-bankruptcy law.

(ii)   Continuance of Workers' Compensation Claims and Direct Actions

The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 11 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit:  (A) claimants with valid workers' compensation claims under any Workers' Compensation Plan or direct action claims covered by the Insurance Plans to proceed with their claims; (B) the Debtors' insurers and/or third party administrators to administer, handle, defend, settle, and/or pay, in the  ordinary course of business and without further order of this Bankruptcy Court, (i) all valid workers' compensation claims arising under the Workers' Compensation Plans, (ii) all claims where a claimant asserts a direct claim against any of the Debtors' insurers under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (iii) all costs in relation to each of the foregoing; and (C) the insurers and third party administrators to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Plans and/or Workers' Compensation Plans in such order as the insurer or third party administrator may determine.

(b)       Directors and Officers Insurance Policies and Agreements

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan (including Section 9.4 of the Plan) to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' aforementioned assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Debtors or the Debtors' insurers, regardless of when they arise, under the D&O Liability Insurance Policies.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

(c)    Certain Indemnification Obligations

Notwithstanding anything in the Plan (including Section 9.4 of the Plan), each Indemnification Obligation to a director, officer, manager or employee who was employed by any of the Debtors in such capacity on the Effective Date or immediately prior thereto shall be deemed assumed effective as of the Effective Date.  Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (i) remain in full force and effect, (ii) not be modified, reduced, discharged, impaired or otherwise affected in any way, (iii) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not Proofs of Claim have been filed with respect to such obligations and (iv) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

Notwithstanding anything contained in the Plan, the Reorganized Debtors, in their sole discretion, may (but have no obligation to) continue to honor each Indemnification Obligation to a director, officer, manager or employee that was no longer employed by any of the Debtors in such capacity on or immediately prior to the Effective Date, unless such obligation (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) is listed on Schedule 9.2(b) of the Plan or (iii) is otherwise expressly rejected pursuant to the terms of the Plan or any Notice of Intent to Assume or Reject; *provided* that, for each such director, officer, manager or employee, the Reorganized Debtors shall be permitted to honor Indemnification Obligations solely to the extent of available coverage under the applicable D&O Liability Insurance Policy (and payable from the proceeds of such D&O Liability Insurance Policies).

(d)    Employee Benefits

As of the Effective Date, unless specifically listed on Schedule 9.2(a) or 9.2(b) or rejected or otherwise addressed by an order of the Bankruptcy Court (including, without limitation, by virtue of the Debtors having been granted the authority to terminate any such plan, policy, program or agreement or the Bankruptcy Court determining that the Debtors cannot successfully reorganize absent such termination), the Debtors and the Reorganized Debtors, in their sole discretion, may (but have no obligation to) honor, in the ordinary course of business, the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, healthcare benefits, disability benefits, deferred compensation benefits, travel benefits (including retiree travel benefits), vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for incentive compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time.  To the extent that the above-listed contracts, agreements, policies, programs and plans are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless a Treatment Objection is timely filed and properly served, each of them will be deemed assumed (as modified or terminated) as of the Effective Date with a Cure of zero dollars.  However, notwithstanding anything else herein, the assumed plans shall be subject to modification in accordance with the terms thereof at the discretion of the Reorganized Debtors.  Notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors shall honor, in the ordinary course of business, (i) the change-in-control agreements among the Debtors and certain of their employees

52

(as described in the Debtors' proxy statement dated March 20, 2015 pursuant to Section 14(a) of the Exchange Act), as amended (the "**Change-in-Control Agreements**") and (ii) all awards granted in respect of the annual incentive compensation program and the performance unit component of the long-term incentive performance plan as approved by the Debtors' board of directors prior to May 31, 2016. To the extent any of the agreements or awards in the foregoing sentence is an executory contract, it shall be deemed assumed (or, as applicable, deemed amended per the foregoing proviso and assumed) pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date with a Cure of zero dollars.

Notwithstanding anything to the contrary herein, (i) any claim by an employee of any of the Debtors under any of the Debtors' healthcare plans that arose on or prior to the Effective Date but that has not been paid on or prior to the Effective Date shall be honored by the Debtors or the Reorganized Debtors in the ordinary course of business after the Effective Date, and (ii) if the Debtors seek to modify or terminate any retiree benefits on or prior to the Effective Date, such modification or termination shall be subject to section 1114 of the Bankruptcy Code to the extent applicable.

(e)    Pension Plans

On the Effective Date, the Debtors shall assume and continue the Pension Plans. On and after the Effective Date, the Debtors shall pay PBGC premiums in accordance with 29 U.S.C. § 1307, satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082 and administer the Pension Plans in accordance with the applicable provisions of ERISA.

**Section 9.4.    Assumption and Rejection Procedures and Resolution of Treatment Objections**

(a)    Proposed Assumptions

(i)    As to any executory contract or unexpired lease to be assumed pursuant to any provision of the Plan or any Notice of Intent to Assume or Reject, unless an Assumption Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed assumed and, if applicable, assigned as of the applicable Assumption Effective Date proposed by the Debtors or Reorganized Debtors, without any further notice to or action by the Bankruptcy Court, and any obligation the Debtors or Reorganized Debtors may have to such Assumption Party with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code shall be deemed fully satisfied by the Proposed Cure, if any, which shall be the Cure.

(ii)    Any objection to the assumption or assignment of an executory contract or unexpired lease that is not timely filed and properly served shall be denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court), and any Claim relating to such assumption or assignment shall be forever barred from assertion and shall not be enforceable against any Debtor or Reorganized Debtor or their respective Estates or properties without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court, and any

obligation the Debtors or the Reorganized Debtors may have under section 365(b) of the Bankruptcy Code (over and above any Proposed Cure) shall be deemed fully satisfied, released and discharged, notwithstanding any amount or information included in the Schedules or any Proof of Claim.

(b)    Proposed Rejections

(i)    As to any executory contract or unexpired lease to be rejected pursuant to any provision of the Plan or any Notice of Intent to Assume or Reject, unless a Rejection Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed rejected as of the Rejection Effective Date proposed by the Debtors or Reorganized Debtors without any further notice to or action by the Bankruptcy Court.

(ii)    Any objection to the rejection of an executory contract or unexpired lease that is not timely filed and properly served shall be deemed denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court).

(c)    Resolution of Treatment Objections

(i)    On and after the Effective Date, the Reorganized Debtors may, in their sole discretion, settle Treatment Objections without any further notice to or action by the Bankruptcy Court or any other party (including by paying any agreed Cure amounts).

(ii)    For each executory contract or unexpired lease as to which a Treatment Objection is timely filed and properly served and that is not otherwise resolved by the parties after a reasonable period of time, the Debtors, in consultation with the Bankruptcy Court, shall schedule a hearing on such Treatment Objection and provide at least 21 calendar days' notice of such hearing to the relevant Assumption Party or Rejection Party.  Unless the Bankruptcy Court expressly orders or the parties agree otherwise, any assumption or rejection approved by the Bankruptcy Court notwithstanding a Treatment Objection shall be effective as of the Assumption Effective Date or Rejection Effective Date originally proposed by the Debtors or specified in the Plan.

(iii)    Any Cure shall be paid as soon as reasonably practicable following the entry of a Final Order resolving an assumption dispute and/or approving an assumption (and, if applicable, assignment), unless the Debtors or Reorganized Debtors file a Notice of Intent to Assume or Reject under Section 9.4(d).

(iv)    No Cure shall be allowed for a penalty rate or default rate of interest, each to the extent not proper under the Bankruptcy Code or applicable law.

(d)    Reservation of Rights

If a Treatment Objection is filed regarding any executory contract or unexpired lease sought to be assumed or rejected by any of the Reorganized Debtors, the Reorganized Debtors reserve the right (i) to seek to assume or reject such agreement at any time before the

54

assumption, rejection or assignment of, or Cure for, such agreement is determined by Final Order and (ii) to the extent a Final Order is entered resolving a dispute as to Cure or the permissibility of assignment (but not approving the assumption of the executory contract or unexpired lease sought to be assumed), to seek to reject such agreement within 14 calendar days after the date of such Final Order, in each case by filing with the Bankruptcy Court and serving upon the applicable Assumption Party or Rejection Party, as the case may be, a Notice of Intent to Assume or Reject.

### Section 9.5.    Rejection Claims

Any Rejection Claim must be filed with the Solicitation and Claims Agent by the Rejection Bar Date.  Any Rejection Claim for which a Proof of Claim is not properly filed and served by the Rejection Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective Estates or properties.  The Debtors or the Reorganized Debtors may contest any Rejection Claim in accordance with Section 8.1 of the Plan.

### Section 9.6.    Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned pursuant to the Plan shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.  Any assignment by the Reorganized Debtors of an executory contract or unexpired lease after the Effective Date shall be governed by the terms of the executory contract or unexpired lease and applicable non-bankruptcy law.

### Section 9.7.    Approval of Assumption, Rejection, Retention or Assignment of Executory Contracts and Unexpired Leases

(a)    Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease that is assumed (and/or assigned) pursuant to the Plan, shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms as of the applicable Assumption Effective Date, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing or providing for its assumption (and/or assignment) or applicable federal law.

55

(b)    The provisions (if any) of each executory contract or unexpired lease assumed and/or assigned pursuant to the Plan that are or may be in default shall be deemed satisfied in full by the Cure, or by an agreed-upon waiver of the Cure. Upon payment in full of the Cure, any and all Proofs of Claim based upon an executory contract or unexpired lease that has been assumed in the Chapter 11 Cases or under the terms of the Plan shall be deemed disallowed and expunged with no further action required of any party or order of the Bankruptcy Court.

(c)    Confirmation and consummation of the Plan and consummation of the Restructuring Transactions shall not constitute a change of control under any executory contract or unexpired lease assumed by the Debtors on or prior to the Effective Date, including the Change-in-Control Agreements.

### Section 9.8.    Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided by the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in remedy related to such premises, unless any of the foregoing agreements has been or is rejected pursuant to an order of the Bankruptcy Court or is otherwise rejected as part of the Plan.

Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (i) do not alter in any way the prepetition nature of the executory contracts and unexpired leases, or the validity, priority or amount of any Claims against the Debtors that may arise under the same, (ii) are not and do not create postpetition contracts or leases, (iii) do not elevate to administrative expense priority any Claims of the counterparties to the executory contracts and unexpired leases against any of the Debtors and (iv) do not entitle any Entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition executory contracts or unexpired leases and subsequent modifications, amendments, supplements or restatements.

## ARTICLE 10
### PROVISIONS REGARDING GOVERNANCE OF THE REORGANIZED DEBTORS

### Section 10.1.  Organizational Action

(a)    On and after the Effective Date, the adoption, filing, approval and ratification, as necessary, of all limited liability company, corporate or related actions contemplated hereby for each of the Reorganized Debtors, including the Restructuring Transactions, shall be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may

include: (i) the adoption and filing of an amendment to the New Certificate of Incorporation, (ii) the adoption of the New Bylaws, (iii) the adoption and filing of the Reorganized Subsidiary Debtors' Certificates of Incorporation and Reorganized Subsidiary Debtors' LLC Agreements, as applicable, (iv) the approval of the Reorganized Subsidiary Debtors' Bylaws and Reorganized Subsidiary Debtors' Operating Agreements, as applicable, (v) the election or appointment, as the case may be, of directors, officers, managers or managing members for the Reorganized Debtors, (vi) the issuance of the New Common Stock and the New Prairie Holdings Stock (if any), (vii) the Restructuring Transactions to be effectuated pursuant to the Plan and (viii) the qualification of any Reorganized Debtors as foreign corporations if and wherever the conduct of business by such entities requires such qualifications.

(b)    All matters provided for herein involving the organizational structure of any Debtor or any Reorganized Debtor, or any limited liability company or corporate action required by any Debtor or any Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder.

(c)    On or after the Effective Date, the appropriate officers of each Reorganized Debtor and members of the board of directors, board of managers or equivalent body of each Reorganized Debtor are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan in the name of and on behalf of such Reorganized Debtor and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### Section 10.2.  Organizational Documents

(a)    The New Certificate of Incorporation and the New Bylaws shall be amended or deemed amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code, including, among other purposes, to authorize the New Common Stock. After the Effective Date, the Reorganized Debtors may amend and restate their certificates of incorporation, limited liability company agreements, or other analogous organizational documents, as applicable, as permitted by applicable law.

(b)    Subject to the Restructuring Transactions, the Reorganized Subsidiary Debtors' organizational documents in effect before the Effective Date shall remain in effect after the Effective Date, *provided* that, if a Knight Hawk Encumbrance Order has not been entered, the organizational documents of Prairie Holdings shall be amended or deemed amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code, including, among other purposes, to authorize the New Prairie Holdings Stock. After the Effective Date, any of the Reorganized Debtors may file amended and restated certificates of incorporation (or other formation documents, if applicable) with the Secretary of State in any appropriate jurisdiction.

### Section 10.3.  Directors and Officers of the Reorganized Debtors

(a)      Subject to the Restructuring Transactions, on the Effective Date, the management, control and operation of each Reorganized Debtor shall become the general responsibility of the board of directors, members or managing members, as applicable, of such Reorganized Debtor or other governing body as provided in the applicable governing documents.

(b)      On the Effective Date, the term of the members of the Board shall expire and such members shall be replaced by the New Board.  The New Board will initially consist of seven members:  (i) the Chief Executive Officer; and (ii) six directors selected by the Majority Consenting Lenders in consultation with the Chief Executive Officer, at least one of which shall be independent.  The classification and composition of the New Board shall be consistent with the New Stockholders' Agreement, the New Certificate of Incorporation and the New Bylaws.  In the Plan Supplement, to the extent known, the Debtors will disclose pursuant to section 1129(a)(5) of the Bankruptcy Code the identity and affiliations of the Persons proposed to serve on the New Board.  The New Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the New Certificate of Incorporation and the New Bylaws.

(c)      Subject to the Restructuring Transactions, and except as specified in the Plan Supplement, the managers, managing members and members of the boards of directors, as applicable, of the Subsidiary Debtors before the Effective Date shall continue to serve in their current capacities as of the Effective Date.  The classification and composition of the managers, managing members and members of the boards of directors, as applicable, of the Reorganized Subsidiary Debtors shall be consistent with the Reorganized Subsidiary Debtors' LLC Agreements, the Reorganized Subsidiary Debtors' Certificates of Incorporation, the Reorganized Subsidiary Debtors' Bylaws and the Reorganized Subsidiary Debtors' Operating Agreements, as applicable.  Each such director, manager or managing member, as applicable, shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the relevant Reorganized Debtor's constituent documents.

(d)      Subject to the Restructuring Transactions and any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as otherwise specified in the Plan Supplement, the principal officers of each Debtor immediately before the Effective Date will be the officers of the corresponding Reorganized Debtor as of the Effective Date.  Each such officer shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of such Reorganized Debtor's constituent documents.

### Section 10.4.  New Stockholders' Agreements

(a)      On the Effective Date, Reorganized Arch Coal and each Person or Entity that receives New Common Stock under the Plan shall enter into or be deemed to have entered into the new stockholders' agreement substantially in the form included in the Plan Supplement by and among Reorganized Arch Coal and each Person or Entity that receives New Common Stock under this Plan.

(b)      On the Effective Date, provided that a Knight Hawk Encumbrance Order has not been entered, Reorganized Prairie Holdings and each Person or Entity that receives New Prairie Holdings Stock under the Plan shall enter into or be deemed to have entered into the Prairie Holdings Stockholders' Agreement.

# ARTICLE 11
## EFFECT OF CONFIRMATION

### Section 11.1.  Vesting of Assets

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights and privileges related thereto) of each of the Debtors shall vest in each of the respective Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests.  All Liens, Claims, encumbrances, charges and other interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and settle and compromise Claims and Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code with respect to the Debtors.

### Section 11.2.  Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, settled, discharged and compromised, and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns.  The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.

### Section 11.3.  Releases and Discharges

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by holders of Claims, constitute good-faith compromises and settlements of the matters covered thereby and are consensual.  Such compromises and settlements are made in exchange for consideration and are in the best interest of holders of Claims, are fair, equitable, reasonable and are integral elements of the resolution of the Chapter

11 Cases in accordance with the Plan.  Each of the discharge, release, indemnification and exculpation provisions set forth in the Plan (i) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(e) of title 28 of the United States Code, (ii) is an essential means of implementing the Plan, (iii) is an integral and non-severable element of the transactions incorporated into the Plan, (iv) confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their Creditors, (v) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, (vi) is fair, equitable and reasonable and in exchange for good and valuable consideration and (vii) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

### Section 11.4.  Discharge and Injunction

(a)     Except as otherwise specifically provided in the Plan or the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts of, and Claims against, the Debtors and shall terminate all Interests in the Debtors, as well as all interests of any kind, nature or description whatsoever in or against any of the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as otherwise specifically provided in the Plan or the Confirmation Order, upon the Effective Date, all existing Claims against the Debtors and Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Interests (and all representatives, trustees or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against, liabilities of and Interests in the Debtors, subject to the occurrence of the Effective Date.

(b)     Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise specifically provided in the Plan or the Confirmation Order, each holder (as well as any representatives, trustees or agents on behalf of each holder) of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Persons and Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, the Debtors.

(c)     Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims or Interests that arose prior to the Effective Date and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including, without limitation, a Section 510(b) Claim) against or Interest in the Debtors, the Reorganized Debtors or

property of any Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to the Plan, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors or property of any Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to the Plan, (iii) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors other than to enforce any right to a distribution pursuant to the Plan or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, with respect to any such Claim or Interest. Such injunction shall extend to any successors or assignees of the Debtors and Reorganized Debtors and their respective properties and interest in properties.

(d)        Nothing in the Plan or the Confirmation Order

(i)    releases, discharges, exculpates, precludes, or enjoins the enforcement of:

(A) any liability or obligation to, or any Claim or any Cause of Action by, a Governmental Unit under any applicable Environmental Law to which any Reorganized Debtor is subject to the extent that it is the owner, lessee, permittee, controller, or operator of real property or a mining operation after the Effective Date (whether or not such liability, obligation, Claim, or cause of action is based in whole or part on acts or omissions prior to the Effective Date);

(B) the obligations under the Consent Decrees in United States et al. v. Arch Coal, Inc., et al., 2:11-cv-00133 (S.D. W.Va.) and United States et al. v. Arch Coal, Inc., et al., 2:15-cv-11838 (S.D. W.Va.);

(C) any liability to a Governmental Unit under Environmental Law, the Mine Act, any state mine safety law, ERISA or other applicable police or regulatory law, in each case, that is not a Claim;

(D) any liability or obligation under the Black Lung Benefits Act, 30 U.S.C. §§ 901-944;

(E) any Claim of a Governmental Unit under any Environmental Law, ERISA, or other applicable police or regulatory law, in each case, arising after the Effective Date;

(F) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors, or any claim assertable by a Governmental Unit against any Person or Entity other than the Debtors or Reorganized Debtors;

(H) any liability under Environmental Law or ERISA on the part of any Entity other than the Debtors or Reorganized Debtors; or

(I) any valid right of setoff or recoupment by any Governmental Unit.

Notwithstanding clauses (i) and (ii) hereof, and for the avoidance of doubt, any civil penalty payable under Section V of the Consent Decree in United States et al. v. Arch Coal, Inc. et al., 2:15-cv-11838 (S.D. W. Va.) may only be enforceable as a General Unsecured Claim under the Plan.

(ii)    shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside this Bankruptcy Court, any liability described in the preceding clause (i) hereof, or shall divest any tribunal of any jurisdiction it may have under Environmental Law, ERISA, or other applicable police or regulatory law to adjudicate any defense asserted under the Plan or the Confirmation Order; or

(iii)    authorizes the transfer or assignment of any (i) license, (ii) permit, (iii) registration, (iv) lease, (v) authorization, (vi) approval, (vii) agreement, or (viii) contract, in each case, with a Governmental Unit, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under non-bankruptcy laws and regulations.

(e)    No provision of the Plan, the Confirmation Order or section 1141 of the Bankruptcy Code shall be construed to discharge, release or relieve any party, in any capacity, from liabilities under any law or regulatory provision with respect to the Pension Plans.  The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan, the Confirmation Order or section 1141 of the Bankruptcy Code.

### Section 11.5.  Term of Injunction or Stays

**Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.**

### Section 11.6.  Exculpation

**Pursuant to the Plan, and except as otherwise specifically provided in the Plan or the Confirmation Order, none of the Released Parties shall have or incur any liability to any holder of a Claim, Cause of Action or Interest for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the negotiation of any settlement or agreement, contract, instrument, release or document created or entered into in connection with the Plan or in the Chapter 11 Cases (including the Plan Supplement, the DIP Facility, the Restructuring Support Agreement and, in each case, any documents related thereto), the pursuit of confirmation of the Plan, the consummation of the Plan, the preparation and distribution of the Disclosure Statement, the offer, issuance and distribution of any securities issued or to be issued under or in connection with the Plan, any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the administration of the Plan or the property to be distributed under the Plan, except for any act or omission that is determined in a Final**

Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence. Each Released Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

Section 11.7.   Release by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including Section 11.12 of the Plan) or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors and their Estates from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, their Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, their Estates or the Reorganized Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Exchange Offers, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Support Agreement, the DIP Facility, the Loan Documents (as defined in the First Lien Credit Agreement), the New First Lien Debt Facility Documents or, in each case, related agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct, actual fraud or gross negligence; *provided*, *however*, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, then the release set forth in this Section 11.7 shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such Claim or Cause of Action; *provided further* that the immediately preceding proviso shall not apply to (i) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority or secured status of any prepetition or ordinary course administrative Claim against the Debtors, (ii) any release or

63

indemnification provided for in any settlement or granted under any other court order, (iii) any action by the DIP Agent or DIP Lenders to enforce their rights under the DIP Facility relating to Contingent DIP Obligations, or (iv) any action by the First Lien Agent or the First Lien Lenders to enforce their rights under Sections 5.9 or 11.3 of the First Lien Credit Agreement, *provided* that, in the case of (i) through (iv), the Debtors shall retain all defenses related to any such action.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 11.7 do not release any post-Effective Date obligations of any of the Released Parties under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Section 11.8.   Voluntary Releases by the Holders of Claims and Interests

Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, holders of Claims that (i) are deemed to have accepted or rejected the Plan or vote to accept or reject the Plan and (ii) are provided with a notice or Ballot, as applicable, providing them with the right to opt out of the releases contained in this Section 11.8 and (iii) do not elect to exercise such right shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Released Parties from any and all Claims, interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including those Avoidance Actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Estates, the restructuring, the Chapter 11 Cases, the DIP Facility, the Loan Documents (as defined in the First Lien Credit Agreement), the Exchange Offers, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Restructuring Support Agreement, the DIP Credit Agreement, the Plan Supplement, the New First Lien Debt Facility Documents or, in each case, related agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided* that any holder of a Claim that elects to opt out of the releases contained in this Section 11.8 shall not receive the benefit of the releases set forth in this Section 11.8 (even if for any reason otherwise entitled).  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 11.8 do not release any post-Effective Date obligations of any of the Released

Parties under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Section 11.9.  Injunction

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold or may hold Claims, interests, Causes of Action, Interests or liabilities that: (i) are subject to compromise and settlement pursuant to the terms of the Plan; (ii) have been released pursuant to Section 11.7 hereof; (iii) have been released pursuant to Section 11.8 hereof; (iv) are subject to exculpation pursuant to Section 11.6 hereof, including exculpated claims (but only to the extent of the exculpation provided in Section 11.6 hereof); or (v) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from: (A) commencing or continuing in any manner any action or other proceeding of any kind, whether directly, derivatively or otherwise, including on account of any claims, interests, Causes of Action or liabilities that have been compromised or settled against any Released Party (or the property or estate of any Released Party) on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, interests, Causes of Action or liabilities; (B) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action, or liabilities; (C) creating, perfecting or enforcing any Lien, Claim, or encumbrance of any kind against any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action, or liabilities; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action or liabilities (unless such holder has filed a timely Proof of Claim with the Bankruptcy Court preserving the right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise); and (E) commencing or continuing in any manner any action or other proceeding of any kind against any Released Party or its property on account of or in connection with or with respect to any such released, settled, compromised, or exculpated Claims, interests, Causes of Action, or liabilities released, settled or compromised pursuant to the Plan; *provided* that nothing contained herein shall preclude a Person or Entity from obtaining benefits directly and expressly provided to such Person or Entity pursuant to the terms of the Plan; *provided*, *further*, that nothing contained herein shall be construed to prevent any Person or Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

Section 11.10. Setoff and Recoupment

The Debtors and the Reorganized Debtors may, but shall not be required to, set off or recoup against any Claim and any Cash distribution to be made on account of such Claim, any and all Claims, rights and Causes of Action of any nature that the Debtors may

have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim shall constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such Claims, rights and Causes of Action that the Debtors or the Reorganized Debtors may have against the holder of such Claim.

### Section 11.11. Avoidance Actions

On the Effective Date, the Reorganized Debtors shall be deemed to waive and release (a) all Avoidance Actions against officers, directors, employees or representatives of the Debtors or the Reorganized Debtors and (b) all Avoidance Actions other than the foregoing unless such Avoidance Action is listed on Schedule 11.11; *provided* that, except as expressly provided in this Article 11 or the Confirmation Order, the Reorganized Debtors shall retain the right to assert any Claims assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Creditor. The Reorganized Debtors shall retain the right, after the Effective Date, to prosecute any of the Avoidance Actions listed on Schedule 11.11.

### Section 11.12. Preservation of Causes of Action

(a)     Except as expressly provided in this Article 11 or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors, the Reorganized Debtors or the Estates may have or that the Reorganized Debtors may choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Estates to the Debtors.

(b)     Except as set forth in this Article 11 or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)     Except as set forth in this Article 11 or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### Section 11.13. Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the

66

provisions of the Plan shall constitute a good-faith compromise of all Claims, Causes of Action and controversies relating to the contractual, legal and subordination rights that a holder of an Allowed Claim may have against any Debtor, or any distribution to be made on account of such an Allowed Claim.  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan and as a mechanism to effect a fair distribution of value to the Debtors' constituencies, except as set forth in the Plan, the provisions of the Plan shall also constitute a good-faith compromise of all Claims, Causes of Action and controversies by any Debtor against any other Debtor or against the Released Parties. In each case, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and the holders of such Claims and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, the Debtors may compromise and settle Claims against them and Causes of Action against other Entities and after the Effective Date, such right shall pass to the Reorganized Debtors.

## ARTICLE 12

### CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### Section 12.1.  Conditions to Confirmation

Confirmation of the Plan will not occur unless each of the following conditions has been satisfied or waived in accordance with Section 12.3 of the Plan:

(a)      The Confirmation Order shall be entered; and

(b)      The Plan Supplement and all of the schedules, documents and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Debtors and the Majority Consenting Lenders.

### Section 12.2.  Conditions to Effectiveness

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Section 12.3 of the Plan:

(a)      The Confirmation Order shall have been entered and shall not be subject to a stay nor have been rescinded, vacated or reversed on appeal;

(b)      The New First Lien Debt Facility Documents shall have been duly executed and delivered by the Reorganized Debtors parties thereto, and all conditions precedent to the consummation of the New First Lien Debt Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New First Lien Debt Facility shall have occurred;

(c)     All documents and agreements necessary to implement the Plan, including the Plan Supplement, shall be in form and substance reasonably acceptable to the Majority Consenting Lenders and shall each have been executed;

(d)     Any amendments, modifications or supplements to the Plan (including the Plan Supplement) shall be reasonably acceptable to the Debtors and the Majority Consenting Lenders;

(e)     All reasonable and documented fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Lenders, the DIP Agent, the First Lien Agent and the agent under the New First Lien Debt Facility incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facility and New First Lien Debt Facility and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Petition Date), in each case, that are owed pursuant to the DIP Order, shall have been paid;

(f)     The Securitization Facility shall either be reinstated on terms acceptable to the Securitization Parties in their sole discretion and reasonably acceptable to the Majority Consenting Lenders or be replaced with a new securitization facility on terms set forth in the Plan Supplement and otherwise reasonably acceptable to the Majority Consenting Lenders;

(g)     The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and that are required by law, regulation or order;

(h)     Each of the Certificate of Incorporation, the New Bylaws, the Reorganized Subsidiary Debtors' Certificates of Incorporation, the Reorganized Subsidiary Debtors' LLC Agreements, the Reorganized Subsidiary Debtors' Bylaws and the Reorganized Subsidiary Debtors' Operating Agreements, as applicable, will be in full force and effect as of the Effective Date;

(i)     A Final Order is entered determining whether Prairie Holdings' 49% membership interest in Knight Hawk Holdings, LLC constitutes Pledged Collateral (as defined in the First Lien Credit Agreement); and

(j)     The Effective Date shall be no later than 15 days after the Confirmation Date, unless such condition is waived by the Majority Consenting Lenders.

### Section 12.3.  Waiver of Conditions to Confirmation or Effectiveness

The Debtors, with the prior written consent of the Majority Consenting Lenders, may waive any of the conditions set forth in Section 12.1 or Section 12.2 hereof at any time, without any notice to other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan. The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtors as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors, in their sole discretion). The failure of the Debtors or the Majority Consenting Lenders

68

to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

# ARTICLE 13
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### Section 13.1.  Plan Modifications

(a)      Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date, *provided* that any such alteration, amendment or modification shall be reasonably acceptable to the Majority Consenting Lenders.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement or the Confirmation Order relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)      After the Confirmation Date, but before the Effective Date, the Debtors, with the consent of the Majority Consenting Lenders, may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided* that such adjustments and modifications do not materially and adversely affect the treatment of holders of Claims or Interests.

### Section 13.2.  Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of Confirmation or Effective Date

The Debtors reserve the right to revoke, withdraw or delay consideration of the Plan before the Confirmation Date, either entirely or as to any one or more of the Debtors, and to file subsequent amended plans of reorganization.  If the Plan is revoked, withdrawn or delayed as to fewer than all of the Debtors, such revocation, withdrawal or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn or delayed.  If the Debtors revoke or withdraw the Plan in its entirety or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases effected by the Plan and any document or agreement executed pursuant hereto, shall be deemed null and void and (iii) nothing contained in the Plan shall (A) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person or Entity, (B) prejudice in any manner the rights of such Debtors or any other Person or Entity or (C) constitute an admission of any sort by the Debtors or any other Person or Entity.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting executory contracts or unexpired leases.

# ARTICLE 14

## RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     To hear and determine all matters relating to the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure amounts and Claims resulting therefrom;

(b)     To hear and determine any motion, adversary proceeding, application, contested matter or other matter pending on or commenced after the Confirmation Date in the Bankruptcy Court;

(c)     To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim against any of the Debtors;

(d)     To hear and determine matters relating to the DIP Facility and the DIP Order;

(e)     To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(f)     To hear and determine all applications for compensation and reimbursement of Professional Fee Claims;

(g)     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)     To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(j)     To issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan;

70

(k)      To enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(l)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(m)      To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

(n)      To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Approval Order, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplement; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(o)      To recover all assets of the Debtors and property of the Debtors' Estates, which shall be for the benefit of the Reorganized Debtors, wherever located;

(p)      To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(q)      To hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(r)      To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity;

(s)      To hear any other matter not inconsistent with the Bankruptcy Code; and

(t)      To enter a final decree closing the Chapter 11 Cases.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against the Debtors that arose prior to the Effective Date.

## ARTICLE 15
### MISCELLANEOUS

### Section 15.1.  Exemption from Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, Transfer or exchange of notes or equity securities under the Plan, the creation, the filing or recording of any mortgage,

deed of trust or other security interest, the making, assignment, filing or recording of any lease or sublease, the transfer of title to or ownership of any of the Debtors' interests in any property, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the Plan Documents, the New Common Stock, the New Prairie Holdings Stock (if any) and any agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment in the United States. The Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### Section 15.2.  Expedited Tax Determination

The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of such Debtors or Reorganized Debtors for all taxable periods ending on or before the Effective Date.

### Section 15.3.  Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of title 28 of the United States Code and/or section 3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

### Section 15.4.  Dissolution of the Creditors' Committee

After the occurrence of the Effective Date, the Creditors' Committee's functions shall be restricted to, and shall not be heard on any issue except, applications filed pursuant to sections 330 and 331 of the Bankruptcy Code. Upon the resolution of all applications filed by the Creditors' Committee pursuant to sections 330 and 331 of the Bankruptcy Code, the Creditors' Committee shall dissolve, and the members thereof, in their capacities as such, shall be released and discharged from all rights, duties, responsibilities and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.

### Section 15.5.  Plan Supplement

Draft forms of certain Plan Documents and certain other documents, agreements, instruments, schedules and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement and filed from time to time. Unless otherwise expressly provided in the Plan, the Debtors shall file the Plan Supplement five (5) days prior to the Voting Deadline and may alter, modify or amend any Plan Supplement document in accordance with Section 13.1 of the Plan. Holders of Claims or Interests may obtain a copy of the Plan Supplement on the Debtors' Case Information Website or the Bankruptcy Court's Website.

### Section 15.6.   Claims Against Other Debtors

Nothing in the Plan or the Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim against any other Debtor.

### Section 15.7.   Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### Section 15.8.   Section 1125 of the Bankruptcy Code

As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtors and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### Section 15.9.   Severability

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### Section 15.10. Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or other federal law is applicable, or to the extent the Plan, an exhibit or a schedule hereto, a Plan Document or any settlement incorporated herein provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### Section 15.11. Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former holders of Claims against the Debtors or Interests in the Debtors and their respective heirs, executors, administrators, successors and assigns.

### Section 15.12. Notices

To be effective, any notice, request or demand to or upon, as applicable, the Debtors, the Creditors' Committee or the United States Trustee must be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

If to the Debtors:

Arch Coal, Inc.
One CityPlace Drive, Suite 300
St. Louis, Missouri 63141
Attention:     Robert G. Jones (bjones@archcoal.com)
               Rosemary L. Klein (rklein@archcoal.com)


with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:     Marshall S. Huebner (marshall.huebner@davispolk.com)
               Brian M. Resnick (brian.resnick@davispolk.com)
               Michelle M. McGreal (michelle.mcgreal@davispolk.com)
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7983

If to the United States Trustee:

Office of the United States Trustee
111 S. 10th St., Suite 6353
St. Louis, Missouri 63102-1125
Attention:     Leonora S. Long
Telephone:  (314) 539-2976

If to the Consenting Lenders:

Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
Attention:     Mark F. Liscio (mark.liscio@kayescholer.com)

Scott D. Talmadge (scott.talmadge@kayescholer.com)
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8689

-and-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:      Brian S. Hermann (bhermann@paulweiss.com)
                      Sarah Harnett (sharnett@paulweiss.com)
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

If to the Reorganized Debtors:

Arch Coal, Inc.
One CityPlace Drive, Suite 300
St. Louis, Missouri 63141
Attention:      Robert G. Jones (bjones@archcoal.com)
                      Rosemary L. Klein (rklein@archcoal.com)

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:      Marshall S. Huebner (marshall.huebner@davispolk.com)
                      Brian M. Resnick (brian.resnick@davispolk.com)
                      Michelle M. McGreal (michelle.mcgreal@davispolk.com)
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7983

If to the Creditors' Committee:

Kramer, Levin, Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10035
Attention:      Thomas Moers Mayer (tmayer@kramerlevin.com)
                      Douglas Mannal (dmannal@kramerlevin.com)
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

If to the DIP Agent:

Seward & Kissel, LLP
One Battery Park Plaza

New York, New York 10004
Attention:     Ronald L. Cohen (cohen@sewkis.com)
               Laurie Binder (binder@sewkis.com)
               Michael Tenenhaus (tenenhaus@sewkis.com)
Telephone:  (212) 574-1200
Facsimile:  (212) 480-8421

### Section 15.13. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Before the Effective Date, none of the filing of the Plan, any statement or provision contained herein or the taking of any action by the Debtors related to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors of any kind, including as to the holders of Claims or Interests or as to any treatment or classification of any contract or lease.

### Section 15.14. Further Assurances

The Debtors, the Reorganized Debtors and all holders of Claims receiving distributions hereunder and all other parties in interest may and shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### Section 15.15. Case Management Order

Except as otherwise provided herein, the Case Management Order shall remain in full force and effect, and all Court Papers (as defined in the Case Management Order) shall be filed and served in accordance with the procedures set forth in the Case Management Order; *provided* that on and after the Effective Date, Court Papers (as defined in the Case Management Order) need only be served on the attorneys for the Reorganized Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attention: Marshall S. Huebner and Michelle M. McGreal; *provided further* that final requests for payment of Professional Fee Claims filed pursuant to Section 7.1(a) of the Plan (and all Court Papers related thereto) shall also be served on (i) the Office of the United States Trustee for the Eastern District of Missouri, 111 S. 10th Street, Suite 6353, St. Louis, Missouri 63102-1125, Attention: Leonora S. Long and (ii) counsel to the Creditors' Committee, Kramer, Levin, Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10035, Attention: Thomas Moers Mayer and Douglas Mannal.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

Dated:   St. Louis, Missouri
         [●], 2016

                         Respectfully submitted,

                         Arch Coal, Inc. (for itself and on behalf of all Debtors)

                         By: _____
                             Name:
                             Title:

**Schedule A**

Debtor Entities

| | |
|---|---|
| 1. | ACI Terminal, LLC |
| 2. | Allegheny Land Company |
| 3. | Apogee Holdco, Inc. |
| 4. | Arch Coal, Inc. |
| 5. | Arch Coal Sales Company, Inc. |
| 6. | Arch Coal West, LLC |
| 7. | Arch Development, LLC |
| 8. | Arch Energy Resources, LLC |
| 9. | Arch Reclamation Services, Inc. |
| 10. | Arch Western Acquisition Corporation |
| 11. | Arch Western Acquisition, LLC |
| 12. | Arch Western Bituminous Group, LLC |
| 13. | Arch Western Finance LLC |
| 14. | Arch Western Resources, LLC |
| 15. | Arch of Wyoming, LLC |
| 16. | Ark Land Company |
| 17. | Ark Land KH, Inc. |
| 18. | Ark Land LT, Inc. |
| 19. | Ark Land WR, Inc. |
| 20. | Ashland Terminal, Inc. |
| 21. | Bronco Mining Company, Inc. |
| 22. | Catenary Coal Holdings, Inc. |
| 23. | Catenary HoldCo, Inc. |
| 24. | Coal-Mac, Inc. |
| 25. | CoalQuest Development LLC |
| 26. | Cumberland River Coal Company |
| 27. | Energy Development Co. |
| 28. | Hawthorne Coal Company, Inc. |
| 29. | Hobet Holdco, Inc. |
| 30. | Hunter Ridge, Inc. |
| 31. | Hunter Ridge Coal Company |
| 32. | Hunter Ridge Holdings, Inc. |
| 33. | ICG, Inc. |
| 34. | ICG, LLC |
| 35. | ICG Beckley, LLC |
| 36. | ICG East Kentucky, LLC |

| | |
|---|---|
| 37. | ICG Eastern, LLC |
| 38. | ICG Eastern Land, LLC |
| 39. | ICG Illinois, LLC |
| 40. | ICG Natural Resources, LLC |
| 41. | ICG Tygart Valley, LLC |
| 42. | International Coal Group, Inc. |
| 43. | Jacobs Ranch Coal LLC |
| 44. | Jacobs Ranch Holdings I LLC |
| 45. | Jacobs Ranch Holdings II LLC |
| 46. | Juliana Mining Company, Inc. |
| 47. | King Knob Coal Co., Inc. |
| 48. | Lone Mountain Processing, Inc. |
| 49. | Marine Coal Sales Company |
| 50. | Melrose Coal Company, Inc. |
| 51. | Mingo Logan Coal Company |
| 52. | Mountain Coal Company, L.L.C. |
| 53. | Mountain Gem Land, Inc. |
| 54. | Mountain Mining, Inc. |
| 55. | Mountaineer Land Company |
| 56. | Otter Creek Coal, LLC |
| 57. | Patriot Mining Company, Inc. |
| 58. | P.C. Holding, Inc. |
| 59. | Powell Mountain Energy, LLC |
| 60. | Prairie Coal Company, LLC |
| 61. | Prairie Holdings, Inc. |
| 62. | Saddleback Hills Coal Company |
| 63. | Shelby Run Mining Company, LLC |
| 64. | Simba Group, Inc. |
| 65. | Thunder Basin Coal Company, L.L.C. |
| 66. | Triton Coal Company, L.L.C. |
| 67. | Upshur Property, Inc. |
| 68. | Vindex Energy Corporation |
| 69. | Western Energy Resources, Inc. |
| 70. | White Wolf Energy, Inc. |
| 71. | Wolf Run Mining Company |

**Schedule 9.2(a)**

Executory Contracts and Unexpired Leases to Be Assumed

[TO COME]

**Schedule 9.2(b)**

Executory Contracts and Unexpired Leases to Be Rejected

[TO COME]

**Schedule 11.11**

Retained Avoidance Actions

[TO COME]

**Appendix B**

Liquidation Analysis

**ARCH COAL, INC.,** *et al*
**Appendix B:  Hypothetical Liquidation Analysis**
*Projected as of August 31, 2016*

TABLE OF CONTENTS

1.  Introduction ............................................................................................................B-1

2.  General Approach and Summary Results..............................................................B-3

3.  Notes to the Liquidation Analysis ........................................................................B-6


*Exhibit 1*        Summary of Debtors' Liquidation Analysis

# ARCH COAL, INC., *et al.*
## Hypothetical Liquidation Analysis

**1. INTRODUCTION**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (i) accepts the plan of reorganization, or (ii) receives or retains under the plan, as of the effective date of the plan, value that is not less than the value such holder would receive or retain if the applicable debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. This is often referred to as the "Best Interests Test."

The management of Arch Coal, Inc. and its subsidiaries (collectively "**Arch**," or, when referring to only those entities which are currently debtors under chapter 11 of the Bankruptcy Code, the "**Debtors**") believes that the Debtors' plan of reorganization (the "**Plan**") satisfies the Best Interests Test, and that the holders of allowed claims and equity interests in each impaired class will receive at least as much under the Plan as they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the Best Interests Test, the Debtors present the following hypothetical liquidation analysis (the "**Liquidation Analysis**"), based on certain assumptions discussed herein. The Liquidation Analysis was prepared by FTI Consulting, Inc. ("**FTI**"), one of the Debtors' professionals, with the assistance of and based on information provided by the Debtors' management and other professionals retained by the Debtors. Capitalized terms not defined herein shall have the meanings ascribed to them in the Disclosure Statement, to which this analysis is attached as Appendix C, or in the Plan.

Underlying this Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors. The Debtors believe that this Liquidation Analysis and the conclusions set forth herein are fair and accurate, and represent the best judgment of FTI and the Debtors' management with regard to the results of a hypothetical chapter 7 liquidation of the Debtors.

This Liquidation Analysis was prepared for the sole purpose of providing a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code, and it is not intended and should not be used for any other purpose. The underlying financial information in this Liquidation Analysis was not compiled or examined by any independent accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THAT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY

MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

The Liquidation Analysis assumes a hypothetical conversion of the Debtors' Chapter 11 Cases to a chapter 7 liquidation on September 30, 2016 (the "**Liquidation Date**"). Subject to certain *pro forma* adjustments as set forth herein, the balance sheets of each of the Debtors as of March 31, 2016 are used as reasonable proxies for their respective hypothetical balance sheets as of the Liquidation Date. The results of the Liquidation Analysis are summarized and attached hereto in Exhibit 1.

As substantially all of the Debtors' assets serve as collateral for the DIP Lenders, the Liquidation Analysis further assumes that a trustee must be successful in obtaining either use of cash collateral or new financing from other third parties in order to manage the chapter 7 process to its completion.

The Liquidation Analysis assumes a shutdown of operations following a conversion to chapter 7 and that no Debtor assets would be sold as going concern businesses. This assumption is made because of the Debtors' management's assessment that, in the wake of chapter 7 conversions and consequent disruption and attrition, the likelihood that the Debtors or substantial business units of the Debtors can continue operations and do so in a manner that yields material positive incremental cash flow is low. Further, this assumption considers that the Debtors' businesses are managed and run by mine complex-based business units across legal entities and localities, and certain business functions, such as sales and marketing, engineering, finance, legal, and human resources are shared across business units. These factors increase the complexity of selling business units as going concerns, as well as the difficulty of obtaining additional financing for such a sale process.

*This Liquidation Analysis sets forth the estimated values that might be obtained upon disposition of assets pursuant to a hypothetical chapter 7 liquidation, as an alternative to continued operation of the business as proposed under the Plan.* Accordingly, values discussed herein are different from amounts referred to in the Plan, which illustrates the value of the Debtors' business as a going concern.

The liquidation of all of the Debtors' assets is assumed to occur following the conversion. For purposes of the Liquidation Analysis, lower case and higher case estimates were made based on two scenarios for the liquidation:

The lower case scenario assumes forced liquidation values ("**FLV**"), wherein the Debtors are compelled by circumstances to sell their assets with a sense of immediacy. In this scenario, substantially all assets are assumed to be sold by the chapter 7 trustee within a 90-day period. Following the primary liquidation phase, an additional 12-month period is assumed to be required for the administrative completion of the chapter 7 case; and

The higher case scenario assumes orderly liquidation values ("**OLV**"), wherein circumstance enable a chapter 7 trustee a reasonable period of time to manage a process

B-2

to prepare, market, and sell assets. In this scenario, substantially all assets are assumed to be sold by the chapter 7 trustee within a 12-month period. Following the primary liquidation phase, an additional 12-month period is assumed to be required for the administrative completion of the chapter 7 case

In both scenarios, a source of funding (whether from use of cash collateral or from third-party financing) is assumed. The higher case scenario requires additional resources from the Debtors and their professionals over a longer period in order to realize greater asset values, compared to the lower case scenario. The likelihood of obtaining sufficient funding to conduct the liquidation process assumed in the either scenario is highly speculative.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of claims listed on the Debtors' Schedules and Proofs of Claim filed to date. In addition, this Liquidation Analysis includes estimates for certain costs and claims not currently asserted in these Chapter 11 Cases, but that could be asserted and allowed in a chapter 7 liquidation. These costs and Claims include those incurred to manage the chapter 7 liquidation (such as trustee and professional fees, and operational wind-down costs), and additional Administrative Expense Claims. Certain other claims that could be asserted in a chapter 7 liquidation, such as rejection damages claims for contracts that would be assumed in a chapter 11 reorganization, have been estimated based on claims filed to date and/or management's best estimates. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims. For purposes of this Liquidation Analysis, the Debtors' estimates of Allowed Claims are used. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THESE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## 2. GENERAL APPROACH AND SUMMARY RESULTS

The determination of the cost of and hypothetical proceeds from the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. The

B-3

Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code.   As previously noted, the underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.

Estimated liquidation values of all asset categories on both an FLV and OLV basis were based on the business judgment and experience of the Debtors' management and advisors.

THIS LIQUIDATION ANALYSIS ASSUMES VALUES BASED ON THE DEBTORS' BUSINESS JUDGMENT.  NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY MATERIALLY.

The Liquidation Analysis assumes that holders of Claims and Interests recover (if at all) according to their relative priority under applicable law.  The Liquidation Analysis uses the Debtors' reasonable good-faith estimates of Claims and Interests.  The Debtors recognize that conversion of these cases to a chapter 7 liquidation would trigger additional claims as well, such as postpetition accounts payable and claims that would be assumed in the Plan; however, the Debtors have not made an effort to estimate all such claims (e.g. additional General Unsecured Claims that would result from the rejection of executory contracts and unexpired leases that would likely be assumed in a chapter 11 reorganization), nor do the Debtors believe inclusion of such additional claims would have a material impact on the conclusions of the Liquidation Analysis.

The proceeds from the hypothetical liquidation of the assets of each Debtor were estimated based on the assumptions discussed below, and then applied to the estimated values of claims against each such Debtor to determine liquidation recovery estimates for each Class of Claims and Interests under the Plan.  These liquidation recovery estimates were compared to the estimated recoveries under the Plan.  As shown in the table below, for each Class of Claims or Interests, liquidation under chapter 7 of the Bankruptcy Code would yield recoveries that are no better—and, in many cases, worse— than the recoveries available pursuant to the proposed chapter 11 Plan.

B-4

| Class | Description | Estimated Recovery Under the Plan | Estimated Recovery in Liquidation | | |
|-------|-------------|-----------------------------------|------|-----|------|
|       |             |                                   | Low  | Mid | High |
|       | DIP Facility Claims | 100% | 100% | 100% | 100% |
|       | Administrative Expense Claims | 100% | 0% | 0% | 0% |
| 1A-71A | Priority Tax Claims and Other Priority Claims | 100% | 0% | 0% | 0% |
| 1B-71B | Other Secured Claims | 100% | 100% | 100% | 100% |
| 1C-71C | First Lien Credit Facility Claims | **37% - 60%** | 1% | 9% | 16% |
|       | Prepetition Lender Adequate Protection Claim | N/A | * | * | * |
| 1D-70D | General Unsecured Claims | **0.7%** | 0% | 0% | 0% |
| 1E | Prairie Holdings GUC Claims | 0 − 2% | 0% | 0% | 0% |
| 1F-71F | Section 510(b) Claims | 0% | 0% | 0% | 0% |
| 1G | Interest in Arch Coal | 0% | 0% | 0% | 0% |
| 2G | Interest in Prairie Holdings | 0% | 0% | 0% | 0% |
| 3G-72G | Interest in Subsidiary Debtors other than Prairie Holdings | N/A | 0% | 0% | 0% |

* The amount of the Prepetition Lender Adequate Protection Claim under the liquidation scenario has not been calculated and, therefore, a percentage has not been assigned.

**3.  NOTES TO THE LIQUIDATION ANALYSIS**

Summary results of the Liquidation Analysis for the Debtors are attached hereto as Exhibit 1.  The Liquidation Analysis reflects the estimated proceeds generated from the liquidation of the assets in addition to cash estimated to be held by the Debtors on the Liquidation Date (such proceeds, the "**Liquidation Proceeds**") that would be available to a chapter 7 trustee for distribution.  The trustee would use the Liquidation Proceeds to satisfy first the cost of the liquidation, including wind-down costs and trustee fees (such costs, the "**Liquidation Costs**"), and Secured Claims, Administrative Expense Claims, Priority Claims, including additional claims that are estimated to be triggered by a chapter 7 liquidation.  Any remaining net Liquidation Proceeds would then be allocated to holders of General Unsecured Claims and Equity Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.

The Liquidation Analysis provides for higher and lower recovery percentages for Claims and Interests upon the trustee's application of the Liquidation Proceeds. The higher and lower recovery ranges reflect higher and lower ranges of estimated Liquidation Proceeds from the trustee's sale of the Debtors' assets and the cost of conducting the liquidation and administering the chapter 7 case, based largely upon differences in the time allotted for monetization of assets, described previously.

*1.  Book Values*
- Unless otherwise stated, the book values used in the Liquidation Analysis are the unaudited net book values[1] of the Debtors as of March 31, 2016.  These book values, in combination with pro forma adjustments, are assumed to be representative of the Debtors' assets as of the hypothetical Liquidation Date.

- The book values have not been subject to any review, compilation or audit by an independent accounting firm.

*2.  Cash and Equivalents*
- The liquidation value for the Debtors is based on a forecasted balance of cash and equivalents as of August 31, 2016, which takes into account the projected use of cash between March 31, 2016 and the hypothetical Liquidation Date.

- The Liquidation Analysis assumes that the Debtors' operations during the liquidation period would not generate additional cash available for distribution except for proceeds from the disposition of non-cash assets.

- The liquidation value for Cash and Equivalents for all entities holding cash is estimated to be 100% of the projected net book value as of the Liquidation Date.

---

[1]  The individual balances presented herein as "unaudited" balances as of March 31, 2016 are not audited on a stand-alone basis; however, such   individual amounts agree to the Arch's general ledger and accounting records underlying the audited financial statements.

3. *Accounts Receivable*

- Virtually all of the Debtor's Coal Trade Receivables are pledged to its Securitization Facility supporting the Debtor's $200M Letter of Credit Facility. These Trade Receivables are held at Arch Receivable, LLC, which is a non-filing entity of Arch.

- The analysis of accounts receivable assumes that a chapter 7 trustee would retain certain existing staff to handle an aggressive collection effort for outstanding trade accounts receivable for the entities undergoing liquidation and the non-filing entity that holds trade receivables described above

- Included in the Wind Down Costs (described in further detail in Note: 16) as a source of cash are the assumed collections of the Trade Receivables contained in the Securitization Facility at an assumed collection rate of 85% offset by the assumed draws to outstanding letters of credit at the time of liquidation. The Debtors' trade receivables are generally concentrated among a relatively small group of comparatively large customers. The Debtors' analysis takes into consideration the risk that collections during a liquidation of the Debtors may be compromised by claims for damages for breaches of customer contracts, especially where the pricing of such contracts is below the expected replacement pricing for similar volumes.  Customers may attempt to set off outstanding amounts owed to the Debtors against such claims.

- Collectible accounts receivable primarily included miscellaneous accounts receivable. The miscellaneous accounts receivable are the only receivables on the Debtors' books and therefore the recovery percentage range is entirely dedicated to these receivables only.

- For purposes of the Liquidation Analysis, the liquidation values of accounts receivable were estimated to range from 50% to 70% of the net book values.

4. *Coal Inventory*

- The Debtors' coal inventories are composed of raw and processed coal located at various mining complexes, preparation plants, and trans-loading facilities.  This analysis assumes that raw coal inventories as of the Liquidation Date would be cleaned and processed following the conversion, and would then be saleable at the same values as processed coal, less incremental processing costs.

- Revenues from the liquidation of coal inventory would be reduced by the payment of extraction taxes and royalties.

- As domestic supply of coal has reached significant levels, the spot rate of coal has decreased substantially. In the event of liquidation, it is anticipated that due to the challenging environment in the current coal market, return on sales of inventory would be materially impaired. Furthermore, typically coal held in inventory for extended periods tends to be of lesser quality, yielding lower value in the event of a

sale. As a result of the aforementioned, it is being estimated that the recovery rate on coal inventory will be between 35% and 50%.

5. *Diesel Inventory*
- Diesel inventory consist of the net book value of diesel inventory.

- Diesel inventory assets are assumed to generate no proceeds in a liquidation scenario because the fuel is assumed to be consumed to move equipment into numerous central locations in preparation for sale.

6. *Parts & Supplies*
- Parts & Supplies consist of the net book value of parts & supplies, which include explosives, tires, steel and other raw materials as well as spare parts and other consumables used in the mining process.

- Parts & supplies used in the mining process tend to be very specialized and may be used to support equipment and machinery specific to Arch. As a result, it is estimated that the recovery rate of Parts & Supplies will be between 10% and 20%.

7. *Prepaid Royalties (Current portion)*
- Prepaid royalties consist of the net book value of prepayments to lessors for leased mineral rights recoupable against royalties owed on future revenues from the underlying coal.

- Recouping money from lessors whose leases will be broken and royalties gone unpaid is anticipated to present significant challenges. As such, no recovery is estimated for the current portion of prepaid royalties.

8. *Coal Derivative Assets*
- Coal derivative assets consist of the fair value of coal derivative instruments held for trading purposes.

- Coal derivative assets are estimated to have no recovery value as the liquidation analyses assumes we would not be able to monetize the net asset position at an amount greater than $0.

9. *Other Current Assets*
- Other current assets consists primarily of the net book value of the current portion of deferred financing costs, prepaid insurance, and capitalized long wall move costs along with various other items.

- As many items within the account such as deferred financing costs as well as other capitalized expenditures have no cash value, it is estimated that recovery rates for other current assets will be between 2% and 6%.

10. *Net Coal Properties*
- Net coal properties includes asset and accumulated depletion accounts for Land and Coal Interests, which includes leased and owned coal interests ("**Reserves**"), as well as surface land.

- In a market of extensive supply, heavy regulation, and a current plethora of assets available for sale, it is anticipated that it will be difficult to capture the value of current reserves despite the fact that the ARO liabilities associated with these assets are assumed to be funded in cash (see Note 17 related to wind-down costs). The Debtors and their advisors estimate the potential recoveries based on reserves and resources as of March 31, 2016 at an assumed price per ton range between $.01 and $1.50, predicated on location and coal type in current market conditions. Based on the Debtors' best estimates and current market conditions, it is estimated that net coal properties will recovery between 6% and 18% of asset value.

11. *Net Plant & Equipment*
- Net Plant & Equipment includes asset and accumulated depreciation accounts for fixed assets, including:
  - Buildings and Improvements, which includes preparation plants, loadouts, and land as well as leasehold and building improvements; and
  - Machinery and Equipment, which primarily consists of mining, and support equipment, as well as vehicles, power distribution equipment, and office equipment.

- Net plant & equipment is estimated to return between 4% and 10% of asset value:

  - A majority of the stationary items such as prep plants, crushers, etc. are projected to return near zero value as salvage companies would only pay for the assets what it will cost in labor to dismantle and dispose of the asset.
  - Related to moveable equipment, the market continues to be flooded with new equipment for sale. The Company had a small set of its equipment recently valued by Hilco at values ranging from 0% to 15% of current book value. The Hilco valuation was used to extrapolate across the remainder of the Debtors' mobile equipment inventory.

12. *Net Deferred Charges (CIP)*
- Net deferred charges are capitalized costs of developing new mines or significantly expanding the capacity of existing mines and are amortized using the units-of-production method over the estimated recoverable reserves that are associated with the property being benefited.

- Net deferred charges are assumed to generate no proceeds in a liquidation scenario as they are capitalized expenditures with no cash value.

13. *Deferred Income Taxes*
- Deferred income taxes consist of the net book value of deferred tax assets.

- Deferred tax assets are assumed to generate no proceeds in a liquidation scenario.

*14. Equity Investments*
- Equity investments consist of the net book value of the current interest in the following joint ventures:

    o Knight Hawk Holdings, LLC
    o Dominion Terminal Associates
    o Black Thunder Terminal

- The equity investment in Knight Hawk Holdings, LLC is assumed to generate 23% to 47% of asset value in liquidation, which was determined based on a valuation performed by PJT Partners  and reflects a forced sale discount in the lower and middle recovery case.  $0 in value is ascribed to the other investments listed above.

*15. Prepaid Royalties (Non-current portion)*
- Prepaid royalties consist of the net book value of prepayments to lessors for leased mineral rights recoupable against royalties owed on future revenues from the underlying coal.

- These particular prepaid royalties represent prepayments that are recoupable after the conclusion of liquidation and are therefore assumed to generate no proceeds in a liquidation scenario.

*16. Other Assets*
- Other assets principally represent posted cash collateral, deposits, and the insurance cash surrender value of executive deferred compensation.

- Other assets are assumed to generate 1% to 5% of asset value in liquidation.

*17. Liquidation Costs*
- Chapter 7 trustee fees are based on historical experience in other chapter 7 cases and are assumed to range from 1.5% to 3% of the asset proceeds, excluding cash and equivalents.

- Chapter 7 professional fees include the cost of attorneys, financial advisors, accountants, and other professionals retained by a chapter 7 trustee or the Creditors' Committee.  This analysis assumes that professional fees would range from $12 million to $48 million, based on an estimate of $4 million per month during the primary liquidation phase (three, seven and ½, or twelve months in the lower, middle and higher case scenarios, respectively).

- The largest projected expense of the wind-down costs is the assumed funding of the asset retirement obligations (ARO) of the Debtors. Given market conditions, the Debtors assume that in order to liquidate the net coal properties at a value greater than zero, the ARO would need to be fully funded for any potential buyer to be interested.

B-10

Therefore, the wind-down costs assume that available cash collateral, 3rd party funding, or proceeds from other asset sales are used to fund in escrow the full amount of ARO less previously bonded amounts.

- The wind-down costs also assume that all operations' workers are issued warn notices on the hypothetical conversion date and stay on staff for 60 days post-conversion to shut down the mine, mothball and remove equipment, assist with the liquidation's coal inventory, and prepare the mine for liquidation/sale. A certain level of SG&A staff will need to be retained over the liquidation period to assist the trustee and its advisers to realize the projected liquidation values and assist the trustee to maintain the Debtors' books and records and ongoing estate affairs. These resources are assumed to diminish over time as the assets are liquidated and disposed of.

- Transaction costs (such as broker or liquidator fees) related to the liquidation of owned and leased coal reserves, other land assets, and other fixed assets (principally buildings, machinery, and equipment) are not included as a separate cost of the liquidation process, but rather incorporated and netted from projected liquidation proceeds.

*18. Claims*

- The classes of claims used in the Liquidation Analysis are defined and described in the Plan and Disclosure Statement Documents, and include:

    o DIP Facility Claims: Up to $275 million in loans and estimated to be 100% recoverable under liquidation.

    o Administrative Expense Claims: This category of claims is estimated to total $264 million and includes 503(b)(9) as well as various vendor pre-petition AP and accrued expenses. These claims are not estimated to recover any amounts under liquidation.

    o Priority Claims: Assumed to total $23 million, primarily related to tax claims receiving priority status. These claims are not estimated to recover any amounts under liquidation.

    o Other Secured Claims: Estimated at $41 million and includes mobile equipment capital leases as well as a secured note payable supporting potential subsidence liability. The recoveries are estimated to be 100% as the analysis assumes that we return the collateral to the secured parties.

    o First Lien Credit Facility Claims: $1.886 billion senior secured credit facility net of $106.87 million in adequate protection interest payments made after filing. The recovery on these Claims is estimated between 1% and 16%.

    o Prepetition Lender Adequate Protection Claim: Calculated as the difference between the value of the prepetition lenders' collateral on the petition date and the expected recoveries under the liquidation scenario. While the Debtor and its advisors have not attempted to determine the petition date collateral value, the analysis assumes that this claim would far exceed the projected recovery value

B-11

range for Prairie Holdings. Thus, this claim class would capture the entire projected value recovered at Prairie Holdings.

o Prairie Holdings GUC Claims: Estimated at approximately $5.24 billion, comprised of borrower guarantees on the following debts:
- First Lien Credit Facility: $1.886 billion
- Second Lien Notes: $364 million
- Unsecured Bonds: $2.987 billion

These claims are not estimated to recover any amounts under liquidation.

o General Unsecured Claims: Estimated at approximately $3.75 billion. These claims are not estimated to recover any amounts under liquidation and include:
- $3.35 billion in unsecured note and bond claims
- $355 million related to the present value of contract rejections/liquidated damages claims
- $40 million of other pre-petition General Unsecured Claims
- $747 to $1,185 million of First Lien Credit Facility Deficiency Claim range

**Exhibit 1**

Summary of Debtors' Liquidation Analysis

Arch Coal, Inc. (Consolidated)

### *Summary of Liquidation Analysis*

| ($ in millions) | Footnotes: | Book Value | Estimated Recovery Rates | | | Estimated Recovery Values | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Liquidation Proceeds:** | | | | | | | | |
| Cash and cash equivalents | 2 | $ 531 | 100% | 100% | 100% | $ 531 | $ 531 | $ 531 |
| Short term investments | 2 | 201 | 100% | 100% | 100% | 201 | 201 | 201 |
| Accounts Receivable | 3 | 8 | 50% | 60% | 70% | 4 | 5 | 6 |
| Coal Inventory | 4 | 86 | 35% | 43% | 50% | 30 | 37 | 43 |
| Diesel Inventory | 5 | 1 | 0% | 0% | 0% | - | - | - |
| Parts & Supplies | 6 | 109 | 10% | 15% | 20% | 11 | 16 | 22 |
| Prepaid Royalties | 7 | 8 | 0% | 0% | 0% | - | - | - |
| Coal Derivative Assets | 8 | 6 | 0% | 0% | 0% | - | - | - |
| Other Current Assets | 9 | 42 | 2% | 4% | 6% | 1 | 2 | 3 |
| Net Coal Properties | 10 | 2,346 | 6% | 12% | 18% | 134 | 274 | 414 |
| Net Plant & Equipment | 11 | 869 | 4% | 7% | 10% | 35 | 61 | 87 |
| Net Deferred Charges (CIP) | 12 | 272 | 0% | 0% | 0% | - | - | - |
| Deferred Income Taxes | 13 | 0 | 0% | 0% | 0% | - | - | - |
| Equity Investments | 14 | 202 | 23% | 34% | 47% | 46 | 68 | 95 |
| Prepaid Royalties | 15 | 21 | 0% | 0% | 0% | - | - | - |
| Other Assets | 16 | 57 | 1% | 3% | 5% | 1 | 2 | 3 |
| **Total Assets/Gross Proceeds** | | $ 4,759 | **21%** | **25%** | **29%** | $ 993 | $ 1,196 | $ 1,404 |
| | | | | | | | | |
| *Less Liquidation Costs:* | | | | | | | | |
| Trustee Fees | 17 | | | | | (4) | (10) | (20) |
| Professional Fees | 17 | | | | | (12) | (30) | (48) |
| Wind-down Costs | 17 | | | | | (590) | (621) | (653) |
| **Total Liquidation Costs** | | | | | | $ (606) | $ (662) | $ (721) |
| | | | | | | | | |
| **Net Liquidation Proceeds** | | | | | | $ 386 | $ 534 | $ 683 |

| | | Estimated Claims | Estimated Recovery Rates | | | Estimated Recovery Values | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| *Estimated Claims and Recoveries:* | | | | | | | | |
| *Secured claims* | 18 | | | | | | | |
| DIP Facility Claims | | 275 | 100% | 100% | 100% | 275 | 275 | 275 |
| First Lien Credit Facility Claims | | 1,779 | 1% | 9% | 16% | 27 | 155 | 279 |
| Other Secured Claims | | 41 | 100% | 100% | 100% | 41 | 41 | 41 |
| **Total Secured Claims** | | $ 2,096 | | | | $ 343 | $ 471 | $ 596 |
| | | | | | | | | |
| *Prepetition Lender Adequate Protection Claim* | | [1] | N/A | N/A | N/A | 43 | 63 | 87 |
| | | | | | | | | |
| *Administrative Expense Claims* | | 264 | 0% | 0% | 0% | - | - | - |
| | | | | | | | | |
| *Priority Tax Claims and Other Priority Claims* | | 23 | 0% | 0% | 0% | - | - | - |
| | | | | | | | | |
| *Prairie Holdings GUC Claims* | | 5,237 | 0% | 0% | 0% | - | - | - |
| | | | | | | | | |
| *General Unsecured Claims* | | 4,493 - 4,931 | 0% | 0% | 0% | - | - | - |
| | | | | | | | | |
| **Total Claims and Recoveries** | | 12,112 - 12,550 | | | | $ 386 | $ 534 | $ 683 |

[1] The prepetition lender adequate protection claim, under this liquidation scenario, would far exceed the projected recovery value range for Knight Hawk and therefore, all projected value would flow to the first lien lenders.

Prairie Holdings, Inc.

***Summary of Liquidation Analysis***

| ($ in millions) | Footnotes: | Book Value | Estimated Recovery Rates | | | Estimated Recovery Values | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Liquidation Proceeds:** | | | | | | | | |
| Cash and cash equivalents | 2 | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Short term investments | 2 | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable | 3 | - | 0% | 0% | 0% | - | - | - |
| Coal Inventory | 4 | - | 0% | 0% | 0% | - | - | - |
| Diesel Inventory | 5 | - | 0% | 0% | 0% | - | - | - |
| Parts & Supplies | 6 | - | 0% | 0% | 0% | - | - | - |
| Prepaid Royalties | 7 | - | 0% | 0% | 0% | - | - | - |
| Coal Derivative Assets | 8 | - | 0% | 0% | 0% | - | - | - |
| Other Current Assets | 9 | - | 0% | 0% | 0% | - | - | - |
| Net Coal Properties | 10 | - | 0% | 0% | 0% | - | - | - |
| Net Plant & Equipment | 11 | - | 0% | 0% | 0% | - | - | - |
| Net Deferred Charges (CIP) | 12 | - | 0% | 0% | 0% | - | - | - |
| Deferred Income Taxes | 13 | - | 0% | 0% | 0% | - | - | - |
| Equity Investments | 14 | 151 | 31% | 45% | 63% | 46 | 68 | 95 |
| Prepaid Royalties | 15 | - | 0% | 0% | 0% | - | - | - |
| Other Assets | 16 | 0 | 1% | 3% | 5% | 0 | 0 | 0 |
| **Total Assets/Gross Proceeds** | | $ 151 | 31% | 45% | 63% | $ 46 | $ 68 | $ 95 |
| | | | | | | | | |
| **_Less Liquidation Costs:_** | | | | | | | | |
| Trustee Fees | 17 | | | | | (1) | (2) | (3) |
| Professional Fees | 17 | | | | | (2) | (4) | (5) |
| Wind-down Costs | 17 | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | | $ (3) | $ (5) | $ (8) |
| | | | | | | | | |
| **Net Liquidation Proceeds** | | | | | | $ 43 | $ 63 | $ 87 |

| ***Estimated Claims and Recoveries:*** | Estimated Claims | Estimated Recovery Rates | | | Estimated Recovery Values | | |
|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High |
| *Prepetition Lender Adequate Protection Claim* | [1] | N/A | N/A | N/A | 43 | 63 | 87 |
| *Prairie Holdings GUC Claims* | 5,237 | 0% | 0% | 0% | - | - | - |
| **Total Claims and Recoveries** | $ 5,237 | | | | $ 43 | $ 63 | $ 87 |

[1] The prepetition lender adequate protection claim, under this liquidation scenario, would far exceed the projected recovery value range for Knight Hawk and therefore, all projected value would flow to the first lien lenders.

**Filing Entities (less Prairie Holdings, Inc.)**

*Summary of Liquidation Analysis*

| ($ in millions) | Footnotes: | Book Value | Estimated Recovery Rates | | | Estimated Recovery Values | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Liquidation Proceeds:** | | | | | | | | |
| Cash and cash equivalents | 2 | $ 531 | 100% | 100% | 100% | $ 531 | $ 531 | $ 531 |
| Short term investments | 2 | 201 | 100% | 100% | 100% | 201 | 201 | 201 |
| Accounts Receivable | 3 | 8 | 50% | 60% | 70% | 4 | 5 | 6 |
| Coal Inventory | 4 | 86 | 35% | 43% | 50% | 30 | 37 | 43 |
| Diesel Inventory | 5 | 1 | 0% | 0% | 0% | - | - | - |
| Parts & Supplies | 6 | 109 | 10% | 15% | 20% | 11 | 16 | 22 |
| Prepaid Royalties | 7 | 8 | 0% | 0% | 0% | - | - | - |
| Coal Derivative Assets | 8 | 6 | 0% | 0% | 0% | - | - | - |
| Other Current Assets | 9 | 42 | 2% | 4% | 6% | 1 | 2 | 3 |
| Net Coal Properties | 10 | 2,346 | 6% | 12% | 18% | 134 | 274 | 414 |
| Net Plant & Equipment | 11 | 869 | 4% | 7% | 10% | 35 | 61 | 87 |
| Net Deferred Charges (CIP) | 12 | 272 | 0% | 0% | 0% | - | - | - |
| Deferred Income Taxes | 13 | 0 | 0% | 0% | 0% | - | - | - |
| Equity Investments | 14 | 51 | 0% | 0% | 0% | - | - | - |
| Prepaid Royalties | 15 | 21 | 0% | 0% | 0% | - | - | - |
| Other Assets | 16 | 57 | 1% | 3% | 5% | 1 | 2 | 3 |
| **Total Assets/Gross Proceeds** | | $ 4,608 | 21% | 24% | 28% | $ 947 | $ 1,128 | $ 1,309 |
| | | | | | | | | |
| *Less Liquidation Costs:* | | | | | | | | |
| Trustee Fees | 17 | | | | | (3) | (9) | (17) |
| Professional Fees | 17 | | | | | (10) | (27) | (43) |
| Wind-down Costs | 17 | | | | | (590) | (621) | (653) |
| **Total Liquidation Costs** | | | | | | $ (604) | $ (657) | $ (713) |
| | | | | | | | | |
| **Net Liquidation Proceeds** | | | | | | $ 343 | $ 471 | $ 596 |

| | Estimated Claims | Estimated Recovery Rates | | | Estimated Recovery Values | | |
|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High |
| *Estimated Claims and Recoveries:* | | | | | | | |
| *Secured claims* | 18 | | | | | | |
| DIP Facility Claims | 275 | 100% | 100% | 100% | 275 | 275 | 275 |
| First Lien Credit Facility Claims | 1,779 | 1% | 9% | 16% | 27 | 155 | 279 |
| Other Secured Claims | 41 | 100% | 100% | 100% | 41 | 41 | 41 |
| **Total Secured Claims** | $ 2,096 | | | | $ 343 | $ 471 | $ 596 |
| | | | | | | | |
| *Administrative Expense Claims* | 264 | 0% | 0% | 0% | - | - | - |
| | | | | | | | |
| *Priority Tax Claims and Other Priority Claims* | 23 | 0% | 0% | 0% | - | - | - |
| | | | | | | | |
| *General Unsecured Claims* | 4,493 - 4,931 | 0% | 0% | 0% | - | - | - |
| | | | | | | | |
| **Total Claims and Recoveries** | 6,875 - 7,313 | | | | $ 343 | $ 471 | $ 596 |

# Appendix C

Financial Projections

## FINANCIAL PROJECTIONS

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared financial projections (the "Projections") for the years 2016 through 2018 (the "Projection Period").  The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations. The Debtors' board of directors was not asked to, and thus did not, approve the Projections or evaluate or endorse the Projections or the assumptions underlying the Projections.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF FRESH START ACCOUNTING, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, DO NOT ASSUME RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN THE

DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

**Key Income Statement Assumptions:**

I.   *Total Tons Sold* – Projected tons sold are the aggregation of both contracted and uncontracted tons expected to be sold.  Total tons sold are projected to increase over the Projection Period.

    a.  *Contracted Tons* – Tons to be sold for which buyers have already entered contracts.

    b.  *Uncontracted Tons* – Tons to be sold for which buyers have yet to enter contracts and selling prices have yet to be determined.

| ($/ ton, tons in mm) | 2016 | 2017 | 2018 |
|---|---|---|---|
| Committed Tons | 85 | 51 | 21 |
| Uncommitted Tons | 22 | 66 | 100 |
| **Total Tons Sold** | **107** | **117** | **120** |
| | | | |
| *Contracted Tons %* | *80%* | *44%* | *17%* |
| *Uncontracted Tons %* | *20%* | *56%* | *83%* |
| | | | |
| *Memo: Average Realized Price by Region* | | | |
| PRB | $12.69 | $12.23 | $12.37 |
| Appalachia | 53.00 | 54.12 | 60.70 |
| Bituminous Thermal | 29.20 | 31.87 | 33.23 |

II.   *Coal Sales* – Comprises revenue from coal sales, based on forecasted future pricing for each of the Company's various coal qualities.  Sales are based upon currently contracted sales, estimates of projected uncontracted tons sold, and forecasted pricing at each mining complex.

III.   *Cost of Coal Sales* – Production costs associated with the Company's mining of coal. Production costs are expected to decline as a percentage of revenue due to operating leverage.

IV.   *Selling, General and Administrative Expenses ("SG&A")* – SG&A expenses include all expenses related to corporate management and joint facility functions.  SG&A expenses are expected to increase at roughly the pace of inflation.

V.   *Depreciation, Depletion, and Amortization ("DD&A")* – DD&A expenses relate to declines in long-lived assets, including plant, equipment, and coal reserves.  DD&A expenses do not reflect the impact of fresh start accounting.

VI.   *Non-Operating Expenses* – Represents professional fees incurred and expected to be incurred during the Chapter 11 cases.

VII.    *Net Interest Expense* – Includes cash interest paid on the DIP loan and adequate protection payments made on the term loan during the Chapter 11 cases as well as cash interest payments on post-emergence debt, interest income, and other interest expense.

VIII.   *Income Taxes* – Federal and state income tax obligation.  Income taxes do not reflect the impact of cancellation of debt income and the effect on the Company's various tax attributes.

## Key Cash Flow Statement Assumptions

I.      *Interest and Fees on Funded Debt* - Includes cash interest and fees paid on the DIP loan and post-emergence debt.

II.     *Professional Fees* – Represents professional fees incurred and expected to be incurred during the Chapter 11 cases.

III.    *Change in Net Working Capital and Other* – Reflects changes in working capital accounts and accruals.

IV.     *Capital Expenditures* – Capital expenditures comprise cash outflows primarily for continued investment in mine development, mining equipment and maintenance costs.

V.      *Investment in JVs* – Investments in the Company's joint ventures, including Millennium Bulk Terminal.

VI.     *Adequate Protection Payments* – Reflects cash payments to term loan during the chapter 11 cases.

VII.    *Cash Distribution to Term Lenders* – Reflects cash paid upon emergence to the Term Lenders pursuant to the Restructuring Support Agreement.

VIII.   *Cash Posted as Collateral* – Reflects cash posted or released from the Company's A/R Securitization Facility. Excludes any cash required to be posted as collateral upon emergence.

## Key Balance Sheet Assumptions

I.      No fresh start accounting reflected.

II.     *New First Lien Debt* – Reflects take-back paper provided to the Term Lenders pursuant to the Restructuring Support Agreement.

## Summary Income Statement[1]

| ($ in millions) | 2016F | 2017F | 2018F |
|---|---|---|---|
| Coal Sales | $1,933 | $2,029 | $2,250 |
| Less: Cost of Coal Sales | (1,740) | (1,794) | (1,945) |
| **Gross Profit** | **$192** | **$235** | **$305** |
| *% Margin* | *10%* | *12%* | *14%* |
| | | | |
| Less: SG&A | (87) | (88) | (89) |
| Less: Other Operating (Expenses) / Income | (3) | (5) | (8) |
| **EBITDA** | **$102** | **$141** | **$208** |
| *Margin* | *5%* | *7%* | *9%* |
| | | | |
| Less: Depreciation, Depletion & Amortization | (256) | (266) | (300) |
| **Operating Income** | **($153)** | **($124)** | **($92)** |
| *% Margin* | *(8%)* | *(6%)* | *(4%)* |
| | | | |
| Less: Non-operating Expenses | (78) | – | – |
| Less: Net Interest Expense | (146) | (35) | (29) |
| **Pre-tax Income** | **($378)** | **($160)** | **($121)** |
| *% Margin* | *(20%)* | *(8%)* | *(5%)* |
| | | | |
| Less: Income Taxes | (0) | 0 | (0) |
| **Net Income** | **($378)** | **($160)** | **($121)** |
| *% Margin* | *(20%)* | *(8%)* | *(5%)* |

---

[1] Includes the financial results of Knight Hawk, and excludes any cash paid to holders of Prairie Holdings GUC Claims in lieu of New Prairie Holdings Stock.

**Summary Cash Flows**[1]

| ($ in millions) | 2016F | 2017F | 2018F |
|---|---|---|---|
| _Cash from Operating Activities_ | | | |
| EBITDA | $102 | $141 | $208 |
| Interest and Fees on Funded Debt | (33) | (33) | (33) |
| Professional Fees | (78) | – | – |
| Change in Net Working Capital and Other | 82 | 3 | 27 |
| **Cash from Operating Activities** | **$74** | **$112** | **$203** |
| | | | |
| _Cash from Investing Activities_ | | | |
| Capex | (133) | (48) | (113) |
| Investments in JVs | (8) | (8) | (8) |
| **Cash from Investing Activities** | **($141)** | **($56)** | **($121)** |
| | | | |
| _Cash from Financing Activities_ | | | |
| Adequate Protection Payments | (100) | – | – |
| Cash Distribution to Term Lenders | (15) | – | – |
| Cash Posted as Collateral | 2 | (1) | 12 |
| **Cash from Financing Activities** | **($112)** | **($1)** | **$12** |
| | | | |
| Beginning Cash | $651 | $472 | $526 |
| Change in Cash | (179) | 55 | 94 |
| **Ending Cash** | **$472** | **$526** | **$620** |

[1] Includes the financial results of Knight Hawk, and excludes any cash paid to holders of Prairie Holdings GUC
Claims in lieu of New Prairie Holdings Stock.

**Summary Balance Sheet[1]**

| ($ in millions) | 2016F | 2017F | 2018F |
|---|---|---|---|
| Assets: | | | |
| Unrestricted Cash + ST Investments | $472 | $526 | $620 |
| Restricted Cash | 95 | 96 | 84 |
| Accounts Receivable | 161 | 159 | 180 |
| Inventory | 152 | 155 | 160 |
| Other Current Assets | 56 | 49 | 35 |
| **Total Current Assets** | **$935** | **$985** | **$1,079** |
| | | | |
| Net PP&E | $3,490 | $3,280 | $3,099 |
| Other Long-term Assets | 338 | 340 | 336 |
| **Total Long-term Assets** | **$3,828** | **$3,619** | **$3,436** |
| **Total Assets** | **$4,763** | **$4,605** | **$4,514** |
| | | | |
| Liabilities and Shareholders' Equity: | | | |
| Accounts Payable | $132 | $132 | $139 |
| Accrued Expenses | 70 | 78 | 86 |
| Current Portion of Long-term Debt | 12 | 12 | 12 |
| **Total Current Liabilities** | **$214** | **$221** | **$237** |
| | | | |
| Long-term Debt | $338 | $335 | $332 |
| Reclamation Obligations | 416 | 433 | 458 |
| Other Long-term Obligations | 243 | 224 | 217 |
| **Total Long-term Liabilities** | **$997** | **$992** | **$1,007** |
| **Total Liabilities** | **$1,212** | **$1,213** | **$1,243** |
| | | | |
| Stockholders' Equity | $3,552 | $3,392 | $3,271 |
| **Total Liabilities plus Equity** | **$4,763** | **$4,605** | **$4,514** |

---

[1] Includes the financial results of Knight Hawk, and excludes any cash paid to holders of Prairie Holdings GUC Claims in lieu of New Prairie Holdings Stock.

## Appendix D

Valuation Analysis

## VALUATION ANALYSIS

At the Debtors' request, PJT Partners, Inc. ("PJT") performed a valuation analysis of the Reorganized Debtors. Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations and qualifications described herein, PJT's view, as of June 14, 2016, is that the estimated going concern enterprise value of the Reorganized Debtors is between $650 million and $950 million. For the avoidance of doubt, this estimated going concern enterprise value includes the value attributable to Knight Hawk. The Reorganized Debtors' will have $326.5 million of debt at emergence, and the estimated value of the Reorganized Debtors' equity is between $355 million and $731 million, which reflects the Reorganized Debtors' estimated excess cash at emergence. PJT's views are necessarily based on economic, market and other conditions, and the information made available to PJT as of the date of this analysis.

PJT's analysis is also based on the assumption that the Debtors will be reorganized in accordance with the Plan, and on the Financial Projections prepared by the Debtors' management. PJT makes no representation as to the achievability of the Financial Projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. See Disclosure Statement Appendix C (Financial Projections). In preparing this Valuation Analysis, PJT assumed that the Financial Projections reflect the best information available to the Debtors' management as well as management's reasonable judgments regarding the Reorganized Debtors' future financial and operating performance. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections. Additionally, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

The enterprise value estimated in this Valuation Analysis represents the hypothetical enterprise value of the Reorganized Debtors as the continuing operators of their businesses after giving effect to the Plan, and is based on the valuation methodologies described below. The enterprise value estimated herein does not necessarily reflect the market value that might be realized through a sale or liquidation of the assets of, or ownership interests in, the Reorganized Debtors. The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainty, depends on contingencies that are difficult to predict and will fluctuate with changes in various factors that affect the business's financial condition and prospects.

In conducting its analysis, PJT, among other things: (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that PJT deemed relevant; (ii) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets, liabilities and prospects of the Reorganized Debtors, including the Financial Projections, furnished to PJT by the Debtors; (iii) conducted discussions with members of senior management and representatives of the Debtors concerning the matters

described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtors' business and prospects before and after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data for certain other companies in lines of business that PJT deemed relevant; (v) reviewed the financial terms of certain transactions that PJT deemed relevant; and (vi) conducted other financial studies and analyses and took into account other information that PJT deemed appropriate. In connection with its review, PJT did not independently verify the information supplied to, discussed with, or reviewed by PJT and, relied on such information being complete and accurate in all material respects. In addition, PJT did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, or otherwise) of the Reorganized Debtors. PJT also assumed, with the Debtors' consent, that the final form of the Plan will not differ from the draft that PJT reviewed in any respect that is material to PJT's analysis.

The enterprise value estimated in this Valuation Analysis does not constitute a recommendation to any holder of a Claim or Interest as to how such person should vote or otherwise act with respect to the Plan. PJT has not been asked to, and does not, express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The enterprise value estimated herein does not constitute an opinion as to fairness, from a financial point of view, of the consideration to be received by any person under the Plan or the terms and provisions of the Plan.

<u>Valuation Methodologies</u>

In preparing its valuation, PJT performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses considered by PJT, which consisted of (a) a discounted cash flow analysis, (b) a selected publicly traded companies analysis and (c) a sum-of-the-parts analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by PJT. The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant and the application of those methodologies to particular facts and circumstances in a manner that is not readily susceptible to summary description.

A. **<u>Discounted Cash Flow Analysis</u>**: The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. PJT's DCF analysis used the Reorganized Debtors' Financial Projections of its debt-free, after-tax cash flows, as amended to include two additional years of cash flows as well as an estimate of a terminal value at the end of the five year period. These cash flows were then discounted at a range of estimated weighted average

costs of capital. The discounted cash flow analysis involves complex considerations and judgments concerning appropriate discount rates.

B. **<u>Selected Publicly Traded Companies Analysis</u>**: The selected publicly traded companies analysis is based on the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors, for example, operational requirements and risk and profitability characteristics. Selected companies are comprised of coal mining companies with primary operations in the United States. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to the Reorganized Debtors' financials to imply an enterprise value for the Reorganized Debtors.

C. **<u>Sum-of-the-Parts Analysis</u>**: The sum-of-the-parts analysis is a more detailed market multiples approach that values each part of a company's business separately based upon the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to each part of the Reorganized Debtors' businesses. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected comparable company and then applied to the relevant segment of the Reorganized Debtors' financials to imply an enterprise value for the Reorganized Debtors.

<u>Valuation Considerations</u>

As a result of the foregoing, the enterprise value estimated herein is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein. Accordingly, none of the Debtors, PJT or any other person assumes responsibility for the accuracy of such estimated enterprise value. Depending on the actual financial results of the Debtors or changes in the financial markets, the enterprise value of the Reorganized Debtors as of the Effective Date may differ from the enterprise value estimated herein. In addition, the market prices, to the extent there is a market, of the Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

**Schedule 1**

Debtor Entities

| | |
|---|---|
| 1. | ACI Terminal, LLC |
| 2. | Allegheny Land Company |
| 3. | Apogee Holdco, Inc. |
| 4. | Arch Coal, Inc. |
| 5. | Arch Coal Sales Company, Inc. |
| 6. | Arch Coal West, LLC |
| 7. | Arch Development, LLC |
| 8. | Arch Energy Resources, LLC |
| 9. | Arch Reclamation Services, Inc. |
| 10. | Arch Western Acquisition Corporation |
| 11. | Arch Western Acquisition, LLC |
| 12. | Arch Western Bituminous Group, LLC |
| 13. | Arch Western Finance LLC |
| 14. | Arch Western Resources, LLC |
| 15. | Arch of Wyoming, LLC |
| 16. | Ark Land Company |
| 17. | Ark Land KH, Inc. |
| 18. | Ark Land LT, Inc. |
| 19. | Ark Land WR, Inc. |
| 20. | Ashland Terminal, Inc. |
| 21. | Bronco Mining Company, Inc. |
| 22. | Catenary Coal Holdings, Inc. |
| 23. | Catenary HoldCo, Inc. |
| 24. | Coal-Mac, Inc. |
| 25. | CoalQuest Development LLC |
| 26. | Cumberland River Coal Company |
| 27. | Energy Development Co. |
| 28. | Hawthorne Coal Company, Inc. |
| 29. | Hobet Holdco, Inc. |
| 30. | Hunter Ridge, Inc. |
| 31. | Hunter Ridge Coal Company |
| 32. | Hunter Ridge Holdings, Inc. |
| 33. | ICG, Inc. |
| 34. | ICG, LLC |
| 35. | ICG Beckley, LLC |
| 36. | ICG East Kentucky, LLC |
| 37. | ICG Eastern, LLC |
| 38. | ICG Eastern Land, LLC |
| 39. | ICG Illinois, LLC |
| 40. | ICG Natural Resources, LLC |
| 41. | ICG Tygart Valley, LLC |
| 42. | International Coal Group, Inc. |
| 43. | Jacobs Ranch Coal LLC |
| 44. | Jacobs Ranch Holdings I LLC |
| 45. | Jacobs Ranch Holdings II LLC |
| 46. | Juliana Mining Company, Inc. |
| 47. | King Knob Coal Co., Inc. |
| 48. | Lone Mountain Processing, Inc. |
| 49. | Marine Coal Sales Company |
| 50. | Melrose Coal Company, Inc. |
| 51. | Mingo Logan Coal Company |
| 52. | Mountain Coal Company, L.L.C. |
| 53. | Mountain Gem Land, Inc. |
| 54. | Mountain Mining, Inc. |
| 55. | Mountaineer Land Company |
| 56. | Otter Creek Coal, LLC |
| 57. | Patriot Mining Company, Inc. |
| 58. | P.C. Holding, Inc. |
| 59. | Powell Mountain Energy, LLC |
| 60. | Prairie Coal Company, LLC |
| 61. | Prairie Holdings, Inc. |
| 62. | Saddleback Hills Coal Company |
| 63. | Shelby Run Mining Company, LLC |
| 64. | Simba Group, Inc. |
| 65. | Thunder Basin Coal Company, L.L.C. |
| 66. | Triton Coal Company, L.L.C. |
| 67. | Upshur Property, Inc. |
| 68. | Vindex Energy Corporation |
| 69. | Western Energy Resources, Inc. |
| 70. | White Wolf Energy, Inc. |
| 71. | Wolf Run Mining Company |